IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BIGBAND NETWORKS, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 07-351 (JJF) |
| IMAGINE COMMUNICATIONS, INC., | ) ) ) |
| Defendant. | ) ) |

**DECLARATION OF KAREN JACOBS LOUDEN IN SUPPORT OF
BIGBAND'S MOTION FOR PROTECTIVE ORDER TO STRIKE
IMAGINE'S SECOND AMENDED NOTICE OF DEPOSITION
OF BIGBAND PURSUANT TO FED. R. CIV. P. 30(B)(6)**

I, Karen Jacobs Louden, hereby declare as follows:

1.      I am a partner with the law firm of Morris, Nichols, Arsht & Tunnell LLP.  I am one of the attorneys representing BigBand Networks, Inc. ("Big Band") in this litigation.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the BigBand Networks, Inc.'s Response and Objections to Defendant Imagine Communications, Inc.'s First Amended Notice of Deposition Pursuant to Fed. R. Civ. P. 30(b)(6), dated February 20, 2008.

3.      Attached hereto as Exhibit 2 is a true and correct copy of a February 5, 2008 letter from J. Minton to P. Gratzinger.

4.      Attached hereto as Exhibit 3 is a true and correct copy a February 11, 2008 letter from J. Minton to P. Gratzinger.

5.      Attached hereto as Exhibit 4 is a true and correct copy of an April 24, 2008 letter from S. Petersen Graves to J. Benassi.

6.      Attached hereto as Exhibit 5 is a true and correct copy a January 8, 2008 letter from J. Minton to P. Gratzinger.

7.    Attached hereto as Exhibit 6 is a true and correct copy of Imagine Communication, Inc.'s First Amended 30(b)(6) Notice to Bigband Networks, Inc., dated February 5, 2008.

8.    Attached hereto as Exhibit 7 is a true and correct copy of a February 1, 2008 letter from P. Gratzinger to J. Minton

9.    Attached hereto as Exhibit 8 is a true and correct copy of a February 14, 2008 letter from P. Gratzinger to J. Minton.

10.    Attached hereto as Exhibit 9 is a true and correct copy of the Judge Farnan's March 2, 2007 Oral Order.

11.    Attached hereto as Exhibit 10 is a true and correct copy of Sinclair et al., *Discovering Corporate Knowledge and Contentions:  Rethinking Rule 30(b)(6) and Alternative Mechanisms* from the Alabama Law Review, Vol. 40, No. 3 (Spring 1999).

12.    Attached hereto as Exhibit 11 is a true and correct copy of the March 7, 2008 hearing transcript in *Reliant Pharmaceuticals, Inc. v. Par Pharmaceutical, Inc.*, C.A 06-774-JJF.

13.    Attached hereto as Exhibit 12 is a true and correct copy of excepts from the August 2, 2005 hearing transcript in *McKesson Information Solutions, LLC v. The Trizetto Group, Inc.*, C.A. 04-01258-SLR.

14.    Attached hereto as Exhibit 13 is a true and correct copy of excerpts from the October 11, 2005 teleconference in *Pharmacia & Upjohn Co. v. Sicor Inc.*, C.a. 04-833-KAJ.

15.    Attached hereto as Exhibit 14 is a true and correct copy of a February 1, 2008 letter from P. Gratzinger to J. Minton.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed on this 2nd day of May, 2008.

_Karen Jacobs Louden_
Karen Jacobs Louden (#2881)

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on May 2, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Mary B. Matterer
> MORRIS JAMES LLP

I also certify that copies were caused to be served on May 2, 2008 upon the following in the manner indicated:

| BY HAND AND E-MAIL | BY E-MAIL |
|---|---|
| Mary B. Matterer | John Benassi |
| Morris James LLP | Alexander Brainerd |
| 500 Delaware Avenue | Heller Ehrman LLP |
| Suite 1500 | 4350 La Jolla Village Drive |
| Wilmington, DE  19801 | Suite 700 |
| | San Diego, CA 92122 |

/s/    *Karen Jacobs Louden (#2881)*
Karen Jacobs Louden

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BIGBAND NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-351 (***) |
| | ) | |
| IMAGINE COMMUNICATIONS, INC., | ) | |
| | ) | |
| Defendant and Counterclaim Plaintiff. | ) | |

## PLAINTIFF BIGBAND NETWORKS, INC.'S RESPONSE AND OBJECTIONS TO DEFENDANT IMAGINE COMMUNICATIONS, INC.'S FIRST AMENDED NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and the Local Rules for the United States District Court of Delaware, Plaintiff BigBand Networks, Inc. ("BigBand") hereby responds and objects to Defendant Imagine Communications, Inc.'s ("Imagine") First Amended Notice to BigBand pursuant to Rule 30(b)(6).

## GENERAL OBJECTIONS

1.      BigBand generally objects to Imagine's instructions, definitions, and topics of examination to the extent that they purport to impose requirements other than or in addition to the requirements of the Federal Rules of Civil Procedure, the Local Rules of the District of Delaware, or Order of the Court.

2.      BigBand generally objects to each and every definition and category for examination to the extent it is compound and contains multiple parts and subparts.

3.      BigBand generally objects to each and every definition and category for examination to the extent it is vague, ambiguous, and fails to describe the documents requested with reasonable particularity.

4. BigBand generally objects to each and every definition and category for examination to the extent it is overly broad, unduly burdensome, oppressive, and/or would entail undue expense.

5. BigBand objects to each and every category for examination to the extent that it requests BigBand's contentions which are not a proper topic for a deposition. In this regard, BigBand notes that Imagine specifically identifies topics 1-12 as seeking "BigBand's Contentions."

6. BigBand generally objects to each and every definition and category for examination as unduly burdensome to the extent it seeks information outside the "needs of the case" (Fed. R. Civ. P. 26(b)(2)).

7. BigBand generally objects to each and every definition and category for examination to the extent it calls for legal conclusions.

8. BigBand generally objects to each definition and category for examination to the extent it seeks information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege, immunity or protection from discovery.

9. BigBand generally objects to each and every definition and category for examination to the extent it is not relevant to a claim or defense of any party to this litigation or reasonably calculated to lead to the discovery of admissible evidence.

10. BigBand generally objects to each and every definition and category for examination to the extent it does not specify a time period.

11. BigBand generally objects to each and every category for examination to the extent that it seeks information already in Imagine's possession, custody or control, or available to Imagine from public sources.

12.    BigBand generally objects to each and every category for examination to the extent it seeks expert opinion and is therefore premature.  BigBand reserves the right to offer expert opinions on applicable subjects at the appropriate stage of this litigation.

13.    BigBand objects to Imagine's notice to the extent it purports to require the identification of documents that are duplicative of those already requested and/or produced.

The foregoing General Objections shall be deemed to be apply to each of the responses to the categories of examination that follow, even if not specifically referred to therein

## TOPICS OF EXAMINATION

### Factual Basis for BigBand's Contentions

## TOPIC NO. 1:

YOUR factual basis for YOUR contention that the ACCUSED PRODUCTS infringe the asserted claims of the PATENT-IN-SUIT, including without limitation:

(a)  All facts showing that the ACCUSED PRODUCTS contain a "session manager" or its equivalent as that term is used in the '477 PATENT and the identity of witness knowledgeable thereof.

(b)  All facts showing that in the ACCUSED PRODUCTS, the aggregate bandwidth of received packets exceeds the bandwidth of the limited bandwidth media, as those terms are used in the '477 PATENT and the identity of witnesses knowledgeable thereof.

(c)  All facts showing that the ACCUSED PRODUCTS "select basic media data units to be modified in response to a modification priority," or have an equivalent function, as those terms are used in the '619 PATENT and the identity of witnesses knowledgeable thereof.

(d)  All facts showing that the ACCUSED PRODUCTS use a "modification priority" or its equivalent, as that term is used in the '619 PATENT and the '087 PATENT and the identity of witnesses knowledgeable thereof.

(e)  All facts showing that the ACCUSED PRODUCTS use a "non addressable stream output port" or its equivalent, as that term is used in the '477 PATENT and the identity of witnesses knowledgeable thereof.

(f)  All facts regarding YOUR claim charts served as Attachments A, B, and C to YOUR responses to Imagine's First Set of Interrogatories, including without limitation the factual basis for YOUR allegation that documents referenced in those charts reflect products made, used, sold, or offered for sale by IMAGINE and the identity of

witnesses knowledgeable thereof.

**RESPONSE TO TOPIC NO. 1:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 1 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand also objects to this topic as overly broad and unduly burdensome.

BigBand further objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand provided information sought in this topic in its response to Imagine's Interrogatory No. 1.

BigBand also objects to this topic to the extent it calls for legal conclusions. BigBand further objects to this topic to the extent it calls for expert opinion prior to the date for such disclosure dictated by the Federal Rules and Court order. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 2:**

The factual basis for YOUR allegation in Paragraph 5 of YOUR Complaint that IMAGINE has indirectly infringed the PATENTS-IN-SUIT, including without limitation the identity of all third parties whose infringement IMAGINE has induced or to whose infringement IMAGINE has contributed and the identity of witnesses knowledgeable thereof.

**RESPONSE TO TOPIC NO. 2:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 2 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand also objects to this topic as overly broad and unduly burdensome.

BigBand also objects to this topic as seeking BigBand's contentions which are not a

4

proper topic for a deposition, but are more appropriately reserved for written discovery.

BigBand provided the information sought in this topic in its response to Imagine's Interrogatory

No. 3.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand

also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case.

BigBand reserves all rights to present expert opinion evidence according to the schedule adopted

by the Court.

**TOPIC NO. 3:**

The factual basis of YOUR allegation in Paragraph 6 of YOUR Complaint that IMAGINE's alleged infringement is willful and deliberate and the identity of witnesses knowledgeable thereof.

**RESPONSE TO TOPIC NO. 3:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 3 to the extent that it seeks information protected by the attorney-client privilege,

the work product doctrine, and/or any other applicable privilege or immunity. BigBand also

objects to this topic as overly broad and unduly burdensome. BigBand further objects to this

topic to the extent it calls for legal conclusions.

BigBand further objects to this topic as seeking BigBand's contentions which are not a

proper topic for a deposition, but are more appropriately reserved for written discovery.

BigBand provided the information sought in this topic in its response to Imagine's Interrogatory

No. 4.

**TOPIC NO. 4:**

The identity of all PERSONS who participated in any way in any analysis relating to YOUR allegations of infringement, and separately for each PERSON identified, the timing and substance of the analysis conducted and all DOCUMENTS or other information on which that PERSON relied.

**RESPONSE TO TOPIC NO. 4:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 4 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. As previously explained in correspondence dated October 31, 2007 and November 5, 2007, BigBand's pre-filing investigation and analysis performed in preparation for litigation is protected from discovery by the attorney/client privilege and work product doctrine.

BigBand also objects to this topic as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 5:**

The circumstances under which BIGBAND became aware of IMAGINE's financing efforts, including IMAGINE's intent to sell Series B Securities, including without limitation the date on which each executive and board member of BIGBAND first learned this information and the source from which he or she learned it.

**RESPONSE TO TOPIC NO. 5:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 5 because it does not seek information relevant or reasonably calculated to lead to relevant evidence concerning any claim or defense in the case. BigBand further objects to this topic as overly broad, unduly burdensome, and more appropriately reserved for written discovery.

**TOPIC NO. 6:**

DOCUMENTS and communications related to IMAGINE's financing efforts and IMAGINE's intent to sell Series B securities.

**RESPONSE TO TOPIC NO. 6:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 6 because it does not seek information relevant or reasonably calculated to lead to relevant evidence concerning any claim or defense in the case. BigBand further objects to this topic as overly broad, unduly burdensome, and more appropriately reserved for written discovery.

**TOPIC NO. 7:**

All facts and circumstances RELATING TO any non-privileged communications regarding YOUR intent to file this lawsuit and YOUR reasons for filing this lawsuit, including statements made to third parties.

**RESPONSE TO TOPIC NO. 7:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 7 because it does not seek information relevant or reasonably calculated to lead to relevant evidence concerning any claim or defense in the case. BigBand further objects to this topic as overly broad and unduly burdensome. BigBand also objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous.

**TOPIC NO. 8:**

Any communication with any third party regarding BIGBAND's intention to sue IMAGINE.

**RESPONSE TO TOPIC NO. 8:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 8 because it does not seek information relevant or reasonably calculated to lead to relevant evidence concerning any claim or defense in the case. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which

examination is requested and is vague and ambiguous.

**TOPIC NO. 9:**

All facts RELATING TO any offer by IMAGINE to disclose information to YOU regarding its products prior to this lawsuit, including without limitation the communications described in Paragraph 15 of IMAGINE's Counterclaim and the identity of witnesses knowledgeable thereof.

**RESPONSE TO TOPIC NO. 9:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 9 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand further objects to this topic because it does not seek information relevant or reasonably calculated to lead to relevant evidence concerning any claim or defense in the case.

**TOPIC NO. 10:**

To the extent not fully requested above, the IDENTIFICATION of persons, EMPLOYEES, and/or third parties involved in or knowledgeable about matters set forth in the topics above.

**RESPONSE TO INTERROGATORY NO. 10:**

BigBand incorporates its General Objections as if set forth fully herein and its specific objections to topics 1-10. BigBand objects to Topic No. 10 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 11:**

The DOCUMENTS or other information RELATING TO the matters set forth in the topics above, the IDENTITY of the custodian(s) of the document and the location(s) where the document was kept and/or stored in the ordinary course of business.

8

**RESPONSE TO TOPIC NO. 11:**

      BigBand incorporates its General Objections and its Specific Objections to Topics Nos.

1-10 as if set forth fully herein.  BigBand objects to Topic No. 11 as overly broad and unduly

burdensome.  BigBand further objects to this topic on the grounds that it fails to describe with

reasonable particularity the matters on which examination is requested and is vague and

ambiguous.  BigBand also objects to this topic on the ground that it is more appropriately

reserved for written discovery.

**BigBand Patents**

**TOPIC NO. 12:**

      The place and dates of CONCEPTION and REDUCTION TO PRACTICE for each claim
in the PATENTS-IN-SUIT, and all evidence showing or corroborating the dates identified,
including without limitation the identity of all PERSONS with personal knowledge of those
dates and all DOCUMENTS showing or corroborating those dates.

**RESPONSE TO TOPIC NO. 12:**

      BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects

to Topic No. 12 as overly broad and unduly burdensome in that it seeks information relating to

conception and reduction to practice for each and every claim contained in the Patents-In-Suit

and seeks "all evidence showing or corroborating the dates identified."  BigBand also objects

that the topic is not relevant or reasonably calculated to lead to the discovery of admissible

evidence as Imagine has not asserted prior art that would put at issue the dates in question.

      BigBand also objects to the extent the topic requests BigBand's contentions which are

not a proper topic for a deposition, but are more appropriately reserved for written discovery.

BigBand provided information sought in this topic in its response to Imagine's Interrogatory

No. 5 and agreed to produce responsive, non-privileged documents discovered as a result of a

reasonably diligent search in response to Imagine's Request for Production No. 16.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

### TOPIC NO. 13:

All PERSONS who contributed to the CONCEPTION and REDUCTION TO PRACTICE of the claims in each asserted patent, and each PERSON'S contribution to that alleged invention.

### RESPONSE TO TOPIC NO. 13:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 13 as overly broad and unduly burdensome. BigBand also objects that the topic is not relevant or reasonably calculated to lead to the discovery of admissible evidence as Imagine has not asserted prior art that would put at issue the dates in question.

BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand provided the information sought in this topic in its response to Imagine's Interrogatory No. 6.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

### TOPIC NO. 14:

Any texts, treatises, writings, computer software, or other DOCUMENTS that significantly contributed to or influenced conception and reduction to practice of each asserted claim.

**RESPONSE TO TOPIC NO. 14:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 14 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous in its use of the term "contributed to or influenced." BigBand also objects on the ground that the topic is more appropriately reserved for written discovery. BigBand agreed to produce responsive, non-privileged documents discovered as a result of a reasonably diligent search in response to Imagine's Request for Production No. 19.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 15:**

Commercial success of the invention.

**RESPONSE TO TOPIC NO. 15:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 15 as overly broad and unduly burdensome. BigBand also objects to this topic because it fails to describe with reasonable particularity the matters on which examination is requested. BigBand further objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand agreed to produce responsive, non-privileged documents discovered as a result of a reasonably diligent search in response to Imagine's Request for Production No. 25. Moreover, BigBand provided responsive information in its response to Imagine's Interrogatory No. 7.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 16:**

Long felt but unsolved needs met by the invention and failure of others to meet those needs.

**RESPONSE TO TOPIC NO. 16:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 16 as overly broad and unduly burdensome. BigBand also objects to this topic because it fails to describe with reasonable particularity the matters on which examination is requested. BigBand further objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand agreed to produce responsive, non-privileged documents discovered as a result of a reasonably diligent search in response to Imagine's Request for Production No. 25. Moreover, BigBand provided responsive information in its response to Imagine's Interrogatory No. 7.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 17:**

Professional approval of the invention.

**RESPONSE TO TOPIC NO. 17:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 17 as overly broad and unduly burdensome. BigBand also objects to this topic because it fails to describe with reasonable particularity the matters on which examination is requested. BigBand further objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand agreed to produce responsive, non-privileged documents discovered as a result of a reasonably diligent search in response to Imagine's Request for Production No. 25. Moreover, BigBand provided responsive information in its response to Imagine's Interrogatory No. 7.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

## TOPIC NO. 18:

Deliberate copying of the invention.

## RESPONSE TO TOPIC NO. 18:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 18 as overly broad and unduly burdensome. BigBand also objects to this topic because it fails to describe with reasonable particularity the matters on which examination is requested. BigBand further objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand agreed to produce responsive, non-privileged documents discovered as a result of a reasonably diligent search in response to Imagine's Request for Production No. 25. Moreover, BigBand provided responsive information in its response to Imagine's Interrogatory No. 7.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case.

BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 19:**

Laudatory statements by accused infringers.

**RESPONSE TO TOPIC NO. 19:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 19 as overly broad and unduly burdensome. BigBand also objects to this topic because it fails to describe with reasonable particularity the matters on which examination is requested. BigBand further objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand agreed to produce responsive, non-privileged documents discovered as a result of a reasonably diligent search in response to Imagine's Request for Production No. 25. Moreover, BigBand provided responsive information in its response to Imagine's Interrogatory No. 7.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 20:**

Each PRODUCT developed, sold, or licensed by YOU that embodies, practices, or uses any of the alleged inventions claimed in the PATENTS-IN-SUIT, and the operation of each method or feature of that PRODUCT that embodies any of the alleged inventions.

**RESPONSE TO TOPIC NO. 20:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 20 as vague, ambiguous and unintelligible. BigBand also objects to this topic as

overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for legal conclusions.

BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand provided the information sought in this topic in its response to Imagine's Interrogatory No. 8.

BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 21:**

Any disclosures to any third party of the subject matter of any PATENT-IN-SUIT prior to the application date of that patent, including without limitation any publication, presentation, or disclosure, and any DOCUMENTS showing that each disclosure was under express conditions of confidence.

**RESPONSE TO TOPIC NO. 21:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 21 as overly broad and unduly burdensome. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand provided the information sought in this topic in its response to Imagine's Interrogatory No. 9.

**TOPIC NO. 22:**

The first sale, offer for sale, or PUBLIC USE of any PRODUCT that embodies any alleged invention claimed, and documents relating thereto and the identity of witnesses knowledgeable thereof.

**RESPONSE TO TOPIC NO. 22:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 22 as overly broad and unduly burdensome. BigBand further objects to this topic to

the extent it calls for legal conclusions. BigBand also objects to the extent the topic requests

BigBand's contentions which are not a proper topic for a deposition, but are more appropriately

reserved for written discovery.

**TOPIC NO. 23:**

The identity of any DOCUMENT or thing that any person has suggested to BIGBAND is
prior art or potential prior art to the PATENTS-IN-SUIT or that BIGBAND has considered to be
prior art or potential prior art to the PATENTS-IN-SUIT.

**RESPONSE TO TOPIC NO. 23:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 23 to the extent that it seeks information protected by the attorney-client privilege,

the work product doctrine, and/or any other applicable privilege or immunity. BigBand further

objects to this topic as overly broad and unduly burdensome. BigBand also objects to this topic

on the ground that it is more appropriately reserved for written discovery.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand

also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case.

BigBand reserves all rights to present expert opinion evidence according to the schedule adopted

by the Court.

**TOPIC NO. 24:**

The field of invention of each PATENT-IN-SUIT.

**RESPONSE TO TOPIC NO. 24:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 24 on the ground that the term "field of invention" is undefined, vague and

ambiguous. BigBand further objects to this topic to the extent it calls for legal conclusions.

BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in

this case.  BigBand reserves all rights to present expert opinion evidence according to the

schedule adopted by the Court.

**TOPIC NO. 25:**

All non-privileged communication between BIGBAND and any of the inventors of the PATENTS-IN-SUIT RELATING TO this action.

**RESPONSE TO TOPIC NO. 25:**

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects

to Topic No. 25 to the extent that it seeks information protected by the attorney-client privilege,

the work product doctrine, and/or any other applicable privilege or immunity.  BigBand also

objects to this topic as overbroad and irrelevant to the extent it seeks non-privileged

communications relating to anything other than the inventions embodied by the Patents-In-Suit.

**TOPIC NO. 26:**

The level of education, experience, and/or skill held by a person of ordinary skill in the art related to alleged inventions contained in PATENTS-IN-SUIT at the time of the alleged invention.

**RESPONSE TO TOPIC NO. 26:**

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects

to Topic No. 26 to the extent that it calls for legal conclusions.  BigBand further objects to this

topic to the extent it calls for expert opinion, which is not yet due in this case.  BigBand reserves

all rights to present expert opinion evidence according to the schedule adopted by the Court.

BigBand further objects to this topic as seeking BigBand's contentions which are not a proper

topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 27:**

The IDENTITY of all persons and/or employees involved in the conception, design, development, engineering, and testing of BIGBAND's products that allegedly embody any of the PATENTS-IN-SUIT or allegedly compete with any ACCUSED PRODUCT.

**RESPONSE TO TOPIC NO. 27:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 27 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic as not relevant or reasonably calculated to lead to relevant evidence to the extent that it seeks information about persons or products that are not relevant to any claim or defense in the action. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 28:**

The IDENTITY of all locations involved in the conception, design, development, engineering, and testing of BIGBAND's products that allegedly embody any of the PATENTS-IN- SUIT or allegedly compete with any ACCUSED PRODUCT.

**RESPONSE TO TOPIC NO. 28:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 28 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic as not relevant or reasonably calculated to lead to relevant evidence to the extent that it seeks information that is not relevant to any claim or defense in the action.

**TOPIC NO. 29:**

The IDENTIFICATION of persons, EMPLOYEES, and/or THIRD PARTIES involved in or knowledgeable about matters set forth in the topics above.

**RESPONSE TO TOPIC NO. 29:**

18

BigBand incorporates its General Objections and its Specific Objections to Topics Nos. 12-28 as if set forth fully herein.  BigBand objects to Topic No. 29 as overly broad and unduly burdensome.  BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous.  BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

## TOPIC NO. 30:

The DOCUMENTS or other information RELATING TO the matters set forth in the topics above, the IDENTITY of the custodian(s) of the document and the location(s) where the document was kept and/or stored in the ordinary course of business.

## RESPONSE TO TOPIC NO. 30:

BigBand incorporates its General Objections and its Specific Objections to Topics Nos. 12-28 as if set forth fully herein.  BigBand objects to Topic No. 30 as overly broad and unduly burdensome.  BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous.  BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

### Prosecution

## TOPIC NO. 31:

BIGBAND's knowledge of and decision not to disclose prior art to the '477 PATENT during the prosecution of the '477 PATENT, including without limitation,

    (a)    U.S. patent No. 6,141,339 to Kaplan et al.

    (b)    U.S. patent No. 6,128,649 to Smith et al.

    (c)    U.S. Patent No. 5,481,542 to Logston et al.

    (d)    Digital Audio-Visual Council's DAVIC 1.4 Specification

    (e)    ISO/IEC 13818 Annex H Switched Digital Broadcast Service

**RESPONSE TO TOPIC NO. 31:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 31 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand further objects to this topic as overly broad and unduly burdensome. BigBand also objects to this topic to the extent it assumes facts not in evidence. BigBand further objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 32:**

BIGBAND's knowledge of and decision not to disclose prior art to the '087 PATENT during the prosecution of the '087 PATENT, including without limitation,

    (a)    U.S. patent No. 6,141,339 to Kaplan et al.

    (b)    U.S. patent No. 6,128,649 to Smith et al.

    (c)    U.S. Patent No. 6,434,141 to Oz et al.

    (d)    U.S. patent No. 6,014,694 to Aharoni et al.

    (e)    U.S. Patent No. 5,742,343 to Haskell

    (f)    U.S. Patent No. 5,481,542 to Logston et al.

    (g)    U.S. Patent No. 5,929,850 to Broadwin et al.

    (h)    U.S. Patent No. 5,548,532 to Menand et al.

    (i)    U.S. Patent No. 5,742,623 to Nuber et al.

    (j)    U.S. Patent No. 5,734,432 to Netravali et al.

    (k)    U.S. Patent No. 5,233,606 to Pashan et al.

    (l)    "MCNS/DOCSIS MAC CLEARS THE PATH FOR THE CABLEMODEM INVASION," Electronic Design, US, Penton Publishing, Cleveland OH, Vol. 45, no. 27, 1 December 1997.

    (m)    U.S. Patent No. 5,561,669 to Lenney et al.

    (n)    U.S. Patent No. 6,081,519 to Petler

    (o)      International Publication WO 98110541 entitled "BROADBAND COMMUNICATION SYSTEM FOR HIGH-SPEED INTERNET ACCESS" published March 03, 1998 naming inventors Enns, Moura, Gronski, Neelmegh, Kim, Bieraum, and Rubin;

    (P)      International Publication WO 99/09689 entitled "SYSTEM, DEVICE, AND METHOD FOR SCHEDULING IN A COMMUNICATION NETWORK" published February 25, 1999 naming inventors Ruszczyk, Lee, and Chlamtac; and the following publications:

    (q)      "ADAPTIVE DIGITAL ACCESS PROTOCOL: A MAC PROTOCOL FOR MULTISERVICE BROADBAND ACCESS NETWORKS" IEEE Communications Magazine, IEEE Service Center. Piscataway NJ, Vol. 34, no. 3, 1 March 1996

    (r)      "BROADBAND CPN DEMONSTRATOR USING WAVELENGTH AND TIME DIVISION MULTIPLEXING," Electronics and Communication Engineering Journal, IEEE London, GB, vol. 4 no. 4, 01 August 1992.

    (s)      Digital Audio-Visual Council's DAVIC 1.4 Specification

    (t)      ISO/IEC 13818 Annex H Switched Digital Broadcast Service

## RESPONSE TO TOPIC NO. 32:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 32 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand further objects to this topic as overly broad and unduly burdensome. BigBand also objects to this topic to the extent it assumes facts not in evidence. BigBand further objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

## TOPIC NO. 33:

BIGBAND's knowledge of and decision not to disclose prior art to the '619 PATENT during prosecution of the '619 PATENT, including without limitation,

    (a)      U.S. patent No. 6,141,339 to Kaplan et al.

    (b)      U.S. patent No. 6,128,649 to Smith et al.

    (c)      U.S. patent No. 6,014,694 to Aharoni et al.

    (d)      U.S. Patent No. 5,481,542 to Logston et al.

(e)     U.S. Patent No. 5,929,850 to Broadwin et at.

(f)     U.S. Patent No. 5,548,532 to Menand et al.

(g)     U.S. Patent No. 5,742,623 to Nuber et al.

(h)     U.S. Patent No. 5,734,432 to Netravali et al.

(i)     U.S. Patent No. 5,233,606 to Pashan et al.

(j)     "MCNSIDOCSIS MAC CLEARS THE PATH FOR THE CABLEMODEM INVASION," Electronic Design, US, Penton Publishing, Cleveland OH, Vol. 45, no. 27, 1 December 1997.

(k)     U.S. Patent No. 5,561,669 to Lenney et al.

(1)     U.S. Patent No. 6,081,519 to Petler

(m)     International Publication WO 98/10541 entitled "BROADBAND COMMUNICAnON SYSTEM FOR HIGH-SPEED INTERNET ACCESS" published March 03, 1998 naming inventors Enos, Moura, Gronski, Neelmegh, Kim, Bieraum, and Rubin;

(n)     International Publication WO 99/09689 entitled "SYSTEM, DEVICE, AND METHOD FOR SCHEDULING IN A COMMUNICATION NETWORK" published February 25, 1999 naming inventors Ruszczyk, Lee, and Chlamtac; and the following publications:

(o)     "ADAPTIVE DIGITAL ACCESS PROTOCOL: A MAC PROTOCOL FOR MULTISERVICE BROADBAND ACCESS NETWORKS" IEEE Communications Magazine, IEEE Service Center. Piscataway NJ, Vol. 34, no. 3, 1 March 1996

(P)     "BROADBAND CPN DEMONSTRATOR USING WAVELENGTH AND TIME DIVISION MULTIPLEXING," Electronics and Communication Engineering Journal, IEEE London, GB, vol. 4 no. 4, 01 August 1992.

(q)     Digital Audio-Visual Council's DAVIC 1.4 Specification

(r)     ISO/IEC 13818 Annex H Switched Digital Broadcast Service

(s)     All facts RELATING TO BIGBAND's advertising, marketing, and promotion of BIGBAND's products to third parties.

## RESPONSE TO TOPIC NO. 33:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 33 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand further

objects to this topic as overly broad and unduly burdensome. BigBand also objects to this topic

to the extent it assumes facts not in evidence. BigBand further objects to the extent the topic

requests BigBand's contentions which are not a proper topic for a deposition, but are more

appropriately reserved for written discovery.

**Damages**

**TOPIC NO. 34:**

The harm (monetary or otherwise) that YOU claim YOU have suffered as a result of
IMAGINE's alleged infringement of the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 34:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 34 as overly broad and unduly burdensome. BigBand further objects to this topic to

the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls

for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert

opinion evidence according to the schedule adopted by the Court. BigBand further objects to the

extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but

are more appropriately reserved for written discovery.

**TOPIC NO. 35:**

The factual basis for any claim for damages, including but not limited to lost profits,
reasonable royalty, or price erosion, that YOU intend to make for IMAGINE's alleged
infringement.

**RESPONSE TO TOPIC NO. 35:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 35 as overly broad and unduly burdensome. BigBand further objects to this topic to

the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls

for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert

23

opinion evidence according to the schedule adopted by the Court. BigBand also objects to the

extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but

are more appropriately reserved for written discovery.

**TOPIC NO. 36:**

    YOUR marketing policies, practices, and plans for PRODUCTS that allegedly embody
any of the PATENTS-IN-SUIT or allegedly compete with any ACCUSED PRODUCT, during
any period of time that YOU allege IMAGINE infringed the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 36:**

    BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 36 as overly broad, unduly burdensome, and not relevant or reasonably calculated

to lead to the discovery of admissible evidence given the breadth of the topic. BigBand further

objects to this topic on the grounds that the topic fails to describe with reasonable particularity

the matters on which examination is requested and is vague and ambiguous. BigBand also

objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 37:**

    YOUR pricing policies, practices, and plans for PRODUCTS that allegedly embody any
of the PATENTS-IN-SUIT or allegedly compete with any ACCUSED PRODUCT, during any
period of time that YOU allege IMAGINE infringed the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 37:**

    BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 37 as overly broad, unduly burdensome, and not relevant or reasonably calculated

to lead to the discovery of admissible evidence given the breadth of the topic. BigBand further

objects to this topic on the grounds that it fails to describe with reasonable particularity the

matters on which examination is requested and is vague and ambiguous. BigBand also objects to

this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 38:**

Any competition for sales between IMAGINE and YOU.

**RESPONSE TO TOPIC NO. 38:**

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects

to Topic No. 38 as overly broad and unduly burdensome.  BigBand also objects to this topic

because it fails to describe with reasonable particularity the matters on which examination is

requested.  BigBand further objects to this topic on the grounds that the term "[a]ny competition"

is vague and ambiguous.

**TOPIC NO. 39:**

For each instance in which YOU submitted a proposal or bid for the sale of YOUR
PRODUCTS that compete with any ACCUSED PRODUCT, the identity of the customer, the
location of the customer, the scope and content of the bid or proposal, the identity of any
competing bidders, any evaluation performed by YOU of the competing bids or proposals, the
identity of the Person(s) responsible for YOUR bid or proposal, the date that YOU submitted the
proposal, and the status of the bid or proposal (including whether YOU were awarded the bid or
proposal, and, if not, YOUR understanding of the reason the bid or proposal was awarded
elsewhere).

**RESPONSE TO TOPIC NO. 39:**

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects

to Topic No. 39 as overly broad and unduly burdensome.  BigBand also objects to this topic on

the ground that the terms used are vague and ambiguous.

BigBand further objects to this topic to the extent it calls for expert opinion, which is not

yet due in this case.  BigBand reserves all rights to present expert opinion evidence according to

the schedule adopted by the Court.  BigBand also objects on the ground that this topic is more

appropriately reserved for written discovery.

**TOPIC NO. 40:**

Any competitive analysis or market analysis conducted by YOU with respect to YOUR
PRODUCTS, including without limitation the nature of the market and identity of competitors
YOU identified for each PRODUCT.

**RESPONSE TO TOPIC NO. 40:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 40 as overly broad, unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence given the breadth of the topic. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous.

BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand further objects to the extent this topic is more appropriately reserved for written discovery.

**TOPIC NO. 41:**

YOUR estimates or beliefs of the relative market share of all competitors in any market in which YOU compete with IMAGINE, and YOUR method for determining that market share.

**RESPONSE TO TOPIC NO. 41:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 41 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous.

BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 42:**

YOUR estimates or projections of the future growth of any market in which YOU compete with IMAGINE.

**RESPONSE TO TOPIC NO. 42:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 42 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous.

BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 43:**

YOUR sales, revenues, costs, profits and loss from the date of commercial introduction of any PRODUCT YOU allege competes with any IMAGINE product.

**RESPONSE TO TOPIC NO. 43:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 43 as overly broad and unduly burdensome. BigBand also objects to this topic because it fails to describe with reasonable particularity the matters on which examination is requested. BigBand further objects to this topic on the grounds that the term "commercial introduction" is vague and ambiguous.

BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand further objects that this topic is more appropriately

reserved for written discovery.

**TOPIC NO. 44:**

YOUR projected sales, revenues, costs, profits and loss for any PRODUCT YOU allege competes with any IMAGINE product.

**RESPONSE TO TOPIC NO. 44:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 44 as overly broad and unduly burdensome. BigBand also objects to this topic because it fails to describe with reasonable particularity the matters on which examination is requested. BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects that this topic is more appropriately reserved for written discovery.

**TOPIC NO. 45:**

YOUR manufacturing and marketing capacity.

**RESPONSE TO TOPIC NO. 45:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 45 as overly broad and unduly burdensome. BigBand also objects to this topic on the ground that the term "capacity" is vague and ambiguous.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand further objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 46:**

Any sale that YOU allege you lost to IMAGINE.

**RESPONSE TO TOPIC NO. 46:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 46 as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 47:**

The sale of any product or service made in conjunction with or driven by the sale of any of YOUR PRODUCTS on which YOU claim YOU lost profits.

**RESPONSE TO TOPIC NO. 47:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 47 as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 48:**

Any reduction in price YOU allege resulted from IMAGINE's infringement.

**RESPONSE TO TOPIC NO. 48:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 48 as overly broad and unduly burdensome. BigBand further objects to this topic to

the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 49:**

Any license or sublicense to which YOU are a party relating to any of YOUR PRODUCTS or any of the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 49:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 49 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that it is vague and ambiguous by its use of the term "relating to." BigBand also objects on the ground that the topic is more appropriately reserved for written discovery.

**TOPIC NO. 50:**

YOUR practices and policies for licensing YOUR patents to third parties.

**RESPONSE TO TOPIC NO. 50:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 50 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects on the ground that the topic is more appropriately reserved for written discovery.

**TOPIC NO. 51:**

Any established royalty for the PATENTS IN SUIT or any industry royalty rate that YOU believe is relevant to the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 51:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 51 as overly broad and unduly burdensome. BigBand further objects to this topic to

the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all

rights to present expert opinion evidence according to the schedule adopted by the Court.

BigBand also objects to the extent the topic requests BigBand's contentions which are not a

proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 52:**

Any agreements, including without limitation settlements and covenants not to
sue, relating to the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 52:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 52 as overly broad and unduly burdensome. BigBand also objects to this topic as

vague and ambiguous by its use of the term "relating to." BigBand further objects to this topic to

the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all

rights to present expert opinion evidence according to the schedule adopted by the Court.

BigBand also objects on the ground that the topic is more appropriately reserved for written

discovery.

**TOPIC NO. 53:**

Any correspondence, communications, and negotiations with third parties relating to the
licensing or cross-licensing of the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 53:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 53 as overly broad, unduly burdensome and not relevant or reasonably calculated to

lead to the discovery of admissible evidence given the breadth of the topic. BigBand further

objects to this topic on the grounds that it fails to describe with reasonable particularity the

matters on which examination is requested and is vague and ambiguous. BigBand further

31

objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 54:**

All PERSONS that YOU claim infringe any of the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 54:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 54 to the extent it seeks information protected by the attorney-client privilege, work product immunity, or other immunity. BigBand further objects to this topic as not relevant or reasonably calculated to lead to the discovery of admissible evidence. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 55:**

The IDENTIFICATION of persons, employees, and/or third parties involved in or knowledgeable about matters set forth in the topics above.

**RESPONSE TO TOPIC NO. 55:**

BigBand incorporates its General Objections and its Specific Objections to Topics Nos. 34-54 as if set forth fully herein. BigBand objects to Topic No. 55 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 56:**

The DOCUMENTS or other information RELATING TO the matters set forth in the topics above, the IDENTITY of the custodian(s) of the document and the location(s) where the document was kept and/or stored in the ordinary course of business.

**RESPONSE TO TOPIC NO. 56:**

BigBand incorporates its General Objections and its Specific Objections to Topics Nos.

34-54 as if set forth fully herein. BigBand objects to Topic No. 56 as overly broad and unduly

burdensome. BigBand further objects to this topic on the grounds that it fails to describe with

reasonable particularity the matters on which examination is requested and is vague and

ambiguous. BigBand also objects to this topic on the ground that it is more appropriately

reserved for written discovery.

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

*/s/ Karen Jacobs Louden*
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
jblumenfeld@mnat.com
klouden@mnat.com
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200

*Attorneys for Plaintiff/Counterclaim*
*Defendant BigBand Networks, Inc.*

OF COUNSEL:

Peter P. Chen
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600
Peter.Chen@lw.com

James L. Day
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
Jim.Day@lw.com

February 20, 2008

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that copies of the foregoing were caused to be served on February 20, 2008 by e-mail and U.S. Mail:

Mary B. Matterer
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19899

Peter Gratzinger
John Benassi
HELLER EHRMAN LLP
4350 La Jolla Village Drive, Suite 700
San Diego, CA  92122

*/s/ John D. Minton*
John D. Minton

# EXHIBIT 2

**John D. Minton**
Direct Dial: +1.650.463.3009
john.minton@lw.com

140 Scott Drive
Menlo Park, California 94025
Tel: +650.328.4600  Fax: +650.463.2600
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

**VIA E-MAIL**

February 5, 2008

Peter E. Gratzinger
HELLER EHRMAN LLP
333 South Hope Street, 39th Floor
Los Angeles, CA 90071

Re:   *BigBand Networks, Inc. v. Imagine Communications, Inc.,*
        C.A. No. 07-351 (***) (D. Del.)

Dear Peter:

Further to your request on our January 28, 2008 phone call regarding Imagine's deposition notice pursuant to Fed. R. Civ. Proc. 30(b)(6), I am providing you authority from the Delaware District Court regarding our objections to the deposition topics directed to BigBand's contentions.

In the District of Delaware, a Rule 30(b)(6) deposition requesting a party to present its contentions is improper. *See, e.g., Heron v. Potter*, 2006 U.S. Dist. LEXIS 77094, *3-4 (D. Del. Oct. 23, 2006) (holding that requiring a deponent "to make a legal opinion or conclusion" is objectionable, and noting, "Plaintiff has other discovery tools available to determine the relevant facts that may support its contention . . . .") (Farnan, J.); *Axiohm IPS, Inc. v. Epson Am., Inc.,* C.A. No. 00-420-SLR, at 4 (D. Del. Mar. 28, 2001) ("[W]e don't do contention depositions in this district") (transcript of hearing before Judge Robinson) (Attachment A).  As Judge Stapleton noted more than twenty years ago:

> It has been the consistent position of this Court that a lay person shouldn't be required to formulate a party's contention in response to deposition questions and that not even a lawyer should be required to formulate a trial strategy and contentions in immediate response to questions on deposition.  And it has accordingly been the consistent practice to require that the contention discovery,

# LATHAM&WATKINS LLP

which is clearly permissible and very constructive in narrowing the issues, but to confine it to interrogatories to a party, period.

*Tiegel Manu Co. v. Globe-Union, Inc.*, C.A. No. 84-483, at 14 (D. Del. Oct. 5, 1984) (transcript of hearing before Judge Stapleton) (Attachment B). The law on this point remains the same. *See, e.g., McKesson Info. Solutions LLC v. The TriZetto Group, Inc.*, C.A. No. 04-1258-SLR, at 21 (D. Del. Aug. 2, 2005) ("[I]f you ask for depositions concerning the basis for a defense, that [should be] a contention interrogatory.") (transcript of hearing before Judge Robinson) (Attachment C); *Elf Atochem North America, Inc. v. Libbey-Owens-Ford Co., Inc.*, C.A. No. 94-670-RRM, at 34-35 (D. Del. Feb. 24, 1995) ("I don't think it's productive to try to pull from a witness what their contentions are . . . .") (transcript of hearing before Judge McKelvie) (Attachment D).

This clear prohibition on contention depositions cannot be side-stepped by simply referring semantically to "facts" rather than "contentions." A Rule 30(b)(6) deposition notice that seeks all of the "facts" supporting a party's claim necessarily seeks its contentions. "[I]nserting of the word 'facts' doesn't make [a deposition topic] less of an effort to get at what is essentially the legal position of the party . . . ." *Pharmacia & Upjohn Co. v. Sicor Inc.*, C.A. No. 04-833-KAJ, at 36 (D. Del. Oct. 11, 2005) (transcript of hearing before Judge Jordan) (Attachment E); *ArthroCare Corp. v. Smith & Nephew, Inc.*, C.A. No. 01-504-SLR, at 13-14 (D. Del. Oct. 15, 2002) (transcript of hearing before Judge Robinson) ("I would not put any credence in contention depositions to have one person be designated as the corporate spokesperson for legal issues . . . and even incorporating all the facts. That's what interrogatories are for. . . . I would say don't bother taking them [contention depositions]. I think they're ridiculous . . . .") (Attachment F).

This limitation on the scope of Rule 30(b)(6) depositions is a practical one. A Rule 30(b)(6) deposition cannot require a witness "to know every fact pertaining to every contention." *Pharmacia & Upjohn* at 37 (Attachment E); *see also Seagate Tech. LLC v. Cornice, Inc.*, C.A. No. 04-418-SLR, at 38 (D. Del. June 28, 2005) ("No contention depositions. Those are in writing. There's no one person that should have to answer that.") (transcript of hearing before Judge Robinson) (Attachment G). The Delaware District Court is clear on this point. Contention depositions, such as Imagine has attempted to notice, are simply improper.

Please let me know if you have any further questions regarding this issue.

Truly Yours,

John D. Minton
of LATHAM & WATKINS LLP

cc: Mary Matterer
John Benassi

# EXHIBIT 3

**John D. Minton**
Direct Dial: +1.650.463.3009
john.minton@lw.com

140 Scott Drive
Menlo Park, California 94025
Tel: +650.328.4600  Fax: +650.463.2600
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

<u>**VIA E-MAIL**</u>

February 11, 2008

Peter E. Gratzinger
HELLER EHRMAN LLP
333 South Hope Street, 39th Floor
Los Angeles, CA 90071

> Re:   *BigBand Networks, Inc. v. Imagine Communications, Inc.*,
> C.A. No. 07-351 (***) (D. Del.)

Dear Peter:

Further to our discussion during the January 28, 2008 meet and confer regarding Imagine's deposition notice pursuant to Fed. R. Civ. P. 30(b)(6), I am providing you authority regarding our objections to the deposition topics directed to BigBand's prefiling investigation and intent in filing suit.

A party's subjective intent is irrelevant in determining whether that party has satisfied the pleading requirements under Rule 11. The District of Delaware has concluded that "the Rule 11 test 'is now an objective one of reasonableness.'" *Loving v. Pirelli Cable Corp*, 11 F.Supp. 2d 480, 493 (D. Del. 1998) (quoting *Lony v. E.I. DuPont de Nemours & Co.*, 935 F.2d 604, 616 (3d Cir. 1991)). In determining whether a party had an improper motive, "a court must judge [a party's] conduct under an objective standard of reasonableness rather than assessing subjective intent." *Stevens v. Lawyer's Mutual Liability Ins. Co.*, 789 F.2d 1056, 1060 (4th Cir. 1986). *See also Cabell v. Petty*, 810 F.2d 463, 465 (4th Cir. 1987) (holding that the district court incorrectly considered the plaintiff's subjective intent in determining whether a Rule 11 violation had occurred).

Notably, where a complaint is "well grounded in fact and warranted under existing law," the initial complaint cannot, of itself, violate the "improper purpose" language of Rule 11. 5A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 3035 (3d ed. 2004). "[I]t would be counterproductive to use Rule 11 to penalize the assertion of non frivolous substantive claims, even when the motives for asserting those claims are not entirely pure." *Townsend v. Holman Consulting Corp.*, 914 F.2d 1136, 1140 (9th Cir. 1990) (citing *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 834 (9th Cir. 1986)). *See also Paciulan v. George*, 38 F.Supp. 2d 1128, 1144 (N.D. Cal. 1999) ("Where there is a basis for a claim in law and fact, the '*subjective intent of the pleader . . . is of no moment.*'" (quoting *Zaldivar*, 780 F.2d at 830)

**LATHAM&WATKINS**LLP

(emphasis added)). Thus, while BigBand's intent to protect its intellectual property rights that are being infringed by Imagine is entirely proper, its reasons for filing suit are not relevant to any Rule 11 analysis.

Moreover, as we have previously noted in our October 31, 2007 letter, a party's prefiling investigation is not properly discoverable. *See, e.g., Intel Corp. v. Amberwave Sys. Corp.*, C.A. No. 06-429-KAJ (D. Del. Oct. 24, 2006) (transcript of hearing before Judge Jordan) (Attachment A). Rule 11 cannot be used as a wedge to seek discovery otherwise irrelevant to any claim or defense in the case. *Notes of Advisory Committee on 1993 Amendments* (Rule 11 "should not be employed as a discovery device or to test the legal sufficiency or efficacy of allegations in the pleadings; other motions are available for those purposes . . . ."). *See also Osram Sylvania, Inc. v. Durel Corp.*, C.A. No. 00-501-GMS (D. Del. Aug. 15, 2000) (transcript of hearing before Judge Sleet) (Attachment B). This principle makes good sense, given that "[i]n the absence of an actual motion [under Rule 11] to the contrary, *the court will assume that [opposing] counsel has complied with their ethical obligations under Fed. R. Civ. P. 11.*" *Symbol Technologies, Inc. v. Hand Held Products, Inc.*, 2003 U.S. Dist. LEXIS 21002, *8 n.1 (D. Del. Nov. 14, 2003) (emphasis added) (Robinson, J.).

BigBand's Complaint is well grounded in fact and law as will be established over the course of the suit through BigBand's discovery responses, expert reports, and the ultimate disposition of this action. As the above reflects, however, BigBand's intent in filing suit is irrelevant, and independent discovery sought to inquire into such intent is improper and will not be permitted by Delaware courts.

Truly Yours,

John D. Minton
of LATHAM & WATKINS LLP

cc:  Mary Matterer
      John Benassi

**Attachment A**

SHEET 1

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                         - - -

 4    INTEL CORPORATION,         :   CIVIL ACTION
                                 :
 5            Plaintiff and      :
              Counterclaimant,   :
 6    v.                         :
                                 :
 7    AMBERWAVE SYSTEMS CORPORATION,  :
                                 :
 8            Defendant and      :   NO. 06-429 (KAJ)
              Counterdefendant.  :
 9                         - - -

10              Wilmington, Delaware
            Tuesday, October 24, 2006 at 2:07 p.m.
11              TELEPHONE CONFERENCE

12                         - - -

13    BEFORE:     HONORABLE KENT A. JORDAN, U.S.D.C.J.

14                         - - -

      APPEARANCES:
15
              YOUNG CONAWAY STARGATT & TAYLOR
16            BY:  JOHN W. SHAW, ESQ.

17                   and

18            SIMPSON THACHER & BARTLETT, LLP
              BY:  GEORGE M. NEWCOMBE, ESQ., and
19                 PATRICK E. KING, ESQ.
                   (Palo Alto, California)
20
                      Counsel for Intel Corporation
21

22            MORRIS NICHOLS ARSHT & TUNNELL
              BY:  LESLIE A. POLIZOTI, ESQ.
23
24                   and

                              Brian P. Gaffigan
25                            Registered Merit Reporter
```

SHEET 2

**2**

1  APPEARANCES: (Continued)
2
3          IRELL & MANELLA, LLP
4          BY:  SAMUEL K. LU, ESQ.,
             JASON G. SHEASBY, ESQ., and
5          ANDREW WEISS, ESQ.
             (Los Angeles, California)
6
             Counsel for Amberwave Systems
7            Corporation
8
9
10                    - oOo -
11          P R O C E E D I N G S
12          (REPORTER'S NOTE:  The following telephone
13  conference was held in chambers, beginning at 2:07 p.m.)
14          THE COURT:  Hi, this is Judge Jordan.  Who do I
15  have on the line?
16          MR. SHAW:  Good afternoon, Your Honor.  It's
17  John Shaw at Young Conaway for Intel.  And on the line from
18  Simpson Thacher, it's George Newcombe; and from Intel, Allon
19  Stabinsky.
20          Also, Your Honor, we wanted to apologize for the
21  delay.  We had inadvertently, both sides sent phone numbers
22  out.  Our half were on one phone call, half on the other and
23  we had to get them together.
24          MR. KING:  Patrick King is here, Your Honor.  I
25  also wanted to make that clear on the record.

**3**

1          THE COURT:  All right.
2          MS. POLIZOTI:  Good afternoon, Your Honor.  This
3  is Leslie Polizoti from Morris Nichols.  With me on the line
4  from Irell Manella are Sam Lu, Jason Sheasby and Andrew
5  Weiss.
6          THE COURT:  Okay.  I appreciate folks getting
7  on the phone.  I spent some time with the materials you sent
8  over and given other things that were going on, I thought
9  perhaps the quickest way to address this was to get you on
10  the phone.  I think what's caused some consternation for me,
11  but I believe I have got it sorted out here, is the merging
12  of two concepts or two separate things as people have been
13  arguing to me.
14          I view as distinct, and to the extent this isn't
15  clear let me make it clear.  I'm talking about the, in
16  effect, motion to compel that Intel has put before me and
17  the assertion of work product doctrine that Amberwave has
18  made with respect to prelitigation testing that Amberwave
19  performed on Intel products and that resulted in a
20  discussion we had on the phone about a month ago, September
21  26th of this year, and then an exchange of letters that I
22  asked for in the aftermath of that call.
23          And I hear Amberwave telling me in its papers,
24  look, we answered their contention interrogatories but we
25  should not be required to give up our testing.  Our presuit

**4**

1  testing is confidential as work product undertaken at
2  the direction of counsel with nontestifying, i.e.,
3  consulting experts.  And I hear Intel saying on the other
4  side, essentially, well, they haven't answered our
5  interrogatories.  But I think those are two separate
6  inquiries.
7          First, Amberwave, have I got your position right
8  as I said it a moment ago?
9          MR. LU:  This is Samuel Lu for Amberwave.  Yes,
10  you have gotten our position correct.
11          THE COURT:  And having reviewed the cases people
12  put in front of me, I agree now with Amberwave.  I said you
13  had an uphill battle but you have made it up that hill.  And
14  I think it way you did it on the legal point is to show me
15  that we're talking here not about hiding how you say this
16  is infringing, which is what was troubling to me in the
17  presentation I was getting before, but I understand you to
18  be saying we have said, through a claim chart, how we allege
19  Intel is infringing the asserted claims of the asserted
20  patent.  How we got to that point is what we're allowed
21  to keep under wraps, and at some point we'll have expert
22  exchanges and we'll talk further about that.
23          I don't really need any more argument or
24  discussion on that point.  I agree with that assertion that
25  as long as they've said how Intel is alleged to infringe,

**5**

1  the better reasoned authority and the greater bulk of
2  authority says the testing that gets them there, and that
3  is the testing methods and procedures and protocols and
4  questions asked and the hypotheses formulated, that is all
5  work product they're entitled to maintain a shield around.
6          That does not, of course, answer the question of
7  whether, as a matter of fact, the contention interrogatories
8  were adequately answered and the bases for the assertion of
9  infringement have been disclosed.  On that point, I have
10  been spending some time looking through the claim chart that
11  Amberwave submitted with one of their letters and I guess I
12  wanted to ask somebody on the Intel side, since you've said,
13  hey, they haven't answered our interrogatories, what is it
14  about that claim chart that leaves you saying they haven't
15  told us?
16          MR. NEWCOMBE:  Your Honor, this is George
17  Newcombe.  May I address that?
18          THE COURT:  I wish you would.
19          MR. NEWCOMBE:  Thank you, Your Honor.  Let me
20  just begin with the '632.  If you look at Claim 1 of the
21  '632 and look at Amberwave's answers, you will see -- which
22  appears on page 17 of their interrogatory responses that
23  were dated July 12, 2006.
24          THE COURT:  Well, let me ask you to identify, is
25  this one of the things attached to their materials?  Is this

SHEET 3

**6**

1  the Exhibit A to their docket item 181 or is it something
2  different?
3      MR. NEWCOMBE: I think it's something different,
4  Your Honor. I could read you the portion that I think will
5  make my point.
6      THE COURT: All right. Go ahead.
7      MR. NEWCOMBE: Okay. Claim 5 provides -- and
8  I'll read you the element that is specifically at issue
9  and why we think their contention interrogatories are
10  inadequate. It says, "providing a heterostructure having a
11  silicon substrate and a strained layer thereover, the
12  strained layer exhibiting a surface roughness less than one
13  nanometer."
14      Now, their chart which they send with that or
15  responsive infringement chart -- excuse the phone that is
16  ringing, Your Honor. I can't control that -- states as
17  follows: "The surface of the strained layer comprises
18  impressively strained silicon butting the gate of the PMOS
19  transistor in the channel region and adds a surface
20  roughness of less than one nanometer," which is basically
21  parroting the language in the claim.
22      Let me tell you why that is inadequate for us.
23  First of all, the term "surface roughness" is a derived
24  number. And by that, I mean it is a number which you
25  determine based on other things. None of these other things

**7**

1  are disclosed.
2      For example, the number is a measurement that is
3  taken over a specific area. Therefore, you need to know the
4  length and the width and the area that is subjected to this
5  measurement. That is not disclosed.
6      Second, you need to know the location. You need
7  to know exactly where does this area begin and where does it
8  end? That is not disclosed.
9      Thirdly, you need to know the type of roughness
10  they're talking about. There are a host of different
11  roughness measurements. There is root mean square. There
12  is something called R max, R average. There is a host of
13  these. That is not specified.
14      Fourth, the method is not specified by which
15  they claim this roughness should be determined. Why is that
16  important? Because it varies. You can get a different
17  answer depending upon what you use. What was the probe size
18  used? How was the area prepared?
19      Next, there are two different processes
20  involved here. There is Intel's 90 nanometer process and
21  Intel's 65 nanometer process. These are two completely
22  different manufacturing processes. There is absolutely no
23  differentiation between them in the answer, and it's hard
24  to believe that exactly the same thing would apply to each
25  but there is not even an attempt to differentiate their

**8**

1  infringement contentions with respect to each of the
2  processes. And for these reasons alone on this particular
3  one, and this is why I also believe that exceptional
4  circumstances exist here even if Your Honor were to find
5  that work product doctrine applies, is that there is no
6  way --
7      THE COURT: Well, Mr. Newcombe, hold on.
8      MR. NEWCOMBE: -- you could even try to
9  replicate whatever they claim. We don't know what it is,
10  because less than one nanometer could be anything. We
11  don't know what they're claiming the surface roughness is
12  and we could be two ships totally passing in the night.
13      THE COURT: All right. Do you have me on
14  speakerphone?
15      MR. NEWCOMBE: I do.
16      THE COURT: You are going to have to pick up so
17  if I need to interrupt, I can.
18      MR. NEWCOMBE: I'm sorry, Your Honor.
19      THE COURT: That's all right.
20      All right. Well, you don't have to say "if you
21  were to find" because I have found. I mean that is what we
22  had the discussion a month ago on. That is what you
23  submitted letters on, that is what I read your respective
24  authorities on, and I've ruled for Amberwave on that front.
25      But now I hear you saying we've got exceptional

**9**

1  circumstances. That means we ought to be able to get at it
2  here.
3      MR. NEWCOMBE: Well, I'm saying, Your Honor,
4  that, one, this is how their contentions are inadequate, but
5  I also think when you understand the fullness of this, and
6  I will address the '292 and the concentration gradient for
7  the second, it may well be something which amounts to
8  exceptional circumstances, too. Can I?
9      THE COURT: Well, let's take it, instead of
10  having too much to deal with all at once, let's take it a
11  bite at a time.
12      Mr. Lu, do you have the ball for Amberwave?
13      MR. LU: Actually, Mr. Sheasby does.
14      THE COURT: All right. Mr. Sheasby, I want you
15  to respond to that. And I want you to precisely respond to
16  the assertion that it's impossible for them to know as a
17  factual matter what it is you are saying about their product
18  infringing because you haven't told them anything about how
19  you got to a conclusion except to recite back the claim
20  limitation.
21      MR. SHEASBY: Your Honor, I understand the
22  interrogatory that they're identifying is an interrogatory
23  that asks you to identify the elements and the locations of
24  the elements of the claim. I think if you will look at the
25  response that I know you don't have in front of you, we

SHEET 4

**10**

1  identify the area, the strained layer exhibiting a surface
2  roughness less than one nanometer as the region below the
3  gate of the PMOS transistor. And that is the defined
4  location on their PMOS transistor, the defined location of
5  the 90 nanometer transistor, the 65 nanometer transistor,
6  the 45 nanometer transistor which is not yet released but
7  will soon be released. And what this does for them is that
8  we have identified the exact location where we believe there
9  is a surface roughness less than one nanometer.
10  THE COURT: Well, we really do have ships
11  passing in the night here because I have Mr. Newcombe
12  saying -- I asked a question about tell me how this thing
13  infringes this particular claim limitation. This is what I
14  got back. It's only a repetition of the claim limitation.
15  Then I have you saying we have a response about where
16  something was located. So I don't even have lawyers talking
17  to me about the same question at this point. I want at
18  least to be talking about the same question. Are we talking
19  about the same interrogatory?
20  MR. SHEASBY: Your Honor, I think one of the
21  issues here is Mr. Newcombe has obviously come well prepared
22  to identify additional pieces of information he wants from
23  us in our contention interrogatories, and I understand that.
24  It would have been nice if Mr. Newcombe would have met and
25  conferred with us on this but they have chosen not to. The

**11**

1  reality is that if they want more information, you know,
2  frankly, Your Honor, we want more information as well. And
3  we think their interrogatories are -- you know, the point
4  I'm trying to make, I think this is something that needs to
5  be discussed between the parties.
6  THE COURT: All right. Go ahead, Mr. Newcombe.
7  MR. NEWCOMBE: Your Honor, I disagree with that.
8  We have gone around and around with them. And we don't
9  have this. The reason we served them more specific
10  interrogatories that were the subject of the letters were
11  to precisely get at this information. And it may be that
12  we approached it in a way that Your Honor has ruled is not
13  appropriate at this point. But on the other hand, as a
14  contention matter, the things I addressed go to the same
15  issue of telling us what it is they contend, and we don't
16  know that yet. And I can say this. I can go over the
17  '292 in a second, if you would like me to.
18  THE COURT: Well, I wouldn't because here is
19  the problem. I really do have lawyers talking right past
20  each other. That is totally unhelpful to me. It doesn't
21  do me any good to hear somebody say they didn't answer
22  this question, and then have the other side say, well, we
23  answered this other question.
24  Look, I don't want to get tied up in labels
25  here and calling something a contention interrogatory or

**12**

1  noncontention interrogatory. Let me try to articulate this
2  is in a way that will move the ball forward. And if we're
3  back here again with more motion practice, we'll just end
4  up doing this in a more full blown way. And if I have to
5  tack the parties with the cost of me getting an expert in,
6  I guess we'll take it to that point. I'm hoping we don't
7  have to do that because at that juncture, it's expensive for
8  everybody. And I'm not sure that that is going to be any
9  more satisfactory at the end of the day than if both sides
10  sit down and talk to each other about an acceptable exchange
11  of information.
12  It looks to me from the submissions I've gotten
13  that Amberwave is saying we don't want to tell you more than
14  our conclusions until we get to the point of expert reports.
15  And I hear Intel telling me, we can't even figure out what
16  we need to do in the way of dealing with these assertions
17  of infringement until we get more information. In other
18  words, if I'm understanding Mr. Newcombe's arguments right,
19  it's something to the effect of there are exceptional
20  circumstances here because we can't even frame up a response
21  based on what we've got. And I may be reading a little bit
22  between the lines. We can't adequately get experts in the
23  mix. I don't know.
24  But whatever the ultimate push here is as to the
25  parties positions with respect to each other, I think it's

**13**

1  got to be true, given the character of the litigation thus
2  far, that there is room on both sides where you each want
3  something the other has got, and you ought to be willing to
4  give to get. And if you are not, we'll just take it to the
5  next step.
6  I can't, based on people reading to me over the
7  phone, give you further rulings. I'm just not prepared to
8  do it today. Today, I was prepared to do what I have done,
9  which is to tell you as a legal matter the concept that you
10  are entitled to get their testing data because "that's not
11  work product protected, it's just fact information," I'm
12  rejecting that based on the arguments you made, authorities
13  that you have cited to me and my research on it.
14  Now, I'll reiterate, that does not answer the
15  question of whether what has happened here in the way of
16  responses is adequate. Because all I've done is looked at
17  the Exhibit A that was sent over to me by Amberwave with
18  their October 6th letter which has some boilerplate nonsense
19  at the front of it, and it is nonsense.
20  And I'll get on my soapbox for a minute here and
21  say I wish lawyers would stop just hitting the print button
22  on their word processor and saying that things are "vague
23  and ambiguous and burdensome and oppressive" when they're
24  plainly not those things, which are improper objections that
25  Amberwave has asserted with respect to this Interrogatory

SHEET 5

**14**

1   No. 9, which Amberwave itself quotes as saying give the
2   identity and structure, materials in each accused product
3   that Amberwave contends performed the claimed invention.
4        Well, you have given a response that runs to,
5   I don't know, close to 20 pages -- 17 pages. Obviously,
6   it wasn't so "vague and ambiguous and burdensome and
7   oppressive" that you couldn't come up with some response so
8   I don't know why people bother with the boilerplate stuff
9   at the front. It's unhelpful.
10       But we do get into some detail. There is a
11  claim chart there. I'm looking at the claim chart with my
12  level of understanding of the technology. It looks good
13  to me. If you want Intel to make this a point-by-point
14  battle on each other interrogatory and claim chart position,
15  you are going to have to come forward and not only be
16  prepared to say why theirs is inadequate but why, in
17  contradistinction, what you have given them is better. Do
18  you understand? And if we have to get into that level of
19  micromanagement of discovery, it's going to be a lengthy
20  and expensive process that I would prefer to avoid.
21       I will reiterate, I'm prepared to get into it
22  with you if you can't work it out, but I am directing you to
23  work it out. And when you say we've been around and around,
24  Mr. Newcombe, and we haven't gotten this done, I'm hearing
25  the other side tell me right now they didn't meet and

**15**

1   confer. So obviously there is still a disconnect. And you
2   are going to need, both sides, to build a record about what
3   you have done to try to get an answer to specific questions.
4        Now, if I weren't on this phone call, and, Mr.
5   Newcombe, you were speaking to Mr. Sheasby and you said
6   this is what I want and I can't figure out and I can't do
7   anything with this because you haven't told me the area that
8   you are covering when you are doing the measurement or the
9   type of measurement protocol that you have used, we just
10  can't figure out why you are saying what you are saying and
11  we ought to be able to do that. I mean if you are telling
12  me you had that discussion and you can demonstrate to me
13  that you had that discussion and that they flatly refused
14  to move forward with you and you can also demonstrate to me
15  that you haven't been playing hide the ball yourself, then
16  you've got the moral high ground but, right now, nobody has
17  got the moral high ground. I just have lawyers bickering.
18  Does everybody on the call understand the challenge I feel
19  like I'm facing in helping you move forward?
20       (The attorneys respond, "yes, Your Honor.")
21       THE COURT: Okay. Well, then please take it
22  back, have the kind of conversation we were just having
23  but without me on the line. I realize that lawyers are
24  like everything else in nature, behavior changes under
25  observation, but imagine I were on the call with you even

**16**

1   if I'm not and have that sort of open discussion that will
2   move things forward on both sides, a real honest-to-goodness
3   meet-and-confer where patience is exercised and a good faith
4   attempt is made for both sides to get the cards on the table
5   in an appropriate fashion.
6        And then if that best faith effort doesn't
7   produce something, I'm going to be asking for people to come
8   to Wilmington and we'll sit around a table and we'll start
9   to go through it together and I'll see if I can help you
10  without an expert. And if I conclude I can't help you on
11  the basis of what I am able to understand, I still can't
12  figure out who is being less than helpful, at that point
13  maybe I will get an expert in the mix to help out.
14       At this stage, though, I've given you the
15  answer that is the best one I can give you. That is, as
16  long as they tell you, with specificity, this is the way
17  you guys are infringing our product, they have a work
18  product protection. You may be able to show exceptional
19  circumstances, et cetera. I'm not prejudging any of that.
20       All right. So go back to your drawing board.
21  Hopefully, I won't hear about this again. If I do, just be
22  prepared, both sides, to be showing up in Wilmington with
23  your respective positions already prepared because at that
24  point, Mr. Sheasby, the "I'm not ready to respond to that,"
25  which I'm not saying is illegitimate on this call, I'm just

**17**

1   saying it won't work next time.
2        MR. NEWCOMBE: Your Honor, I will be prepared if
3   it's necessary. And we hope it's not.
4        THE COURT: Me, too.
5        All right. I'm hesitant to stay it out as long
6   as I have got you all on the phone, is there anything else I
7   can help you out with, Mr. Lu or Mr. Sheasby?
8        MR. LU: Nothing on our side, Your Honor.
9        THE COURT: Mr. Newcombe, on your side?
10       MR. NEWCOMBE: At this moment, we will continue
11  working. And hopefully we will never have to go back to ask
12  you anything, but I'm afraid we will.
13       THE COURT: All right. Well, if people are
14  moving forward with their eyes on the ultimate prize here,
15  which is a fair resolution of the matter, I'm hoping we
16  won't, but we will take it a step at a time. Thanks.
17       (The attorneys respond, "Thank you, Your
18  Honor.")
19       (Telephone conference ends at 4:30 p.m.)
20
21
22
23
24
25

**Attachment B**

1

1            IN THE UNITED STATES DISTRICT COURT

2            IN AND FOR THE DISTRICT OF DELAWARE

3                            - - -

OSRAM SYLVANIA, INC.,

4                                  :      CIVIL ACTION
            Plaintiff,             :

5                                  :
            v.                     :

6                                  :
DUREL CORPORATION,                 :

7                                  :      NO. 00-501 (GMS)
            Defendant.             :

8                            - - -

9                    Wilmington, Delaware
            Tuesday, August 15, 2000 at 2:06 p.m.

10                   CHAMBERS CONFERENCE

11                           - - -

12    BEFORE:     HONORABLE GREGORY M. SLEET, U.S.D.C.J.

13                           - - -

    APPEARANCES:

14

15          YOUNG CONAWAY STARGATT & TAYLOR, LLP
            BY:  JOSY W. INGERSOLL, ESQ.

16
                     and

17
            KIRKLAND & ELLIS

18          BY:  JOHN DESMARAIS, ESQ.
                 (New York, New York)

19
                         Counsel for Plaintiff Osram

20                       Sylvania Inc.

21
            MORRIS, NICHOLS, ARSHT & TUNNELL

22          BY:  DONALD F. PARSONS, JR., ESQ. and
                 KAREN JACOBS LOUDEN, ESQ.

23
                     and

24

25                       Brian P. Gaffigan
                         Official Court Reporter

2

1   APPEARANCES: (Continued)

2              PRETTY SCHROEDER & POPLAWSKI, PC
               BY:  LAURENCE H. PRETTY, ESQ.
3                  (Los Angeles, California)

4                      Counsel for Defendant Durel Corporation

5                          - oOo -

6                  P R O C E E D I N G S

7          (Proceedings started at 2:06 p.m. with

8   introductions being made.)

9              THE COURT:  Okay.  We have a one patent action;

10  right?

11             MR. DESMARAIS:  That's right.

12             THE COURT:  '496 patent.

13             MR. DESMARAIS:  And it's a welcome relief.

14             THE COURT:  You just spoke a mouthful, counsel.

15             Why don't we just sort of cut straight to the

16  chase.  I'm looking for the page where, paragraph 12, we have

17  the proposed schedule, which I see the parties have agreed

18  upon.  And in the main, it's acceptable to the Court.  I

19  believe it's consistent with the Court's availability for

20  trial.

21             Ms. Preston, were you going to?

22             THE DEPUTY CLERK:  There is only one change for

23  the pretrial conference.  We'd have to change the date to

24  October 26th.

25             THE COURT:  Okay.

3

1              THE DEPUTY CLERK:  That's the only change.

2              THE COURT:  Right.  So the trial date is a good

3    trial date.

4              THE DEPUTY CLERK:  That's fine.

5              THE COURT:  The only other date that --

6              MR. DESMARAIS:  Your Honor, may I?

7              THE COURT:  Yes.

8              MR. DESMARAIS:  I am scheduled to do a mediation

9    here with the magistrate judge.

10             THE COURT:  On that date?

11             MR. DESMARAIS:  It's actually scheduled.  It's a

12   huge case and she scheduled three days, the 25th, 26th and

13   27th.

14             THE COURT:  All right.  We can move that.

15             THE DEPUTY CLERK:  The pretrial.

16             THE COURT:  Yes, we'll get another date.  While

17   Ms. Preston is checking the calendar for that, I am going to

18   move the proposed dispositive motion filing deadline to May

19    -- to the end of May, if May 31 is not -- I'm not sure what

20   day of the week that is.

21             MR. DESMARAIS:  This is May next year.

22             THE COURT:  Yes.  Gail, I'm going to move the

23   case dispositive deadline.

24             MR. DESMARAIS:  May 31 is a Thursday.

25             THE COURT:  It's a Thursday.  We'll move it to

4

1    May 31.

2                THE DEPUTY CLERK:  Okay.

3                THE COURT:  And the only other significant

4    issues that we need to account for in the schedule as far

5    as I can tell are related to Markman.  I have begun taking

6    the approach that each case is unique and has different

7    requirements apparently with regard to the scheduling and

8    positioning of Markman in the process, so I have moved away

9    from, not that my approach was ever rigid, but firm approach

10   one way or the other.  And for purposes of discussion, I'll

11   suggest, and counsel, please feed back to me, that Markman

12   might be positioned some time after the fact discovery

13   deadline but before the opening due date on opening expert

14   reports.

15                MR. DESMARAIS:  That would be fine with the

16   plaintiff.

17                MR. PRETTY:  Yes, I can work with that.

18                THE COURT:  What I would then suggest is that

19   we make the opening expert reports due 30 days after the

20   Markman.

21                MR. DESMARAIS:  I didn't hear.

22                THE COURT:  After the ruling on Markman, which I

23   would endeavor to get out in 30 days of the hearing.  So we

24   need to account for a date for the hearing, Ms. Preston.

25                THE DEPUTY CLERK:  Markman hearing?

5

1          THE COURT:  Yes.  I would anticipate a half day

2    to a day.

3          MR. DESMARAIS:  I don't know that it would take

4    a day.  It's a pretty simple patent.  A half day should be

5    fine.

6          MR. PRETTY:  Yes.  I take it this isn't

7    preclusive of summary judgment motions before that time --

8          THE COURT:  Oh, no.

9          MR. PRETTY:  -- which may involve Markman

10   rulings.

11         MR. DESMARAIS:  So I would say a half day.

12         MR. PRETTY:  Yes.

13         THE COURT:  You can file those summary judgment

14   motions.  I'm not sure I'm going to get to them before

15   addressing Markman.  I tend not to mix-up the issues usually

16   attendant or raised in summary judgment with Markman.  Right

17   now, I'm somewhat of a purist in approaching Markman and

18   keeping Markman issues to purely matters of claim interpret-

19   ation almost exclusively in consideration of intrinsic

20   evidence, not ruling out the possibility that extrinsic

21   evidence may be appropriate in a given case but not generally

22   predisposed to hearing it, not at this stage where I'm

23   prepared to combine issues, summary judgment and Markman

24   judgment issues absent some persuasive argument from the

25   parties.

6

1          MR. PRETTY:  I think actually I agree with Mr.

2    Desmarais.  It may be that we won't even have a Markman

3    hearing.

4          THE COURT:  And there is nothing that says you

5    have to have a Markman hearing, as far as I can tell; and

6    that's perfectly fine.

7          MR. DESMARAIS:  I think if the parties agree

8    there are no terms in dispute there.

9          THE COURT:  There is no need for one.

10         MR. DESMARAIS:  Right.  Or if we wanted to go

11   with the plain language.

12         MR. PRETTY:  We may well do that.

13         THE COURT:  In point of fact, even if there are

14   claims in dispute, Markman says you don't have to have a

15   hearing.

16         MR. PARSONS:  Right.

17         THE COURT:  So then is it your feeling right now

18   that we should go ahead and schedule a date for a Markman?

19         MR. DESMARAIS:  I think it would be helpful.

20         MR. PRETTY:  Just in case.

21         THE COURT:  Yes, why don't we do that.

22         THE DEPUTY CLERK:  May 18th.

23         THE COURT:  May 18th.

24         MR. DESMARAIS:  I misspoke on October.  I was

25   looking at October 2000.  I don't have anything for October

7

1   2001, so the 26th is good.

2                MR. PRETTY:  I was impressed.

3                MR. DESMARAIS:  Yes.

4                MS. INGERSOLL:  Really.

5                MR. DESMARAIS:  Just off by a year.

6                THE COURT:  Yes, because you were going to be the

7   first attorney that came in with that, having planned out

8   that far.  Unfortunately, we have to plan that far.

9                Otherwise, the dates proposed in paragraph 12,

10  has anything changed since this was prepared?

11               MR. DESMARAIS:  Not that I'm aware of.

12               MR. PRETTY:  No.

13               THE COURT:  Then what I would ask of plaintiff's

14  counsel is to set this down in the form of in a formal

15  proposed scheduling order.

16               MS. INGERSOLL:  Okay.

17               THE COURT:  And send it over to with a disk, 6.0

18  WordPerfect.

19               MR. DESMARAIS:  WordPerfect.

20               THE COURT:  And I will, after you of course

21  exchange drafts with your opponent, I will turn it around,

22  along with a form of order for the preparation of the

23  proposed final pretrial order --

24               MR. DESMARAIS:  Okay.

25               THE COURT:  -- that will accompany that.  As

8

1   your local counsel knows who have appeared before me before,

2   it's fairly detailed and small type but it's really worth

3   following.

4           MS. INGERSOLL:  Yes.

5           MR. DESMARAIS:  Okay.

6           MS. INGERSOLL:  If we decide not to have a

7   Markman, we'll come back with a stipulated order giving you

8   the expert deadlines because otherwise we won't have it.

9           THE COURT:  That's right.  Otherwise, we won't

10  have a date, nor expert reports, so if you would do that.

11          MR. PRETTY:  We probably won't know the Markman

12  issue until we have contention interrogatories outstanding,

13  then we'll see the answers, then we'll see whether we have a

14  Markman dispute that will show up.

15          MS. INGERSOLL:  Yes.

16          MR. PARSONS:  I think what we'll do is we'll have

17  a tentative date for the Markman hearing, and then we'll,

18  maybe we'll put, some 30 days from that, maybe 60 days from

19  that, we'll put the expert reports due unless the Court, you

20  know, unless we don't have the Markman ruling, which it will

21  be 30 days.

22          MR. DESMARAIS:  Yes.  If we're going to agree not

23  to have a Markman at the same time, agree when we have the

24  expert reports, we can do that.

25          MS. INGERSOLL:  What I was going to do if I'm

9

1   granted this was Markman hearing May 18th and then opening

2   expert report 30 days after the ruling on Markman.

3                    MR. DESMARAIS:  Yes, that's what the judge said.

4                    MS. INGERSOLL:  Right.

5                    MR. PARSONS:  That's fine.

6                    THE COURT:  I understand what you are saying.

7                    MS. INGERSOLL:  And then if we don't have the

8   Markman, we'll just do a stipulated order --

9                    MR. DESMARAIS:  At that time.

10                   MS. INGERSOLL:  -- at that point.

11                   MR. DESMARAIS:  Right.

12                   THE COURT:  I need impose one additional

13  requirement related to Markman, in the event that we are

14  going to have disputed terms, that they be identified in some

15  sort of claim chart and the meaning described by the parties

16  to those terms and submitted to the Court I guess a couple of

17  weeks before briefs are due.

18                   MR. DESMARAIS:  Okay.

19                   THE COURT:  Okay?  And I would like to have

20  briefs two weeks in advance of the hearing, if we're going to

21  have one.

22                   As far as briefing in a general sense and

23  certainly as related to case dispositive motions, you can

24  brief on the local rule, and if you need relief from the

25  provisions of that rule, please write to me and set forth

10

1    the reasons in the letter.

2             A brief word about discovery disputes.  They

3    do crop up from time to time -- he said facetiously.  And I

4    would appreciate you following a procedure that will be

5    outlined in the scheduling order but I will outline briefly

6    now that is a two page opening letter, single spaced, and

7    with any attachments that you feel would help me decide the

8    issue at hand, two page answer and a two page reply.

9             It is my strong recommendation, which this is

10   informal motions practice and I think lends itself to a

11   timing provided by the local rule, that you do it on a more

12   expedited basis, since I do handle them directly and get to

13   them, usually try to get to them sooner rather than later,

14   so we can keep the case moving and not get bogged down in

15   motions practice and opinion writing and the like in terms

16   of discovery disputes, unless it's a dispute that I don't

17   feel I can address on the submissions and on the argument

18   we will have on the teleconference which will follow the

19   submissions.  If I don't feel that I can do justice to the

20   issue that way, then I will free you up to engage in motions

21   practice.  Pretty simple.  Okay?

22             MR. DESMARAIS:  Sounds great.

23             THE COURT:  The other matter that I have on my

24   agenda, before I get to it, why don't we talk about estimated

25   length of trial and any other issues that counsel might have.

11

1        MR. DESMARAIS:  Can I ask one question about the

2   schedule?

3        THE COURT:  Yes.

4        MR. DESMARAIS:  Did you want to set a time for

5   the pretrial conference and the Markman hearing?

6        THE DEPUTY CLERK:  Pretrial conference will be at

7   2:00 o'clock and the Markman hearing will be at 10:00.

8        MR. DESMARAIS:  Okay.

9        THE COURT:  Let's say a word about pretrial

10  conferences, and it sort of may help you think a little bit

11  about length of trial.  We, as I think do most federal

12  district judges, really do what we can to pretry as much

13  of the case as possible.  So that all rulings that can be

14  anticipated certainly by way of motion in limine and my

15  pretrial order requires that you fully brief all motions

16  in limine and submit them at the time of the filing of the

17  proposed order; but those objections that are able to be

18  anticipated and legal issues can be raised in that way or at

19  the beginning of each day or at the close of the day session,

20  we will do that so that we can eliminate the interruptions

21  for the jury.

22        MR. DESMARAIS:  Great.

23        THE COURT:  But we do a lot to try to cut down

24  the amount of time that is necessary to actually be in that

25  courtroom in front of the jury.

12

1          MR. DESMARAIS:  Great.

2          THE COURT:  Jury selection doesn't take a long

3    time at all in this court.  Two hours should do it.

4          MR. PARSONS:  Max.

5          MR. DESMARAIS:  Judge Farnan threw me a loop last

6    fall and had the lawyers do the jury selection.

7          MR. PARSONS:  Yes, we did that, too.

8          MR. DESMARAIS:  On 15 minutes notice.

9          THE COURT:  Is that right?

10         MR. PARSONS:  Right.

11         MS. INGERSOLL:  We went first, though.  We were

12   just, yes, he brought us back and thought, oh, right before

13   the panel came in and said I want to try something new this

14   morning.

15         MR. DESMARAIS:  You guys go out there.  I said,

16   judge, can I give me 10 minutes to get ready.

17         MR. PARSONS:  Right.

18         MR. DESMARAIS:  But it was fun, though.  It was

19   actually fun.

20         THE COURT:  No.  When I was a practitioner, I

21   much preferred to do it myself, but now I'm not any longer,

22   I've become an ogre.  No, I do allow at the side bar, during

23   the side bar follow-up questions to be posed by counsel.  And

24   usually I find that counsel don't have that many questions

25   that they want to ask.  Sometimes there is a time when it's

13

1    appropriate.  But given the opportunity to sit down over a

2    period of time and craft questions you are going to do that

3    and some of them will be great questions, some of them I

4    won't agree are great questions.  So I'm still of the mind to

5    do it myself in the main, but you will have an opportunity

6    during the voir dire when we bring up the individual person

7    to the side bar.

8              We were going to talk a little bit more about

9    length of trial.

10             MR. PARSONS:  Right, length of trial.

11             THE COURT:  Length of trial.

12             MR. PRETTY:  Yes.  I think as I understand it,

13   Mr. Desmarais thinks it will be a one week trial, we think it

14   will be a two week trial.  I think one of the factors will be

15   the foreign witnesses, that may there may be a number of

16   them, Japanese possibly, not conversant in English.  So if

17   you end up with translation time, it can slow a trial down a

18   lot.  So we have put two weeks to be on the safe side just in

19   case we run into translation difficulties.

20             THE COURT:  Well --

21             MR. DESMARAIS:  I would be surprised if there

22   were that many foreign witnesses.

23             THE COURT:  As you might imagine in this court,

24   we deal with foreign witnesses a lot and I would be loath to

25   schedule a one patent matter, absent some really exceptional

14

1    circumstance, and foreign witnesses is not one that comes to

2    mind, to my mind for a two week trial.  So I am going to

3    schedule it for five days of trial.  If we find that we've

4    run into a problem, we'll of course all be watching the clock

5    because I probably will put you on a timer, we will be able

6    to anticipate that problem and make some kind of allowance --

7            MR. PRETTY:  All right.

8            THE COURT:  -- in some way.

9            MR. PRETTY:  And we may be moving at some time,

10   by the way, to bifurcate the damages.

11           THE COURT:  Likely, that will not be a motion

12   well taken, but I certainly would not preclude you from

13   filing it.  It's not generally the practice in this

14   particular district and not this particular judge's

15   practice, absent some compelling circumstance, to bifurcate

16   those issues.  But I will not cut you off from making your

17   argument, and I will listen to it.

18           MR. PRETTY:  Okay.

19           THE COURT:  The only other issue that I have --

20   and we can do this either off the record -- is settlement.

21   I'd like to talk a little bit about that.  And if counsel are

22   more comfortable off the record, we can certainly do that.

23           MR. PRETTY:  I think off the record for

24   settlement.

25           MR. DESMARAIS:  That would be fine.

15

1          THE COURT:  All right.  We can go off, Brian.

2          (Discussion held off the record from 2:22 p.m.

3  until 2:25 p.m.)

4          THE COURT:  We should go back on the record.

5          Is there anything else we should talk about

6  today?

7          MR. PRETTY:  There is the motion Mr. Desmarais

8  brought up.

9          THE COURT:  I have not read the papers, quite

10  frankly.  I think there is a discovery dispute.

11          MR. DESMARAIS:  That's right.

12          MR. PRETTY:  Yes.

13          THE COURT:  I'm unfortunately just back a second

14  day from vacation.

15          MR. DESMARAIS:  Good for you.

16          THE COURT:  I have not yet --

17          MR. DESMARAIS:  We're happy to take it up by

18  telephone --

19          THE COURT:  We can do that.

20          MR. DESMARAIS:  -- when you are comfortable.

21          MR. PRETTY:  Yes.  The only problem I have is one

22  of timing.  This deposition was originally noticed for I

23  guess last Friday, and then the letter got I guess filed on

24  Monday.  I'm not quite sure of my dates.

25          MR. PARSONS:  It was more like Wednesday.

16

1          MR. PRETTY:  Wednesday, okay.  So now we

2     rescheduled the deposition for this coming Friday, and of

3     course for me to get from California to wander takes a day

4     of travel.

5          MR. DESMARAIS:  The case just started.  There is

6     no urgency to have the deposition in our view.  We have a

7     year to do discovery.

8          MR. PRETTY:  Until we get into the merits of the

9     motion, which I don't think the judge wants to raise right

10    now, I'm just trying to work out if the judge was going to

11    rule on this quite fast.  The issues are so simple, I wonder

12    if we could sort of argue it now and maybe get a decision

13    on.  Well, I can put it off a week.

14          THE COURT:  Do you have the submissions?

15          THE DEPUTY CLERK:  Yes.

16          THE COURT:  Let me see what you've got.

17          Are there any cases I need to read?

18          MR. DESMARAIS:  Well, I think the legal issues

19    we could probably each tell you about.  I have copies.

20          THE COURT:  Okay.  Ms. Preston?

21          MR. DESMARAIS:  I have cases but unfortunately I

22    highlighted.  If you don't mind looking at my highlighting,

23    I'm happy to show them to you.

24          THE COURT:  Why don't you just outline.  Whose

25    motion is it?

17

1          MR. DESMARAIS:  It's the defendant filed a

2    30(b)(6) deposition notice, we made a motion for protective

3    order not to go forward with the deposition and they

4    responded.  It's our motion but it's the defendant who is

5    seeking the discovery.

6          THE COURT:  I don't mind taking a few moments to

7    listen.

8          MR. DESMARAIS:  I can outline the dispute for you

9    in two minutes, and you can decide if you want to go forward.

10         THE COURT:  All right.

11         MR. DESMARAIS:  On the same day we got the

12   30(b)(6) deposition notice for essentially contentions

13   supporting the infringement allegations in the complaint,

14   we got interrogatories seeking contentions supporting

15   infringement allegations in the complaint, we got document

16   requests seeking the documents supporting the contentions

17   of the complaint, and we got requests to admit seeking

18   admissions relating to the contentions in the complaint.

19         It's our view that a contention 30(b)(6)

20   deposition doesn't make any sense in these kinds of cases.

21   I personally have never done them because really what a

22   deposition like that is asking for is me or one of the

23   workers from my law firm to be the witness, to testify what

24   did do you to prepare the complaint?  What did you look at?

25   What were all the things you did?  What were the bases for

18

1    that?  And, why did you do it?  That's the kind of stuff it's

2    looking for.  I'd have to testify myself or one of my

3    associates.

4            Ordinarily in these type of cases, the way I

5    have handled it in the past is through contention interrog-

6    atories where you serve an interrogatory that asks the

7    same question.  What are the basis for the infringement

8    allegations?  What products are you charging?  What claims?

9    You know, give us a claim chart, tell us what it's all

10   about.  They served interrogatories on the same day.  If you

11   look at the case law, it's clear the cases favor contention

12   interrogatories for the very reason I just articulated.

13           THE COURT:  Yes.

14           MR. DESMARAIS:  They don't want lawyers telling

15   why they did it.  The lawyers sit down, craft the answers and

16   the other side gets the discovery.

17           And the other thing that is odd is you certainly

18   don't, at least in all the cases I have looked at, you don't

19   get contention discovery the day the case starts.  Each side

20   does discovery and the cases, you know, almost all the

21   reported decisions that I have read say that when contention

22   discovery is available is towards the middle of discovery or

23   towards the end of discovery when the parties have formulated

24   ideas, when they've come up with a long list of what products

25   are going to be in the case, which claims are going to be in

19

1   the case, and then you put up, you answer the interrogatories

2   with the detailed allegations somewhere once discovery is

3   underway, and that's the way I have always done it.

4           We don't see how it's appropriate to go forward

5   with a 30(b)(6) deposition.  And in fact, there is no

6   witness.  It would have to be a witness from Kirkland & Ellis

7   which we put up, which is, I've never had to do that before.

8           THE COURT:  Okay.

9           MR. DESMARAIS:  So we just think it's not an

10  appropriate form of discovery.

11          THE COURT:  Okay.

12          MR. DESMARAIS:  We have the cases cited in our

13  letter.

14          THE COURT:  Okay.  Mr. Pretty.

15          MR. PRETTY:  The whole premise of Mr. Desmarais'

16  argument is that there is a contention deposition.  They're

17  not.  We asked contention interrogatories because we know

18  you can't get contentions by a deposition.  We found in the

19  previous litigation that because of the nature of the subject

20  matter, what you really need to find out early on in the case

21  is what type of testing equipment was used?  What type of

22  test results did you get?  And, what type of data did you

23  have as facts?  We asked entirely facts because until you

24  know, for example, whether you are going to use particular

25  types of equipment, you can't really start your discovery in

20

1    a focused way.  You need to know, for example, how do you

2    count particles?  Do you use a particle counter?  Do you use

3    this piece of equipment or that?

4             So our questions are very carefully crafted not

5    to be contention interrogatories.  If I can just hand them to

6    you, they're all asking what type of test equipment did you

7    use?  What test results did you get?  Because we knew that

8    contention interrogatories are improper or at least not

9    favored.

10             And we're not going to be asking about their

11    mental processes.  We're not going to be asking for lawyer

12    work product.  We just want a technician to come out who

13    did the average particle size, how did he do it?  And

14    interrogatories are really of no use for these kind of

15    questions because you have to ask, well, did you adjust the

16    gain this way when you were doing it?  What data did you

17    get?  Did you factor in the temperature at that time?

18    There is a whole bunch of stuff that you can only really

19    find out when you ask fact questions, you have follow-up

20    discovery.

21             And we're doing this now because we find that

22    when you know what the test methodology is, then you can

23    really focus the rest of your discovery very efficiently.

24    And it worked in the last lawsuit and I think it will work

25    here.  So we're not asking for contentions.  And they're

21

1    going to be at the deposition.  If they think we're asking

2    for a contention, they can certainly tell the witness not to

3    answer.  I'm not going to push the point.  I just want to

4    find out facts because I want to know.

5            They filed this complaint.  We have a problem in

6    this case that there are products made by my client Durel and

7    products which are from Toshiba.  They haven't even told us

8    which products are the ones that infringe.  We want to ask,

9    for example, well, what products did you analyze?  So we can

10   know whether it's our products or their production.  Then we

11   want to know, well, what type of analyzer did you test it

12   in?  This is all fact information.  None of it is contention

13   information.  And the cases that they've cited are all ones

14   that deal with contention interrogatories.  And we agree with

15   them.  The contention interrogatories, we've asked those and

16   we'll get the contentions through those.  But right now, we

17   want the facts to get our case started because they have sued

18   us and we want to defend ourselves.

19           MR. DESMARAIS:  If I might reply to that?

20           THE COURT:  Sure.

21           MR. DESMARAIS:  Looking at the deposition notice,

22   I didn't address the test results.  I'd like to do that now.

23   But just looking at a large portion of the deposition notice

24   relates to contentions.  If you look at it, it says give us

25   a witness who is knowledgeable about the allegation in the

22

1    paragraph in the complaint about Durel has infringed the

2    patent and is continuing to infringe under these sections

3    of the patent.  Who is knowledgeable about the second cate-

4    gories, how Durel has infringed the '496 patent by importing,

5    using.  And the third one, the same thing, paragraph 9 in

6    the complaint, that Durel had constructive notice and that

7    the infringement is willful.  Those are standard textbook

8    contentions.  There are all sorts of topics relating to

9    testing.  I omitted those in my opening remarks.

10          The testing that was done at the direction of

11   Kirkland & Ellis in consultation with the client prior to the

12   filing of the lawsuit is textbook attorney work product.  And

13   we have a case from this district, Phillips vs. Universal

14   Electronics where it says that that sort of testing and

15   analysis done and relied upon in the decision to file the

16   complaint, textbook work product not discoverable.

17          We also have a case from the Third Circuit which

18   is In Re: Ford Motor Company vs. -- and then there is

19   individual names vs. Ford Motor Company, which is reported at

20   110 F.3d 954.

21          THE COURT:  Is that cited in your submission?

22          MS. INGERSOLL:  It is.

23          MR. DESMARAIS:  Is it?

24          MS. JACOBS LOUDEN:  No, it's not.

25          MR. DESMARAIS:  It's In Re: Ford Motor Company.

1    THE COURT:  Why don't you give me that and I'll

2  copy this.

3    MR. DESMARAIS:  Yes.

4    THE COURT:  Okay.

5    MR. DESMARAIS:  Is Philips v Universal?

6    MS. INGERSOLL:  Yes, Philips is.

7    MR. DESMARAIS:  So Philips is and the other is

8  not.  They say the kinds of testing and analysis done in

9  consultation with the law firm and between the client to

10  decide how to formulate the allegations and to consult the

11  client is all work product, it's attorney-client work and

12  work product and they don't need it for the case.  What they

13  need for the product is what products we're going to charge

14  for infringement, what claims we're going to do, and what

15  tests we're going to rely on at trial.

16    It doesn't make any difference to their case,

17  maybe we did 10 different cases to decide whether to sue or

18  not, that's not relevant.  What is relevant is how we're

19  going to go forward with the trial and what we're going to

20  proffer during the case that is developed during discovery.

21  We're going to exchange contentions.  That is how all the

22  cases I've been involved in proceed.

23    THE COURT:  I'll give you an option to reply.

24    MR. PRETTY:  Yes.  On the first point, your

25  Honor, the part up front here before the lettered topics

24

1    merely parrots their complaint.  I'd asked for someone

2    knowledgeable, but the topics of the letter, topics A

3    through, whatever it is, E, those are the topics for the

4    deposition, and they are all tests.  There is not one

5    contention amongst them.

6            THE COURT:  But they're tests counsel contends

7    were done at the direction of counsel and, therefore, fall

8    within classic definition of work product.

9            MR. DESMARAIS:  If you look more closely, it's

10   tests that were relied on to show infringement.  Tests that

11   were relied on to determine whether -- you know, it's all

12   attorney-client privilege --

13           MR. PRETTY:  Well --

14           MR. DESMARAIS:  -- or attorney work product.

15           MR. PRETTY:  That is merely to identify that

16   we're talking about these tests.  We're not talking about

17   tests that have nothing to do with the lawsuit.  We're

18   talking about the test methodology.  We want to know what

19   type of analyzer did you use to find out average diameters.

20   A lot of analyzers can be used.  We want to know how you

21   did it.

22           THE COURT:  Let me interrupt, counsel, because

23   what I'm interested in knowing is having a direct response

24   to his contention that this is work product.  And do you

25   disagree?

25

1          MR. PRETTY:  Yes, I disagree with that, your

2     Honor.

3          THE COURT:  And what is the basis of that?

4          MR. PRETTY:  The case he relied on is this

5     Lock-Tite -- I'm sorry -- the Phillips case.  The Phillips

6     case which is out of this district is one where they were

7     seeking documents that embodied the counsel's work product.

8     And the judge says no, you can't have the documents, they

9     embody the work product, but the underlying facts, the judge

10    went on to say -- and it was Judge --

11         MS. INGERSOLL:  McKelvie.

12         MR. PRETTY:   Judge McKelvie says that plaintiff

13    may not rule on, rely on Rule 26(b)(3) or claims of work

14    product as a basis for refusing to respond to discovery

15    requests seeking the disclosure of nonprivileged facts.

16         All we want is the facts.  We don't want any

17    contentions.  We don't want their mental theories.  We just

18    want to know what type of machine did you use?  How did you

19    set it?  What were the test data?  And I'm not going to push

20    it.  If, at the deposition, Mr. Desmarais says you can't ask

21    that particular question and it's not one relating to these

22    types of facts, we'll just go on to something else.

23         MR. DESMARAIS:  But, respectfully, counsel is

24    misreading the case when he talks about nonprivileged facts.

25    The facts he is seeking in this case are the privileged facts

26

1    which tests the law firm in consultation with what the client

2    chose to run, which tests were decided to be relied on to go

3    forward with the allegation.  Those are privileged facts or

4    work product facts.

5         What facts wouldn't be privileged would be, for

6    instance, if this case was about documents, if, within the

7    document, it said, you know, on a particular day, Durel

8    launched a product.  You know, that is a nonprivileged fact.

9    If it happens to be contained in the work product memo, that

10   probably needs to be disclosed.  But the essence of the work

11   product and the privilege is what we have advised the client

12   to do, how to work the test, what tests are used, and how to

13   rely on those.  That's the essence of the work product.

14        THE COURT:  I have never had a request or seen

15   one in my young career where counsel, one side or the other,

16   has sought information that was used in the due diligence

17   essentially leading up to the filing of the complaint.  So

18   sort of circling back to counsel's earlier suggestion that

19   during the course of discovery, you will have certainly

20   the opportunity to discover that information which you need

21   to support your contentions, whatever they are, regarding

22   infringement, noninfringement, validity, willfulness, what-

23   ever they may be.  But why is this particular information

24   that is that which was done at the direction of counsel,

25   whether it be a tweak or a twit or whatever by a engineer or

27

1    a scientist, why are you entitled to that information?

2            MR. PRETTY:  Well, one thing, your Honor, goes

3    very importantly to our claim for attorney fees at the

4    end.  Because, for example, one of the key factors in this

5    case they're alleging is size of particles.  Well, we think

6    that if they analyzed the Durel particles, they should know

7    they're too big for the patent claim.  We want to get the

8    discovery now so we can say later on down the case, if we

9    win, that, look, you brought this lawsuit at a time when you

10   knew that the Durel particles were too big.  If I relegated,

11   if I can't ever get the discovery on what did you bring the

12   lawsuit on, I'm being deprived of discovery that I need to

13   show that this lawsuit was brought without a proper basis.

14           THE COURT:  Is that to say that you would never

15   have opportunity to get that discovery?

16           MR. PRETTY:  It sounds kind of like it from what

17   he is saying.

18           THE COURT:  Let's hear --

19           MR. DESMARAIS:  No.  As the case goes forward,

20   if we can't prove that his particles are the right size,

21   that's the time when he complains that the action is

22   frivolous.  He doesn't need to know how we went about put-

23   ting the complaint together.  What he needs, he needs to

24   ultimately win this case.  And if he wins his case and proves

25   to the Court that the case was frivolous, and that we just

28

1   can't meet our allegations, at that point he moves for

2   attorney fees.  It doesn't make any difference.  He couldn't

3   need the work product from my consultations with my client

4   to make that proof.

5          If you look at any of these attorney fees or

6   frivolous case actions or Rule 11 actions, it's all based on

7   whether the merits of the case was frivolous at the time he

8   litigated.  Did he file a motion for summary judgment?  Did

9   he get dismissed?  In your opinion, did you say the action

10  was frivolous?  That is all based on what comes out in

11  discovery, not what comes out in due diligence, to use your

12  Honor's phrase.

13         THE COURT:  Counsel.  Mr. Parsons.

14         MR. PARSONS:  Well, I mean there is recent

15  Federal Circuit law within the last, certainly within the

16  last six months, maybe within the last three months, as to

17  the type of investigation that is required to meet a party's

18  obligations for filing a complaint for patent infringement.

19         THE COURT:  But my concern at this point, Mr.

20  Parsons, my concern is a timing one.  And I don't see that

21  this issue cannot be raised again later on at a time that it

22  might be more appropriate after some discovery has actually

23  transpired, because being quite candid, counsel, are you

24  interested in knowing whether you are able to move for

25  attorney fees at an appropriate time?

29

1          MR. PRETTY:  That's right.

2          THE COURT:  It strikes me -- I'm sorry to use

3    this cliche -- it's a little bit cart before the horse in a

4    way.

5          MR. PRETTY:  Well, the other thing is at some

6    point, we are going to have to depose the guy who ran the

7    average particle size counter.

8          THE COURT:  Okay.

9          MR. PRETTY:  Now, I don't want to be told that

10   the same arguments are going to come up then, oh, you can

11   never depose the guy who ran the average particle size

12   counter because that is a very crucial part of the case.

13         THE COURT:  Well, I don't know how could they

14   interpose that argument or objection.

15         MR. PRETTY:  Well, the argument apparently is

16   they select the type of counter to be used.  That is part

17   of their work product.  I don't see why that argument won't

18   apply equally well three months from now when I want to

19   get to the guy.  I mean either I'm entitled to take his

20   deposition on how he ran the counter or I'm not.

21         THE COURT:  Well, this is someone that I would

22   presume would be offered as an expert.

23         MR. DESMARAIS:  Exactly.

24         MR. PRETTY:  This is a technician.  This machine

25   is typically run by a technician.

30

1          MR. DESMARAIS:  The person that would be deposed
2   by the other side would be the expert when we go forward
3   with putting our contention, and that comes through expert
4   discovery, and that expert will say how my client feels the
5   machine should be run.  You are exactly right.
6          THE COURT:  Counsel, I'm going to grant the
7   protective order and deny -- grant the motion without
8   prejudice to your renewing this issue at a later time, based
9   on what I'm hearing right now.  I'm certainly willing to stay
10  my hand and take a further look at these cases but just based
11  on what I'm hearing, you did indicate you thought this matter
12  from a timing point is somewhat critical.  I feel comfortable
13  in saying that my ruling today does not inure to your ever-
14  lasting prejudice to renew the issue, and I don't think any-
15  thing that I'm intending to imply by my ruling is intended
16  to suggest, because I'm not articulating exactly the basis,
17  quite frankly, that you should be precluded in or estopped
18  from making the same arguments or additional arguments at a
19  later time.  And the same would go for you as well.
20         MR. DESMARAIS:  Thank you, your Honor.
21         MS. INGERSOLL:  Thank you, your Honor.
22         MR. PRETTY:  Your Honor, I would like to ask one
23  thing.
24         THE COURT:  Sure.
25         MR. PRETTY:  You haven't had a chance to read all

31

1    the cases.

2                THE COURT:   Granted.

3                MR. PRETTY:   And I wondered if you could just

4    look at the Lock-Tite case because that is a 7th Circuit case

5    out of this district, but it did deal with the fact --

6                THE COURT:   Is that --

7                MR. PRETTY:   I don't --

8                MR. DESMARAIS:   It's referenced in your papers.

9                MR. PRETTY:   This was going on to the importance

10   of tests.   I underlined in red the two parts.

11               THE COURT:   Okay.

12               MR. PRETTY:   You're in a chemical case where

13   they point out how important it is you get to depose and

14   take -- well, sorry -- to take discovery on the test equip-

15   ment used.   And then on the earlier part that I underlined in

16   red, they pointed out --

17               THE COURT:   Well, I think there is no disagree-

18   ment that you are entitled to take discovery on the test

19   equipment used.

20               MR. DESMARAIS:   Exactly.

21               THE COURT:   It's for what purpose I think is

22   really -- well, go ahead.

23               MR. PRETTY:   I think he said I'm not even

24   entitled to take the deposition of a technician, who is a

25   crucial person to take.   He said I can only take the expert.

32

1    That is ridiculous.

2        MR. DESMARAIS:  It's our position that at no

3    time, unless we're down the line deciding whether attorney

4    fees are relevant or not, at no time during the case is it

5    discoverable or even needed in these cases what the client

6    and the lawyers did to confirm to them theirselves that the

7    allegations were sufficient to file the complaint.  What he

8    is entitled to and what happens in these cases is eventually

9    we have to give each other contentions.  I'm going to prove

10   at trial that your products are the right size because this

11   guy did a test, this is how he did it, and that means you

12   infringed.

13       He is going to depose all those people that we're

14   going to pony up to support our contentions, the contentions

15   we're going to go forward to trial on.  Those are a different

16   set of contentions.  That's my attorney work product with

17   my client deciding whether to bring the case at all in the

18   beginning.  The question is can we support the contentions

19   through the case?  That's a two different testing here.

20       THE COURT:  That's the sort of the rub here.

21       MR. PRETTY:  No, he is making a distinction

22   between the experts and the technicians.  The last case,

23   we found the way the equipment is set up on these things,

24   you have to get to the guy who twiddles the knobs, the blue

25   collar person who is actually operating the equipment because

1    the experts will interpret the data one way, but you want to

2    know was he turning the gain up to 5.7 to get this result

3    before it was given to the expert?

4            MR. DESMARAIS:  I'm not taking issue with that.

5    You can have, at the relevant time in expert discovery, you

6    can have the technician and anyone who did anything to the

7    tests when we're going forward with the contentions in the

8    case.  I'm not saying you can't have that.  You can have full

9    discovery on all that.

10           MR. PARSONS:  Well, I don't think it needs to

11   wait.  In our view, it doesn't need to wait until expert

12   discovery to find out how tests are run.

13           THE COURT:  Can't that be done during fact

14   discovery?

15           MR. PRETTY:  Yes.

16           MR. DESMARAIS:  When we exchange contentions.

17           MR. PRETTY:  No, I want it before then.  I want

18   it early on in the case.  Believe me, this technology, I've

19   been litigating it for five years.  How the tests are run is

20   crucial.  Now I want to know how those tests are run early

21   in the case.  I can't wait until the end of the case.  If I

22   don't do it this month, can do it next month perhaps, your

23   Honor?

24           MR. DESMARAIS:  Your Honor, what I'm

25   understanding here, I assume he is going to get his own

34

1    expert and run the tests. He gets an expert that has his

2    people run the tests. He decides how to set it up so it

3    shows one size. My experts and technicians do the test and

4    decide it shows whatever size. That's the fact issue for

5    trial. What size these particles are is the fact issue for

6    trial.

7         THE COURT: No, I understand the distinction.

8         MR. PRETTY: But I want the harmful facts that

9    came out when you tried it with your technician and found

10   the particles are too big, if that is the case, because then

11   I want to have that as evidence at trial. Right now, you're

12   saying I can only rely on my evidence, I can't look for

13   admissions or any bad conduct on your side.

14        THE COURT: That has relevance to more than just

15   the narrow issue you focused on which was attorney fees.

16        MR. PRETTY: Yes, I agree with that, your Honor.

17        THE COURT: Okay. And I think counsel is saying

18   he doesn't object to giving you access to that information;

19   is that correct?

20        MR. DESMARAIS: I'm not 100 percent sure. I

21   don't have objection to him talking to the technicians.

22        THE COURT: See, this is one of the reasons this

23   Court so enjoys when counsel are able to sit down and really

24   flesh these things out among yourselves. Since we joined the

25   issue, we might as well try to see what we can do to resolve

35

1    it now.  I think there is basis for an agreement here.

2         MR. DESMARAIS:  I do, too.  I have no objection

3    to him deposing the technicians and the test operators and us

4    producing all the discovery on the tests -- the tests being

5    the tests that we're going to use to support our contentions

6    going forward with the case in discovery and to trial, what

7    are we going to prove at trial?  We're going to exchange.  He

8    asked an interrogatory already, which claim are you going to

9    assert?  Which products are you going to claim infringe?  And

10   what are the underlying basis for that?  We're going to work

11   on the response to that interrogatory.  It's going to say we

12   rely on this test, these people and this expert.  And if you

13   want the technicians, we'll give you the technicians, and you

14   can depose them all.

15        I'm drawing a distinction between that set of

16   analyses I'm going to go to trial on, I'm drawing a dis-

17   tinction between that and whatever analyses we did with

18   the client and the law firm to determine whether there was

19   infringement and to bring a lawsuit.

20        THE COURT:  Yes, I don't think he is after the

21   work product.

22        MR. PRETTY:  No, I'm not after his work product.

23        MR. DESMARAIS:  Then we don't have a problem.

24        THE COURT:  Then the issue that is left, it seems

25   to me, on the table is one of timing.

36

1       MR. PRETTY:  That's exactly right, your Honor.

2       MR. DESMARAIS:  Right.

3       MR. PRETTY:  We want it as soon as possible.

4       THE COURT:  So what can we do?

5       MR. DESMARAIS:  The case just started.

6       THE COURT:  Ms. Ingersoll.

7       MS. INGERSOLL:  I was just curious when the

8   interrogatories have come in?  And these are the

9   interrogatories we're talking about that we will respond to

10  in 30 days, I'm assuming --

11      MR. DESMARAIS:  Right.

12      MS. INGERSOLL:  -- at that point.

13      MR. DESMARAIS:  Well, I'm not sure.  We

14  haven't even started discovery yet.  We have to discover

15  what products they have.  They have to discover what our

16  positions are.  I mean this is something the case just

17  started.  Ordinarily, contentions are at least midway

18  through discovery.

19      THE COURT:  Go ahead, counsel.

20      MR. PRETTY:  You can see I'm not going to get

21  any meaningful answers on what test equipment was done or

22  anything until they've stalled me through interrogatory

23  answers.  I've had to move to compel.  I'm entitled to this

24  information now.

25      THE COURT:  No, no.  I'm trying to determine the

37

1    authority for that.

2              MR. PRETTY:  Okay.  Here is the authority.

3              THE COURT:  No, no.  But you submitted written

4    questions, interrogatories.

5              MR. PRETTY:  Right.

6              THE COURT:  And you've noticed the deposition.

7              MR. PRETTY:  Right.

8              THE COURT:  I don't know if the notice is

9    premature or not.

10             MR. PRETTY:  Okay.

11             THE COURT:  Conceivably it is under the rules.

12   I'd have to go back and take a quick look at the rules.  But

13   it seems to me that as a practical matter, not trying to

14   be over legalistic here, that counsel does not object to

15   responding in a timely fashion to provide you the very

16   information that you requested.  So based on the words I just

17   heard exchanged, I don't think that you are going to need to

18   file a motion to compel that which you seek.

19             Now, we can talk this out right now so we can

20   determine whether you are going to need to file a motion to

21   compel, because I don't want to leave this having invested

22   now 22 minutes and leave this to the point where you do have

23   to file a motion to compel, because I think that should not

24   transpire.

25             MR. DESMARAIS:  Right.  I believe he is entitled

38

1    to contention responses, and I would like to serve contention

2    interrogatories on him and I expect him to answer.  The only

3    question is how detailed the answers are at this point.  I

4    mean discovery has started today.  We haven't even exchanged

5    documents.  We haven't had additional disclosures yet.

6          THE COURT:  Whether we call them contentions

7    interrogatories, I don't want to get bogged down on that.

8    The better analyzed cases in my view have moved away from

9    that and have recognized there is always, always the

10   opportunity to supplement to seek relief from the Court

11   to amend where because the early response to a so-called

12   contention interrogatory position has changed in light of new

13   evidence or whatever.  So I'm not hung up on that label.

14   Nor do I think it's appropriate to put you to the burden of,

15   plaintiff's counsel or plaintiff, to the burden of making a

16   response that it is not prepared to make within the rules.

17          Essentially, the complaint I hear coming from

18   this side of the table is that, judge, we haven't had a

19   chance to really respond to this.  And there is still time

20   left within the rules to give us an opportunity to respond

21   in a timely way as opposed to you ordering us to do it

22   today.  And, is that really what you want?

23          MR. PRETTY:  Well, they did file a complaint.

24   Under Rule 11, they must have had some facts that made it.  I

25   just want to know what the facts are that base the complaint.

39

1          THE COURT:  That's my concern, that this is

2     really a Rule 11 issue.  And Rule 11 is always in play,

3     counsel, but I am not going to allow you, with all due

4     respect, to back-door that issue in this way.  So -- Yes,

5     Mr. Parsons?

6          MR. PARSONS:  No, I appreciate that; and I think

7     I understand what the Court is saying there.  And I think

8     what we're probably going to have to do is let the responses

9     come in, and I'm not sure we're not going to have a motion to

10    compel sort of situation.

11         THE COURT:  You might.

12         MR. PARSONS:  But we may have to just let the

13    responses come in, pursue the fact discovery, non-Rule 11

14    type fact discovery that we think we're entitled to.  If

15    there is an issue, we'll have to be back to the Court on it.

16         THE COURT:  And I rather think so.  So my ruling

17    today certainly in no way prejudices you from renewing this

18    issue.  What is the specific relief that you request in your

19    paperwork?

20         MR. DESMARAIS:  Not to go forward with the

21    30(b)(6) contention deposition.

22         THE COURT:  Okay.  I'm going to order that that

23    notice be quashed.  And, you can renew it at a later time.

24         MR. DESMARAIS:  Thank you, your Honor.

25         THE COURT:  All right.  Is there anything else?

40

1          MR. DESMARAIS:  Not from the plaintiff.

2          MS. INGERSOLL:  Did we get a date as to when you

3    want the draft?

4          THE DEPUTY CLERK:  Pretrial order.

5          THE COURT:  Well, the pretrial order and the Rule

6    16.

7          THE DEPUTY CLERK:  The pretrial order date will

8    be October 10th, 2001.

9          THE COURT:  Okay.

10          THE DEPUTY CLERK:  Submit the proposed scheduling

11   order by August 30th.

12          THE COURT:  August 30th close of business.

13          Anything else, counsel?

14          MR. PARSONS:  No, that's fine.

15          THE COURT:  I would encourage you to rejoin this

16   issue later on, and I suspect you will be able to resolve it

17   to your satisfaction, but I'm here if you are not.

18          (Conference ends at 2:56 p.m.)

19

20

21

22

23

24

25

# Exhibit 4

Sara Petersen Graves
Direct Dial: +1.650.463.2674
sara.graves@lw.com

140 Scott Drive
Menlo Park, California  94025
Tel: +650.328.4600  Fax: +650.463.2600
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

## VIA EMAIL

April 24, 2008

John M. Benassi
HELLER EHRMAN LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA  92122-1246

Re:    BigBand Networks, Inc. v. Imagine Communications, Inc.
        C.A. No. 07-351 (JJF) (D. Del.)

Dear John:

I write to follow up on our discussion yesterday regarding various discovery matters.

Imagine's Amended 30(b)(6) Deposition Notice to BigBand:

We reiterated that BigBand still has fundamental conceptual concerns regarding Imagine's amended 30(b)(6) deposition notice. For example, we continue to believe that Topics Nos. 1-4, which seek BigBand's contentions, are improper. We also have concerns about the over breadth of many of the topics and the unfairness of having any individual witness provide exhaustive information about matters more appropriately sought by written discovery. We asked if you would take another look at Imagine's notice and consider amending it further. We further indicated that if Imagine chooses to stand on its notice, we would have no option but to seek relief from the Court. You agreed to review BigBand's objections to Imagine's notice and to provide another amended notice by Friday, April 25, 2008.

BigBand's 30(b)(6) Deposition Notice to Imagine:

You asked whether BigBand would be willing to amend its 30(b)(6) notice to address Imagine's objections. We explained that Peter Gratzinger had advised us that Imagine's objections were in the nature of a reservation of rights and that Imagine has never articulated any specific concerns about BigBand's notice, which is of a much narrower scope than Imagine's notice. You agreed to identify any specific concerns Imagine would like addressed in writing by Friday, April 25, 2008 or Monday, April 28, 2008.

LATHAM&WATKINS LLP

Imagine's Responses to BigBand's Written Discovery:

*Interrogatories Nos. 4-6 and Document Requests Nos. 22-24*:

We again asked whether Imagine will produce a chart identifying support for its invalidity contentions (in response to BigBand's Interrogatories Nos. 4-6). You stated that Imagine would be willing to produce a chart comparing the independent claims at issue to prior art within the next one to three weeks. If this is incorrect, or if you believe that Imagine's obligation to provide this chart is conditioned on any obligation of BigBand's, please inform me no later than April 30, 2008.

You asked, during the call, whether BigBand will agree to reduce the number of claims at issue within a certain amount of time after receiving Imagine's invalidity chart. We explained that for BigBand to reduce the number of claims, it requires not only Imagine's invalidity chart, but also further discovery about Imagine's products - namely, design and engineering documents (in response to Document Requests Nos. 22-24). You indicated your belief that Imagine has produced some design and engineering documents and that, as a start-up company, Imagine may not have the documentation of more established companies. We agreed to provide a description of the design-related documents BigBand has received from Imagine to date and a description of the types of documents that BigBand still requires. To be clear, however, BigBand does not agree that any reduction in the asserted claims is tied to Imagine's obligation to provide adequate invalidity charts.

Documents Produced:

BigBand has received the following types of documents from Imagine. We would appreciate receiving confirmation that the versions produced are current:

- Presentations that appear to be directed to investors/ customers – some such presentations include a few technical slides describing Imagine's technology at a high level;

- Presentations that appear to be for internal purposes -- these presentations include slides regarding the architecture Imagine uses; and

- Design documents that appear to be for internal purposes and describe various parts of Imagine's products, including QOD Gateway, Timeslot Population Algorithm, QOD Processor, Enhanced Video Decoder, Quality Manager, TS Packetizer, Variable Length Encoder, and QOD Gateway - SDV 1.0.

Documents Needed:

BigBand seeks the following documents from Imagine:

- Any additional design/ development documentation relating to Imagine's SDV Solution;

- Documents regarding the design/development of the entirety of the products at issue;

John M. Benassi
April 24, 2008
Page 3

LATHAM&WATKINS LLP

- Any testing documents, including without limitation documents relating to the set-up, testing procedure, features tested, results, and personnel involved, including customer or other third party documents in Imagine's possession;

- Any feature matrices tracking progress of implementation, testing, trials, and deployment of Imagine products;

- Any documentation relating to customer trials, including without limitation both those used by Imagine engineers to assist in set up or deployment and documents provided to or by customers describing, explaining, or providing specifications of the trial; and

- Any customer or user manuals describing the features of Imagine's products.

- Any source code implementing features of Imagine's products.

Please advise us whether and when Imagine will produce the documents described above, or if Imagine does not possess such documents. In that event, as we indicated during our discussion, BigBand may be required to take deposition discovery to pursue these design and engineering-related discovery topics before it will be in a position to reduce the number of claims at issue, particularly if, as you suggest, technical documents describing the design and operation of the accused products do not exist. If Imagine is willing to produce the categories of documents identified above, we can be reasonably flexible about the timing of the production. We need a prompt response, however, to the threshold questions of whether Imagine has and is willing to produce these categories of documents. Please respond by April 30 with regard to each category. If there is going to be a dispute as to any of these categories, we wish to address it without further delay

*Interrogatories Nos. 10-11*:

We also asked whether -- in support of its non-infringement contentions -- Imagine will identify other claim elements that it alleges are missing from the accused products. To date, Imagine simply has provided a chart setting forth its contentions "as to at least one limitation that is not met by [the accused] products." You stated that Imagine may not provide non-infringement contentions for all of the current claims, and we reiterated that BigBand has provided its infringement contentions and Imagine should identify all claim elements it alleges are missing from the accused products. Please let us know Imagine's final position as to whether it will identify all elements on which it bases its non-infringement contentions by no later than April 30, 2008.

John M. Benassi
April 24, 2008
Page 4

**LATHAM&WATKINS**LLP

      Please advise me immediately if this letter does not accurately reflect Imagine's position on these matters.

                Truly Yours,

                /s/  Sara Petersen Graves

                Sara Petersen Graves
                of LATHAM & WATKINS LLP


cc:      Christopher Longman
           Mary Matterer

# EXHIBIT 5

**John D. Minton**
Direct Dial: +1.650.463.3009
john.minton@lw.com

140 Scott Drive
Menlo Park, California 94025
Tel: +650.328.4600 Fax: +650.463.2600
www.lw.com

# LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

## VIA E-MAIL AND U.S. MAIL

January 8, 2008

Peter E. Gratzinger
Jon Benassi
HELLER EHRMAN LLP
333 South Hope Street, 39th Floor
Los Angeles, CA  90071

Re:    *BigBand Networks, Inc. v. Imagine Communications, Inc.*,
C.A. No. 07-351 (***) (D. Del.)

Dear Peter:

I am writing with regard to the deposition notice pursuant to Fed. R. Civ. Proc. 30(b)(6) that Imagine served on BigBand the Friday afternoon before the Christmas holiday week. As set forth in the enclosed response and objections, given the sheer breadth of Imagine's 60-topic notice, as well as its broad request for information about BigBand's contentions, which are not a proper topic for deposition in Delaware, among other objections, it is not feasible to proceed with the deposition as noticed. Please let us know when you are available to meet and confer concerning the noticed topics. Absent reasonable agreement on these matters, we will be forced to seek assistance from the Court.

Truly Yours,

John D. Minton
of LATHAM & WATKINS LLP

Enclosure

cc: Mary Matterer (w/enclosure)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BIGBAND NETWORKS, INC.,                    )
                                           )
    Plaintiff and Counterclaim Defendant,  )
                                           )
v.                                         )     C.A. No. 07-351 (***)
                                           )
IMAGINE COMMUNICATIONS, INC.,              )
                                           )
    Defendant and Counterclaim Plaintiff.  )

**PLAINTIFF BIGBAND NETWORKS, INC.'S RESPONSE AND OBJECTIONS TO
DEFENDANT IMAGINE COMMUNICATIONS, INC.'S FIRST
NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)**

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure and the Local Rules for

the United States District Court of Delaware, Plaintiff BigBand Networks, Inc. ("BigBand")

hereby responds and objects to Defendant Imagine Communications, Inc.'s ("Imagine") Notice

to BigBand pursuant to Rule 30(b)(6).

**GENERAL OBJECTIONS**

1.    BigBand generally objects to Imagine's instructions, definitions, and topics of

examination to the extent that they purport to impose requirements other than or in addition to

the requirements of the Federal Rules of Civil Procedure, the Local Rules of the District of

Delaware, or Order of the Court.

2.    BigBand generally objects to each and every definition and category for

examination to the extent it is compound and contains multiple parts and subparts.

3.    BigBand generally objects to each and every definition and category for

examination to the extent it is vague, ambiguous, and fails to describe the documents requested

with reasonable particularity.

4. BigBand generally objects to each and every definition and category for examination to the extent it is overly broad, unduly burdensome, oppressive, and/or would entail undue expense.

5. BigBand objects to each and every category for examination to the extent that it requests BigBand's contentions which are not a proper topic for a deposition. In this regard, BigBand notes that Imagine specifically identifies topics 1-12 as seeking "BigBand's Contentions."

6. BigBand generally objects to each and every definition and category for examination as unduly burdensome to the extent it seeks information outside the "needs of the case" (Fed. R. Civ. P. 26(b)(2)).

7. BigBand generally objects to each and every definition and category for examination to the extent it calls for legal conclusions.

8. BigBand generally objects to each definition and category for examination to the extent it seeks information protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege, immunity or protection from discovery.

9. BigBand generally objects to each and every definition and category for examination to the extent it is not relevant to a claim or defense of any party to this litigation or reasonably calculated to lead to the discovery of admissible evidence.

10. BigBand generally objects to each and every definition and category for examination to the extent it does not specify a time period.

11. BigBand generally objects to each and every category for examination to the extent that it seeks information already in Imagine's possession, custody or control, or available to Imagine from public sources.

2

12.    BigBand generally objects to each and every category for examination to the extent it seeks expert opinion and is therefore premature.  BigBand reserves the right to offer expert opinions on applicable subjects at the appropriate stage of this litigation.

13.    BigBand objects to Imagine's notice to the extent it purports to require the identification of documents that are duplicative of those already requested and/or produced.

The foregoing General Objections shall be deemed to be apply to each of the responses to the categories of examination that follow, even if not specifically referred to therein

## TOPICS OF EXAMINATION

### BigBand Contentions

## TOPIC NO. 1:

YOUR factual basis for YOUR contention that the ACCUSED PRODUCTS infringe the asserted claims of the PATENT-IN-SUIT, including, without limitation:

(a)  All facts showing that the ACCUSED PRODUCTS contain a "session manager" or its equivalent as that term is used in the '477 PATENT and the identity of witnesses knowledgeable thereof.

(b)  All facts showing that the ACCUSED PRODUCTS, the aggregate bandwidth of received packets exceeds the bandwidth of the limited bandwidth media, as those terms are used in the '477 PATENT and the identity of witnesses knowledgeable thereof.

(c)  All facts showing that the ACCUSED PRODUCTS "select basic media data units to be modified in response to a modification priority," or have an equivalent function, as those terms are used in the '619 PATENT and the '087 PATENT and the identity of witnesses knowledgeable thereof.

(d)  All facts showing that the ACCUSED PRODUCTS use a "modification priority" or its equivalent, as that term is used in the '619 PATENT and '087 PATENT and the identity of witnesses knowledgeable thereof.

(e)  All facts showing that the ACCUSED PRODUCTS use a "non addressable stream output port" or its equivalent, as that term is used in the '477 PATENT and the identity of witnesses knowledgeable thereof.

(f)  All facts regarding YOUR claim charts served as Attachments A, B, and C to YOUR responses to Imagine's First Set of Interrogatories, including without limitation the

3

factual basis for YOUR allegation that documents referenced in those charts reflect products made, used, sold, or offered for sale by IMAGINE and the identity of witnesses knowledgeable thereof.

## RESPONSE TO TOPIC NO. 1:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 1 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand also objects to this topic as overly broad and unduly burdensome.

BigBand further objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand provided information sought in this topic in its response to Imagine's Interrogatory No. 1.

BigBand also objects to this topic to the extent it calls for legal conclusions. BigBand further objects to this topic to the extent it calls for expert opinion prior to the date for such disclosure dictated by the Federal Rules and Court order. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

## TOPIC NO. 2:

The factual basis for YOUR allegation in Paragraph 5 of YOUR Complaint that IMAGINE has indirectly infringed the PATENTS-IN-SUIT, including without limitation the identity of all third parties whose infringement IMAGINE has induced or to whose infringement IMAGINE has contributed and the identity of witnesses knowledgeable thereof.

## RESPONSE TO TOPIC NO. 2:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 2 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand also objects to this topic as overly broad and unduly burdensome.

4

BigBand also objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand provided the information sought in this topic in its response to Imagine's Interrogatory No. 3.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

## TOPIC NO. 3:

The factual basis for YOUR allegation in Paragraph 6 of YOUR Complaint that IMAGINE'S alleged infringement is willful and deliberate and the identity of witnesses knowledgeable thereof.

## RESPONSE TO TOPIC NO. 3:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 3 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand also objects to this topic as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for legal conclusions.

BigBand further objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand provided the information sought in this topic in its response to Imagine's Interrogatory No. 4.

## TOPIC NO. 4:

The identity of all PERSONS who participated in any way in any analysis relating to YOUR allegations of infringement, and separately for each PERSON identified, the timing and

5

substance of the analysis conducted and all DOCUMENTS or other information on which that person relied.

**RESPONSE TO TOPIC NO. 4:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 4 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. As previously explained in correspondence dated October 31, 2007 and November 5, 2007, BigBand's pre-filing investigation and analysis performed in preparation for litigation is protected from discovery by the attorney/client privilege and work product doctrine.

BigBand also objects to this topic as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 5:**

The circumstances under which BIGBAND became aware of IMAGINE's financing efforts, including IMAGINE's intent to sell Series B securities, including without limitation the date on which each executive and board member of BIGBAND first learned this information and the source from which he or she learned it.

**RESPONSE TO TOPIC NO. 5:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 5 because it does not seek information relevant or reasonably calculated to lead to relevant evidence concerning any claim or defense in the case. BigBand further objects to this topic as overly broad, unduly burdensome, and more appropriately reserved for written discovery. BigBand provided the information sought in this topic in its response to Imagine's Interrogatory No. 10.

**TOPIC NO. 6:**

DOCUMENTS and communications related to IMAGINE's financing efforts and IMAGINE's intent to sell Series B securities.

**RESPONSE TO TOPIC NO. 6:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 6 because it does not seek information relevant or reasonably calculated to lead to

relevant evidence concerning any claim or defense in the case. BigBand further objects to this

topic as overly broad, unduly burdensome, and more appropriately reserved for written

discovery. BigBand agreed to provide all responsive, non-privileged documents discovered as a

result of a reasonably diligent search in response to Imagine's Request for Production No. 35.

**TOPIC NO. 7:**

All facts and circumstances RELATING TO any non-privileged communications regarding YOUR intent to file this lawsuit and YOUR reasons for filing this lawsuit, including statements made to third parties.

**RESPONSE TO TOPIC NO. 7:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 7 because it does not seek information relevant or reasonably calculated to lead to

relevant evidence concerning any claim or defense in the case. BigBand further objects to this

topic as overly broad and unduly burdensome. BigBand also objects to this topic on the grounds

that the topic fails to describe with reasonable particularity the matters on which examination is

requested and is vague and ambiguous.

**TOPIC NO. 8:**

Any communication with any third party regarding BIGBAND's intention to sue Imagine.

**RESPONSE TO TOPIC NO. 8:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 8 because it does not seek information relevant or reasonably calculated to lead to

relevant evidence concerning any claim or defense in the case.  BigBand further objects to this

topic on the grounds that it fails to describe with reasonable particularity the matters on which

examination is requested and is vague and ambiguous.

**TOPIC NO. 9:**

All facts RELATING TO any offer by IMAGINE to disclose information to YOU
regarding its products prior to this lawsuit, including without limitation the communications
described in Paragraph 15 of IMAGINE's Counterclaim and the identity of witnesses
knowledgeable thereof.

**RESPONSE TO TOPIC NO. 9:**

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects

to Topic No. 9 to the extent that it seeks information protected by the attorney-client privilege,

the work product doctrine, and/or any other applicable privilege or immunity.  BigBand further

objects to this topic because it does not seek information relevant or reasonably calculated to

lead to relevant evidence concerning any claim or defense in the case.

**TOPIC NO. 10:**

All facts and circumstances RELATING TO any communications internally at
BIGBAND or between BIGBAND and any third party referring or RELATING TO IMAGINE,
its technology, solutions, or PRODUCTS and the identity of witnesses knowledgeable thereof.

**RESPONSE TO TOPIC NO. 10:**

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects

to Topic No. 10 to the extent that it seeks information protected by the attorney-client privilege,

the work product doctrine, and/or any other applicable privilege or immunity.  BigBand also

objects to this topic as overly broad and unduly burdensome.

BigBand further objects to this topic on the grounds that the topic fails to describe with

reasonable particularity the matters on which examination is requested and is vague and

ambiguous in its reference to Imagine's "technology" and "solutions." BigBand also objects to

this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 11:**

To the extent not fully requested above, the IDENTIFICATION of persons,
EMPLOYEES, and/or third parties involved in or knowledgeable about matters set forth in the
topics above.

**RESPONSE TO INTERROGATORY NO. 11:**

BigBand incorporates its General Objections as if set forth fully herein and its specific

objections to topics 1-10. BigBand objects to Topic No. 11 as overly broad and unduly

burdensome. BigBand further objects to this topic on the grounds that it fails to describe with

reasonable particularity the matters on which examination is requested and is vague and

ambiguous. BigBand also objects to this topic on the ground that it is more appropriately

reserved for written discovery.

**TOPIC NO. 12:**

The DOCUMENTS or other information RELATING TO the matters set forth in the
topics above, the IDENTITY of the custodian(s) of the document and the location(s) where the
document was kept and/or stored in the ordinary course of business.

**RESPONSE TO TOPIC NO. 12:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 12 as overly broad and unduly burdensome. BigBand further objects to this topic

on the grounds that it fails to describe with reasonable particularity the matters on which

examination is requested and is vague and ambiguous. BigBand also objects to this topic on the

ground that it is more appropriately reserved for written discovery.

**BigBand Patents**

## TOPIC NO. 13:

The place and dates of conception and reduction to practice for each claim in the PATENTS-IN-SUIT, and all evidence showing or corroborating the dates identified, including without limitation the identity of all PERSONS with personal knowledge of those dates and all DOCUMENTS showing or corroborating those dates.

## RESPONSE TO TOPIC NO. 13:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 13 as overly broad and unduly burdensome. BigBand also objects that the topic is not relevant or reasonably calculated to lead to the discovery of admissible evidence as Imagine has not asserted prior art that would put at issue the dates in question.

BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand provided information sought in this topic in its response to Imagine's Interrogatory No. 5 and agreed to produce responsive, non-privileged documents discovered as a result of a reasonably diligent search in response to Imagine's Request for Production No. 16.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

## TOPIC NO. 14:

All PERSONS who contributed to the conception and reduction to practice of the claims in each asserted patent, and each PERSON's contribution to that alleged invention.

## RESPONSE TO TOPIC NO. 14:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 14 as overly broad and unduly burdensome. BigBand also objects that the topic is

not relevant or reasonably calculated to lead to the discovery of admissible evidence as Imagine

has not asserted prior art that would put at issue the dates in question.

BigBand also objects to the extent the topic requests BigBand's contentions which are

not a proper topic for a deposition, but are more appropriately reserved for written discovery.

BigBand provided the information sought in this topic in its response to Imagine's Interrogatory

No. 6.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand

also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case.

BigBand reserves all rights to present expert opinion evidence according to the schedule adopted

by the Court.

**TOPIC NO. 15:**

Any texts, treatises, writings, or other DOCUMENTS that contributed to or influenced
conception and reduction to practice of each asserted claim.

**RESPONSE TO TOPIC NO. 15:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 15 as overly broad and unduly burdensome. BigBand further objects to this topic

on the grounds that it fails to describe with reasonable particularity the matters on which

examination is requested and is vague and ambiguous in its use of the term "contributed to or

influenced." BigBand also objects on the ground that the topic is more appropriately reserved

for written discovery. BigBand agreed to produce responsive, non-privileged documents

discovered as a result of a reasonably diligent search in response to Imagine's Request for

Production No. 19.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand

also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case.

11

BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 16:**

Any "secondary" indications of nonobviousness of the invention claimed, including but not limited to commercial success of the invention, long felt but unsolved needs met by the invention, failure of others to meet those needs, the scope of licensing of the patent, professional approval of the invention, and deliberate copying of the invention or laudatory statements by accused infringers.

**RESPONSE TO TOPIC NO. 16:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 16 as overly broad and unduly burdensome. BigBand further objects to this topic as seeking BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand agreed to produce responsive, non-privileged documents discovered as a result of a reasonably diligent search in response to Imagine's Request for Production No. 25. Moreover, BigBand provided responsive information in its response to Imagine's Interrogatory No. 7.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.

**TOPIC NO. 17:**

Each PRODUCT developed, sold, or licensed by YOU that embodies, practices, or uses any of the alleged inventions claimed in the PATENTS-IN-SUIT, and which specific claims are embodied, practiced or used by that PRODUCT.

**RESPONSE TO TOPIC NO. 17:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 17 as vague, ambiguous and unintelligible. BigBand also objects to this topic as

overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls

for legal conclusions.

BigBand also objects to the extent the topic requests BigBand's contentions which are

not a proper topic for a deposition, but are more appropriately reserved for written discovery.

BigBand provided the information sought in this topic in its response to Imagine's Interrogatory

No. 8.

BigBand further objects to this topic to the extent it calls for expert opinion, which is not

yet due in this case. BigBand reserves all rights to present expert opinion evidence according to

the schedule adopted by the Court.

## TOPIC NO. 18:

Any disclosures to any third party of the subject matter of any PATENT-IN-SUIT prior
to the application date of that patent, including without limitation any publication, presentation,
or disclosure, and any DOCUMENTS showing that each disclosure was under express
conditions of confidence.

## RESPONSE TO TOPIC NO. 18:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 18 as overly broad and unduly burdensome. BigBand also objects to the extent the

topic requests BigBand's contentions which are not a proper topic for a deposition, but are more

appropriately reserved for written discovery. BigBand provided the information sought in this

topic in its response to Imagine's Interrogatory No. 9.

## TOPIC NO. 19:

The first sale offer for sale [sic] and public use of any product that embodies any alleged
invention claimed, and documents relating thereto and the identity of witnesses knowledgeable
thereof.

**RESPONSE TO TOPIC NO. 19:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 19 as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 20:**

All reference materials, including without limitation books, publications, and computer software, that were used or relied upon by each of the inventors of the PATENTS-IN-SUIT during the conception, development, and reduction to practice of their alleged inventions.

**RESPONSE TO TOPIC NO. 20:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 20 as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery. BigBand agreed to produce responsive, non-privileged documents discovered as a result of a reasonably diligent search in response to Imagine's Request for Production No. 19.

**TOPIC NO. 21:**

Any DOCUMENT or thing that any persons has suggested to BIGBAND is prior art or potential prior art to the PATENTS-IN-SUIT or that BIGBAND has considered to be prior art or potential prior art to the PATENTS-IN-SUIT.

**RESPONSE TO TOPIC NO. 21:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 21 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand further

objects to this topic as overly broad and unduly burdensome. BigBand also objects to this topic

on the ground that it is more appropriately reserved for written discovery.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand

also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case.

BigBand reserves all rights to present expert opinion evidence according to the schedule adopted

by the Court.

## TOPIC NO. 22:

The field of invention of each PATENT-IN-SUIT.

## RESPONSE TO TOPIC NO. 22:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 22 on the ground that the term "field of invention" is undefined, vague and

ambiguous. BigBand further objects to this topic to the extent it calls for legal conclusions.

BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in

this case. BigBand reserves all rights to present expert opinion evidence according to the

schedule adopted by the Court.

## TOPIC NO. 23:

All facts and circumstances RELATING TO any interactions or communication between
BIGBAND and any of the inventors of the PATENTS-IN-SUIT RELATING TO YOUR
Complaint, or to this action in general.

## RESPONSE TO TOPIC NO. 23:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 23 to the extent that it seeks information protected by the attorney-client privilege,

the work product doctrine, and/or any other applicable privilege or immunity. BigBand also

objects to this topic as not relevant or reasonably calculated to lead to the discovery of

15

admissible evidence. BigBand further objects to this topic on the grounds that the topic is vague

and ambiguous in its use of the term "this action in general."

**TOPIC NO. 24:**

All facts and circumstances RELATING TO, and/or sufficient to IDENTIFY, YOUR
contentions concerning the level of education, experience, and/or skill held by a person of
ordinary skill in the art at the time of invention which is related to alleged inventions contained
in PATENTS-IN-SUIT.

**RESPONSE TO TOPIC NO. 24:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 24 to the extent that it calls for legal conclusions. BigBand further objects to this

topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves

all rights to present expert opinion evidence according to the schedule adopted by the Court.

BigBand further objects to this topic as seeking BigBand's contentions which are not a proper

topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 25:**

The IDENTITY of all persons and/or employees involved in the conception, design,
development, engineering, and testing of BIGBAND's products.

**RESPONSE TO TOPIC NO. 25:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 25 as overly broad and unduly burdensome. BigBand further objects to this topic

on the grounds that the topic fails to describe with reasonable particularity the matters on which

examination is requested and is vague and ambiguous. BigBand also objects to this topic as not

relevant or reasonably calculated to lead to relevant evidence to the extent that it seeks

information about persons or products that are not relevant to any claim or defense in the action.

BigBand also objects to this topic on the ground that it is more appropriately reserved for written

discovery.

**TOPIC NO. 26:**

The IDENTITY of all locations involved in the conception, design, development, engineering, and testing of BIGBAND's products.

**RESPONSE TO TOPIC NO. 26:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 26 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic as not relevant or reasonably calculated to lead to relevant evidence to the extent that it seeks information that is not relevant to any claim or defense in the action.

**TOPIC NO. 27:**

The IDENTIFICATION of persons, EMPLOYEES, and/or THIRD PARTIES involved in or knowledgeable about matters set forth in the topics above.

**RESPONSE TO TOPIC NO. 27:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 27 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 28:**

The DOCUMENTS or other information RELATING TO the matters set forth in the topics above, the IDENTITY of the custodian(s) of the document and the location(s) where the document was kept and/or stored in the ordinary course of business.

**RESPONSE TO TOPIC NO. 28:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 28 as overly broad and unduly burdensome. BigBand further objects to this topic

17

on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

**Prosecution**

## TOPIC NO. 29:

BIGBAND's reasons for not disclosing, including YOUR prosecution of the PATENTS IN SUIT.

## RESPONSE TO TOPIC NO. 29:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 29 on the ground that it is indecipherable. BigBand further objects to this topic to the extent it assumes facts not in evidence.

## TOPIC NO. 30:

BIGBAND's knowledge of and decision not to disclose prior art to the '477 PATENT during the prosecution of the '477 PATENT, including without limitation,

    (a) U.S. patent No. 6,141,339 to Kaplan et al.

    (b) U.S. patent No. 6,128,649 to Smith et al.

    (c) U.S. patent No. 5,481,542 to Logston et al.

    (d) Digital Audio-Visual Council's DAVIC 1.4 Specification

    (e) ISO/IEC 113818 Annex H Switched Digital Broadcast Service

## RESPONSE TO TOPIC NO. 30:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 30 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand further objects to this topic as overly broad and unduly burdensome. BigBand also objects to this topic to the extent it assumes facts not in evidence. BigBand further objects to the extent the topic

requests BigBand's contentions which are not a proper topic for a deposition, but are more

appropriately reserved for written discovery.

**TOPIC NO. 31:**

       BIGBAND's knowledge of and decision not to disclose prior art to the '087 PATENT during the prosecution of the '087 PATENT, including without limitation,

    (a)  U.S. patent No. 6,141,339 to Kaplan et al.

    (b)  U.S. patent No. 6,128,649 to Smith et al.

    (c)  U.S. patent No. 6,434,141 to Oz et al.

    (d)  U.S. patent No. 6,014,694 to Aharoni et al.

    (e)  U.S. patent No. 5,742,343 to Haskell

    (e)  U.S. patent No. 5,481,542 to Logston et al.

    (g)  U.S. patent No. 5,929,850 to Broadwin et al.

    (h)  U.S. patent No. 5,548,532 to Menand et al.

    (i)  U.S. patent No. 5,742,623 to Nuber et al.

    (j)  U.S. patent No. 5,734,432 to Netravali et al.

    (k)  U.S. patent No. 5,233,606 to Pashan et al.

    (l)  "MCNS/DOCSIS MAC CLEARS THE PATH FOR THE CABLE-MODEM INVASION," Electronic Design, US, Penton Publishing, Cleveland OH, Vol. 45, no. 27, 1 December 1997.

    (m)  U.S. patent No. 5,561,669 to Lenney et al.

    (n)  U.S. patent No. 6,081,519 to Petler

    (o)  International Publication WO 98/10541 entitled "BROADBAND COMMUNICATION SYSTEM FOR HIGH SPEED INTERNET ACCESS" published March 03, 1998 naming inventors Enns, Moura, Gronski, Neelmegh, Kim, Bieraum, and Rubin;

    (p)  International publication WO 99/09689 entitled "SYSTEM, DEVICE, AND METHOD FOR SCHEDULING IN A COMMUNICATION NETWORK" published February 25, 1999 naming inventors Ruszczyk, Lee, and Chlamtac; and the following publications:

(q) "ADAPTIVE DIGITAL ACCESS PROTOCOL: A MAC PROTOCOL FOR MULTISERVICE BROADBAND ACCESS NETWORKS" IEEE Communications Magazine, IEEE Service Center. Piscataway NJ, Vol. 34, no. 3, 1 March 1996

(r) "BROADBAND CPN DEMONSTRATOR USING WAVELENGTH AND TIME DIVISION MULTIPLEXING," Electronics and Communications Engineering Journal, IEEE London, GB, vol. 4 no.4, 01 August 1992.

(s) Digital Audio-Visual Council's DAVIC 1.4 Specification

(t) ISO/IEC 13818 Annex H Switched Digital Broadcast Service

## RESPONSE TO TOPIC NO. 31:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 31 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity. BigBand further objects to this topic as overly broad and unduly burdensome. BigBand also objects to this topic to the extent it assumes facts not in evidence. BigBand further objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

## TOPIC NO. 32:

BIGBAND's knowledge of and decision not to disclose prior art to the '619 PATENT during the prosecution of the '619 PATENT, including without limitation,

(a) U.S. patent No. 6,141,339 to Kaplan et al.

(b) U.S. patent No. 6,128,649 to Smith et al.

(c) U.S. patent No. 6,014,694 to Aharoni et al.

(d) U.S. patent No. 5,481,542 to Logston et al.

(e) U.S. patent No. 5,929,850 to Broadwin et al.

(f) U.S. patent No. 5,548,532 to Menand et al.

(g) U.S. patent No. 5,742,623 to Nuber et al.

(h) U.S. patent No. 5,734,432 to Netravali et al.

20

(i)  U.S. patent No. 5,233,606 to Pashan et al.

(j)  "MCNS/DOCSIS MAC CLEARS THE PATH FOR THE CABLE-MODEM INVASION," Electronic Design, US, Penton Publishing, Cleveland OH, Vol. 45, no. 27, 1 December 1997.

(k)  U.S. patent No. 5,561,669 to Lenney et al.

(l)  U.S. patent No. 6,081,519 to Petler

(m)  International Publication WO 98/10541 entitled "BROADBAND COMMUNICATION SYSTEM FOR HIGH SPEED INTERNET ACCESS" published March 03, 1998 naming inventors Enns, Moura, Gronski, Neelmegh, Kim, Bieraum, and Rubin;

(n)  International publication WO 99/09689 entitled "SYSTEM, DEVICE, AND METHOD FOR SCHEDULING IN A COMMUNICATION NETWORK" published February 25, 1999 naming inventors Ruszczyk, Lee, and Chlamtac; and the following publications:

(o)  "ADAPTIVE DIGITAL ACCESS PROTOCOL: A MAC PROTOCOL FOR MULTISERVICE BROADBAND ACCESS NETWORKS" IEEE Communications Magazine, IEEE Service Center.  Piscataway NJ, Vol. 34, no. 3, 1 March 1996

(p)  "BROADBAND CPN DEMONSTRATOR USING WAVELENGTH AND TIME DIVISION MULTIPLEXING," Electronics and Communications Engineering Journal, IEEE London, GB, vol. 4 no.4, 01 August 1992.

(q)  Digital Audio-Visual Council's DAVIC 1.4 Specification

(r)  ISO/IEC 13818 Annex H Switched Digital Broadcast Service

(s)  All facts RELATING TO BIGBAND's advertising, marketing, and promotion of BIGBAND's products to third parties.

## RESPONSE TO TOPIC NO. 32:

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects to Topic No. 32 to the extent that it seeks information protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege or immunity.  BigBand further objects to this topic as overly broad and unduly burdensome.  BigBand also objects to this topic to the extent it assumes facts not in evidence.  BigBand further objects to the extent the topic

requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**Damages**

## TOPIC NO. 33:

The harm (monetary or otherwise) that YOU claim YOU have suffered as a result of IMAGINE's alleged infringement of the PATENTS IN SUIT.

## RESPONSE TO TOPIC NO. 33:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 33 as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand further objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

## TOPIC NO. 34:

The factual basis for any claim for damages, including but not limited to lost profits, reasonable royalty, or price erosion, that YOU intend to make for IMAGINE's alleged infringement.

## RESPONSE TO TOPIC NO. 34:

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 34 as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but

are more appropriately reserved for written discovery.

**TOPIC NO. 35:**

All facts RELATING TO YOUR advertising, marketing, and promotion of YOUR PRODUCTS.

**RESPONSE TO TOPIC NO. 35:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 35 as overly broad, unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence given the breadth of the topic. BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 36:**

YOUR marketing policies, practices, and plans.

**RESPONSE TO TOPIC NO. 36:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 36 as overly broad, unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence given the breadth of the topic. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 37:**

YOUR pricing policies, practices, and plans.

**RESPONSE TO TOPIC NO. 37:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 37 as overly broad, unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence given the breadth of the topic. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 38:**

Any competition between IMAGINE and YOU.

**RESPONSE TO TOPIC NO. 38:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 38 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that the term "[a]ny competition" is vague and ambiguous.

**TOPIC NO. 39:**

For each instance in which YOU submitted a proposal or bid for the sale of YOUR PRODUCTS that compete with any ACCUSED PRODUCT, the identity of the customer, the location of the customer, the scope and content of the bid or proposal, the identity of any competing bidders, any evaluation performed by YOU of the competing bids or proposals, the identity of the Person(s) responsible for YOUR bid or proposal, the date that YOU submitted the proposal, and the status of the bid or proposal (including whether YOU were awarded the bid or proposal, and, if not, YOUR understanding of the reason the bid or proposal was awarded elsewhere).

**RESPONSE TO TOPIC NO. 39:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 39 as overly broad and unduly burdensome. BigBand also objects to this topic on the ground that the terms used are vague and ambiguous.

BigBand further objects to this topic to the extent it calls for expert opinion, which is not

yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects on the ground that this topic is more appropriately reserved for written discovery.

**TOPIC NO. 40:**

The identity, nature, and the size of the market in which YOU compete with IMAGINE.

**RESPONSE TO TOPIC NO. 40:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 40 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous in its use of the term "nature . . . of the market in which [BigBand] compete[s] with IMAGINE."

BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 41:**

The identity of all competitors in any market in which YOU complete [sic] with IMAGINE.

**RESPONSE TO TOPIC NO. 41:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 41 to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery. BigBand further objects on the grounds that the term "market in which [BigBand] comp[etes] with

25

IMAGINE" is vague and ambiguous.

**TOPIC NO. 42:**

YOUR business plans.

**RESPONSE TO TOPIC NO. 42:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 42 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic as not relevant or reasonably calculated to lead to the discovery of admissible evidence given its breadth.

**TOPIC NO. 43:**

YOUR estimates or beliefs of the relative market share of all competitors in any market in which YOU compete with IMAGINE, and YOUR method for determining that market share.

**RESPONSE TO TOPIC NO. 43:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 43 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous.

BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 44:**

YOUR estimates or projections of the future growth of any market in which YOU compete with IMAGINE.

**RESPONSE TO TOPIC NO. 44:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 44 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that the topic fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous.

BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 45:**

YOUR sales, revenues, costs, profits and loss from the date of commercial introduction of any PRODUCT YOU allege competes with any IMAGINE product.

**RESPONSE TO TOPIC NO. 45:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 45 as overly broad and unduly burdensome. BigBand also objects to this topic on the grounds that the term "commercial introduction" is vague and ambiguous.

BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand further objects that this topic is more appropriately reserved for written discovery.

**TOPIC NO. 46:**

YOUR projected sales, revenues, costs, profits and loss for any PRODUCT YOU allege competes with any IMAGINE product.

**RESPONSE TO TOPIC NO. 46:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 46 as overly broad and unduly burdensome. BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand also objects that this topic is more appropriately reserved for written discovery.

**TOPIC NO. 47:**

Any non-infringing alternatives to any ACCUSED PRODUCT.

**RESPONSE TO TOPIC NO. 47:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 47 as overly broad and unduly burdensome. BigBand also objects to this topic on the grounds that the term "non-infringing alternatives" is vague and ambiguous.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand further objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 48:**

YOUR manufacturing and marketing capacity.

**RESPONSE TO TOPIC NO. 48:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 48 as overly broad and unduly burdensome. BigBand also objects to this topic on the ground that the term "capacity" is vague and ambiguous.

BigBand further objects to this topic to the extent it calls for legal conclusions. BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand further objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 49:**

Any competitive analysis, pricing strategy, or other market analysis conducted by or relied upon by YOU.

**RESPONSE TO TOPIC NO. 49:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 49 as overly broad, unduly burdensome, and not relevant or reasonably calculated to lead to the discovery of admissible evidence given the breadth of the topic. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous.

BigBand also objects to this topic to the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court. BigBand further objects to the extent this topic is more appropriately reserved for written discovery.

**TOPIC NO. 50:**

Any sale that YOU allege you lost to IMAGINE.

**RESPONSE TO TOPIC NO. 50:**

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects to Topic No. 50 as overly broad and unduly burdensome.  BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case.  BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.  BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 51:**

The sale of any product or service made in conjunction with or driven by the sale of any of YOUR PRODUCTS on which YOU claim YOU lost profits.

**RESPONSE TO TOPIC NO. 51:**

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects to Topic No. 51 as overly broad and unduly burdensome.  BigBand further objects to this topic to the extent it calls for expert opinion, which is not yet due in this case.  BigBand reserves all rights to present expert opinion evidence according to the schedule adopted by the Court.  BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 52:**

Any reduction in price YOU allege resulted from IMAGINE's infringement.

**RESPONSE TO TOPIC NO. 52:**

BigBand incorporates its General Objections as if set forth fully herein.  BigBand objects to Topic No. 52 as overly broad and unduly burdensome.  BigBand further objects to this topic to

the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all

rights to present expert opinion evidence according to the schedule adopted by the Court.

BigBand also objects to the extent the topic requests BigBand's contentions which are not a

proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 53:**

Any license or sublicense to which YOU are a party relating to any of YOUR
PRODUCTS or any of the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 53:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 53 as overly broad and unduly burdensome. BigBand further objects to this topic

on the grounds that it is vague and ambiguous by its use of the term "relating to." BigBand also

objects on the ground that the topic is more appropriately reserved for written discovery.

**TOPIC NO. 54:**

YOUR licensing practices and policies.

**RESPONSE TO TOPIC NO. 54:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 54 as overly broad and unduly burdensome. BigBand further objects to this topic

on the grounds that it fails to describe with reasonable particularity the matters on which

examination is requested and is vague and ambiguous. BigBand also objects on the ground that

the topic is more appropriately reserved for written discovery.

**TOPIC NO. 55:**

Any established royalty for the PATENTS IN SUIT or any industry royalty rate that
YOU believe is relevant to the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 55:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 55 as overly broad and unduly burdensome. BigBand further objects to this topic to

the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all

rights to present expert opinion evidence according to the schedule adopted by the Court.

BigBand also objects to the extent the topic requests BigBand's contentions which are not a

proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 56:**

Any agreements, including without limitation settlements and covenants not to sue,
relating to the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 56:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 56 as overly broad and unduly burdensome. BigBand also objects to this topic as

vague and ambiguous by its use of the term "relating to." BigBand further objects to this topic to

the extent it calls for expert opinion, which is not yet due in this case. BigBand reserves all

rights to present expert opinion evidence according to the schedule adopted by the Court.

BigBand also objects on the ground that the topic is more appropriately reserved for written

discovery.

**TOPIC NO. 57:**

Any correspondence, communications, and negotiations with third parties relating to the
licensing or cross-licensing of the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 57:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 57 as overly broad, unduly burdensome and not relevant or reasonably calculated to

lead to the discovery of admissible evidence given the breadth of the topic. BigBand further

objects to this topic on the grounds that it fails to describe with reasonable particularity the

matters on which examination is requested and is vague and ambiguous. BigBand further

objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 58:**

All PERSONS that YOU claim infringe any of the PATENTS IN SUIT.

**RESPONSE TO TOPIC NO. 58:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 58 to the extent it seeks information protected by the attorney-client privilege, work product immunity, or other immunity. BigBand further objects to this topic as not relevant or reasonably calculated to lead to the discovery of admissible evidence. BigBand also objects to the extent the topic requests BigBand's contentions which are not a proper topic for a deposition, but are more appropriately reserved for written discovery.

**TOPIC NO. 59:**

The IDENTIFICATION of persons, employees, and/or third parties involved in or knowledgeable about matters set forth in the topics above.

**RESPONSE TO TOPIC NO. 59:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects to Topic No. 59 as overly broad and unduly burdensome. BigBand further objects to this topic on the grounds that it fails to describe with reasonable particularity the matters on which examination is requested and is vague and ambiguous. BigBand also objects to this topic on the ground that it is more appropriately reserved for written discovery.

**TOPIC NO. 60:**

The DOCUMENTS or other information RELATING TO the matters set forth in the topics above, the IDENTITY of the custodian(s) of the document and the location(s) where the document was kept and/or stored in the ordinary course of business.

**RESPONSE TO TOPIC NO. 60:**

BigBand incorporates its General Objections as if set forth fully herein. BigBand objects

to Topic No. 60 as overly broad and unduly burdensome.  BigBand further objects to this topic

on the grounds that it fails to describe with reasonable particularity the matters on which

examination is requested and is vague and ambiguous.  BigBand also objects to this topic on the

ground that it is more appropriately reserved for written discovery.

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP


*/s/ Karen Jacobs Lauden*
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
jblumenfeld@mnat.com
klouden@mnat.com
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200

*Attorneys for Plaintiff/Counterclaim
Defendant BigBand Networks, Inc.*

OF COUNSEL:

Peter P. Chen
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
(650) 328-4600
Peter.Chen@lw.com

James L. Day
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
(415) 391-0600
Jim.Day@lw.com

January 8, 2008

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that copies of the foregoing were caused to be served on 2008 upon the following in the manner indicated:

**BY U.S. MAIL**

Mary B. Matterer
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19899

**BY E-MAIL AND U.S. MAIL**

Peter Gratzinger
John Benassi
HELLER EHRMAN LLP
4350 La Jolla Village Drive, Suite 700
San Diego, CA  92122

*/s/ John D. Minton*
John D. Minton

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

BIGBAND NETWORKS, INC.,

        Plaintiff and Counterclaim Defendant,

v.

IMAGINE COMMUNICATIONS, INC.,

        Defendant and Counterclaim Plaintiff.

Civil Action No. 1:07-cv-00351 JJF

**DEFENDANT IMAGINE COMMUNICATIONS, INC.'S FIRST AMENDED 30(B)(6)**
**NOTICE TO BIGBAND NETWORKS, INC.**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

        NOTICE IS HEREBY GIVEN pursuant to Federal Rule of Civil Procedure 30(b)(6) that Defendant IMAGINE COMMUNICATIONS, INC. ("IMAGINE") will take the deposition upon oral examination of Plaintiff BIGBAND NETWORKS INC. ("BIGBAND") commencing on February 19, 2008 at 9:00 a.m., or a date and time to be agreed upon, at the law offices of Heller Ehrman LLP, 4350 La Jolla Village Drive, San Diego, California 92122, and continuing from day to day thereafter, excluding weekends and holidays, until completed. The deposition will be recorded by a videographer and/or certified court reporter.

        NOTICE IS HEREBY FURTHER GIVEN pursuant to Federal Rule of Civil Procedure 30(b)(6) that BIGBAND is required to designate one or more of its officers, directors, partners, managing agents or other such persons as are most qualified, knowledgeable, and competent to testify on its behalf as to all matters known or reasonably available to it with respect to the topics identified in Attachment A attached hereto, and for each person designated, to set forth the matters on which the person will testify in a written response to be served on or before February 13, 2008.

Further, IMAGINE hereby requests that the witness(es) designated to testify with respect to the topics attached hereto bring with them to the deposition the technical and operational specifications and documents relating to the BIGBAND products referenced in the deposition topic, which were called for production pursuant to Request For Production of Documents and Things.

Date:  February 5, 2008

MARY B. MATTERER (I.D. No. 2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
Telephone:  302-888-6800
Facsimile:  302-571-1750
Email:  mmatterer@morrisjames.com

OF COUNSEL:

JOHN M. BENASSI (Bar No. 74137)
ALEXANDER BRAINERD (Bar No. 42722)
HELLER EHRMAN LLP
4350 La Jolla Village Drive, 7th Floor
San Diego, CA  92122-1246
Telephone:  858-450-8400
Facsimile:  858-450-8499
Email : john.benassi@hellerehrman.com

PETER E. GRATZINGER (Bar No. 228764)
HELLER EHRMAN LLP
333 South Hope Street
Los Angeles, CA  90071
Telephone:  213-689-0200
Facsimile:  213-614-1868
Email:  peter.gratzinger@hellerehrman.com

Attorneys for Defendant and Counterclaim Plaintiff
IMAGINE COMMUNICATIONS, INC.

## ATTACHMENT A

### DEFINITIONS

    (a)    "DOCUMENTS" shall have the broadest meaning ascribed to it by the Federal Rules of Civil Procedure and applicable case law, including but not limited to electronic files.

    (b)    "IMAGINE" means Imagine Communications, Inc., any corporate predecessor, and any past or present division, department, parent, subsidiary, affiliate, director, officer, principal, agent, employee, consultant, representative, or other person acting on its behalf or under its control.

    (c)    "BIGBAND," "YOU," or "YOUR" means BigBand Networks, Inc, any corporate predecessor, any joint venture to which it is or was a party, any past or present division, department, parent, subsidiary, affiliate, director, officer, principal, agent, employee, consultant, representative, or other person acting on its behalf or under its control.

    (d)    "RELATING TO" means referring to, mentioning, commenting on, reflecting, pertaining to, evidencing, showing, involving, describing, discussing, responding to, supporting, contradicting, rebutting, constituting in whole or in part, consisting of, addressing the subject matter of, or being a draft, copy or summary of, in whole or in part.

    (e)    "The '477 PATENT" means U.S. Patent No. 6,999,477.

    (f)    "The '087 PATENT" means U.S. Patent No. 7,058,087.

    (g)    "The '619 PATENT" means U.S. Patent No. 6,937,619.

    (h)    "The PATENTS-IN-SUIT" means the '477 PATENT, the '087 PATENT, and the '619 PATENT collectively.

    (i)    "PREDECESSORS" are any prior applications or patents to or through which the PATENTS-IN-SUIT claim priority.

    (j)    "SUCCESSORS" are any divisionals, continuations, and continuations-in-part of the PATENTS-IN-SUIT.

    (k)    "FOREIGN COUNTERPARTS" are any patents or applications that are FOREIGN COUNTERPARTS to any of the PATENTS-IN-SUIT or their PREDECESSORS or

SUCCESSORS.

(l)     "PRODUCT" means any product, apparatus, system, service, or method.

(m)     "ACCUSED PRODUCT" means any IMAGINE PRODUCT that YOU allege infringes one or more of the PATENTS IN SUIT.

(n)     "CONCEPTION" means the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice.

(o)     "REDUCTION TO PRACTICE" of an invention means the earlier of (a) filing a patent application for the invention, or (b) demonstrating that the invention will work for its intended purpose, though it need not be in a commercially satisfactory stage of development.

(p)     "PUBLIC USE" means use that is accessible to the public or use that constitutes commercial exploitation of the invention.

(q)     The term "PERSON" shall include both natural PERSONS and corporate or other business entities, whether or not in the employ of a party, and the acts and knowledge of a PERSON are defined to include the acts and knowledge of that PERSON'S directors, officers, members, employees, representatives, agents, and attorneys.

(r)     The term "IDENTIFY" means, with regard to DOCUMENTS, to:

      i.  describe the nature of the document (e.g., letter or memorandum);

      ii.  state the date of the document and its bates or control numbers, if any;

      iii.  identify the PERSON who sent and received the original and any copy of the document;

      iv.  state in as much detail as possible the contents of the document; and

      v.  state the manner and date of the disposition of the document.

(s)     The term "IDENTIFY," with respect to PERSONS, shall mean to state the PERSON'S:

4

    i.  Individual, company, or corporate name;

    ii.  last known address; and

    iii.  last known phone number.

## 30(b)(6) Topics

### Factual Basis For BigBand's Contentions

1.    YOUR factual basis for YOUR contention that the ACCUSED PRODUCTS infringe the asserted claims of the PATENT-IN-SUIT, including without limitation:

(a)    All facts showing that the ACCUSED PRODUCTS contain a "session manager" or its equivalent as that term is used in the '477 PATENT and the identity of witnesses knowledgeable thereof.

(b)    All facts showing that in the ACCUSED PRODUCTS, the aggregate bandwidth of received packets exceeds the bandwidth of the limited bandwidth media, as those terms are used in the '477 PATENT and the identity of witnesses knowledgeable thereof.

(c)    All facts showing that the ACCUSED PRODUCTS "select basic media data units to be modified in response to a modification priority," or have an equivalent function, as those terms are used in the '619 PATENT and the identity of witnesses knowledgeable thereof.

(d)    All facts showing that the ACCUSED PRODUCTS use a "modification priority" or its equivalent, as that term is used in the '619 PATENT and the '087 PATENT and the identity of witnesses knowledgeable thereof.

(e)    All facts showing that the ACCUSED PRODUCTS use a "non addressable stream output port" or its equivalent, as that term is used in the '477 PATENT and the identity of witnesses knowledgeable thereof.

(f)    All facts regarding YOUR claim charts served as Attachments A, B, and C to YOUR responses to Imagine's First Set of Interrogatories, including without limitation the factual basis for YOUR allegation that documents referenced in those charts reflect products made, used, sold, or offered for sale by IMAGINE and the identity of witnesses knowledgeable

5

thereof.

2.    The factual basis for YOUR allegation in Paragraph 5 of YOUR Complaint that IMAGINE has indirectly infringed the PATENTS-IN-SUIT, including without limitation the identity of all third parties whose infringement IMAGINE has induced or to whose infringement IMAGINE has contributed and the identity of witnesses knowledgeable thereof.

3.    The factual basis of YOUR allegation in Paragraph 6 of YOUR Complaint that IMAGINE's alleged infringement is willful and deliberate and the identity of witnesses knowledgeable thereof.

4.    The identity of all PERSONS who participated in any way in any analysis relating to YOUR allegations of infringement, and separately for each PERSON identified, the timing and substance of the analysis conducted and all DOCUMENTS or other information on which that PERSON relied.

5.    The circumstances under which BIGBAND became aware of IMAGINE's financing efforts, including IMAGINE's intent to sell Series B Securities, including without limitation the date on which each executive and board member of BIGBAND first learned this information and the source from which he or she learned it.

6.    DOCUMENTS and communications related to IMAGINE's financing efforts and IMAGINE's intent to sell Series B securities.

7.    All facts and circumstances RELATING TO any non-privileged communications regarding YOUR intent to file this lawsuit and YOUR reasons for filing this lawsuit, including statements made to third parties.

8.    Any communication with any third party regarding BIGBAND's intention to sue IMAGINE.

9.    All facts RELATING TO any offer by IMAGINE to disclose information to YOU regarding its products prior to this lawsuit, including without limitation the communications described in Paragraph 15 of IMAGINE's Counterclaim and the identity of witnesses knowledgeable thereof.

10.     To the extent not fully requested above, the IDENTIFICATION of persons, EMPLOYEES, and/or third parties involved in or knowledgeable about matters set forth in the topics above.

11.     The DOCUMENTS or other information RELATING TO the matters set forth in the topics above, the IDENTITY of the custodian(s) of the document and the location(s) where the document was kept and/or stored in the ordinary course of business.

### BigBand Patents

12.     The place and dates of CONCEPTION and REDUCTION TO PRACTICE for each claim in the PATENTS-IN-SUIT, and all evidence showing or corroborating the dates identified, including without limitation the identity of all PERSONS with personal knowledge of those dates and all DOCUMENTS showing or corroborating those dates.

13.     All PERSONS who contributed to the CONCEPTION and REDUCTION TO PRACTICE of the claims in each asserted patent, and each PERSON'S contribution to that alleged invention.

14.     Any texts, treatises, writings, computer software, or other DOCUMENTS that significantly contributed to or influenced conception and reduction to practice of each asserted claim.

15.     Commercial success of the invention.

16.     Long felt but unsolved needs met by the invention and failure of others to meet those needs.

17.     Professional approval of the invention.

18.     Deliberate copying of the invention.

19.     Laudatory statements by accused infringers.

20.     Each PRODUCT developed, sold, or licensed by YOU that embodies, practices, or uses any of the alleged inventions claimed in the PATENTS-IN-SUIT, and the operation of each method or feature of that PRODUCT that embodies any of the alleged inventions.

21.    Any disclosures to any third party of the subject matter of any PATENT-IN-SUIT prior to the application date of that patent, including without limitation any publication, presentation, or disclosure, and any DOCUMENTS showing that each disclosure was under express conditions of confidence.

22.    The first sale, offer for sale, or PUBLIC USE of any PRODUCT that embodies any alleged invention claimed, and documents relating thereto and the identity of witnesses knowledgeable thereof.

23.    The identity of any DOCUMENT or thing that any person has suggested to BIGBAND is prior art or potential prior art to the PATENTS-IN-SUIT or that BIGBAND has considered to be prior art or potential prior art to the PATENTS-IN-SUIT.

24.    The field of invention of each PATENT-IN-SUIT.

25.    All non-privileged communication between BIGBAND and any of the inventors of the PATENTS-IN-SUIT RELATING TO this action.

26.    The level of education, experience, and/or skill held by a person of ordinary skill in the art related to alleged inventions contained in PATENTS-IN-SUIT at the time of the alleged invention.

27.    The IDENTITY of all persons and/or employees involved in the conception, design, development, engineering, and testing of BIGBAND's products that allegedly embody any of the PATENTS-IN-SUIT or allegedly compete with any ACCUSED PRODUCT.

28.    The IDENTITY of all locations involved in the conception, design, development, engineering, and testing of BIGBAND's products that allegedly embody any of the PATENTS-IN-SUIT or allegedly compete with any ACCUSED PRODUCT.

29.    The IDENTIFICATION of persons, EMPLOYEES, and/or THIRD PARTIES involved in or knowledgeable about matters set forth in the topics above.

30.    The DOCUMENTS or other information RELATING TO the matters set forth in the topics above, the IDENTITY of the custodian(s) of the document and the location(s) where the document was kept and/or stored in the ordinary course of business.

8

**Prosecution**

31.    BIGBAND's knowledge of and decision not to disclose prior art to the '477 PATENT during the prosecution of the '477 PATENT, including without limitation,

     (a)        U.S. patent No. 6,141,339 to Kaplan et al.

     (b)        U.S. patent No. 6,128,649 to Smith et al.

     (c)        U.S. Patent No. 5,481,542 to Logston et al.

     (d)        Digital Audio-Visual Council's DAVIC 1.4 Specification

     (e)        ISO/IEC 13818 Annex H Switched Digital Broadcast Service

32.    BIGBAND's knowledge of and decision not to disclose prior art to the '087 PATENT during the prosecution of the '087 PATENT, including without limitation,

     (a)        U.S. patent No. 6,141,339 to Kaplan et al.

     (b)        U.S. patent No. 6,128,649 to Smith et al.

     (c)        U.S. Patent No. 6,434,141 to Oz et al.

     (d)        U.S. patent No. 6,014,694 to Aharoni et al.

     (e)        U.S. Patent No. 5,742,343 to Haskell

     (f)        U.S. Patent No. 5,481,542 to Logston et al.

     (g)        U.S. Patent No. 5,929,850 to Broadwin et al.

     (h)        U.S. Patent No. 5,548,532 to Menand et al.

     (i)        U.S. Patent No. 5,742,623 to Nuber et al.

     (j)        U.S. Patent No. 5,734,432 to Netravali et al.

     (k)        U.S. Patent No. 5,233,606 to Pashan et al.

     (l)        "MCNS/DOCSIS MAC CLEARS THE PATH FOR THE CABLE-MODEM INVASION," Electronic Design, US, Penton Publishing, Cleveland OH, Vol. 45, no. 27, 1 December 1997.

     (m)        U.S. Patent No. 5,561,669 to Lenney et al.

     (n)        U.S. Patent No. 6,081,519 to Petler

     (o)        International Publication WO 98/10541 entitled "BROADBAND

9

COMMUNICATION SYSTEM FOR HIGH-SPEED INTERNET

ACCESS" published March 03, 1998 naming inventors Enns, Moura,

Gronski, Neelmegh, Kim, Bieraum, and Rubin;

(p)      International Publication WO 99/09689 entitled "SYSTEM, DEVICE,

AND METHOD FOR SCHEDULING IN A COMMUNICATION

NETWORK" published February 25, 1999 naming inventors Ruszczyk,

Lee, and Chlamtac; and the following publications:

(q)      "ADAPTIVE DIGITAL ACCESS PROTOCOL: A MAC PROTOCOL

FOR MULTISERVICE BROADBAND ACCESS NETWORKS" IEEE

Communications Magazine, IEEE Service Center. Piscataway NJ, Vol. 34,

no. 3, 1 March 1996

(r)      "BROADBAND CPN DEMONSTRATOR USING WAVELENGTH

AND TIME DIVISION MULTIPLEXING," Electronics and

Communication Engineering Journal, IEEE London, GB, vol. 4 no. 4, 01

August 1992.

(s)      Digital Audio-Visual Council's DAVIC 1.4 Specification

(t)      ISO/IEC 13818 Annex H Switched Digital Broadcast Service

33.      BIGBAND's knowledge of and decision not to disclose prior art to the '619

PATENT during prosecution of the '619 PATENT, including without limitation,

(a)      U.S. patent No. 6,141,339 to Kaplan et al.

(b)      U.S. patent No. 6,128,649 to Smith et al.

(c)      U.S. patent No. 6,014,694 to Aharoni et al.

(d)      U.S. Patent No. 5,481,542 to Logston et al.

(e)      U.S. Patent No. 5,929,850 to Broadwin et al.

(f)      U.S. Patent No. 5,548,532 to Menand et al.

(g)      U.S. Patent No. 5,742,623 to Nuber et al.

(h)      U.S. Patent No. 5,734,432 to Netravali et al.

(i)        U.S. Patent No. 5,233,606 to Pashan et al.

(j)        "MCNS/DOCSIS MAC CLEARS THE PATH FOR THE CABLE-
           MODEM INVASION," Electronic Design, US, Penton Publishing,
           Cleveland OH, Vol. 45, no. 27, 1 December 1997.

(k)        U.S. Patent No. 5,561,669 to Lenney et al.

(l)        U.S. Patent No. 6,081,519 to Petler

(m)        International Publication WO 98/10541 entitled "BROADBAND
           COMMUNICATION SYSTEM FOR HIGH-SPEED INTERNET
           ACCESS" published March 03, 1998 naming inventors Enns, Moura,
           Gronski, Neelmegh, Kim, Bieraum, and Rubin;

(n)        International Publication WO 99/09689 entitled "SYSTEM, DEVICE,
           AND METHOD FOR SCHEDULING IN A COMMUNICATION
           NETWORK" published February 25, 1999 naming inventors Ruszczyk,
           Lee, and Chlamtac; and the following publications:

(o)        "ADAPTIVE DIGITAL ACCESS PROTOCOL: A MAC PROTOCOL
           FOR MULTISERVICE BROADBAND ACCESS NETWORKS" IEEE
           Communications Magazine, IEEE Service Center. Piscataway NJ, Vol. 34,
           no. 3, 1 March 1996

(p)        "BROADBAND CPN DEMONSTRATOR USING WAVELENGTH
           AND TIME DIVISION MULTIPLEXING," Electronics and
           Communication Engineering Journal, IEEE London, GB, vol. 4 no. 4, 01
           August 1992.

(q)        Digital Audio-Visual Council's DAVIC 1.4 Specification

(r)        ISO/IEC 13818 Annex H Switched Digital Broadcast Service

(s)        All facts RELATING TO BIGBAND's advertising, marketing, and
           promotion of BIGBAND's products to third parties.

11

**Damages**

34.     The harm (monetary or otherwise) that YOU claim YOU have suffered as a result of IMAGINE's alleged infringement of the PATENTS IN SUIT.

35.     The factual basis for any claim for damages, including but not limited to lost profits, reasonable royalty, or price erosion, that YOU intend to make for IMAGINE's alleged infringement.

36.     YOUR marketing policies, practices, and plans for PRODUCTS that allegedly embody any of the PATENTS-IN-SUIT or allegedly compete with any ACCUSED PRODUCT, during any period of time that YOU allege IMAGINE infringed the PATENTS IN SUIT.

37.     YOUR pricing policies, practices, and plans for PRODUCTS that allegedly embody any of the PATENTS-IN-SUIT or allegedly compete with any ACCUSED PRODUCT, during any period of time that YOU allege IMAGINE infringed the PATENTS IN SUIT.

38.     Any competition for sales between IMAGINE and YOU.

39.     For each instance in which YOU submitted a proposal or bid for the sale of YOUR PRODUCTS that compete with any ACCUSED PRODUCT, the identity of the customer, the location of the customer, the scope and content of the bid or proposal, the identity of any competing bidders, any evaluation performed by YOU of the competing bids or proposals, the identity of the Person(s) responsible for YOUR bid or proposal, the date that YOU submitted the proposal, and the status of the bid or proposal (including whether YOU were awarded the bid or proposal, and, if not, YOUR understanding of the reason the bid or proposal was awarded elsewhere).

40.     Any competitive analysis or market analysis conducted by YOU with respect to YOUR PRODUCTS, including without limitation the nature of the market and identity of competitors YOU identified for each PRODUCT.

41.     YOUR estimates or beliefs of the relative market share of all competitors in any market in which YOU compete with IMAGINE, and YOUR method for determining that market share.

12

42.    YOUR estimates or projections of the future growth of any market in which YOU compete with IMAGINE.

43.    YOUR sales, revenues, costs, profits and loss from the date of commercial introduction of any PRODUCT YOU allege competes with any IMAGINE product.

44.    YOUR projected  sales, revenues, costs, profits and loss for any PRODUCT YOU allege competes with any IMAGINE product.

45.    YOUR manufacturing and marketing capacity.

46.    Any sale that YOU allege you lost to IMAGINE.

47.    The sale of any product or service made in conjunction with or driven by the sale of any of YOUR PRODUCTS on which YOU claim YOU lost profits.

48.    Any reduction in price YOU allege resulted from IMAGINE's infringement.

49.    Any license or sublicense to which YOU are a party relating to any of YOUR PRODUCTS or any of the PATENTS IN SUIT.

50.    YOUR practices and policies for licensing YOUR patents to third parties.

51.    Any established royalty for the PATENTS IN SUIT or any industry royalty rate that YOU believe is relevant to the PATENTS IN SUIT.

52.    Any agreements, including without limitation settlements and covenants not to sue, relating to the PATENTS IN SUIT.

53.    Any correspondence, communications, and negotiations with third parties relating to the licensing or cross-licensing of the PATENTS IN SUIT.

54.    All PERSONS that YOU claim infringe any of the PATENTS IN SUIT.

55.    The IDENTIFICATION of persons, employees, and/or third parties involved in or knowledgeable about matters set forth in the topics above.

56.    The DOCUMENTS or other information RELATING TO the matters set forth in the topics above, the IDENTITY of the custodian(s) of the document and the location(s) where the document was kept and/or stored in the ordinary course of business.

CM/ECF LIVE - U.S. District Court:ded                                    Page 1 of 1

**Other Documents**
1:07-cv-00351-JJF-MPT BigBand Networks Inc. v. Imagine Communications Inc.
PATENT, PaperDocuments, VACANTJUDGESHIP

### U.S. District Court

### District of Delaware

**Notice of Electronic Filing**

The following transaction was entered by Matterer, Mary on 2/5/2008 at 5:02 PM EST and filed on 2/5/2008

**Case Name:**        BigBand Networks Inc. v. Imagine Communications Inc.
**Case Number:**      1:07-cv-351
**Filer:**            Imagine Communications Inc.
**Document Number:** 32

**Docket Text:**
AMENDED DOCUMENT by Imagine Communications Inc.. Amendment to [28] Notice to Take Deposition *of BigBand Networks under Fed. R. Civ. P. 30(b)(6)*. (Matterer, Mary)


**1:07-cv-351 Notice has been electronically mailed to:**

Jack B. Blumenfeld    jbbefiling@mnat.com

Karen Jacobs Louden    kjlefiling@mnat.com

Mary Matterer    mmatterer@morrisjames.com, shadley@morrisjames.com, tpullan@morrisjames.com

**1:07-cv-351 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=2/5/2008] [FileNumber=514528-0]
[cfd1c20664dde49725e6faa133ee2dde18161a1560a7d8841133392b1626dab4db0661
2b2de63855615d5442637b1f5284378d0c7275ecd73b3a6d4fb98a4e051]]

# EXHIBIT 7

# HellerEhrman LLP

February 1, 2008

Peter E. Gratzinger
Peter.Gratzinger@hellerehrman.com
Direct +1.213.689.7547
Direct Fax +1.213.244.7861
Main +1 (213) 689-0200
Fax +1 (213) 614-1868

42791.0003

*via E-mail*

John D. Minton
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025

Re:   *BigBand Networks, Inc. v. Imagine Communications, Inc.,* C.A. No. 07-351 (D.Del)

Dear John:

      This is to follow up on our extensive meet and confer regarding Imagine's 30(b)(6) topics. I have revised certain topics to meet your concerns to the best of my ability. You must now tell me which topics BigBand will provide a witness for and which you refuse, and you must provides dates for the former. Imagine will decide whether to move to compel on the latter. If Imagine wins the motion to compel, you may have to provide some witnesses again. That is the risk you take when you refuse to provide a witness for a topic. Imagine will not accept any more delay based on your argument that all disputes should be resolved before BigBand provides its first witness.

      With respect to your assertion that certain topics are improper because they require "contentions" and that certain topics are improper because they go to the adequacy of BigBand's pre-filing investigation, I told you that I am open to any legal analysis or case citation you wish to provide. Since you have provided none, I have not removed any of the allegedly objectionable topics.

      Finally, we are serving Imagine's responses to BigBand's first deposition notice. As I told you on the phone, in light of the fact that Imagine served its notice well before BigBand, I expect that BigBand will produce its witness or witnesses well before Imagine.

Heller Ehrman LLP   333 South Hope Street, 39th Floor   Los Angeles, CA  90071-3043   www.hellerehrman.com

Beijing   Hong Kong   London   Los Angeles   Madison, WI   New York   San Diego   San Francisco   Seattle/Anchorage   Silicon Valley   Singapore   Washington, D.C.

**HellerEhrman**LLP

John D. Minton
February 1, 2008
Page 2

Please feel free to call me to discuss.

Very truly yours,

/s/ Peter E. Gratzinger

# EXHIBIT 8

# HellerEhrman LLP

February 14, 2008

Peter E. Gratzinger
Peter.Gratzinger@hellerehrman.com
Direct +1.213.689.7547
Direct Fax +1.213.244.7861
Main +1 (213) 689-0200
Fax +1 (213) 614-1868

42791.0003

*via E-mail*

John D. Minton
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025

Re:    *BigBand Networks, Inc. v. Imagine Communications, Inc.*, C.A. No. 07-351 (D.Del)

Dear John:

I have reviewed your letters regarding Imagine's 30b6 deposition topics.  While I disagree with much of the analysis, I am willing to make the following additional changes in the interest of moving forward:

Topic 1 (factual basis for infringement contentions):  Imagine is willing to limit this topic to the factual allegations in BigBand's infringement charts with respect to a limited number of elements.  Specifically, Imagine would limit questioning to how the specific documents cited by BigBand demonstrate the presence of the following limitations:

(a) a session manager,

(b) aggregate bandwidth of received packets exceeds the bandwidth of the limited bandwidth media,

(c) select basic media data units to be modified in response to a modification priority,

(d) "modification priority", and

(e) "non addressable stream output port."

This does not seek legal contentions, but an explanation of facts already identified by BigBand. See *e.g. SmithKline Beecham Corp. v Apotex Corp.*, 2004 WL 739959 (E.D. Pa. 2004) ("If SmithKline has concluded that its patents are infringed when paroxetine hydrochloride converts to a different form inside the body, it must have some basis for that belief, and Alphapharm is entitled to discover that information.").

Heller Ehrman LLP   333 South Hope Street, 39th Floor   Los Angeles, CA  90071-3043   www.hellerehrman.com

Beijing   Hong Kong   London   Los Angeles   Madison, WI   New York   San Diego   San Francisco   Seattle/Anchorage   Silicon Valley   Singapore   Washington, D.C.

**HellerEhrman**LLP

John D. Minton
February 14, 2008
Page 2

Topic 2 (indirect infringement):  Imagine is willing to narrow this topic to the identity of any third party direct infringers whose infringement Imagine is allegedly inducing or contributing to, and facts known to BigBand about the relevant third party systems or methods.

Topic 3 (willfulness):  Imagine is willing to narrow this topic to any facts known to BigBand about the access to or knowledge of the Patents In Suit by Imagine employees who are former BigBand employees, during their employment with BigBand.

Topics 4 - 7 (BigBand's pre-filing investigation and knowledge of Imagine's financing):  Imagine is willing to table these topics without prejudice to noticing them again at a later date.

If BigBand is still unwilling to produce a witness for these topics, the dispute will have to be resolved by the Court.  However, any continuing disagreement about these topics is no longer acceptable as an excuse to refuse to provide witnesses and dates for the remaining topics.  As I told you before, I expect BigBand to have dates and witnesses to propose when we next speak on Wednesday.

Please feel free to call me to discuss.

Very truly yours,

/s/ Peter E. Gratzinger

# EXHIBIT 9

**Stitik, Denise**

| | |
|---|---|
| **From:** | Verderamo, Beth Ann |
| **Sent:** | Friday, March 02, 2007 4:55 PM |
| **To:** | Alan Wright; Arie Michelsohn; Barbara Rudolph; Berry, Diana; Bill Lewris; Blumenfeld, Jack; Harrison, Catherine; Karen Jacobs Louden; Linda Wadler; MNAT Internal; Robert Pollock (robert.pollock@finnegan.com); Stitik, Denise |
| **Subject:** | Wyeth/Impax (06-222) - Oral Order entered by the Court on 3/2/07 |

**On behalf of Jack Blumenfeld, I am forwarding the docket text regarding an Oral Order entered by the Court today:**

**Docket Text:**
ORAL ORDER: For the reasons stated on the record during the 3/2/07 Motion day Hearing, D.I. [76] MOTION to Compel *A Response to Interrogatory No. 35* filed by Impax Laboratories Inc. is GRANTED; D.I. [81] MOTION for Protective Order *to Strike and Limit the Scope of Impax's Amended Notice of Deposition of Wyeth Pursuant to Fed. R. Civ. P. 30(b)(6)* filed by Wyeth is GRANTED. Ordered by Judge Joseph J. Farnan, Jr. on 03/02/2007. (dlk)

Beth Ann Verderamo
IP Nighttime Administrative Assistant
Morris Nichols Arsht & Tunnell LLP
1201 North Market Street
Wilmington, DE 19801
(302) 351-9128

# EXHIBIT 10



**The University of Alabama School of Law**

ALABAMA LAW REVIEW
(ISSN 002-4279)

The *Alabama Law Review* is published three times a year by students of The University of Alabama School of Law, Tuscaloosa, Alabama. The Editorial and Business Offices are located at:

Alabama Law Review
The University of Alabama School of Law
Box 870382
Tuscaloosa, Alabama 35487-0382
Phone (205) 348-7191
FAX (205) 348-3917

Subscriptions and Single Issues. The current subscription rates are $24.00 per three-issue volume, $12.00 per issue, plus a shipping and handling charge of $6.00 per volume or $2.00 per single issue order. Subscriptions are automatically renewed unless notification to the contrary is received. Information on back issues is available upon request.

Manuscripts. The *Alabama Law Review* invites submission of unsolicited manuscripts. Citations in the *Alabama Law Review* conform generally to *The Bluebook: A Uniform System of Citation* (16th ed. 1996). However, please note that the Review does not follow Rule 1.2(a) from the 16th Edition. The signal rule for the *Alabama Law Review* is Rule 1.2(a) of the 15th Edition *Bluebook*. The submission of articles on computer diskettes is encouraged, and IBM-compatible software must be used. An envelope with return postage should be enclosed if a manuscript or disk is to be returned after consideration.

Copyright. Copyright © 1999 by The University of Alabama (*Alabama Law Review*), except as otherwise indicated. The copyright in each article is owned by the respective author. All rights reserved. Opinions expressed are those of the contributor and are not presented as the views of the *Alabama Law Review*, its editors, or The University of Alabama School of Law.

Printer. The *Alabama Law Review* is printed by the Darby Printing Company in Atlanta, Georgia.

| VOLUME 50 | SPRING 1999 | NUMBER 3 |
|---|---|---|

## Contents

DISCOVERING CORPORATE KNOWLEDGE AND
CONTENTIONS: RETHINKING RULE 30(B)(6)
AND ALTERNATIVE MECHANISMS
     *Kent Sinclair*
     *Roger P. Fendrich*   651

ENHANCED OBLIGATION OF GOOD FAITH: A
MINE FIELD OF UNANSWERED QUESTIONS
AFTER *L & S Roofing Supply Co.*
     *Karon O. Bowdre*   755

THE LLC VERSUS LLP CONUNDRUM: ADVICE
FOR BUSINESSES CONTEMPLATING THE CHOICE
     *Fallany O. Stover*
     *Susan Pace Hamill*   813

## Commentary

LEVELING THE PLAYING FIELD: MAKING
FEDERAL MARKET PARTICIPANTS
ACCOUNTABLE FOR THEIR
ANTITRUST VIOLATIONS   *Jennifer Marie Buettner*   849

BERNSTEIN, KARN, AND JUNGER:
CONSTITUTIONAL CHALLENGES TO
CRYPTOGRAPHIC REGULATIONS   *Norman Andrew Crain*   869

OUT WITH THE OLD: ABANDONING THE
TRADITIONAL MEASUREMENT OF
CONTRACT DAMAGES FOR A SYSTEM
OF COMPARATIVE FAULT   *John Barclay Phillips*   911

THE USURPATION OF LEGISLATIVE POWER
BY THE ALABAMA JUDICIARY: FROM
LEGISLATIVE APPORTIONMENT
TO SCHOOL REFORM   *Susan Thompson Spence*   929

INDEX TO VOLUME 50   969

# ALABAMA LAW REVIEW

| Volume 50 | Spring 1999 | Number 3 |

## DISCOVERING CORPORATE KNOWLEDGE AND CONTENTIONS: RETHINKING RULE 30(B)(6) AND ALTERNATIVE MECHANISMS

*Kent Sinclair**
*Roger P. Fendrich***

### I. INTRODUCTION

In 1970 the Supreme Court promulgated a useful, simple tool to assist parties litigating against an entity to find knowledgeable witnesses and leads to specific personnel with detailed information about matters in litigation. Rule 30(b)(6) of the Federal Rules of Civil Procedure allows the discovering party to specify topics on which testimony is sought, whereupon the responding entity is required to designate one or more witnesses to provide testimony on those topics. The procedure simplifies the early stages of discovery in many cases.

This tool has been increasingly misused in recent years. Aggressive litigants and a few short-sighted courts have bent this device into a form of "contention discovery" in which an

* Professor of Law, University of Virginia. J.D. 1971, University of California at Berkeley. William J. Moran, University of Virginia School of Law class of 1999, provided valuable research assistance on this Article.

** Member, Arnold & Porter, Washington, D.C. Ph.D., University of Texas, 1971; J.D., Yale Law School, 1980. Scott Hiebel provided valuable preliminary research on the topics addressed in this Article.

Alabama Law Review          [Vol. 50:3:651

entity may be required to respond in impromptu oral examination to questions that require its designated witness to "state all support and theories" for myriad contentions in a complex case. The growing misuse of this basic deposition tool creates unfair, unworkable burdens on the responding parties and risks imposition of inappropriate sanctions, including preclusion of proof.

A recent article in the National Law Journal, co-authored by one of the deans of the American litigating bar, illustrates the dangers.[1] Observing that the Rule 30(b)(6) deposition rule "revolutionized the discovery of corporate entities," the authors urge every litigant to use this procedure for *all* depositions of corporations as a way to force corporations to prepare an omnibus witness with knowledge of all facts anyone associated with the corporation may know.[2] Furthermore, the authors recommend the Rule as a means to obtain "binding admissions" for use on summary judgment or at trial.[3] The Rule 30(b)(6) device is vaunted as a major "offensive weapon to bind entities."[4] These claims are demonstrably false and only serve to highlight the mischief that a misguided reading of Rule 30(b)(6) may engender.

Depositions of entities under this Rule were never intended to serve these purposes, and attempts to warp the rule into a device to achieve these ends creates significant unfairness and abuse.

This Article sketches the actual nature and purpose of the Rule 30(b)(6) device, describes the proper scope of the procedure--especially questions of proper preparation, which have begun to generate a significant body of case law, much of it misguided--and assesses the alternative means open to a discovering party to learn about the entity's factual and legal positions without the abuse inherent in the concept of a deposition of an "omnibus" witness, a super-human artifact whose role is not only impractical, but also unnecessary.

Fifteen years ago Rule 30(b)(6) was referred to as "The For-

1. Jerold Solovy & Robert Byman, *Discovery: Invoking Rule 30(b)(6)*, NAT'L L.J., Oct. 26, 1998, at B13.

2. *See id.*

3. *See id.* (asserting that if a litigator understands this powerful weapon, "[y]our notices will always" invoke the Rule 30(b)(6) mechanism).

4. *Id.*

1999]          Discovering Corporate Knowledge          653

gotten Rule,"[5] but more recently the tactical use of this device to force creation of a witness who will synthesize all facts and issues in the case has transformed the Rule into "a Trojan Horse."[6] And the tactical use of Rule 30(b)(6) against entities has become recognized as a tool of great power,[7] the number of published opinions citing the Rule has increased, presumably reflecting increased use of the device and an increase in motion practice over its proper boundaries. The cases discussing the Rule have increased four-fold since 1988 alone.[8]

*Epistemological Underpinnings.* The misuse of Rule 30(b)(6) which is explored in this Article may trace its roots to a peculiar conception of "corporate knowledge" which, we submit, takes a unique creation of the law--"constructive knowledge"--and distends it beyond reasonable bounds. The law sometimes indulges in the fiction that entities such as corporations and partnerships should be treated as if they "know" whatever their human constituents have learned.[9] The knowledge of the "parts" (at least those who stand in a close relationship to the entity, such as partners, directors, management personnel, and agents with sufficient authority) is "imputed" (attributed) to the entity itself.[10] For many legal purposes, the entity is deemed to know

5. *See* Mark A. Cymrot, *The Forgotten Rule*, 18 LITIGATION 3 (1992).

6. Bradley M. Elwin, *How Rule 30(b)(6) Became a Trojan Horse: A Proposal for Change*, 48 F.I.C.C. Q. 365 (1996).

7. *See infra* text accompanying notes 250-68.

8. The search "30(b)(6) w22 deposition" was run on Lexis using the United States District Courts database separately for each year from 1971, the first year after the rule went into effect, through 1996. The results of the searches were: 1971=1, 1972=2, 1973=3, 1974=0, 1975=3, 1976=2, 1977=3, 1978=3, 1979=4, 1980=1, 1981=5, 1982=7, 1983=8, 1984=3, 1985=18, 1986=22, 1987=18, 1988=14, 1989=21, 1990=30, 1991=45, 1992=54, 1993=45, 1994=51, 1995=61, 1996=67. Other search routines would no doubt yield different absolute numbers, but there seems little doubt that this device has increasingly made its way into court decisions.

9. The law has had occasion to focus on corporate knowledge for a variety of purposes, but most of the developed case law and model statutes bearing on this subject deal with imputing knowledge of an employee or agent to an entity for purposes of determining whether to hold the entity liable to a third party, typically a contract or tort plaintiff. Generally, of course, when a senior officer is aware of a fact, it is deemed corporate "knowledge" of an event "quite evident." Gordon v. S.S. Vedalin, 346 F. Supp. 1178, 1181 (D. Md. 1972).

10. Knowledge of an employee is imputed to a corporation when one employee acts within the scope of the agency or employment, Grand Union Co. v. United States, 696 F.2d 888, 891 (11th Cir. 1983), and at least in part for the benefit of

the composite of the knowledge of all of its agents and employees.[11]

The rules governing such constructive knowledge were developed to serve a variety of purposes. For example, they can be used to defeat a claim that the entity "acted in ignorance;"[12] they provide a chastening incentive for a company to expect and to demand that its agents share information freely within the fold; they promote the proposition that a collective entity must take the consequences for what is known by *any* of its central "players."[13] (Compare, in this regard, similar rules which gov-

---

11. "[C]orporate knowledge and intent is a mosaic made up of smaller bits and pieces of motivation held by various . . . officers and employees, from its Chief Operating Officer to its Divisional Officers, as well as its lawyers, in house and outside." Universal City Studios v. Nintendo Co., 615 F. Supp. 838, 842 (S.D.N.Y. 1985).

A jury instruction to the effect that corporate knowledge depends on the combined knowledge of the employees and agents of the company is normally upheld. *See, e.g.*, People v. American Med. Ctr. of Mich., 324 N.W.2d 782, 792-93 (Mich. Ct. App. 1982).

12. Under traditional case law, the so-called presumption that the principal knows what the agent knows is "irrebuttable"; it cannot be avoided by showing that the agent did not in fact communicate his knowledge." Bowen v. Mount Vernon Sav. Bank, 105 F.2d 796, 799 (D.C. Cir. 1939). The rule provides a mechanism for imputing liability to a principal for actions of an officer or agent in order to protect innocent third parties; it is intended to preclude proclamations of ignorance that would serve "as a shield for unfair dealing." 3 FLETCHER ET AL., *supra* note 10, § 804, at 55; *see also* Mutual Life Ins. Co. v. Hilton-Green, 241 U.S. 613, 623 (1916).

13. Under standard principles of agency law, knowledge acquired by a

ern the attribution of certain *acts* of agents to their masters.[14] Where the master in question is a sizable organization, it may be held responsible for the activities of numerous individuals.[15]

Notice that the predicate for holding an organization such as a corporation or partnership responsible for what is known by its human participants is the patent truth that such entities have no eyes or ears (or minds) of their own;[16] whatever they may be said to know must be the result of whatever their human participants know.[17] But when an *individual* is deposed, the

---

corporation's officers or agents is properly attributable to the corporation itself. BCCI Holdings (Lux.), S.A. v. Clifford, 964 F. Supp. 468, 478 (D.D.C. 1997). *See generally* 3 FLETCHER ET AL., *supra* note 10, § 790, at 15. Because a corporation can only operate through individuals, the "privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization." FDIC v. Ernst & Young, 967 F.2d 166, 171 (5th Cir. 1992) (quoting Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1376 (5th Cir. 1983)). This is true whether or not the officer or agent has actually disclosed the information to the corporation. Clifford, 964 F. Supp. at 478. "The reason for the rule is simple: It is the duty of the officer or agent to communicate his or her knowledge to the corporation, and the law presumes that the officer or agent has carried out this duty." *Id.*; *see also* 3 FLETCHER ET AL., *supra* note 10, § 819, at 116.

It has sometimes been argued that a corporation should not be deemed aware of conditions when no single person has enough of the constituent facts to create a reasonable basis for becoming aware of the overall situation. Most courts hold, however, that the "imputed-collected-knowledge standard" applies where employees acting in the scope of their employment and authority learn or do something on behalf of the corporation, whether or not one employee puts the pieces together. Upjohn Co. v. New Hampshire Ins. Co., 476 N.W.2d 392, 401-02 (Mich. 1991). To allow a corporation to "plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import[,] is[] something the cases . . . clearly reject as the antithesis of imputed collective corporate knowledge." Upjohn, 476 N.W.2d at 400, 401 n.14.

14. *See* RESTATEMENT (SECOND) OF AGENCY § 217 (1958) (principal-agent); RESTATEMENT (SECOND) OF TORTS § 456 (1965) (master-servant).

15. For example, it was held that while the status of the actor in the corporate hierarchy might well have decisive significance in determining questions concerning the intention to benefit the corporation, the corporation may be bound—even for criminal liability—by the acts of subordinate, even menial, employees." Standard Oil Co. v. United States, 307 F.2d 120, 127 (5th Cir. 1962); *see* United States v. Steiner Plastics Mfg. Co., 231 F.2d 149, 153 (2d Cir. 1956); United States v. George F. Fish, Inc., 154 F.2d 798, 801 (2d Cir. 1946); United States v. E. Brooke Matlack, Inc., 149 F. Supp. 814, 819-20 (D. Md. 1957).

16. *See* Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 636 (1819) ("A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law.").

17. *See, e.g.*, Oxford Shipping Co. v. New Hampshire Trading Corp., 697 F.2d 1 (1st Cir. 1982).

he or she is permitted (when it is true) to answer questions with the breathtakingly simple words, "I don't know" (or their cousins, "I don't recall"). And an individual witness cannot be compelled, and is not obliged, to review everything that may be "reasonably available" to prepare for the deposition.

But just as collective entities do not have the sensory or mental abilities to learn things "on their own," neither do they possess the capability to collect, sift and synthesize information for themselves.[18] Rather, they utilize human beings to perform such tasks. In the case of litigation, the discovery and collation of what needs to be known is characteristically undertaken by lawyers. It is the lawyer who investigates the facts, reviews a mosaic of documents, weeds through recollections of participants in the central events, and then attempts to put together a coherent account of "what really happened."

Accordingly, when a rule commands a collective entity to testify to everything that is "known or reasonably available," it is, perforce, in all but the simplest of cases, demanding testimony that can only be the result of an arduous process that has already been conducted by the entity's lawyers. It is one thing, of course, to require the organization (or its lawyers) to proffer the identity of witnesses who were involved in matters at issue in a lawsuit. While such an obligation may require the organization to create and reveal something that did not exist prior to the lawyers' involvement (that is, a compilation identifying the relevant witnesses), such an intrusion into work product is relatively de minimis, may be deemed worth the "price" for what it buys in increased efficiency, and is merely a propaedeutic to further discovery. It is quite another thing to require the organization to prepare one or more witnesses to express its single, final, and definitive position on the ultimate issues on which a case presumably turns.

---

18. Some courts, however, have at least been sensitive to the fact that information acquired by individuals in an entity often is lost, not re-conveyed, or not put together with other facts. See, e.g., First Nat'l Bank & Trust v. Outright, 206 N.W.2d 542, 544 (Neb. 1973). Thus one court commented that it may well be that an entity's "corporate knowledge is less than the sum of the knowledge of all its officers, agents, and employees," hence, imputation doctrine relies on a mere presumption, which is subject to the risks of "human error." Outright, 206 N.W.2d at 544.

If it is a useful fiction to imagine that an organization's access to information is as rich as the collective input of its members, it is a pernicious fiction to assume that the entity possesses an inherent capacity to weed through those disparate sources to produce a single, unified account of the facts. Yet, as discussed in Part IV below, the most expansive interpretations of Rule 30(b)(6) presuppose that the quintessential lawyer's role is somehow part and parcel of an organization's inherent fact-collecting prowess.

## II. DEPOSITIONS OF CORPORATE PERSONNEL BEFORE AND AFTER RULE 30(B)(6)

### A. Goals in the Creation of Rule 30(b)(6)

The Federal Rules of Civil Procedure broadly authorize parties to obtain discovery by various means, of which perhaps the most prominent is depositions upon oral examination.[19] Depositions "rank high in the hierarchy of pre-trial, truth-finding mechanisms."[20] Rule 30(a), in unrestricted language, provides that any "[p]arty may take the testimony of any person, including a party, by deposition upon oral examination."[21]

Of course, "it is not literally possible to take the deposition of a corporation; instead, when a corporation is involved, the information sought must be obtained from natural persons who can speak for the corporation,"[22] and courts recognize that a corporation appears vicariously through individual representatives.[23] And while in one sense any employee might be viewed

---

19. FED. R. CIV. P. 30.

20. Founding Church of Scientology, Inc. v. Webster, 802 F.2d 1448, 1451 (D.C. Cir. 1986) ("Face-to-face confrontations prior to trial, with such indicia of formality as administration of the oath, the presence of counsel and stenographic recording of the proceedings, are a critical component of the tools of justice in civil litigation.").

21. FED. R. CIV. P. 30; cf. id. 26(b)(2). The triage provisions of Rule 26(b)(2) could theoretically require other, more efficient procedures in lieu of rote recourse to depositions in every instance. Searches of the reported opinions, however, uncover almost no cases in which this provision has been used to limit otherwise permissible discovery.

22. 8A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2103, at 30 (2d ed. 1994).

23. See, e.g., Resolution Trust Corp. v. Southern Union Co., 985 F.2d 196, 197

as embodying a portion of the corporation's composite "memo-ry,"[24] the pre-1970 rules made an important distinction be-tween deponents who were officers, directors or managing agents of the entity—whose testimony could for that reason be used against the corporation for any purpose[25]—and all other employees (whose testimony was not automatically admissible against the entity).[26]

The discovering party who wished to elicit testimony at deposition that would be broadly admissible against the corpora-tion was safe in naming top personnel such as the president or chairman of the board, but ran the risk that other employees or agents, even those with impressive titles and broad responsibili-ties, could later be viewed as falling below the level of officers and managing agents, and hence that the transcript would not be admissible against the entity.

A second problem arose with the individual designation system for selecting witnesses from within a corporation: partic-ularly during the early phases of preparation in a case, the dis-covering party was required to *guess* which of the adverse execu-tives would have the knowledge sought. This sometimes bur-dened corporations with a series of unfruitful depositions[28] and on occasion led the discovering party to experience the frustra-tion of "bandying," in which various officers of a corporation

---

(5th Cir. 1993).

24. United States v. Taylor, 166 F.R.D. 356, 361-62 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996).

25. FED. R. CIV. P. Rule 32(a)(2) allows adverse parties to introduce into evi-dence for any purpose the deposition of "anyone who at the time of taking the depo-sition was an officer, director, or managing agent . . . of a public or private corpora-tion, partnership or association."

26. Mitsui & Co. (U.S.A.), Inc. v. Puerto Rico Water Resources Auth., 93 F.R.D. 62, 65 (D.P.R. 1981); *see* Cleveland v. Palmby, 75 F.R.D. 654, 656 (W.D. Okla. 1977); Intercontinental Fibres, Inc. v. United States, 352 F. Supp. 952, 956 (Cust. Ct. 1972); Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 515 (1970). Note, however, that since the creation of the Federal Rules of Evidence, agent admissions on matters within the scope of the employment have been admissible against the employer under the definitions of non-hearsay in Rule 801.

27. *See* Founding Church of Scientology, Inc. v. Webster, 802 F.2d 1448, 1451 (D.C. Cir. 1986); Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 278 (D. Neb. 1989).

28. Taylor, 166 F.R.D. at 360; *see* Catex v. LTV Aerospace Corp., 480 F.2d 620, 623 (5th Cir. 1973); *Protective Nat'l Ins.*, 137 F.R.D. at 278.

---

were deposed and, in turn, each disclaimed knowledge of facts that were clearly known by *someone* in the organization.[29] Clearly, a mechanism was needed "to curb any temptation a [litigant] might have to shunt a discovering party from 'pillar to post . . . .'"[30]

Rule 30(b)(6) was created in 1970 to address both of these problem areas.[31] It provides that a party may, in a notice of deposition, simply name the corporation as deponent and identi-fy the desired topics for testimony.[32] The corporation must thereupon designate one or more officers or directors or man-aging agents or *other persons* to testify on its behalf to "matters known or reasonably available to the organization."[33] In addi-tion, an amendment to Rule 32 provides that the testimony of any witness designated under Rule 30(b)(6) (whether technically an officer or managing agent or not) may be used by the adverse parties for any purpose.[34]

---

29. One poignant example of how this frustration may arise was recounted by a federal judge in describing the tribulations of the plaintiffs in the Dalkon Shield products liability cases:

The project manager for Dalkon Shield explains that a particular question should have gone to the *medical department*. The medical department repre-sentative explains that the question was really the bailiwick of the quality control department. The quality control department representative explains that the project manager was the one with the authority to make a decision on that question.

Miles W. Lord, *The Dalkon Shield Litigation: Revised Annotated Reprimand by Chief Judge Miles W. Lord*, 9 HAMLINE L. REV. 7, 11 (1986).

30. FDIC v. Butcher, 116 F.R.D. 196, 199 (E.D. Tenn. 1987).

31. Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 515 (1970); *see* Cates, 480 F.2d at 623. *See generally* Founding Church of Scientology, 802 F.2d at 1448; Martin M. Velz, *Depositions of Organizations: The Designation Procedure Under the Federal Rules*, 33 S.D. L. REV. 239 (1988). *See also* M. Minnette Massey, *Depositions of Corporations: Problems and Solutions—Fed. R. Civ. P. 30(b)(6)*, 1986 ARIZ. ST. L.J. 81.

32. FED. R. CIV. P. 30(b)(6).

33. *Id.; see Protective Nat'l Ins.*, 137 F.R.D. at 277-78 (quoting FED. R. CIV. P. 30(b)(6)) (emphasis omitted).

34. FED. R. CIV. P. 32(a)(2). Although some commentators continue to voice con-cern regarding potentially lingering problems with the inclusion of the term "manag-ing agent" in Rule 30(b)(6), *see, e.g.*, Massey, *supra* note 31, at 89-99, the list of persons who can be designated by a corporation is not limited to managing agents, or even officers, but rather includes a generic category of potential 30(b)(6) witness-es: "other persons who consent to testify on its behalf." FED. R. CIV. P. 30(b)(6). Thus, the managing agent issue is moot under Rule 30(b)(6) because the onus is on the corporation to designate some witness regardless of his position.

This procedure adds a convenient alternative means of locating an appropriate corporate witness, but "does not preclude taking a deposition by any other procedure authorized in these rules,"[35] and the more common procedure of specific notices naming an adverse corporate agent, "long known to the bar, thus remains available for litigants to employ if they see fit."[36]

The simple Rule 30(b)(6) procedure was thus conceived as an adjunct to the more common form of direct witness designation, an alternative especially helpful when the discovering party has no knowledge of the internal structure of an opposing entity.[37] In recent years, however, discovering parties have begun to warp this tool into a form of oral contention interrogatories and have read into the rule a requirement that a witness be prepared by the entity to provide a binding synthesis of every fact in the case. Ensuing sections of this Article sketch the basic operation of this deposition device and explore in greater depth the practical misuse to which some courts and litigants are putting the procedure.

## B. Basic Issues in the Operation of the Rule

The Notice Must Invoke the Rule 30(b)(6) Mechanism. A notice expressly invoking the concepts of Rule 30(b)(6) must be used if the discovering party wishes to be entitled to the efforts this rule requires in locating and producing knowledgeable witnesses from within an entity. In one case, a court denied sanctions in the face of a discovering party's claim that two witnesses produced lacked specific knowledge about the issues in question and were ill-prepared for their depositions[38] because the

court found that the discovering party's letter "request" for "Deposition Witnesses" did not function as a notice pursuant to Rule 30(b)(6).[39]

In general, a deposition notice that states that the depositions are being taken pursuant to Rule 30(b)(6), but names specific individuals as deponents, is inconsistent with the procedure described in Rule 30(b)(6).[40] A simple notice under Rule 30(b)(1) will be sufficient to compel the production of a named officer of the entity, and no specification of subject matter is required for such notice.[41] A notice of deposition which simply indicates that the testimony "is being taken of the organization through the named official or representative" will ordinarily be interpreted as a standard Rule 30(b)(1) notice,[42] and while some courts have suggested that the person designated in the notice will then be expected to testify to matters known or reasonably available to the organization, as under Rule 30(b)(6),[43] no similar duty of preparation is imposed under Rule 30(b)(1).[44]

Hybrid deposition notices are not always treated as facially invalid. One such notice was issued in a Jeep-rollover death case, naming twenty-one specific deponents and also including ten "Rule 30(b)(6) categories."[45] In response, the car maker moved to quash the depositions and sought a protective order, and it offered to produce six individuals to provide the information sought by the plaintiffs.[46] The court ordered the company to produce those six individuals for deposition and, if necessary, any additional persons with knowledge of the ten Rule 30(b)(6) categories.[47]

Note that a narrow subject focus in a Rule 30(b)(6) notice

---

35. FED. R. CIV. P. 30(b)(6).

36. *Founding Church of Scientology*, 802 F.2d at 1451 (citing *Atlantic Cape Fisheries v. Hartford Fire Ins. Co.*, 509 F.2d 577, 578-79 (1st Cir. 1975); 8A WRIGHT ET AL., *supra* note 22, § 2103). The Advisory Committee Note to Rule 30(b)(6) expressly states that the procedure does not supplant but merely "supplements the existing practice whereby the examining party designates the corporate official to be deposed." Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 515 (1970).

37. Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 515 (1970).

38. *Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd.*, 171 F.R.D. 135, 145 (S.D.N.Y. 1997).

39. *Bank of N.Y.*, 171 F.R.D. at 145. The court concluded that the papers exchanged by counsel were "more aptly described as informal requests between counsel," in the form of letters. *Id.* at 146.

40. *Operative Plasterers' & Cement Masons' Int'l Ass'n of the U.S. and Can. AFL-CIO v. Benjamin*, 144 F.R.D. 87, 89-90 (N.D. Ind. 1992).

41. *Benjamin*, 144 F.R.D. at 89-90.

42. *Id.*

43. *Id.*

44. *Compare* FED. R. CIV. P. 30(b)(1) (placing no duty of preparation on deponent), *with Id.* 30(b)(6) (requiring that the person designated testify regarding matters known or reasonably available to the organization).

45. *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1325 (8th Cir. 1986).

46. *Shelton*, 805 F.2d at 1324.

47. *Id.*

may have the effect of forcing designation of a specific individual as the witness. Thus, a notice calling for a witness who can testify as to "all communications" of a named person and four entities quite naturally was read as effectively calling for designation of the named individual, who presumably would have better knowledge of his own communications than any other person and might well be the only person on the planet who would have knowledge of them all.[48]

*Specificity Standards.* According to one court, "[f]or a Rule 30(b)(6) deposition to operate effectively, the deposing party must designate the areas of inquiry with reasonable particularity . . . ."[49] Some Rule 30(b)(6) designations are quite specific as to date, time, place and subject matter.[50] Decisions construing the rule have recognized that the particularity of the specification by the discovering party is crucial,[51] and one court found that the requisite specificity was provided where the actual scope of the deposition topics set forth in the notice had been the subject of a pre-deposition motion to quash, a "clarification" motion, and oral argument which had been resolved in two written orders prior to the deposition ever taking place.[52]

Subject listings that are overly broad are improper Rule 30(b)(6) topic specifications.[53] Some Rule 30(b)(6) deposition topic specifications are few in number but very broad in cover-

---

48. Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co., No. 90-7811-KC, 1993 U.S. Dist. LEXIS 1163, at *4-*7 (S.D.N.Y. Feb. 4, 1993).

49. United States v. Taylor, 166 F.R.D. 356, 360 (M.D.N.C. 1996), aff'd, 166 F.R.D. 367 (M.D.N.C 1996).

50. For example, in one Arizona litigation, the discovering party asked the adversary to produce the following:

[O]ne or more officers, directors, managing agents, or other persons who consent to testify [regarding] the events that occurred on June 15, 1990 at the [responding party's facility] located at Thirty-sixth Street and Indian School Road in Phoenix, Arizona between the hours of 10:00 p.m. and 12:00 a.m., June 16, 1990, involving Clayton Sanders and Richard Edmonds.

Sanders v. Circle K Corp., 137 F.R.D. 292, 293 (D. Ariz. 1991).

51. E.g., Graco Childrens Prods., Inc. v. Century Prods. Co. No. 93-6710, 1996 WL 39476, at *33 (E.D. Pa. Feb. 1, 1996); Fleischer v. Resolution Trust Corp., Nos. 92-4918-DES, 92-4919-DES, 1994 WL 726342, at *1 (D. Kan. Dec. 29, 1994).

52. Taylor, 166 F.R.D. at 360.

53. Doe v. Yorkville Plaza Assoc., No. 92-8250 (JGK), 1996 U.S. Dist. LEXIS 8653, at *20 (S.D.N.Y. June 21, 1996) (determining, inter alia, that the listing "Fire Code requirements for residential buildings built in New York City from 1983 to date" was overly broad).

---

age, such as one in an insurance case which suggested that the witness would need to be fully familiar with her company's allegations of gross negligence against another insurance company in a complex reinsurance arrangement.[54] Using conclusory statements to serve as specifications is not sufficient to justify imposition of broad deposition testimony obligations.[55] Instead, information requests must be "structured" to reach "relevant questions."[56] In the face of overbroad discovery demands, timely objection is useful, as is a constructive proffer of alternative means of setting forth information.[57] The Rule 30(b)(6) designation must also list topics that bear a reasonable relationship to the legal issues in the case.[58]

A specification in a blunderbuss format calling for all information supporting a claim or defense averment in a pleading does not, in the view of many courts, constitute a deposition demand providing reasonable particularity about the matters on which examination is requested; hence, it is not sufficient to impose an obligation on the entity to produce a witness who knows about each and every such averment.[59] As one court concluded in denying relief on this ground, "[p]laintiff should have specifically listed all subject matters for which a 30(b)(6) designation is sought."[60]

These decisions demonstrate that proper use of the Rule 30(b)(6) mechanism is a two-way street. The discovering party must take reasonable steps to spell out and confine the definition of topics to be covered so that the preparation burdens imposed on the responding entity remain reasonable.

---

54. See Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 278 (D. Neb. 1989).

55. Doe, 1996 U.S. Dist. LEXIS 8653, at *23.

56. Id.

57. See id.

58. See id. at *21 (stating that discovery must focus on legally operative subjects).

59. See, e.g., Sklodzien v. St. Francis Reg'l Med. Ctr., No. 95-1516-MLB, 1996 U.S. Dist. LEXIS 20621, at *1-*2 (D. Kan. Dec. 16, 1996).

60. Sklodzien, 1996 U.S. Dist. LEXIS 20621, at *2.

## C. Designating the Witness

Once served with a Rule 30(b)(6) notice, the corporation is obligated to comply, and it may be ordered to designate witnesses if it fails to do so.[61]

The choice of whom to designate rests with the entity. On occasion, a would-be discovering party has sought to require the entity to designate a specific person as the Rule 30(b)(6) witness in a motion to compel.[62] Neither the Rule nor the Advisory Committee commentary suggests that the discovering party has this right. In one case in which the issue was litigated, the court declined to require the designation because the individual whose designation was sought had interests that were, in fact, adverse to the company on whose behalf the testimony was sought.[63]

In general, there is no need for the relief of compelling a corporation to designate a specific person to testify on its behalf. If the discovering party *knows* of a specific witness whose testimony may be beneficial to its case, the discoverer may issue a *regular* deposition notice and take the witness' testimony under Rule 30. If the employee is an officer, director or managing agent, the testimony will be admissible at trial.[64]

*Who May Be Designated.* Any employee of the entity, or any other persons, may be designated if capable of giving responsive testimony, as discussed in later sections of this Article.[65] When originally contacted, the witness need have no personal knowledge. Hence, a witness' assertion that he lacks "current" knowledge is insufficient to demonstrate a problem with the witness as a deponent.[66]

Some litigants have contended—unsuccessfully—that a person who was not personally involved in the underlying trans-

---

61. 8A WRIGHT ET AL., supra note 22, § 2103, at 33.
62. Sanders v. Circle K Corp., 137 F.R.D. 292, 293 (D. Ariz. 1991).
63. Sanders, 137 F.R.D. at 293.
64. See FED. R. CIV. P. 32(a)(2).
65. Some litigants have contended that a person who is not an officer, director or managing agent for the responding entity is, for that reason, not an appropriate corporate spokesperson within the meaning of FED. R. CIV. P. 30(b)(6). Sanders, 137 F.R.D. at 293. Nothing in the Rule, however, limits appropriate designees to these senior officials.
66. See Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co., No. 90-7811-KC, 1993 U.S. Dist. LEXIS 1163, at *5-*6 (S.D.N.Y. Feb. 4, 1993).

---

actions is not a proper designee for Rule 30(b)(6) testimony.[67] Any witness who can gather responsive information may be designated by the company, and one common scenario finds that corporations have designated as Rule 30(b)(6) witnesses persons who, although lacking personal knowledge, have already performed some sort of internal investigation of the circumstances leading to the litigation.[68]

*Former Employees, Consultants and Third Parties as Rule 30(b)(6) Witnesses.* Outside of the Rule 30(b)(6) context, depositions of former employees are generally treated as depositions of non-parties, requiring service of a subpoena.[69] The former employee no longer has authority to testify on behalf of the entity, and the entity typically will not have control over the production of the witness.[70] As a result, the discovering party must proceed as in the case of any other individual non-party witness, which includes following the general rules applied to those witnesses residing beyond the court's subpoena power.[71]

It is generally held that a company cannot be "required to designate a retired employee to serve as a 30(b)(6) designee, because 'it cannot be supposed that . . . former employees would identify their interests with those of their former employers to such an extent that admissions by them should be held to bind the employer.'"[72] Thus the entity is under no *compulsion* to produce a non-party, such as a former employee, as a witness at a 30(b)(6) deposition.[73]

However, *at the option of the entity* a person who is not a director, officer or even an employee of the entity from whom evidence is sought may serve as a proper designee under Rule

---

67. Sanders, 137 F.R.D. at 293.
68. Id. (involving regional personnel officer who investigated the events for the company shortly after the incident).
69. Operative Plasterers' & Cement Masons' Int'l Ass'n of the U.S. and Can. AFL-CIO v. Benjamin, 144 F.R.D. 87, 90 (N.D. Ind. 1992).
70. Benjamin, 144 F.R.D. at 90.
71. Id. (citing Harris Corp. v. Amperex Elec. Corp., No. 86-C8338, 1987 U.S. Dist. LEXIS 14108, at *7 (N.D. Ill. May 8, 1987)); 7 MOORE'S FEDERAL PRACTICE § 30.21 (3d ed. 1997).
72. Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11887, at *6 (E.D. Pa. Aug. 20, 1991) (quoting Proseus v. Anchor Line, Ltd., 26 F.R.D. 165, 167 (S.D.N.Y. 1960)).
73. Abramson v. Florida Gas Transmission Co., 908 F. Supp. 1376, 1382 (E.D. La. 1995).

30(b)(6). Many times a company responding to a Rule 30(b)(6) notice is hard-pressed to locate present employees who have any knowledge of bygone events. If the entity is willing to designate a former employee as its deponent (and if the witness accepts the role), the use of a former employee or any other person as a designee is fully permissible under the Rule.[74] In one litigation, a Swiss citizen was deposed on behalf of two entities which had been dormant for some years and had no current officer with knowledge of the transactions at issue in the lawsuit.[75] The designated witness was the sole person then directing and controlling the entities but had no personal knowledge of the issues.

In some cases, corporations served with a deposition request under the rule may then retain a former employee as a consultant to give testimony.[76] At least one observer has endorsed this process as indicating a flexible means by which a corporation may respond when the issues addressed in the deposition notice are within the knowledge of a particular former employee still favorably disposed toward the company.[77]

The entity designating a witness is ipso facto empowering that individual to give testimony admissible against the company.[78] Thus, it has been held that a company is free to designate third persons who have appropriate knowledge to give testimony on behalf of the entity under the Rule 30(b)(6) deposition procedure.[79]

Clearly, placing the fate of a corporate litigation party in the hands of former employees, consultants and non-parties is a dramatic step, one that is contemplated in practice only because the obligation to locate and prepare a witness in response to a Rule 30(b)(6) request sometimes cannot be satisfied by current personnel. Imposition of this burden—with its attendant risks—is

---

74. *Icrardi*, 1991 U.S. Dist. LEXIS 11887, at *6.

75. *Sierra Rutile, Ltd. v. Katz*, 1995 U.S. Dist. LEXIS 118, at *2,*3, *5 (S.D.N.Y. Jan. 10, 1995).

76. *Hilbern v. John Deere & Co.*, No. 88-3692, 1990 U.S. Dist. Lexis 10299, at *9,*10 (E.D. Pa. Aug. 7, 1990).

77. John J. Barnhardt, III & Jeffrey S. Whittle, *Use of Rule 30(b)(6) Depositions in Intellectual Property Litigation*, 74 J. PAT. OFF. SOC'Y 683, 697 (1992).

78. *See* FED. R. CIV. P. 32(a)(2) (referring to testimony of "a person designated under Rule 30(b)(6)").

79. *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996).

---

appropriate only where the discoverer has used the Rule 30(b)(6) device for proper purposes, and where proceeding with such testimony is a sensible and efficient means of illuminating the issues on which discovery is sought.[80]

*Designating Multiple Witnesses.* A party responding to a Rule 30(b)(6) request may designate a single witness or a slate of deponents calculated to address the various topics the discovering party has set forth.[81] A party intending to produce multiple witnesses in response to a Rule 30(b)(6) notice probably should indicate by letter or another written response the identity of all persons who will be designated as deponents at the Rule 30(b)(6) deposition, their dates of availability for examination, and, for each such person, the areas of inquiry and/or sub-area of inquiry as well as the period of time as to which such persons will testify.[82] Evidently, to facilitate determination of whether the party has adequately addressed the identified topics, some courts have required that the witnesses be produced in the *order* of the topic listing.[83] Obviously, as complexity increases, there is greater need for cooperation and negotiation to resolve practical difficulties with schedules, overlapping topic coverage of multiple individuals, and the like.

*Adopting the Testimony of Others as a 30(b)(6) Response.* In one of the most prominent decisions construing the Rule 30(b)(6) device, the court appears to have contemplated that a corporation could "adopt" testimony in prior depositions as its position on various issues.[84] This option is attractive for corporations who are litigating over events that happened so far in the past that they have no current witnesses with knowledge, and who may benefit from selecting among the versions of events expressed by third-party witnesses.[85] While this option provides the discovering party with testimony it can use against the enti-

---

80. *See infra* discussion of alternative means for disclosure of facts text accompanying notes 163-66.

81. Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997).

82. *See Taylor*, 166 F.R.D. at 364, ¶ 3.

83. *See id.* (adopting this procedure where the government had identified seventy-six topics and subtopics on which it demanded deposition testimony under the rule).

84. *See id.* at 365, ¶ 11.

85. *See id.*

ty for all purposes, it also raises the possibility that the prior depositions would have been conducted differently if the discoveror had known that the testimony elicited represented a statement of the corporate position of the entity on the subjects addressed.

In passing, however, at least one court has stated that a prior deposition of the designee "as a fact witness" is not grounds for precluding further questioning under Rule 30(b)(6).[86] To the extent that this approach prevails, the ability to adopt other testimony may have limited utility.

### D. *Scope of the Questioning at the Deposition*

A Rule 30(b)(6) notice does not limit the scope of the deposition to the designated topics.[87] Counsel for the discovering party is permitted to ask a witness produced pursuant to this Rule *any question pertinent to discovery in the suit*, and the witness must answer on behalf of the corporation to the extent that the witness is able.[88]

---

86. Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11667, at *6 (E.D. Pa. Aug. 20, 1991).

87. King v. Pratt & Whitney, 161 F.R.D. 475, 476 (S.D. Fla. 1995).

88. *See* Paparelli v. Prudential Ins. Co., 108 F.R.D. 727, 729 (D. Mass. 1985). Neither the text of the Rule 30(b)(6) nor the notes of the Advisory Committee indicates that the "matters on which examination is requested" which are listed in a 30(b)(6) deposition notice limit the scope of the examination. Thus, on the rare occasion where this issue has come up, courts have concluded that the sentence in Rule 30(b)(6) which states that the "persons so designated shall testify as to *matters* known or reasonably available to the organization" should be read to provide that the deposition is not strictly limited to the "matters" listed in the notice. *See Paparelli*, 108 F.R.D. at 729. Note that the purpose of Rule 30(b)(6) is to afford the party deposing the corporation the ability to obtain information on certain matters in the form of testimony on behalf of the corporation without having to name the individual in the corporation to be deposed. Therefore,

it makes little sense for a party to state in a notice that it wishes to examine a representative of a corporation on certain matters, have the corporation designate the person most knowledgeable with respect to those matters, and then to ask the representative about matters (different from or unrelated to the) ones listed in the notice.

*Id.* at 729-30. The goal of having witnesses who actually have the knowledge needed by the discovering party is also thwarted if the notice is not a guide to the scope of the testimony. *Id.* at 730. Finally, the "reasonable particularity" requirement applicable to the notice

also lends weight to the notion that a limitation on the scope of the deposi-

---

This breathtaking license for the discovering party allows it to capture admissions that may be used against the company on all manner of subjects. However, any more narrow reading of the scope of permissible examination would provide little comfort to the corporation (or witness) because the discovering party could expand the specified coverage by renewing the Rule 30(b)(6) deposition notice with a broader topic listing or simply by re-noticing the deposition under the regular notice provisions to ask him the same questions that were subject to objection in the 30(b)(6) deposition.[89] Prevailing judicial thinking, however, is that the discovering party "should not be forced to jump through that extra hoop absent some compelling reason."[90] Thus, while the discovering party has presumably listed the most important of the expected deposition topics in the Rule 30(b)(6) notice (so as to assure itself of a witness knowledgeable about the expected topics for examination), most courts have ruled that questioning on other topics is permissible.[91] Hence, if the witness happens to have knowledge on an appropriate topic not listed in the notice, answers will be required.[92]

It sometimes happens, of course, that at the deposition itself discovering counsel will think of topics that were not listed in the specification accompanying the Rule 30(b)(6) notice. In that situation, efforts to elicit testimony on the additional topics are obviously not barred, though gaps in the witness' responses are understandable given the lack of notice of the added topics.[93] One court observed that if the deponent does not know the answer to questions *outside* the scope of the matters described in the notice, then that is the examining party's problem.[94]

---

tion to the matters specified in the notice is implied in the rule. If a party were free to ask any questions, even if "relevant" to the lawsuit, which were completely outside the scope of the "matters on which examination is requested," the requirement that the matters be listed "with reasonable particularity" would make no sense.

*Id.*

89. *King*, 161 F.R.D. at 476.

90. *Id.*

91. *Id.*

92. *See id.*

93. Sikkelion v. St. Francis Reg'l Med. Ctr., No. 95-1616-MLB, 1996 U.S. Dist. LEXIS 20621, at *2 (D. Kan. Dec. 18, 1996); *see also King*, 161 F.R.D. at 476.

94. *Sikkelion*, 1996 U.S. Dist. LEXIS 20621, at *2.

The Rule's requirement that the notice "describe with reasonable particularity" the subjects is thus a two-edged sword. It imposes an obligation on a corporation to 'make reasonable efforts to locate a designee who can indeed answer the particular questions presaged by the notice, but Rule 30(b)(6) does not limit what can be asked at deposition.[95] Because there is no specific limitation in that rule on what can be asked at deposition, the general deposition standards govern.[96] The goals in adopting Rule 30(b)(6) were not to provide greater notice or protections to corporate deponents, but rather to have a knowledgeable person present at deposition to give testimony on its behalf.[97]

### III. MEASURING ADEQUACY OF THE 30(B)(6) DEPOSITION: GAPS, FALLBACKS AND NON-APPEARANCE

#### A. The Basic Obligation to Appear

Pursuant to Rule 37(d), the court can impose sanctions when a party or person designated under Rule 30(b)(6) fails "to appear before the officer who is to take the deposition, after being served with a proper notice."[98] Although one can easily

---

95. *Id.*

96. FED. R. CIV. P. 30(b)(6) ("This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules.").

97. *King*, 161 F.R.D. at 478. In *King*, the court stated:
The Rule is not one of limitation but rather of specification within the broad parameters of the discovery rules. This is made clear by both the Advisory Committee's statement that 30(b)(6) "should be viewed as an added facility for discovery . . . " and the Rule's final sentence: "This subdivision (b)(6) does not preclude taking a deposition by any other procedure authorized in these rules." This Court sees no harm in allowing all relevant questions to be asked at a Rule 30(b)(6) deposition or any incentive for an examining party to somehow abuse this process.
*Id.* (citation omitted).

98. FED. R. CIV. P. 37(d); *see* Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997); *see also* FED. R. CIV. P. 37(b)(2) (permitting the court to make such orders "as are just" and/or impose sanctions where the party or person designated under Rule 30(b)(6) "fails to obey an order to provide or permit discovery"); Republic of the Philippines v. Marcos, 888 F.2d 954 (2d Cir. 1989) (holding that sanction of dismissal for failure of corporate plaintiff to present two witnesses for deposition was proper).

grasp what is meant by the concept of appearance for specifically designated witnesses under Rule 30(b)(1), determining whether a corporation has arranged for an effective appearance by its designated Rule 30(b)(6) witnesses can be more elusive. Recent misuse of the Rule 30(b)(6) device is often manifested in and centered around arguments that gaps in the knowledge of a company's designated witness are effectively a form of "non-appearance" subject to draconian Rule 37 sanctions. A review of the case law and reflection on the purposes of this rule, however, suggest that the approach to gaps in the testimony should be quite different. Especially when one considers that often Rule 30(b)(6) depositions are sought on topics as to which the responding party simply has no viable witness possessing the requisite knowledge, forcing the responding party to recruit, educate, and prepare a person to give testimony on subject matters in which he or she had no involvement at the relevant times, a knee-jerk application of sanctions seems highly inappropriate.

*True Non-Appearance.* One prominent decision construing sanctions under this discovery device imposed the ultimate sanction of disposing of a case entirely.[99] Although dismissal of an action or proceeding is the most severe of appropriate sanctions,[100] the "element of willfulness or conscious disregard' for the discovery process . . . justifies the sanction of dismissal."[101] Thus, in a case in which there were clearly knowledgeable witnesses who blatantly refused to make themselves available for deposition pursuant to the notice after repeated court orders requiring appearance, the trial judge's decision to impose a dismissal sanction was upheld.[102] The testimony was so important to the action that failure to appear for deposition was found to have visited significant prejudice upon the other parties.[103] The

---

99. *Marcos*, 888 F.2d at 955.

100. *See* National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 642-43 (1976) (per curiam).

101. Founding Church of Scientology, Inc. v. Webster, 802 F.2d 1448, 1458 (D.C. Cir. 1986) (quoting Dellums v. Powell, 566 F.2d 231, 235 (D.C. Cir. 1977)).

102. *Marcos*, 888 F.2d at 955. The two witnesses who refused to appear were managing agents for the several corporations who were parties to the action, and one of the witnesses was the beneficial owner of much of the property involved. *See id.* at 955-57.

103. *See id.* at 956-57.

reviewing court was able to reach that conclusion because *other testimony* from witnesses documented the controlling role of the two witnesses who refused to appear.[104] Finally, there was a sense that the defaulting witnesses, owners of property who sought affirmative relief from the court, could not at the same time withhold information vital to the defense.[105] However, in keeping with the strong policy of deciding cases on the merits, the reviewing court noted that because the principal non-appearing financier had been extradited to the United States in another connection, the option existed to move the district court "to vacate its judgment upon tendering him for deposition."[106]

## B. Non-Responsiveness "Tantamount" to Non-Appearance

A party which does no more than produce a live body in the deposition room who disclaims any knowledge of the topics designated for testimony has, in the view of the cases, in effect not appeared at the deposition. Accordingly, designation of witnesses in response to a Rule 30(b)(6) deposition notice who claim to command no knowledge whatsoever about the topics listed by the discovering party has been deemed persuasive evidence of behavior by the party which is "tantamount to a complete failure of the corporation to appear."[107]

Many cases in recent years have spoken about this type of "non-appearance" and have created the specter that a broad range of weak deposition testimony may be deemed a failure to appear.[108] A close analysis of these cases indicates that the rhetoric of the decisions should not be read to erect burdens not contemplated in the rules and that most courts do not hinge toward the imposition of sanctions when problems arise in Rule 30(b)(6) depositions. A few courts, however, have taken the aspirational rhetoric as a literal synthesis of legal obligations, and sanction decisions are starting to emerge from this deposition procedure that are neither warranted under the Rule nor

104. *See id.*
105. *Marcus*, 888 F.2d at 957.
106. *Id.*
107. Resolution Trust Corp. v. *Southern Union Co.*, 985 F.2d 196, 197 (5th Cir. 1993).
108. *See infra* note 114.

sustainable in logic and common sense.[109] Our goal in this discussion, therefore, is to separate the dicta from the holdings in these cases and to identify the proper office of the Rule 30(b)(6) deposition device.

The test of compliance with the rules is actual testimony: it is *not* acceptable for the producing party to designate persons who simply "might have pertinent knowledge."[110] In an earlier era similar abusive behavior was encountered in some instances in which document production was used in lieu of interrogatory responses,[111] and led to an express comment in the Advisory Committee commentary to the effect that the producing party must have reason to believe that the information is likely to be available in the location to which the discovering party is directed.[112] Applying these concerns to Rule 30(b)(6) depositions, it has been noted that a responding party cannot satisfy the rule if its response reflects no recognition of an "obligation to make any investigation, including the review of readily available records, to identify an appropriate witness for Rule 30(b)(6) purposes."[113]

In this context, a few courts have held that "[p]roducing an unprepared witness is tantamount to a failure to appear."[114]

109. *See infra* notes 114-17.
110. *Southern Union Co.*, 985 F.2d at 197.
111. FED. R. CIV. P. 33(d) provides that a responding party may accept responsibility for preparing a textual response to an interrogatory if the interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an examination, audit or inspection of such business records, including a compilation, abstract or summary thereof, and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served . . . .
*Id.* In practice, a disclosing party is not free to send the discovering party on a goose chase in search of information that "might" be located in documents. The Advisory Committee has commented that the disclosing party must have reason to conclude that the information is actually available in the records to which it would remit the discoverer. *See* Amendments to the Federal Rules of Civil Procedure, 85 F.R.D. 521, 531 (1980).
112. *See* Amendments to the Federal Rules of Civil Procedure, 85 F.R.D. 521, 531 (1980).
113. *Southern Union Co.*, 985 F.2d at 197.
114. United States v. Taylor, 166 F.R.D. 356, 363 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996) (citing *Southern Union Co.*, 985 F.2d at 197); *cf.* Grout v. Equity Ass. Ins. Co., 884 P.2d 220, 232 (Ariz. Ct. App. 1994) ("Providing an uninformed warm body for a Rule 30 deposition approximates providing no one at all.").

Courts, almost by rote, conclude that a party which fails to provide a witness who is knowledgeable in the areas requested in a Rule 30(b)(6) notice is subject to sanctions.[115] Where the 30(b)(6) process results in testimony that is judged to be tantamount to a total failure to appear, the rules provide the court with the discretion to impose a selection of sanctions that range from the imposition of costs to the entry of a default judgment.[116] However, to warrant imposition of sanctions, "the inadequacies in a deponent's testimony must be egregious and not merely lacking in desired specificity in discrete areas."[117]

One federal court found that where a witness was "wholly unable to render testimony regarding one of the three subject areas for which he was designated," the "performance amounts to non-appearance, which could warrant the imposition of sanctions."[118] While the partial inability to testify could thus be viewed as non-appearance on that topic, "because sanctions that prohibit a party from introducing evidence are typically reserved for only flagrant discovery abuses," preclusion orders should not flow from such incremental defects.[119]

*Hiding the Ball.* If the entity has a witness with pre-existing knowledge of specified topics at its disposal, designation of sham witnesses who lack knowledge of the subjects on which testimony is sought will subject the company to sanctions.[120] For example, in *Resolution Trust Corp. v. Southern Union Co.,*[121] a prominent case, the discovering party served a Rule 30(b)(6)

---

135. *See* Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 78 (S.D.N.Y. 1991); Thomas v. Hoffman-La Roche, Inc., 126 F.R.D. 522, 524-25 (N.D. Miss. 1989).

116. *See* FED. R. CIV. P. 37(b)(2); Bank of N.Y. v. Meridian BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151-52 (S.D.N.Y. 1997).

117. *Bank of N.Y.,* 171 F.R.D. at 151 (quoting Zappia Middle East Constr. Co. v. The Emirate of Abu Dhabi, No. 94-1942, 1995 WL 686715, at *8 (S.D.N.Y. Nov. 17, 1996)).

118. *Id.*

119. *Id.* at 151-52 (declining to impose even cost sanctions given the complexity of the issues and the disclosures that were in fact made). In *Turner v. Hudson Transit Lines, Inc.,* the designated witness lacked knowledge about two out of four designated areas and provided misleading testimony about a third, 142 F.R.D. at 79; *see also Thomas,* 126 F.R.D. at 524 (awarding sanctions where deponents, medical doctors, were unable to testify about matters of a drug and dissemination of information about it as requested in the Rule 30(b)(6) deposition notice).

130. Resolution Trust Corp. v. Southern Union Co., 985 F.2d 196, 196 (5th Cir. 1993).

121. 985 F.2d 196 (5th Cir. 1993).

---

notice one and one-half pages in length, listing ten separate topics on which a knowledgeable witness was sought.[121] Counsel for the parties had several telephone calls about the arrangements.[122] Though the entity knew of at least one witness knowledgeable on the matters, it designated two individuals with no knowledge whatsoever.[124] Discovering counsel flew from Washington, D.C. to Texas for the depositions, and as he went down the roster of ten topics, to each subject the witnesses affirmed that they had no knowledge.[126]

*After* one discovering counsel's motion for sanctions, the corporation produced documents addressing some of the subjects, including some papers that identified another individual as having relevant knowledge.[126] This third individual was deposed and shown the relevant documents, and his recollection was refreshed.[127] The reviewing court concluded that the corporation "obviously made no effort to review documents which would have informed it of [the third witness'] relevant knowledge."[128] On this record sanctions were imposed and upheld by the Fifth Circuit.[129]

The Second Circuit has taken the position that a deponent's failure to answer questions at a deposition was not equivalent to a failure to appear.[130] Under this view, as long as the deponent physically appears, "the proper procedure is first to obtain an order from the court, as authorized by Rule 37(a), directing him to be sworn and to testify."[131] Most other courts, however, have taken the view that proffering a completely unknowledgeable witness may be construed as a form of default.[132] The Fifth Circuit rejected a direct analogy between the

---

122. *Southern Union Co.,* 985 F.2d at 196.

123. *Id.*

124. *Id.* at 196-97.

125. *Id.*

126. *Id.* at 197.

127. *Southern Union Co.,* 985 F.2d at 197.

128. *Id.*

129. *Id.* The sanction selected was an award of costs and fees incurred in deposing the first two designated representatives and in identifying the third individual as a person with knowledge. *Id.*

130. Salahuddin v. Harris, 782 F.2d 1127, 1131 (2d Cir. 1986).

131. *Salahuddin,* 782 F.2d at 1131 (quoting SEC v. Research Automation Corp., 521 F.2d 585, 588-89 (2d Cir. 1975)).

132. Greenwood v. Dittmer, 776 F.2d 785, 790-91 (8th Cir. 1985) (interpreting the

deposition of a natural person under a normal notice and the deposition of a corporation under Rule 30(b)(6).[132] Because the purpose of the Rule 30(b)(6) device is to streamline the discovery process, this mechanism places the different form of burden on the corporation for identifying responsive witnesses. Under this procedure, when an entity designates a person to testify on its behalf, "the corporation appears vicariously through that agent."[134] Therefore, the Fifth Circuit held that if the designated agent is not knowledgeable about relevant facts, "the principal has failed to designate an available, knowledgeable, and readily identifiable witness, [and] the appearance is, for all practical purposes, no appearance at all."[135]

Thus, on one level, there is a distinction between a typical deposition in which *the discovering party selects the deponent* and a Rule 30(b)(6) deposition, where the responding entity is obliged to select a witness to address listed topics. The court acknowledged that there is, in some sense, a potential for abuse in the Rule 30(b)(6) context which is not present when the party

---

similar language in Rule 30(g)(2)). In *Greenwood*, the Eighth Circuit held that a court may "order a party to reimburse those attending a deposition if the witness does not appear because the party failed to serve a subpoena upon him" and stated that Rule 30(g)(2) also may be invoked if a physically present witness is unwilling to testify. *Greenwood*, 776 F.2d at 190-91.

In a multi-district, multi-party lawsuit where a defendant's attorneys from one of the districts had attended the deposition of a non-party witness and plaintiff's counsel had said that he would inquire into issues relevant to that defendant's case but only made inquiries into matters relevant to other cases, the Tenth Circuit held that the lower court should wait until the final disposition of the case before considering the propriety and amount of sanctions for attorney fees and expenses. *Cronin v. Midwestern Okla. Dev. Auth.*, 619 F.2d 856, 864 (10th Cir. 1980). Although the appellate court noted that "[a]ttendance without proceeding forward with a deposition is sufficient to invoke the provisions of Rule 30(g)," the court reasoned that it was too early to determine the propriety of deposition vis-a-vis this particular defendant, because all of the pending cases "involved interrelated nationwide fraudulent schemes." *Cronin*, 619 F.2d at 864. The appellate court also held that the lower court erred by restraining further depositions until plaintiff had deposited reimbursement monies for this deposition with the court. *Id.* Lower courts have also treated unknowledgeable witnesses as a form of default. E.g., *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 79 (S.D.N.Y. 1991) (awarding costs and fees to examining party where the deposed party's 30(b)(6) designee failed to have knowledge regarding two of four topics requested in the 30(b)(6) notice and provided misleading testimony regarding a third topic).

133. *Southern Union Co.*, 985 F.2d at 197.
134. *Id.*
135. *Id.*

---

noticing the deposition specifies the deponent.[136] While nothing in Rule 30(b)(6) requires *personal knowledge* in the sense of knowledge gained during the underlying transactions, case law implementing the rule focuses on whether the witness proffered has information to convey on the topics designated.

It is significant that the Fifth Circuit holding in *Resolution Trust Corp. v. Southern Union Co.*, upholding sanctions, was conditioned upon the fact that there *was* a knowledgeable witness readily available.[137] In this case, the producing entity possessed documents that clearly identified a third individual as having personal knowledge of the subject of the deposition, and the entity did not produce those documents or designate the third witness until *after* it had designated two utterly unknowledgeable witnesses, had imposed upon counsel for the discovering party the expense of traveling across the country for two pointless deposition exercises, and had then been served with a motion for sanctions.[138] In this egregious situation, the Fifth Circuit found that the trial court's conclusion that the producing party did not make a "meaningful effort to acquit its duty to designate an appropriate witness" was manifestly correct and surely not an abuse of discretion.[139] Hence, it upheld the award of costs and fees under Rule 37(d).[140]

### C. Determining when Some Testimony Is Enough

By contrast, one court determined that when the deponents in a case rendered testimony concerning some of the subject areas of their designation, regardless of what other subject areas could have been covered by the deponents, their performance did *not* amount to non-appearance,[141] and hence sanc-

---

136. *Id.*
137. *Id.*
138. *Southern Union Co.*, 985 F.2d at 197.
139. *Id.* The court also rejected the notion that a mini-hearing into the circumstances of the witnesses' designation was obligatory. In the context, the trial court could determine the sanction application without holding an evidentiary proceeding. *Id.*
140. *Id.*
141. *Zappia Middle East Constr. Co. v. The Emirate of Abu Dhabi*, No. 94-1942, 1995 U.S. Dist. LEXIS 17197, at *26-*27 (S.D.N.Y. Nov. 17, 1995).

tions were not applicable.

While a largely unresponsive corporate designee may be considered tantamount to a "no show,"[142] where there are claimed gaps in the deponent's testimony, the fact that the designated Rule 30(b)(6) witnesses "did render testimony concerning the subject areas of their designations"[143] is often considered controlling. Thus, in one case, the court found that four transcripts containing 163 pages of responsive testimony was at least an appearance, not tantamount to presentation of "no witness" and hence not subject to sanctions.[144]

*Unanswered Questions Versus Unaddressed Topics.* For purposes of determining whether the entity is culpable for failing to produce a proper witness, the test is whether the proffered deponent was "an utterly inadequate 30(b)(6) witness."[145]

Some courts have taken the inflexible view that where the corporate party's designee gives answers to one or more questions which are to the effect that the witness lacks knowledge or has no opinion, then "[a]s to the subject matter of each such question, [the discovering party] is entitled to an additional 30(b)(6) designee who is able to give responsive answers that will bind Plaintiff at the trial of this action."[146] The better decisions, however, approach the evaluation of a deposition by focusing on the roster of legitimate topics properly set forth and the proportion of those topics on which the witness produced had some relevant information.

One court, quite evidently irritated at a variety of misconduct in conjunction with the deposition program, ruled that if a Rule 30(b)(6) designee gave "noncommittal answers to any substantive question" bearing on a list of allegations in the pleadings, "then on the next business day [the entity] shall produce for deposition one or more 30(b)(6) designees who can answer all yet-unanswered questions and all reasonable follow-up

---

142.  Barron v. Caterpillar, Inc., 168 F.R.D. 175, 177 (E.D. Pa. 1996).
143.  Zappia Middle East Constr. Co. 1995 U.S. Dist. LEXIS 17287, at *27.
144.  *Id.* at n.13 (tabulating transcript pages).
145.  *Id.* at *14.
146.  *See, e.g.,* Masco Corp. v. Price Pfister, Inc., No. 94-728-A, 1994 U.S. Dist. LEXIS 20597, at *7,*8 (E.D. Va. Nov. 30, 1994), *aff'd in part, rev'd in part,* 1994 U.S. Dist. LEXIS 20365 (E.D. Va. Oct. 28, 1994).

questions."[147]

### D. Fallback Witnesses

Where the witness has *some* knowledge and has not totally failed to address the topics specified, no relief may be necessary. One court expressly concluded that the entity had satisfied its duty under Rule 30(b)(6) by providing "the most qualified person available" as its deponent.[148] Such a witness, combined with other discovery made available under regular means such as interrogatory responses and document production, will in many cases provide the deposing party with all that it needs to be ready to present its case at trial and to challenge the entity's case.[149] Particularly when substantial time has passed between the events being litigated and the date of the deposition, limits on the knowledge of the witness are not surprising, and where both 30(b)(6) and regular depositions have taken place, re-deposition under Rule 30(b)(6) can be avoided.[150]

Nonetheless, where there are needs not otherwise dealt with in other discovery, the appropriate response to gaps in the testimony may be either for the witness to be re-prepared, if there are information sources reasonably available to the entity, or for *other witnesses* to be designated to provide supplemental testimony pursuant to the notice under the Rule. As one court commented, if the witness designated initially "cannot answer the questions, perhaps other corporate representatives can."[151] If, despite good faith efforts by the entity to prepare its designee, a witness is unable to respond to a specific area of inquiry, the entity has been given leave promptly to designate and prepare a substitute to testify to that area of inquiry.[152] Some courts

---

147.  Masco Corp., 1994 U.S. Dist. LEXIS 20597, at *8.
148.  Barron v. Caterpillar, Inc., 168 F.R.D. 175, 177 (E.D. Pa. 1996).
149.  *See generally* Barron, 168 F.R.D. at 177 (noting that other discovery had been made available to the deposing party).
150.  *See, e.g.,* United States v. Massachusetts Indus. Fin. Agency, 162 F.R.D. 410, 412 (D. Mass. 1995) (stating that one Rule 30(b)(6) deposition and five Rule 30(b)(1) depositions of specified individuals sufficed to make further 30(b)(6) testimony unnecessary).
151.  Audiotext Communications Network v. US Telecom, Inc., No. 94-2395-GTV, 1995 U.S. Dist. LEXIS 15416, at *38 (D. Kan. Oct. 5, 1995).
152.  Audiotext Communications Network, 1995 U.S. Dist. LEXIS 15416, at *39,

have stated that the party must do so,[153] and a few courts say the follow-up must take place "immediately."[154]

A step-by-step approach is implicit even in the decisions of the most demanding courts. Thus, they hold that once a company becomes aware that the chosen representative lacks sufficient knowledge about certain matters, the company has the duty to substitute another person for deposition or adequately prepare the initial deponent for a further session of testimony in which he could fully answer the questions.[155]

Of course, if a party recognizes in advance that no one witness could bear the burden of testifying for the company as to all issues in the deposition notice or for other strategic reasons, it may designate a slate of deponents calculated to address the various topics the discovering party has set forth.[156]

### E. Relevance of Other Information Sources

In determining whether a Rule 30(b)(6) deposition with apparent gaps in the testimony represents a discovery shortfall, and hence demonstrates a need for remedial action, the question should not be whether the deposition transcript sets forth every fact in the case and takes a position on every issue, construes every document and describes every event. Rather, the question should be whether the deposition in conjunction with other information available to the discovering party is sufficient to permit fair preparation for the coming trial.

One measured response to uncontestable gaps in the testimony of a Rule 30(b)(6) designee is to rely on alternative discovery tools to complete the discovering party's necessary picture of the events. Thus, it has been recognized by some courts that the mere fact that there are topics in the notice which the witness cannot address does *not* make out a prima facie showing that

¶ 6.
153. *E.g.*, FDIC v. Butcher, 116 F.R.D. 196, 199 (E.D. Tenn. 1986), *aff'd* 116 F.R.D. 203 (E.D. Tenn. 1987).
154. *See, e.g.*, Sanstrom v. Rosa, No. 93-7146 (RLC), 1996 U.S. Dist. LEXIS 11923, at *17 (S.D.N.Y. Aug. 16, 1996) (quoting 8A WRIGHT ET AL., *supra* note 22, § 2103, at 37-37).
155. Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126 (M.D.N.C. 1989).
156. *See supra* text accompanying notes 81-83.

there was conduct tantamount to a complete failure to appear.[157] Absent a showing of willfulness or bad faith, the better judicial response is to consider other means of shedding light on the facts.[158] One court declined the discovering party's motion for the appointment of an additional Rule 30(b)(6) designee after the one presented purportedly failed to provide complete responses to the government's requests.[159] In many cases "the most the Court will do . . . is to require [defendant] to produce more documents and clarify its position in response to a number of interrogatories."[160] The discovering party will need to specify in new requests the items of information needed and not previously addressed, and the entity will be permitted to "explain its position further through responses to those interrogatories and requests."[161]

As a result, some courts have taken the position that disclosing the identity of a knowledgeable employee, along with providing basic information to permit the discovering party to serve a notice upon the individual, is sufficient to render "moot any issue as to whether [the entity] should have produced him at a 30(b)(6) deposition."[162]

In a complex antitrust case involving telephone rates, production of three witnesses in response to a Rule 30(b)(6) deposition notice was held to be adequate, despite complaints from the discovering parties that there were gaps in the knowledge of the individuals and despite the fact that the producing entity failed to specify which of the twenty-six categories listed in the discovering party's motion about which the three witnesses could testify.[163] Because the discovering party was able to depose three witness who had some knowledge and had other discovery addressing the issues in the case, the trial judge's conclusion that

157. United States v. Massachusetts Indus. Fin. Agency, 162 F.R.D. 410, 412 (D. Mass. 1995).
158. *Massachusetts Indus. Fin. Agency*, 162 F.R.D. at 412.
159. *Id.*
160. *Id.*
161. Barron v. Caterpillar, Inc., 168 F.R.D. 175, 178 (S.D. Pa. 1996).
162. Abramson v. Florida Gas Transmission Co., 908 F. Supp. 1376, 1383 (E.D. La. 1995).
163. Directory Sales Management Corp. v. Ohio Bell Tel. Co., 833 F.2d 606, 609 (6th Cir. 1987).

682     Alabama Law Review   [Vol. 50:3:651]

further discovery was not required was upheld.[164]

*Rule 26 Triage Provisions.* There is little case law under Rule 26(b)(2), but arguments stressing the availability of simpler, cheaper means of learning facts may be pertinent in Rule 30(b)(6) contexts. In the reported decisions to date, an entity has occasionally attempted to use the availability of alternative avenues to obtain reversal through supervising courts of decisions by judges and magistrate judges who have already set a plan of discovery in motion. In that posture, where the abuse of discretion test applies, the fact that the judge managing discovery has not focused on the less burdensome alternative means has not generally proved persuasive.[165]

Rule 30(b)(6) was intended in part to promote the efficient discovery of facts.[166] For that reason, it seems eminently reasonable to use the balancing and triage provisions of Rule 26 when considering the appropriate scope of burdens to place on a party responding to a deposition notice under the Rule.

*Documents Previously Produced.* If the documents the deposition witness would be questioned about have already been made available to the discovering party, the discovering party does not have "a legitimate need" to inquire on deposition into the facts contained in the file.[167] As one experienced federal judge commented concerning the need for testimony which characterizes the supporting documents: "[The parties and] counsel can read them and determine which documents pertain to an allegation, and to what degree, directly or indirectly . . . . No Rosetta stone is necessary to unlock their mysteries."[168]

*Other Depositions Already Taken.* When there have already been witnesses deposed on behalf of an entity, most courts will view the Rule 30(b)(6) testimony as a "supplement" to the specif-

---

164. *Directory Sales Management Corp.*, 833 F.2d at 608.
165. *See, e.g.,* Resolution Trust Corp. v. Sands, 151 F.R.D. 616, 618-20 (N.D. Tex. 1993).
166. *Mitsui & Co. v. Puerto Rico Water Resources Auth.*, 93 F.R.D. 62, 65 (D.P.R. 1981); *see* Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 515 (1970).
167. *EEOC v. American Int'l Group, Inc.*, No. 93-6390 (DKL) (RLE), 1994 U.S. Dist. LEXIS 9815, at *8-*9 (S.D.N.Y. July 18, 1994).
168. *United States v. District Council of Carpenters*, No. 90-5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *43 (S.D.N.Y. Aug. 18, 1992) (opinion of Judge Charles S. Haight).

---

1999]   Discovering Corporate Knowledge   683

ic officers already deposed.[169] The scope of information needed is "narrowed" by the prior testimony, and a Rule 30(b)(6) designee's testimony may well be fully sufficient where it follows other officers who have been individually deposed, even when such testimony by the designee would be inadequate if it were the sole evidence disclosed by the entity on the listed subjects.[170] Where the entity designee—or the individual deponents from the corporate ranks—provides adequate coverage on the contested issues, "no relief is warranted."[171]

*Leads.* A straightforward reading of the legislative history of Rule 30(b)(6) makes it quite clear that the central function envisioned for this procedure by the Advisory Committee was to provide the discovering party with reliable leads to the identities of persons within the entity who have actual knowledge of the events in suit.[172] A corporation's willingness to disclose names of specific employees and former employees with knowledge is a factor demonstrating that the goals of full discovery are being advanced and that gaps in Rule 30(b)(6) testimony are insignificant.[173]

## IV. ADEQUACY OF PREPARATION EFFORT: BURDENS AND ALTERNATIVES

### A. Reasonable Scope or Absolute Perfection

Rule 30(b)(6) delineates what has been called an "affirmative duty" to produce a representative who can answer questions that are both within the scope of the matters described in the notice and are known or reasonably available to the corporation.[174] Our assessment from study of the emerging case law is that unrealistic expectations, glib verbal formulas, and a failure to consider other mechanisms in the exchange of information

---

169. *Zappia Middle East Constr. Co. v. The Emirate of Abu Dhabi*, No. 94-1942, 1995 U.S. Dist. LEXIS 17167, at *21-*22 (S.D.N.Y. Nov. 17, 1995).
170. *Zappia Middle East Constr. Co.*, 1995 U.S. Dist. LEXIS 17167, at *21-*22.
171. *Id.*
172. *See* Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 515 (1970).
173. *Lapenna v. Upjohn Co.*, 110 F.R.D. 15, 24 (E.D. Pa. 1986).
174. *King v. Pratt & Whitney*, 161 F.R.D. 475, 476 (S.D. Fla. 1995).

during pretrial phases of litigation have led to confusion in the courts. In one sense, the mistake being made in a number of the decisions is the assumption that this one' device, Rule 30(b)(6) depositions, must perform all preparation functions and must provide an evidentiary event that, in and of itself, culminates all preparations and distills all knowledge on a topic. Nothing in the Advisory Committee's conception of this deposition device suggests that it was intended to perform such extensive and Herculean roles.

While the initial purpose of the deposition procedure under the Rule centered upon the start-up phase of the proceedings and the issue of how a party litigating against an entity can avoid a series of missteps in locating personnel with knowledge,[175] one widely cited district court decision rejected as a "restrictive characterization" of the scope of Rule 30(b)(6) the view that this mechanism was "designed to save one step in the deposition process by eliminating a deposition designed to ascertain the name of witnesses to be deposed subsequently."[176] That purpose, which is clearly one of the goals of the representative deposition procedure, is not a complete description as the doctrine is applied today.

In addition, however, it is taken to be one of the "self-evident propositions" on the operation of 30(b)(6) derived from the plain language of the Rule that the "persons so designated shall testify as to matters known or *reasonably available* to the organization."[177] Thus, courts interpreting the rule generally hold that if the rule is to be implemented in a fashion calculated to promote effective discovery regarding the knowledge of a corporation, "the spokesperson must be informed."[178]

The issue, of course, is how much preparation is enough. The test of reasonableness in the Rule, which is compatible with the approach of the discovery rules in other contexts,[179] would

---

175. *See infra* text accompanying notes 349-50.
176. Mitsui & Co. v. Puerto Rico Water Resources Auth., 93 F.R.D. 62, 64 (D.P.R. 1981).
177. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 278 (D. Neb. 1989) (citing FED. R. CIV. P. 30(b)(6)).
178. *See Protective Nat'l Ins.,* 137 F.R.D. at 278.
179. *See, e.g.,* FED. R. CIV. P. 34(b) ("The request shall set forth . . . the items to be inspected [and] describe[d] with reasonable particularity.").

---

recognize limits and alternatives. Unfortunately, in one widely quoted distillation of the scope of the preparation duty, a trial court lost sight of those natural considerations and created a stringent, absolutist test for adequacy of the Rule 30(b)(6) witness.[180] The court stated that the goal of a meaningful deposition is that: "[The corporation] must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the interrogator] and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed by [the interrogator] as to the relevant subject matters."[181] None of the concepts in this test has a basis in either the text of the rule, the Advisory Committee Note, or the goals of the device. But the clarion call of this summary has led several other courts to treat it as the applicable standard nonetheless.[182]

The most demanding readings of the testimonial obligations inherent in the Rule proceed from a basic sense that such an interpretation of the scope of the obligations is necessary "in order to make the deposition a meaningful one and to prevent the 'sandbagging' of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial [which] would totally defeat the purpose of the discovery process."[183] As we will note below, however, the panoply of discovery and other procedural devices in federal litigation provide a number of protections against late revelation of information, such that it is not necessary that this discovery mechanism carry the full weight of the policy favoring active contest of proof on the merits.

---

180. *Mitsui,* 93 F.R.D. at 66-67.
181. *Id.* at 67 (requiring a corporation to designate a 30(b)(6) spokesperson and imposing fees and sanctions for the failure to do so). *Mitsui* appears to be the origin of this test, which is cited with approval in several more recent decisions. *See, e.g.,* Dravo Corp. v. Liberty Mut. Ins. Co., 164 F.R.D. 70, 75 (D. Neb. 1995); *In re* Analytical Sys., Inc., 71 B.R. 408, 412 (N.D. Ga. 1987). *Mitsui* cited no authority for the language setting forth these requirements. *See* 93 F.R.D. at 66-67.
182. Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 150 (S.D.N.Y. 1997); SEC v. Morelli, 143 F.R.D. 42, 45 (S.D.N.Y. 1992); *see also Protective Nat'l Ins.,* 137 F.R.D. at 278; FDIC v. Butcher, 116 F.R.D. 196, 199 (E.D. Tenn. 1986), *aff'd,* 116 F.R.D. 203 (E.D. Tenn. 1987).
183. United States v. Taylor, 166 F.R.D. 356, 362 (M.D.N.C. 1996), *aff'd* 166 F.R.D. 367 (M.D.N.C. 1996).

A standard requiring only *reasonable efforts* should be applied here, as it does under each of the other discovery devices in the federal rules. For example, recall that under Rule 33, interrogatory answers for a corporate party must reflect corporate knowledge and not simply the knowledge of the individual making the answer.[184] In responding to interrogatories, a corporate party has the duty to undertake reasonable investigation.[185] The duty is interpreted to require reasonable efforts by the entity to locate information within its grasp.[186] These efforts include, for example, interviewing lower level employees[187] and in appropriate cases contacting affiliate entities or subsidiaries, domestic and foreign.[188] A similar reasonableness test is applied in assessing the duty of factual exploration under Rule 36 admissions practice.[189]

*A Reasonably Knowledgeable Witness.* Applying similar notions of reasonable preparation makes for a Rule that is both workable and successful at attaining its basic purposes and avoids the opportunities for misuse which arise when it is assumed that the Rule requires perfection.

The preparation of a Rule 30(b)(6) witness is often measured in the case law by considering the categories specified in the notice, rather than any abstract perspective on the subject matter of the suit or the education and practical background of the witness. Thus, in a case in which a Rule 30(b)(6) notice of deposition requested testimony as to corporate practices of a large financial institution, production of a witness who was only knowledgeable about one "team" of professionals and who could not confirm that other teams within the corporation followed the same practices was inadequate.[190] Similarly, a witness knowledgeable about corporate activity in one calendar year would not

be deemed sufficiently knowledgeable because part of the notice sought information as to a later year.[191]

It is generally recognized that the "duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved."[192] An entity does not discharge its duty under the Rule simply by canvassing its personnel to determine whether it has any witness knowledgeable about the specified subjects, or to determine the most appropriate existing witness.[193] Using the discovering party's roster of desired information as a guide, the entity is expected to *create* a witness with responsive knowledge.[194] While, as noted above, the Rule should require reasonable efforts to prepare a witness to be responsive, the more absolutist courts embrace a stronger sense of the efforts required.

Imposition of considerable burdens in preparing a Rule 30(b)(6) deponent has been rationalized as "merely . . . the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business."[195] No explanation is offered, however, as to why the opportunity to use the corporate form of organization requires more than disclosure of what persons under the control of the entity know. Of course, Rule 30(b)(6) is not limited to depositions of corporations, but can be used for partnerships, unincorporated associations or other entities.[196]

*Events Long Past.* One situation in which corporate knowledge is often sparse arises when the time period in which the events took place is quite remote, illustrated in *Barron v. Caterpillar, Inc.*, a products liability case litigated in the 1990s concerning machinery designed in the mid-1960s by then employees of the corporate entity.[197] Most courts, but not all,[198] have

184. *Segarra v. Waterman S.S. Corp.*, 41 F.R.D. 245, 247 (D.P.R. 1966); *Holler v. General Motors Corp.*, 3 F.R.D. 296, 297 (E.D. Mo. 1944).
185. *See* 8A WRIGHT ET AL., *supra* note 22, § 2261, at 560.
186. *Weddington v. Consolidated Rail Corp.*, 101 F.R.D. 71, 75 (N.D. Ind. 1984).
187. *Weddington*, 101 F.R.D. at 75.
188. *E.g.*, *Transcontinental Fertiliser Co. v. Samsung Co.*, 108 F.R.D. 650, 652-53 (E.D. Pa. 1985).
189. *United States v. Taylor*, 166 F.R.D. 356, 362 (M.D.N.C. 1996), *aff'd* 166 F.R.D. 367 (M.D.N.C. 1996).
190. *Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 338, 343 (N.D. Ill. 1995).

191. *Buycks-Roberson*, 162 F.R.D. at 343.
192. *Taylor*, 166 F.R.D. at 361 (citing *Buycks-Roberson*, 162 F.R.D. at 343; *SEC v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992)).
193. *Id.*
194. *See id.*
195. *Id.* at 362.
196. *See Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery*, 48 F.R.D. 487, 514-16 (1970).
197. 168 F.R.D. 175, 177 (E.D. Pa. 1996).
198. *See infra* discussion of *Taylor*, text accompanying notes 224-40.

recognized that where there is a delay, such as a twenty-five-year hiatus, "*both parties should anticipate* the unavailability of certain information."[199]

In such circumstances, if the entity produces a senior person who had relevant responsibilities, such as a manager involved with the product, the company will have provided for the discovering party the "best chance of obtaining any information" concerning the relevant facts.[200] Where "the inescapable and unstoppable forces of time have erased items from [the initial designee's] memory which neither party can retrieve," but that person was the most knowledgeable individual still associated with the entity, requiring the company to appoint an additional corporate designee "presents an *inappropriate* remedy to cure the discovery problems presented . . . ."[201]

*Older Practices and Policies.* Perhaps even more troublesome than "facts" from years past is a discovery request that specifies an entity's general policies or practices from an earlier era. Such matters are not closed to discovery as a matter of law. One court has rejected a corporation's argument that "it is difficult and time-consuming to investigate unwritten practices that were in effect three years ago,"[202] finding that such arguments "fail to confront the fact that [the entity] had a duty to provide a witness or witnesses with the requisite knowledge and to prepare these witnesses, despite the difficulty of investigating the subject matter requested by the deposing party."[203] Obviously, however, if no personnel or documents reasonably accessible to the company illuminate the general practices specified, knowledge will understandably be very difficult to locate.

*Expertise?* In *Resolution Trust Corp. v. Sands,*[204] one governmental entity subjected to a deposition request under the Rule argued that the notice required it, in effect, to produce an expert witness in circumstances where the then-applicable requirements of Rule 26(b)(4) had not been met, indeed prior to

---

199. *Barros*, 168 F.R.D. at 177 (emphasis added).
200. *Id.*
201. *Id.* (emphasis added).
202. Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 342 (N.D. Ill. 1995).
203. *Buycks-Roberson*, 162 F.R.D. at 342.
204. 151 F.R.D. 618, 619-20 (N.D. Tex. 1993).

---

the time set for identification of experts.[205] The topic specification in the notice required the entity to tender a witness to testify about the party's "claims that the officers and directors were negligent, grossly negligent or breached their fiduciary duties."[206] The court, however, observed that while the discovering party might better have framed the request in terms of "the factual basis" for these claims, there was no implicit thrust in such a question calculated to discover anything other than factual predicates for the causes of action.[207] Both substantive and damage-support questions were viewed as not inherently calling for expertise.[208]

*B. Where There Is No Knowledgeable Witness Within the Entity*

One recent decision has suggested that the circumstance in which a corporate designee lacks sufficient knowledge of the relevant facts to provide adequate responses to the discovering party's requests is a frequent occurrence.[209] The normal solution for this common situation is for the entity to shoulder the burden of presenting additional designees capable of providing sufficient answers to the unaddressed requests.[210]

A few courts have taken the position that "[n]othing in Rule 30(b)(6) requires a party to 'create' a witness in response to a 30(b)(6) notice."[211] But the view that the duty to educate a person with no prior knowledge is "prejudicial" to a corporation[212] has not prevailed, and it appears now to be recognized that the Rule 30(b)(6) deponent must be woodshedded with information

---

205. *See Sands*, 151 F.R.D. at 619-20.
206. *Id.* at 620.
207. *Id.*
208. *Id.*
209. Barron v. Caterpillar, Inc., 168 F.R.D. 175, 177 (E.D. Pa. 1996).
210. *Barron*, 168 F.R.D. at 177 (quoting 8A WRIGHT ET AL., *supra* note 22, § 2103 ("[i]f in the course of taking the deposition it becomes apparent that the . . . [sic] persons designated are not able to provide testimony on the matters specified in the notice, it is the duty of the corporation immediately to make a new designation substituting someone who can give the needed testimony.")).
211. Resolution Trust Co. v. Kasimover, No. C92-0185, (N.D. Iowa Nov. 16, 1992) (unpublished opinion cited in Elbein, *supra* note 6, at 369).
212. *See* unreported cases, most of which relate to the Resolution Trust Co. as a litigant, collected in Elbein, *supra* note 6, at 369 n.8.

that was never known to the witness prior to deposition preparation. In that sense, a deposition under the Rule "represents the knowledge of the corporation, not of the individual deponents."[213] Several courts have held, accordingly, that the duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved.[214]

    *When No Information Is Available.* Under Rule 30(b)(6), even the courts which impose the most stringent preparation burdens on an entity responding to a deposition notice commonly recite that it is possible for the corporation to plead lack of knowledge, sometimes analogized to an individual deponent's lack of memory.[215] Given the language of the Rule itself, it should be recognized that if the entity "does not possess such knowledge as to so prepare [the initial deponent] or another designate, then its obligations under Rule 30(b)(6) obviously cease, since the rule requires testimony only as to 'matters known or reasonably available to the organization.'"[216]

    *When Information Can Be Collected.* When the corporation has available to it the sources of information needed to prepare a witness to give testimony on the corporation's behalf, several courts have subscribed to the general statement that "[i]f the persons designated by the corporation do not possess personal knowledge of the matters set out in the deposition notice, the corporation is obligated to prepare the designees so that they may give knowledgeable and binding answers for the corporation."[217] For example, a governmental regulatory body created in 1990 was required to produce a fact witness about events that had happened years earlier.[218] In general, governmental claims

---

213. United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996), *aff'd,* 166 F.R.D. 367 (M.D.N.C. 1996).

214. *See, e.g.,* Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 343 (N.D. Ill. 1996); SEC v. Morelli, 143 F.R.D. 42, 45-46 (S.D.N.Y. 1992).

215. *Taylor,* 166 F.R.D. at 361.

216. Drave Corp. v. Liberty Mut. Ins. Co., 164 F.R.D. 70, 76 (D. Neb. 1995) (citing FED. R. CIV. P. 30(b)(6)). In rejecting case-dispositive consequences in such circumstances, one court reported that it could locate "no cases . . . in which a court has held that a party's *inability* to designate a corporate representative warrants Rule 11 sanctions." Federal Sav. and Loan Ins. Corp. v. Village Creek Joint Venture, 130 F.R.D. 357, 359 (N.D. Tex. 1989) (emphasis added).

217. *Taylor,* 166 F.R.D. at 361 (citing *Drave Corp.,* 164 F.R.D. at 75).

218. *See, e.g.,* Resolution Trust Corp. v. Sands, 151 F.R.D. 616, 619-19 (N.D. Tex.

of lack of personal knowledge pertaining to the relevant time period have met a similar fate in disputes under Rule 30(b)(6).[219] However, it should be noted that on occasion a court has held that the existence of other forms of discovery information available to the adversary may excuse the obligation to create a deposition witness out of whole cloth.[220]

    As a consequence of Rule 30(b)(6)'s requirement that the witness testify as to matters known or reasonably available, information held within the organization and documents reasonably available should be reviewed by the designee. Simply producing a participant in the underlying transactions, despite lack of current recall, has been held an inadequate Rule 30(b)(6) response.[221] When others within the entity have knowledge,

---

1993).

219. Morelli, 143 F.R.D. at 45 (rejecting the contention "that Rule 30(b)(6) is only intended to apply to actions in which a governmental agency or someone in its employ has participated in the transactions or events in controversy or has actual knowledge of facts or information relevant to the action."); FDIC v. Butcher, 116 F.R.D. 196, 199 (E.D. Tenn. 1986), *aff'd,* 118 F.R.D. 203 (E.D. Tenn. 1987) ("One of the purposes of Rule 30(b)(6) is to curb any temptation a corporation might have to shunt a discovering party from 'pillar to post' by preventing deponents who each disclaim knowledge of facts clearly known to someone in the organization.").

220. In one case, the F.S.L.I.C. sued with respect to transactions involving a failed Savings & Loan. *Village Creek Joint Venture,* 130 F.R.D. at 358. In the course of discovery, the defendants demanded that the F.S.L.I.C. designate a Rule 30(b)(6) corporate representative or other person to testify on its behalf. *Id.* Because the transactions and conduct upon which the complaint was predicated had occurred during the life and operation of the defunct savings bank, neither the F.S.L.I.C., nor its appointed manager, the FDIC, had any involvement with the bank's operations. Accordingly, plaintiff's counsel advised counsel for the discovering defendants, in response to a supplemental deposition notice, that plaintiff had no representative who could appear as a Rule 30(b)(6) representative and that persons with knowledge were either participants in the transaction in question (and were therefore aligned with defendants) or were former employees of the failed S & L. *Id.* at 358. The defendants followed with a motion to dismiss, predicated upon the legal premise that a party's inability to designate a Rule 30(b)(6) representative is legally equivalent to a party's concession that no factual basis existed for the filing of the alleged offending pleading. In this case plaintiff F.S.L.I.C.'s complaint. *Id.* However, the court expressly found this context "distinguishable from those circumstances in which a party has timely failed to designate a Rule 30(b)(6) representative, which ordinarily if established warrants the imposition of sanctions under Rule 37." *Id.* Other discovery, including interrogatory responses filed by the plaintiff, was sufficient to negate the thesis of the motion claiming effective failure to make a Rule 30(b)(6) designation. *Village Creek Joint Venture,* 130 F.R.D. at 358-59.

221. Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997).

conferences by the designee with other current employees may be appropriate.[222] Indeed, two decisions have imposed an obligation for an entity's designee to confer with past employees, or "other sources."[223]

*Over-reading the Requirement.* Perhaps the high-water mark in federal decisions requiring a party to prepare a witness to give 30(b)(6) testimony even when there are *no* current employees with personal knowledge of the events in litigation is a magistrate's decision in *United States v. Taylor*,[224] upheld by the supervising district judge.[225] The decision, however, illustrates both the breadth and the limits of current case law concerning preparation duties because it reflects a broad conception of the duties borne by the parties under the Rule, but implements these obligations in a step-wise fashion, without sanctions, to facilitate gradual piecing together of the requisite information.

*Taylor* concerned a CERCLA action[226] in which the United States as plaintiff served a Rule 30(b)(6) notice of deposition on defendant Union Carbide Corporation.[227] A dispute arose concerning the scope of a party's necessary efforts to prepare a Rule 30(b)(6) deponent.[228] The case had been pending for seven

---

222. *Bank of N.Y.*, 171 F.R.D. at 151. In instances where the knowledge required by the Rule 30(b)(6) deposition is extensive, or where it sounds in several domains, the organization has the option of designating one or more such persons or providing a single witness with his account of the events as a means of preparing him for the deposition. *Id.*

223. United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996) (citing Ierardi v. Lorillard, Inc., No. 90-7049, 1991 WL 158911, at *3 (E.D. Pa. Aug. 13, 1991)).

224. 166 F.R.D. 356 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996).

225. United States v. Taylor, 166 F.R.D. 367 (M.D.N.C. 1996).

226. Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675 (1994). CERCLA is a complex environmental remediation statute whose primary purpose is prompt cleanup of hazardous waste sites. *Id.*

227. In *Taylor*, the United States sought to recover costs of cleaning up a Superfund site known as the "Aberdeen Pesticide Site." *Taylor*, 166 F.R.D. at 356. In addition, the government asserted that Union Carbide was liable as an owner or operator by virtue of its control of an entity known as Grower Service, which Union Carbide sold prior to the commencement of the litigation. *Id.*

228. *Id.* at 359-60. It may be relevant that during the same period in which the Rule 30(b)(6) dispute arose the government also served extensive Rule 36 Requests for Admissions on Union Carbide, which raised issues concerning the obligation of a party to authenticate documents. *Id.* at 365-66.

---

years when the dispute arose,[229] a consideration in a determination of the fair scope of duties imposed on a disclosing party.[230] While that timing might ordinarily favor forcing a party to make definitive statements, it was counterbalanced by a litigation history in which key claims against Union Carbide were not advanced until late in 1995, six years into the litigation and one month before the scheduled discovery cut-off on liability issues.[231]

The Rule 30(b)(6) deposition sought by the United States identified topics bearing on Union Carbide's alleged liability as an owner/operator of the Grower Systems facility. The time periods covered in the notice ran from 1959 through 1981.[232] At the time of the deposition dispute, Union Carbide's sale of the Grower Systems division had occurred fifteen years earlier.[233] As a result, the court observed, most of the individuals with knowledge of the Union Carbide/Grower Systems relationship and activities no longer were employed by Union Carbide and some of them had possibly died.[234]

Union Carbide moved for a protective order that would have quashed the Rule 30(b)(6) notice, and in late 1995 the court addressed that motion at a status hearing, entering a written order granting the motion only in part and denying other relief from the deposition.[235] The court adopted as its standard another decision from the same district which, several years before, had taken one of the most demanding views ever recorded of the duty to educate a Rule 30(b)(6) witness.[236] After Union Carbide sought clarification of the court's instructions, an initial session

---

229. *Id.* at 358.

230. We note elsewhere that the timing of contention interrogatories is a matter of some significance in managing that discovery tool; to the extent that a discovering party is permitted to use the Rule 30(b)(6) device to explore similar sorts of subjects, the timing of the deposition request bears on whether the case has reached such a stage that it is reasonable to require a party to take a firm position on its legal theories and the factual support for such theories. *See infra* text accompanying note 323.

231. *Taylor*, 166 F.R.D. at 358.

232. *Id.*

233. *Id.*

234. *Id.*

235. *Id.*

236. *See* Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126-27 (M.D.N.C. 1989).

of the deposition went forward in December 1995.[237]

The government was dissatisfied with that initial session and argued to the court in a telephonic motion that Union Carbide had failed adequately to prepare the witnesses.[238] Carbide took the position that its duty of reasonable effort meant that it must locate any knowledgeable current employees and use any documents then available to the company in the preparation, but that where there were no current employees with knowledge and no documents, it could respond by identifying retired employees who would be in a position to speak on the topics.[239]

The court clarified its prior instructions by advising Carbide that:

[i]f it did not have any employees who had any knowledge about a topic, it was not required to provide an answer and thereby take a stance or assert a position, but *as a consequence, it also could not offer any evidence, direct or rebuttal, or argument at trial as to that topic.*[240]

*Requiring Preparation Using Other Discovery Fruits.* Any implementation of the preparation required under Rule 30(b)(6) to require review of "prior fact witness deposition testimony as well as documents and deposition exhibits"[241] is extremely dangerous. The asserted justification for this obligation—which obviously requires the witness to be fully prepared on the entire litigation—is that this level of preparation will allow the witness for the entity to state the "corporate position" at the Rule 30(b)(6) deposition "with regard to the prior deposition testimony."[242]

However, there is no basis for imposing a requirement that the corporation take a "position" on all deposition testimony in a

---

237. *Taylor*, 166 F.R.D. at 358.
238. *Id.* at 358-59.
239. *Id.*
240. *Id.* at 359 (emphasis added). Because of the paucity of case law elucidating the duties of entities which lack employees with knowledge about a specified Rule 30(b)(6) deposition topic, the court imposed no sanctions despite expressing the conclusion that the deposition was "unacceptable." *See id.* After the parties could not agree on draft orders embodying the court's telephonic rulings and almost a *year* of submissions, the court entered the published opinion resolving Carbide's obligations. *Taylor*, 166 F.R.D. at 362.
241. *Id.*
242. *Id.*

case. In part, this nonsensical implementation of Rule 30(b)(6) obligations flows from the rote application of the thought that all items "reasonably available" to the entity must be consulted.[243] This observation gets to one aspect of the problem: the proper mission of a deposition under the rule should be to provide the discovering party with advance warning about what persons within the entity know. It is not a device intended to provide *reactions to or assessments of* the myriad assertions in all depositions given by other witnesses, including non-parties or the adversary's own personnel.[244]

*Preparation Involving Third Parties or the Adversary.* In the most demanding of rulings, the federal magistrate judge in *Taylor* required a party to have its Rule 30(b)(6) designee review not only documents recognized by the entity to be relevant for preparation, but also deposition transcripts of *other parties' witnesses selected by the examining adverse party.*[245] Collecting information from such sources is particularly troubling. Can it reasonably be argued that the corporation's witness must "learn" facts asserted by the adversary's witnesses in order to report the entity's "position" on contested facts? There are obviously many cases in which there are competing and inconsistent pieces of evidence. The notion that when the corporation has no knowledge through employees and documents in its possession, custody, or control, the company must select from, say, three non-party witnesses' versions of the events the one that it adopts as its knowledge or position is glib at best. To require the deposition designee to consider adversary witness testimony as part of the corporation's knowledge base is even less defensible.[246]

---

243. *Id.* at 361-62.
244. Using the deposition mechanism to obtain "admissions" about various facts buried in other deposition testimony which took place "prior to" the 30(b)(6) deposition itself has several problems. For one, the oral testimony mechanism is inherently less precise than a written distillation of desired "admissions," and in fact a tool exists for precisely this purpose: Rule 36 Requests for Admissions. *See infra* text accompanying notes 315-18.
245. *Taylor*, 166 F.R.D. at 365, 18; *see also* Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126-27 (D.N.C. 1989) [describing the extensive duties of entity proffering Rule 30(b)(6) witness in preparing its designated deponents for testimony about the areas of inquiry set forth in a notice).
246. *Cf.* T. Rowe Price Small-Cap-Fund, Inc. v. Oppenheimer & Co., 174 F.R.D 38 (S.D.N.Y. 1997). At issue in the case was whether Oppenheimer had interviewed certain employees of its client, a bank, when conducting due diligence. *Oppenheimer*,

The placement of the burden of proof has a distinct bearing on the coherence of this position. If the corporation is the *defendant*, for example, it need not proffer any of the competing versions of the event, because the burden of producing evidence and the risk of non-persuasion on the factual propositions will lie with the opposition throughout the trial. The company can attack and oppose any or all of the "facts" asserted by the various witnesses purporting to have knowledge. Imposing an obligation on the entity to adopt one of the competing versions of events in such situations is senseless, unfair, and inconsistent with the standard (and accepted) burden.

In broad perspective, the enforcement of an obligation to review all disclosure material and to synthesize opposing as well as client-based factual materials is part and parcel of a view of the deposition process that seeks to make it the equivalent of a contention interrogatory device, which as we demonstrate below, is safer, less burdensome, and less subject to abuse than the oral deposition mechanism for these purposes.[247]

### C. Proving or Disproving Adequate Preparation

Where an entity's designee has no ability to recall "most of the events" on a topic designated for Rule 30(b)(6) testimony, the deposition testimony may be rendered meaningless.[248] And, predictably, where the topics on which the testimony is sought are matters over which the witness had personal responsibility, a fruitless deposition is sometimes taken as strong evidence of

---

174 F.R.D. at 45. Plaintiffs, contending that bank employees had given uncontradicted deposition testimony that they had *not* been interviewed, demanded that Oppenheimer must admit or deny that the interviews had taken place. *Id.* Oppenheimer responded that it was unable to admit or deny the request because its own personnel, when asked, could not remember whether they, or others who had done due diligence (some of whom were no longer available), had conducted such interviews. *Id.* The court held that "[u]nder these circumstances, Oppenheimer is not required to concede that [the third-party bank employees'] version of the facts is true." *Id.* In effect, the court recommended a solution which seems perfectly suitable for parallel situations that arise in the context of Rule 30(b)(6) controversies: Let the evidence be presented, and let the finder of fact evaluate its credibility and weight. *Id.; see also infra* text accompanying notes 360-70.

247. *See infra* text accompanying notes 284-355.

248. Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 151 (S.D.N.Y. 1997).

---

poor preparation.[249]

Even with respect to topics about which the designated witness did not have "first-hand knowledge and involvement in the underlying transaction, the focus remains on the preparedness of the witness."[250] Because the topics selected by the discovering party may be broad, covering many subjects and long periods of time, a better approach to these issues is to focus on the available sources of information and the extent to which the witness was exposed to those matters before giving testimony.

Once an initial session of the deposition is held and disputes arise about the completeness of the witness's preparation, courts regularly consider several factors. The factors considered in measuring adequacy of preparation include: conferences by the witness with predecessors or co-workers, checking with outside offices such as governments or regulatory officials, contacting appropriate branches of the enterprise, and contacting senior executives.[251]

Sometimes affidavits submitted for another purpose will demonstrate that others possess knowledge that the designated witness lacks, and hence that the witness is either inadequately prepared or an insufficient designee.[252] Even if the designee "may have been the individual best situated to testify" as to some subjects, the witness may be inadequate as to others.[253]

Perhaps the most common issue in assessing proper preparation of a deposition witness under the rule center around whether review of documents or familiarity with pertinent documentary sources of information can be demonstrated in support of finding that the witness was properly prepared.[254] Whether

---

249. *Bank of N.Y.*, 171 F.R.D. at 151.

250. *Id.* (citing SEC v. Morelli, 143 F.R.D. 42, 45 (S.D.N.Y. 1992)).

251. Zapple Middle East Constr. Co. v. The Emirate of Abu Dhabi, No. 94-1942, 1995 U.S. Dist. LEXIS 17187, at *16 (S.D.N.Y. Nov. 17, 1995).

252. *Bank of N.Y.*, 171 F.R.D. at 151.

253. *Id.*

254. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267 (D. Neb. 1989). In this case, the following colloquy concerning preparedness evolved:
Mr. Factor: Well, hold on a second. The trouble is when you use lawyer's words the witness may not understand what you're talking about. I'll represent that Ms. Murphy took a look at the counterclaim that we had filed, and I assume that's embraced in what you mean by pleading. And she also took a

the witness has reviewed the pleadings is a common issue.[254]

Theoretically, preparation of a witness should not be limited to those documents the discovering party has thought to seek in Rule 34 production as of the date of the deposition. Rather, documents reasonably pertinent to the subject matters of the requested deposition testimony should be reviewed, whether or not the documents themselves have been requested or produced for inspection.[255]

In some litigations it has been suggested that by limiting the documents reviewed by the designated Rule 30(b)(6) witness,

---

look at some interrogatory responses.

I don't know whether that's embraced or not in what you mean by pleadings. And I also assume she's excluding from her answer things that she's seen over the past couple years before you served Exhibit 1 on Commonwealth's attorneys, which obviously are part of her background in being a designee of Commonwealth. So let me object to the ambiguity of the question.

Mr. Fitzgerald: Q. Well, let me just—I'll just clarify that.

You looked at Commonwealth's answer and counterclaim and you looked at Commonwealth's answers to interrogatories and you looked at the notice.

Did you look at anything else to get ready for this deposition:

A. I looked at the notice today.

Q. Okay. Did you do anything else to get ready for the deposition?

Mr. Factor: Same objection. It's the "get ready" part that we're having trouble with. She's obviously reviewed many documents related to this matter over the course of time. All of that is part of her readiness. If you're asking whether in the last few hours she's studied things, that's a different question.

Mr. Fitzgerald: Q. Have you looked at some of the documents that either Protective National or Global or Intere have provided as part of this lawsuit?

A. When?

Q. At any time before this deposition.

A. I guess I don't understand. Do you mean in the last couple of years?

Q. Yes.

A. Yes, in the last couple of years I've looked at some.

Q. You didn't look at any of that stuff specifically to get ready for this deposition within the last, I don't know, week or whatever. Is that a fair statement?

A. Yes.

Mr. Factor: There hasn't been much time to do anything but travel in the last week for either of us.

Mr. Fitzgerald: Okay.     (Pause.)

Q. Is there anybody at Commonwealth who is better qualified or more suitable to testify regarding the subjects that we have listed on page 2 of the notice to take deposition?     (Pause.)

A. At this time, no.

*Protective Nat'l Ins.*, 137 F.R.D. at 271.

255. *Id.*

256. *Zappia Middle East Constr. Co.*, 1995 U.S. Dist. LEXIS 17167, at *22-*24.

the disclosing party can undermine the efficacy of the deposition. However, it has been held that a record indicating merely that a party has previously produced all of the documents the witness reviewed in preparation for testimony is not, ipso facto, a sign of inadequate preparation.[257] Conversely, the fact that an entity's document production in an action has arguably been inadequate and erratic may well demonstrate that the witness it produces under Rule 30(b)(6) was not properly prepared.[258]

## V. MISUSE OF RULE 30(B)(6) DEPOSITIONS TO DISCOVER CONTENTIONS OR "ALL SUPPORTING PROOF"

Rule 30(b)(6) was never intended to be a culminating stage at which a party's entire proof may be synthesized for the benefit of the other side, organized, then restated orally by one omniscient witness's integration.[259] Nor does it perform this

---

257. *Id.* at *23. The following record was deemed barren of any suggestion that documents were selected for deposition preparation based on what has or has not been produced:

Q: . . . In preparation for this deposition, did you review a box file of documents provided to you by your attorneys?

A: Yes.

Q: In preparation for the deposition, did you review any other documents?

A: No.

Ms. Weinstein: Have you provided us all the documents that were in the box file, Mr. Liebman?

Mr. Liebman: Yes.

*Id.* at *24.

258. *Id.* at *24.

259. To appreciate the potential misuse of Rule 30(b)(6) and the mischief to which misapplication of its concepts may lead, assume that an entity has been noticed for a deposition under the Rule. The events giving rise to the claims, let us assume, are complex and involve the actions of any number of participants over a course of long time. Assume further that the events which are central to the lawsuit occurred long ago, so that some number of the people who were agents of the entity are no longer under its control. Other participants in the events may be dead or missing. Still others are third parties who are not, and perhaps were never, under the control of the organization. Documents that bear upon the events are extremely voluminous, scattered, and often ambiguous—especially when their authors or recipients do not remember them, not to speak of when they are no longer available to interpret them. Counsel for the entity is now faced with the task of helping the client select and prepare one or more designees to testify on its behalf on what is "known or reasonably available" about the subjects which have been identified in a Rule 30(b)(6) notice.

In order to get a feel for some of the problems which may be engendered by

function fairly if pressed into the service of that goal. Nonetheless, a very common misuse of this procedure is reflected in topic specifications calling for just such a complete summary, listing all proof in support of each paragraph of a claim or defense. A similar form of inquiry calls for testimony about any averment in the discovering party's pleading as to which the adversary entered a *denial*.[259] The effect is equally broad.

While most requests for depositions under the rule arise in litigation among private parties, the reporters also contain numerous cases in which parties litigating against a governmental agency attempt to use the device to compel the governmental body—which typically did not focus on the events in question until long after the actors actually completed them—to tender a witness to synthesize what its investigation has disclosed. Depositions have been sought regularly from the Resolution Trust Corporation,[260] the Equal Employment Opportunity Commis-

---

an expansive and (we believe) misguided reading of the obligations imposed by Rule 30(b)(6) (as well as parallel provisions frequently found in state rules of procedure), imagine that the defendant in this case is the United States, and that the designated subject of the deposition is: What were the events leading up to and surrounding the assassination of President Kennedy? Or, to choose another example: How did the United States get involved in the Vietnam conflict; what happened during the course of that involvement; and what were the results?

While it may be difficult to envision the cases out of which these hypothetical 30(b)(6) deposition notices could issue, the point of the examples is to imagine what the far-reaches of the Rule might be thought to demand and, thus, get a better idea of what is fundamentally wrong with that position. After all, because the Government was at the center of critical events in both scenarios, because documents and witnesses are theoretically available, and because there are virtually unlimited resources of legal assistance and fact-gathering mechanisms available to the party targeted for the deposition, why shouldn't that entity be held responsible for formulating definitive responses to the questions posed and thereafter bound to adhere to those positions at a trial? One's immediate impulse is to respond as follows: The folly of the hypothetical examples is demonstrated by the fact that today, more than thirty years after the events in question, new (and sometimes even scholarly) books are still being written that offer "answers" which differ in dozens and hundreds of ways as to the details and the most fundamental underlying facts, contributing factors, and causes of the central events at issue in the designated topics. It is not just that one person, or a vast collection of persons, cannot be said to "know" the answers; rather, what we are disposed to say is that no one (individually) and we (collectively) do not know the answers. Yet, as we shall see, some courts have subscribed to a reading of the Rule which will not tolerate that sort of response by a 30(b)(6) deponent.

260.  Shindsen v. St. Francis Reg'l Med. Ctr., No. 96-1518-MLB, 1996 U.S. Dist. LEXIS 20621, at *3 (D. Kan. Dec. 19, 1996).

261.  *E.g.*, Resolution Trust Corp. v. Sands, 151 F.R.D. 616, 617-18 (N.D. Tex.

---

sion,[262] the Securities Exchange Commission,[263] and many others.[264]

One egregious Rule 30(b)(6) request called upon a large corporation to produce competent witnesses, as well as documents, in response to a 143-category notice under the Rule, many of which had additional subparts.[265] As interpreted by the court, the discovering party asked the entity to produce "every document, and recall every fact, conception, intention, understanding, belief, and sense impression" relevant to all of the issues in the case.[266]

The use of Rule 30(b)(6) depositions for this purpose flies in the face of the reasons for adopting the procedure as demonstrated in the legislative history of the Rule. In addition, this use of the questioning is unfair to the witness who is selected, as well to the party selecting the witness.[267] It ignores the concerns favoring the use of written discovery to obtain a specification of the contentions.

The potential for abuse by the discovering party is high here. Courts have noted that "if it's [sic] Rule 30(b)(6) representative cannot answer a question, either because the witness was not 'fully educated' or due to faulty memory, the party may well be confronted with a motion to dismiss or for summary judgment as a result of the witness' inability to answer."[268] Because in a complex case it may be impossible to "fully educate" any slate of witnesses to restate all aspects of the case in deposition format, the risk of a preclusive motion following the Rule 30(b)(6) depo-

---

1993) (seeking information on events occurring before Resolution Trust became involved in the underlying issue).

262.  *E.g.*, EEOC v. American Int'l Group, Inc., No. 93-6390 (DRL) (RLE), 1994 U.S. Dist. LEXIS 9815, at *5-*10 (S.D.N.Y. July 18, 1994) (upholding the Agency's objections to Rule 30(b)(6) requests).

263.  *E.g.*, SEC v. Morelli, 143 F.R.D. 42, 45 (S.D.N.Y. 1992).

264.  *See, e.g.*, Martin v. Valley Nat'l Bank of Ariz., 140 F.R.D. 291, 315-16 (S.D.N.Y. 1991) (allowing Rule 30(b)(6) deposition of Department of Labor).

265.  General Foods Corp. v. Computer Election Sys., 211 U.S.P.Q. 49, 49-50 (S.D.N.Y. 1980).

266.  *General Foods*, 211 U.S.P.Q. at 49-50.

267.  Ebbin, *supra* note 6, at 365 ("A savvy party, using Rule 30(b)(6) aggressively—and capitalizing on the organization's ignorance—can destroy an organization's accustomed defenses before the organization is aware of an attack.").

268.  *Id.* at 359 n.10 (citing Resolution Trust Corp. v. Bright, No. 3-92-CV-995-D, and other unreported cases involving the Resolution Trust Corporation).

sition makes the propriety of requiring such a synthesis in the first place a consideration of enormous import.

### A. The Super-Human Witness Required to Synthesize an Entire Case

Many courts hold that the deponent must be both knowledgeable about a given area and prepared to give complete and binding answers on behalf of the organization.[269] But if the discovering party contends that the entity witness has "an obligation to prepare himself by searching files and interviewing witnesses so that he could fully and completely answer all questions," the super-human feat contemplated has led some courts to observe that "Rule 30(b)(6) is not designed to be a memory contest;" it may fairly be concluded that "[i]t is not reasonable to expect any individual to remember every fact in an [agency] investigative file."[270] Some courts have recognized the limits on a single human being who may otherwise be an appropriate designee in response to a Rule 30(b)(6) notice, characterizing the preparation and testimonial obligations to be an effort to testify "to the extent that she is able."[271]

A Non-30(b)(6) Example. Suppose, for example, that an examiner asks a corporate executive whether he has any basis for the company's claim. In one reported case, a party's president and chief executive officer testified at a deposition that he had no factual basis to support the company's allegations that the adversary had revealed confidential business information to third parties.[272] The adversary then moved for summary judg-

269. Bank of N.Y. v. Meridien BIAO Bank Tanz., Ltd., 171 F.R.D. 135, 150 (S.D.N.Y. 1997). See generally FDIC v. Butcher, 116 F.R.D. 196, 201 (E.D. Tenn. 1986), aff'd, 116 F.R.D. 203 (E.D. Tenn. 1986) (indicating a duty to prepare 30(b)(6) witnesses to speak for the corporation).

270. EEOC v. American Int'l Group, Inc., No. 93-6390 (DKL) (RLE), 1994 U.S. Dist. LEXIS 9815, at *8-*9 (S.D.N.Y. July 18, 1994); Bank of N.Y., 171 F.R.D. at 150.

271. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 283 (D. Neb. 1989).

272. Mike v. Dymon, Inc., No. 95-2406-EEB, 1996 U.S. Dist. LEXIS 18603, at *7 (D. Kan. Nov. 6, 1996). In Mike, The adversary moved for summary judgment based on testimony of this character:

Q: Do you know any factual basis for that allegation?

ment, claiming that the executive's "admission" bound the party, and that its claim therefore should be dismissed.[273] The court noted that the witness testified that he was not personally aware of any facts supporting the allegations in his company's claim, but the form of the questions did not purport to elicit overall corporate knowledge.[274] It held that a "corporation's knowledge certainly consists of more than the personal knowledge of a single officer."[275] As the court observed: "No corporate officer is required legally to have personal knowledge of the factual allegations supporting every lawsuit that involves the corporation."[276] The alternative would allow for unfair outcomes based on an artificial requirement that there be one omniscient executive who was capable of knowing and reporting all of the facts known to the entity as a whole:

> To hold otherwise would require the court to grant summary judgment in nearly every case that involves a large corporation. In each case, the moving party likely could find a single officer who did not know of the factual allegations of a lawsuit (and in fact did not even know a lawsuit had been filed).[277]

Thus, at least where counsel's questions were directed at the executive's personal knowledge, not the corporation's knowledge, from the form of the deposition notice, binding effect is denied.[278] Factors important to the court's conclusion that this was the concept of the deposition included whether the examiner noticed the deposition for testimony as an individual witness pursuant to Rule 30(b)(1), as a corporate officer under the same rule, or as a designated corporate representative most knowledgeable of the facts in the claim pursuant to Rule 30(b)(6).[279]

A: I have no factual basis.
Q: So no one has told you anything to show that he [the adversary party] has revealed confidential information?
A: No one showed me anything.
Mike, 1996 U.S. Dist. LEXIS 18603, at *8.

273. Id. at *8.
274. Id. at *8.
275. Id.
276. Id.
277. Mike, 1996 U.S. Dist. LEXIS 18603, at *8.
278. Id.
279. Id. at *9 (citing CTE Prods. Corp. v. Gen. 115 F.R.D. 67, 68 (D. Mass. 1987)).

Because an individual deposition was sought, the court rejected the argument that the party had admitted that it had no factual support for its claim.[280] The same conclusion follows when the deposition notice is issued pursuant to Rule 30(b)(6) as discussed below.

*The Omniscient Witness to Convey Analysis of the Case.* Reliance on Rule 30(b)(6) as a basis for requiring creation of a single, omniscient witness who can synthesize all of the preparations and knowledge of a party has been roundly castigated as a procedure not meriting serious consideration and one that refutes itself when spelled out. One court examined the logic of the process whereby a designee is expected to "supplement her limited personal knowledge with all relevant information known to the Government"[281] and concluded that however liberal the discovery rules are, they could not reasonably be construed as requiring a party in a case such as this to make a Rule 30(b)(6) deponent, who is an investigator assisting counsel, the repository of all information known to counsel so that she could then provide it to an adversary.[282]

While a party has the right to discover relevant factual information, when the facts are "available in the documents provided and through depositions of fact witnesses who were named as having relevant information," it is not appropriate to require an entity in effect to "marshall all of its factual proof and then provide it to [the Rule 30(b)(6) designee] so that she could respond to what are essentially a form of contention inter-

---

280. *Id.*
281. United States v. District Council of Carpenters, No. 90 Civ. 5722 (CHS), 1992 U.S. Dist. Lexis 12307, at *46 (S.D.N.Y. Aug. 14, 1992).
282. *District Council of Carpenters*, 1992 U.S. Dist. Lexis 12307, at *45. The court there stated:
Defendants' contention that, as a Rule 30(b)(6) deponent, Agent Worsham has an obligation to supplement her limited personal knowledge with all relevant information known to the Government, does not, in my view, merit serious consideration. Taken to its logical conclusion, defendants' position would require that: 1) the various Assistant United States Attorneys with responsibility for drafting the Supplemental Complaint, supervising the investigation and preparing for trial in this action, collect and synthesize all of the information in their possession; 2) that they then impart that body of knowledge to Agent Worsham; and 3) that Agent Worsham, in turn, feed it back to defendants in response to their deposition questions. To state the proposition is to defeat it. *Id.*

---

rogatories. Aside from any issues of privilege, this would be highly inefficient and burdensome, rather than the most direct manner of securing relevant information . . . ."[283]

## B. *Contention Interrogatories and Rule 30(b)(6)*

A party has a recognized right to learn before the trial begins what the contentions of the adversary will be. But in considering the discovery of contentions and expected evidentiary support for specific averments, "how this information should be elicited [is] another matter."[284] Whether to use a deposition tool under Rule 30(b)(6), which itself makes no reference to discovery of contentions, or some other device, is an important issue. According to one court, "[s]ome inquiries are better answered through contention interrogatories wherein the client can have the assistance of the attorney in answering complicated questions involving legal issues."[285] Because the modern procedure rules have one device specifically directed to disclosure of such matters in the discovery phase—contention interrogatories—it is appropriate to consider whether that device is either the exclusive means for discovery into such matters, or sufficiently superior so that use of depositions as an alternative should be rejected.[286]

---

283. *Id.* at *48-*49; accord *In re Independent Serv. Org. Antitrust Litig.*, 168 F.R.D. 651, 654 (D. Kan. 1996).
284. *See Protective Nat'l Ins. Co. v. Commonwealth Ins. Co.*, 137 F.R.D. 267, 281 (D. Neb. 1989).
285. United States v. Taylor, 166 F.R.D. 356, 362 n.7 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996); *see* FED. R. CIV. P. 33(c).
286. When formulating the 1970 amendment, the Advisory Committee viewed the expenditure of judicial energy in deciding upon the permissibility of contention interrogatories as futile. The Committee stated that "[e]fforts to draw sharp lines between facts and opinions have invariably been unsuccessful, and the clear trend of the cases is to permit 'factual' opinions." Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 524 (1970). Thus, Rule 33 was amended to permit contention interrogatories. FED. R. CIV. P. 33(b). The following sentence now included in Rule 33(c) reflects this amendment:
An interrogatory otherwise proper is not necessarily objectionable merely because an answer to the interrogatory involves an opinion or contention that relates to fact or the application of law to fact, but the court may order that such interrogatory need not be answered until after designated discovery has been completed or at a pre-trial conference or other later time.
FED. R. CIV. P. 33(c).

Under Rule 33, interrogatories asking for a statement of a party's opinion or contention that relates to fact or the application of law to fact is expressly permitted.[287] Generally speaking, the use of contention interrogatories has been restricted in many courts to the latter stages of the preparations:[288]

> Since interrogatories involving mixed questions of law and fact may create disputes between the parties which are best resolved after much or all of the other discovery has been completed, the court is expressly authorized to defer an answer. Likewise, the court may delay determination until pretrial conference, if it believes that the dispute is best resolved in the presence of the judge.[289]

Some districts have explicitly incorporated such a timing provision in their local rules,[290] while others have imposed timing limitations in case law.[291] However, some courts also permit contention interrogatories in the early stages of litigation if the interrogatories would promote the goals of discovery.[292]

Most experienced judges and litigators recognize that the answers to contention interrogatories are in fact written by lawyers, not parties.[293] This is often for good reason, as the lawyer may have collected information from many different sources and will have knowledge of the legal regime that transcends the understanding of the client and its personnel.[294]

---

287. FED. R. CIV. P. 33(c).

288. B. Braun Med. Inc. v. Abbott Laboratories, 155 F.R.D. 525, 527 (E.D. Pa. 1994); *In re* Convergent Technologies Securities Litig., 108 F.R.D. 328, 337 (N.D. Cal. 1985).

289. *Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery*, 48 F.R.D. 487, 524 (1970).

290. S.D.N.Y. Rule 33.3 ("At the conclusion of other discovery, and at least 30 days prior to the discovery cut-off date, interrogatories seeking the claims and contentions of the opposing party may be served unless the court has ordered otherwise.").

291. *E.g.*, McCarthy v. Paine Webber Group, Inc., 168 F.R.D. 448, 450 (D. Conn. 1996); Fischer and Porter Co. v. Tolson, 143 F.R.D. 93, 96 (E.D. Pa. 1992).

292. *E.g.*, King v. E.F. Hutton & Co., Inc., 117 F.R.D. 2, 6 n.5 (D.D.C. 1987).

293. McCormick-Morgan, Inc. v. Teledyne Industries, 134 F.R.D. 275, 287 (N.D. Cal. 1991), *rev'd on other grounds*, 765 F. Supp. 611 (N.D. Cal. 1991).

294. As the magistrate judge supervising a patent case commented: "Parties, of course, provide substantial input, but they cannot be expected to have the range of understanding of patent law or of proceedings in the patent office to reliably identify and accurately articulate all of the predicates for their legal positions." *McCormick-Morgan*, 134 F.R.D. at 287.

---

*Comparing Contention Interrogatories and Rule 30(b)(6) Depositions.* One magistrate judge observed that "[n]othing in the Federal Rules of Civil Procedure gives a party the *right* to not respond or inadequately respond to a Rule 30(b)(6) deposition notice or subpoena request and elect to supply the answers in a written response to an interrogatory."[295] But even with the vicissitudes of contention interrogatory practice well in mind, comparing that tool to the use of oral depositions makes it apparent that the written medium of responses to sensibly crafted contention interrogatories is more likely to convey information fairly to both sides.[296]

A few courts, without reflection, have held that to the extent a litigant is seeking factual information relating to each of the claims in the litigation, "the use of a 30(b)(6) deposition is wholly appropriate" and the discovering party "need not serve contention interrogatories to discover the facts underlying [the adverse entity's] legal contentions,"[297] essentially dismissing the issue of whether information could more appropriately be provided in response to contention interrogatories as "largely a matter of semantics."[298] Indeed a few district courts have taken the position that deposition questioning is superior to contention interrogatories. One court noted, for example, that while contention interrogatories are a simpler and often more appropriate discovery method, "the deposition process provides a means to obtain more complete information and is, therefore, favored."[299] And a handful of courts have viewed Rule 30(b)(6) depositions and contention interrogatories as equally suitable, alternative devices to achieve the same ends: "Whether a Rule 30(b)(6) deposition or a Rule 33(c) contention interrogatory is more appropriate will be a case by case factual determination."[300] Even these courts

---

295. Marker v. Union Fidelity Life Ins. Co., 125 F.R.D. 121, 126 (M.D.N.C. 1989) (emphasis added).

296. *McCormick-Morgan*, 134 F.R.D. at 287 (requiring, as a condition of an order pretermitting deposition under Rule 30(b)(6), that the entity be required to respond in full, forthcoming detail to the interrogatories that were to be served seeking similar contention information).

297. Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co., No. 90-7511-KC, 1993 U.S. Dist. LEXIS 1163, at *7 (S.D.N.Y. Feb. 4, 1993).

298. *Arkwright Mut. Ins.*, 1993 U.S. Dist. LEXIS 1163, at *7

299. Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11567, at *3 (E.D. Pa. Aug. 23, 1991) (quoting *Marker*, 125 F.R.D. at 126).

300. United States v. Taylor, 166 F.R.D. 356, 362 n.7 (M.D.N.C. 1996), *aff'd*, 166

have usually stopped short, however, of allowing the deposition
mechanisms under this Rule to be used to pin down legal theo-
ries.[301]

More thoughtful decisions, exploring the related consider-
ations in more depth, reach the conclusion that it is a misuse of
the discovery tools to pursue contentions in a Rule 30(b)(6) depo-
sition. These courts recognize that even the circumscribed form
of "focused contention interrogatories," if over-used, can prove
"pointless and can be highly burdensome (e.g., when they re-
quire a party to marshall all of its proof)," and *a fortiori* the use
of an oral examination tool like a deposition under Rule 30(b)(6)
in a fashion "which requires that person to inform herself of all
relevant facts known by counsel or the [entity], is not an appro-
priate alternative."[302]

There is nothing in Rule 30(b)(6) to support the use of this
tool to elicit contentions, and the very different Advisory Com-
mittee commentary on the scope and operation of the two rules,
*issued on the same day by the same committee* considering both
changes, speaks strongly for the opposite conclusion, that these
are separate tools intended to address very different prob-
lems.[303] Most courts have, therefore, rejected the notion that
these devices are equivalent.[304]

Even before the legitimation of contention interrogatories by
express inclusion in Rule 33, one judge looked at the complexity
of the legal allegations and concluded that the better way to
derive the information was by interrogatories with respect to
factual allegations respecting the contentions of the defen-
dant.[305] On the other hand, where factual knowledge can con-

---

F.R.D. 357 (M.D.N.C. 1996).
   301. *See* Taylor, 166 F.R.D. at 362 n.7.
   302. United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH),
1992 U.S. Dist. LEXIS 12307, at *50 (S.D.N.Y. Aug. 14, 1992).
   303. *See infra* text accompanying notes 345-55.
   304. *See, e.g.,* McCormick-Morgan, Inc. v. Teledyne Indus., Inc., 134 F.R.D. 275,
286-87 (N.D. Cal. 1991), *rev'd on other grounds,* 765 F. Supp. 611 (N.D. Cal. 1991)
(stating that a contention interrogatory, not a Rule 30(b)(6) deposition, is more ap-
propriate in very complex and highly technical lawsuits); Protective Nat'l Ins. Co. v.
Commonwealth Ins. Co., 137 F.R.D. 267, 282-83 (D. Neb. 1989) (stating that a Rule
30(b)(6) deposition, not contention interrogatories, is more appropriate where the
designer has expertise to answer questions).
   305. Lance, Inc. v. Ginsburg, 32 F.R.D. 51, 53 (E.D. Pa. 1962).
      To be sure, the client presumably knows the facts (although not always), but

veniently be discovered by deposition, that procedure is
appropriate.[306] More modern decisions under the present rules
have found that a similar analysis is proper today.[307]

One seminal opinion gave the rationale that where the "le-
gal consequences of factual information is sought (for example,
in a trademark case where usage or confusion facts are sought),
it is "unrealistic to expect a lay witness to be able to give that
information" on deposition because the legal aspects involved
professional advice.[308]

One version of the test, therefore, is whether it "might be
reasonably expected" that a witness of the character available to
the company could "explain during an oral deposition" the infor-
mation specified.[309] Of course, if the test is reduced to identify-
ing propositions that are "purely legal" then most topics would
be deemed suitable for deposition coverage.[310]

*Contentions and Beliefs.* Several courts have improvidently
adopted the locution that the Rule 30(b)(6) designee "presents
the corporation's 'position' on the topic."[311] Some courts have

---

he can hardly be expected to know their legal consequences. This is what
lawyers are for. Defendant, of course, when asked the factual basis for what is
obviously his lawyer's allegation, could simply aver lack of knowledge. Such an
answer not only would not advance plaintiff's pre-trial knowledge, but could
conceivably subject defendant to an unwarranted trial hazard on cross-exami-
nation. We think the cause of justice and the fruitful advancement of discov-
ery will be better served by refusing plaintiff's motion to compel answers on
depositions to inquiries on the factual basis of conclusionary allegations. While,
as we have sought to make clear, plaintiff is undoubtedly entitled to such
information, we think it could be more expeditiously and more intelligently
obtained by written interrogatories.
*Lance,* 32 F.R.D. at 53.
   306. *Id.*
   307. *See Protective Nat'l Ins.,* 137 F.R.D. at 282.
   308. *Id.*
   309. *Id.*
   310. *See id.* An example offered by the court illustrates the distinction:
      It is one thing to ask a defendant why an affidavit is "invalid" under the
   "Trade-Mark Act of 1946" and quite another thing to ask an accountant, who
   deals with reinsurance issues on an everyday basis, what facts she has in her
   possession upon which her employer relied when it alleges that "[e]fforts to
   bill and recover deductibles and salvage were highly sporadic, resulting in
   enormous costs to the reinsurers." The same thing is true of damages; certain-
   ly Ms. Murphy as an accountant, and a person experienced in dealing with
   reinsurance matters, can explain, albeit only generally perhaps, how, why, and
   in what measure, her employer claims to be damaged as a matter of fact.
*Id.* at 282-83 (citing *Lance,* 32 F.R.D. at 53) (references to record omitted).
   311. United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C. 1996) *aff'd* 166

gone even further, holding that the designee "must not only testify about facts within the corporation's knowledge, but also as to 'its subjective beliefs and opinions'"[312] and "its 'interpretation of documents and events.'"[313] There is no basis in the Rule or its legislative history for infusing the Rule 30(b)(6) deposition with such a function.

The argument for using the Rule 30(b)(6) mechanism to elicit beliefs, opinions and interpretations is that otherwise the company "would be able to deceitfully select at trial the most convenient answer presented by a number of finger-pointing witnesses at the depositions," and hence "[t]ruth would suffer."[314] In one sense this argument longs for something other than the adversary system, which allows a party to put its best face forward at trial by selecting the most favorable from the pool of potential witnesses to bring forward for testimony at trial. In another basic sense, the argument commits the fallacy of assuming that each discovery device must perform every function a well-designed litigation system must provide. This argument asserts that because the discovering party is entitled to obtain some definition about the adversary's actual contentions and expected trial position, the Rule 30(b)(6) deposition must be set up to provide that defining moment.

That view was clearly not among the intentions of the drafters of the rule. And it ignores the several other devices in the current procedural schema that provide exactly the sort of concrete specificity sought, without the burdens and unfairness of eliciting the information in a fluid, live format from one (or a few) persons who must master a complex situation of which they have no personal knowledge and about which, in the heat (or tedium) of a deposition they speak inaccurately, vaguely, ambiguously, or imprecisely. Such devices include, for example, Requests for Admissions under Rule 36, which can help assure that a party litigating against an entity is not "sandbagged" by new

F.R.D. 367 (M.D.N.C. 1996); see Lapenna v. Upjohn Co., 110 F.R.D. 15, 23 (E.D. Pa. 1986); Toys "R" Us, Inc. v. N.B.D. Trust Co., No. 88-10349, 1993 U.S. Dist. LEXIS 13621, at *4 (N.D. Ill. Sept. 27, 1993).
    312.  Taylor, 166 F.R.D. at 361; Lapenna, 110 F.R.D. at 20.
    313.  Taylor, 166 F.R.D. at 361; Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11320, at *5 (E.D. Pa. Aug. 23, 1991).
    314.  Taylor, 166 F.R.D. at 361 (citing Lapenna, 110 F.R.D. at 25).

or different factual assertions.[315] Unlike statements provided as answers to interrogatories, which may be refuted or explained at trial, answers to requests for admissions conclusively establish the matter[316] and may be withdrawn or amended only with the court's permission.[317] The answer to a request for admissions is treated as a judicial admission "comparable to an admission in pleadings or a stipulation drafted by counsel for use at trial" rather than as an evidentiary admission.[318]

Another device that can provide firm definition to an adversary's contentions and claims, including the factual support that will be offered at a trial, is the pretrial order.[319] In efforts "to eliminate the element of surprise" at trial,[320] the "formulation and simplification of the issues, including the elimination of frivolous claims or defenses," is one of the subjects for consideration at the pretrial conferences which leads to the formulation of the pretrial order.[321] Thus, attorneys are required to "make a full and fair disclosure of their views as to what the real issues of the trial will be."[322] The effect of a pretrial order is further strengthened by Rule 26(a)(3), which imposes an obligation on parties to identify documents and deposition testimony in its

    315.  FED. R. CIV. P. 36(a).
    316.  FED. R. CIV. P. 36(b); see also American Auto Ass'n v. AAA Legal Clinic, 930 F.2d 1117, 1120 (5th Cir. 1991) (holding that Rule 36 admissions conclusively establish a matter whether the admission was made affirmatively or through default, even if the matter pertains to material facts which may defeat the party's claim).
    317.  FED. R. CIV. P. 36(b). A court's disposition on whether to permit withdrawal or amendment to a Rule 36 admission is based on a two prong evaluation: (1) whether the "presentation of the merits of the action will be subserved thereby" and (2) whether the party who has obtained the admission is able to satisfy the court that withdrawal or amendment will result in prejudice. Teleprompter, Inc. v. Erie, 567 F. Supp. 1277, 1286-87 (W.D. Pa. 1983).
    318.  Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 524 (1970).
    319.  FED. R. CIV. P. 16(a). The rule on pretrial orders states: "After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice." Id.
    320.  Gillespie v. Simmons Indus., 91 F.3d 1368, 1173 (8th Cir. 1996) (quoting Nutt v. Black Hills Stage Lines, Inc., 452 F.2d 480, 483 (8th Cir. 1971)).
    321.  FED. R. CIV. P. 16(c)(1).
    322.  Eoff v. MarkHon Indus., Inc., 781 F.2d 613, 617 (7th Cir. 1986) (citing Payne v. S.S. Nabob, 302 F.2d 803 (3d Cir. 1962); Cherney v. Holmes, 185 F.2d 718 (7th Cir. 1950)).

final pretrial disclosures."[323] Rule 37(c)(1) states that failure to make such identifications will render the items unusable as evidence at trial unless the failure to identify was harmless.[324]

The pretrial order controls the "issues to be considered at trial" because it "supersed[es] the pleadings."[325] Courts place importance on the pretrial conference to inform them precisely what is in controversy."[326] Consequently, courts are empowered to bar testimony by witnesses not disclosed at the time of the pretrial order."[327]

Given these devices, and all of the other discovery tools themselves, the need to warp Rule 30(b)(6) proceedings into an all-purpose summary of a party's contentions, expected proof on each point, and synthesis of any contested factual matters is non-existent.

*Timing considerations.* Additionally, the problems of timing and unfairness must be faced. Imposing the obligation on a designated corporate representative to synthesize the corporate position on all prior testimony, which may be impossible in large cases in any event, presupposes that the state of the record at the date of the Rule 30(b)(6) deposition is definitive. Only if the entity deposition is taken at the end of the case—after completion and closure of all other depositions, all document production, rendition of all expert reports and any depositions of the experts—could the deposition of an entity under Rule 30(b)(6) even theoretically provide a distillation of the entity's "position" on all of the assertions made by all witnesses or reflected in all documents.

So the concept only works in the abstract if the Rule 30(b)(6) deposition is the last event on the eve of trial. There is,

323. FED. R. CIV. P. 26(a)(3).

324. *Id.* 37(c)(1).

325. *E.ff.* 781 F.2d at 617 (citing In-Sink-Erator Mfg. Co. v. Waste King Corp., 346 F.2d 248, 251 (7th Cir. 1965)); *see* Hernandez v. Alexander, 671 F.2d 402, 407 (10th Cir. 1982) ("[T]he pre-trial order supersedes the pleadings and becomes the governing pattern of the suit.").

326. *E.ff.* 781 F.2d at 617.

327. Mankey v. Bennett, 38 F.3d 353, 359 (7th Cir. 1994) (excluding the testimony of an expert witness when the proffering party did not include in the witness list and when the proffering party failed to give notice of intent to add the witness until several days before trial).

not to put too fine a point on it, no indication whatsoever in the history of the Rule that it was intended to operate in that fashion. Indeed, in the same revisions to the federal rules by which Rule 30(b)(6) was added, the 1969 amendments effective in 1970, the drafters demonstrated that they knew how to suggest that a device was best reserved for late in the discovery process. Such a suggestion was made in the same 1969/1970 wave of amendments, and the same Advisory Committee notes, with respect to the newly recognized device of contention interrogatories, but *not* with respect to the newly created entity deposition procedure under Rule 30(b)(6).[328] Indeed, the commentary accompanying the entity deposition procedure suggests that these depositions would be useful at the *outset* of discovery, when the person opposing the entity is in the dark as to the identities of knowledgeable witnesses within the company.[329]

And, even assuming that the concept were to have this form of deposition be taken as a culminating event, it treads on unreasonable assumptions. It envisions a single, omniscient witness, or team of witnesses, who can manage to hold in his head all facts, actions, opinions, statements and documents of perhaps dozens of individuals stretching perhaps over many years, and that *oral testimony* at a deposition, with the vicissitudes of memory, oral expression and transcription is a sensible means of eliciting the "corporate position" on all facts and issues in a case. Written contention interrogatories, late in the case preparations, can address these issues, but the use of oral depositions for a similar purpose is foolishly impractical and unfair.

*Work Product Implications.* Some courts have held that

328. Compare the Advisory Committee's Note to Rule 30(b)(6), which makes no mention of delaying the scheduling of an entity deposition until the close of other preparations, with the note accompanying the contention interrogatory language in Rule 33, where the Advisory Committee observed that "[s]ince interrogatories involving mixed questions of law and fact may create disputes between the parties which are best resolved after much or all of the other discovery has been completed," the answer to an interrogatory may be deferred. The Advisory Committee's cautious approach regarding contentions in Rule 33 and the conspicuous absence of any such language in the Note to Rule 30(b)(6) suggest that the use of Rule 30(b)(6) to inquire into contentions was not envisioned by the Advisory Committee. Had it been otherwise, it is likely that the Note to Rule 30(b)(6) would contain similar language. *See* Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 524 (1970).

329. *See, e.g., id.*

contention interrogatories, at least when used late in the preparations, do not implicate attorney work product.[330] Of course, to some extent any identification of contentions reflects the thought processes and advice of counsel. However, at the end of preparations, the need for privacy for work product is alleviated, if only because the actual contentions selected for use at trial will be disclosed publicly shortly and, hence, are not expected or intended to remain protected. The alternative theories or plans considered by counsel along the way but ultimately rejected, which also would disclose counsel's thinking, are not proper subjects for contention interrogatories. On the other hand, a Rule 30(b)(6) deposition mid-stream, which inquires into the ordering of proof and the like, inevitably discloses the interim thinking of counsel on contentions, on the "relevant" or controlling documents for the witness to review, and on which testimony will prove admissible—or persuasive?—at trial. Hence, to this extent, contention interrogatories at the end of the litigation are far less likely to trammel upon a recognized, albeit qualified, area of confidentiality. Several decisions have suggested that the inherent work product concerns about eliciting the ordering and assessment of expected proof are easier to manage when the discovery tool is a written question rather than a more free-flowing and "real time" oral deposition.[331] One judge quoted with approval the conclusion that "contention interrogatories are not just a viable alternative, but the proper discovery device under the circumstances."[332]

*Abuse of the Witness and the Producing Party.* One concern with the use of depositions to catalog all expected proof sounds in fairness. A company responding to discovery demands may

330. *See, e.g., In re* San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1017 (1st Cir. 1988); King v. E.F. Hutton & Co., Inc., 117 F.R.D. 2, 5 n.3 (D.D.C. 1987).

331. *See* SEC v. Morelli, 143 F.R.D. 42, 48 (S.D.N.Y. 1992) (citing McCormick-Morgan, Inc. v. Teledyne Indus., Inc., 134 F.R.D. 275, 286-87 (N.D. Cal. 1991), *rev'd on other grounds,* 765 F. Supp. 611 (N.D. Cal. 1991) (barring a Rule 30(b)(6) deposition and permitting contention interrogatories for discovering "the bases for the contentions made and for the positions taken"); Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 125 F.R.D. 578, 594 (N.D.N.Y. 1989) (recognizing the viability of interrogatories as an alternative discovery method).

332. *See Morelli,* 143 F.R.D. at 48 (S.D.N.Y. 1992); *accord* SEC v. Rosenfeld, No. 97-1467 (RPP), 1997 W.L. 576021 (S.D.N.Y. Sept. 16, 1997).

reasonably fear that the discovering party is attempting to build a record that could later be used unfairly (for example, in a motion for summary judgment, or to embarrass a witness on cross-examination at trial). In particular, the basic concern is that the discovering party, in effect, demands "that a human being who had been designated as a 30(b)(6) witness set forth in full detail every item of evidence and every aspect of legal argument or authority that had any tendency to help support any position (factual or legal) [that the company] was taking in the litigation."[333] Thus, an entity may believe that in a very complex, highly technical lawsuit, no human being could reliably and completely set forth this material, which leads to the specter of the discovering party attempting to use the transcripts of these depositions to limit the evidence and arguments the entity may present at trial, or to argue, as on a motion for summary judgment, that there were insufficient bases for one or more of the contentions.[334]

Other grounds for opting for a more limited construction of Rule 30(b)(6) are the general considerations of efficiency and common sense. One could argue that "by far the most reliable and complete discovery vehicle for setting forth the bases (in evidence, events, and law) for a party's contentions and positions would be a set of responses, written after the close of virtually all other discovery, to sensibly framed contention interrogatories."[335] Indeed, there seems to be no justification for pursuing this kind of information through more than one discovery tool; rather, it makes no sense to waste the time and money that would be involved in exploring the same topics through both a set of 30(b)(6) depositions and through a set of contention interrogatories.[336] While it has been noted that

> there might be some circumstances in which pursuing the same kind of information, or exploring the same subjects, through more than one discovery tool could be justified (e.g., where credibility issues were pivotal, or the information sought was of such an elusive and important character that fair explication of it would

333. McCormick-Morgan, 134 F.R.D. at 286.

334. *Id.*

335. *Id.*

336. *Id.*

require probes from more than one direction and in more than one form),

such a justification should affirmatively be made out before the duplication and waste are undertaken.[337]

When considered on the merits, the question as to "which of the available devices is most appropriate, i.e., which device would yield most reliably and in the most cost-effective, least burdensome manner information that is sufficiently complete to meet the needs of the parties and the court in a case like this[]" is not hard to answer.[338]

Thus, judges who have gone on record in other contexts expressing considerable skepticism about the appropriateness of the use of contention interrogatories at early stages of litigation generally, and in certain kinds of cases,[339] find themselves persuaded that "no one human being can be expected to set forth, especially orally in deposition, a fully reliable and sufficiently complete account of all the bases for the contentions made and positions taken by a party . . . ."[340]

The arguments are even stronger in cases where the "bases" for contentions "do not consist exclusively of relatively straightforward facts or evidence, as might be true, by contrast, in a case arising out of a traffic accident."[341] Therefore, for example, in intellectual property litigation and other domains involving a number of mixed questions of law and fact, "to set forth the bases for contentions . . . it is not enough to describe real world facts and events, even in considerable detail."[342]

Rather, determining what the bases for contentions are in this environment involves compl~x judgments about the relationship between at least three kinds of things: (1) evidence/facts/events in the real world (outside litigation), (2) "claims" as particularly set forth in the patent in issue and in other patents or other material presented to the patent office, and (3) principles of intellectual property law set forth in statutes and in judicial opinions. A non-lawyer deponent might have great knowledge about the products

337.  *Id.*
338.  *McCormick-Morgen*, 134 F.R.D. at 286.
339.  *In re Convergent Techs. Sec. Litig.*, 108 F.R.D. 328, 338 (N.D. Cal. 1985).
340.  *McCormick-Morgen*, 134 F.R.D. at 286.
341.  *Id.* at 287.
342.  *Id.*

in issue here, but be quite ill-equipped to reason reliably about the legal implications of the relationship between those products, or their components, and the various claims of the patent in suit or of other patents or prior art. Patent cases turn peculiarly on a conceptually dense dynamic between physical objects, words in claims, and principles of law.[343]

In many forms of modern, complex litigation, therefore, "a substantial part of 'the bases for contentions' really consists of *quasi-legal argument*."[344]

*Legislative History.* It is inconceivable that the Advisory Committee intended Rule 30(b)(6) to be the means by which discovery of a party's contentions was to be secured. Prior to 1970 there were conflicts in the case law as to the permissibility of contention discovery vel non.[345] In 1970 the Advisory Committee sought to clarify and make coherent the law on the discovery of contentions, and it did so by amending the rule addressing only one of the discovery devices, Interrogatories under Rule 33.[346]

A reading of the advisory commentary accompanying the contention interrogatory language inserted in Rule 33 makes it clear that the Committee was aware of the friction that has historically attended contention discovery. The Committee was evidently cognizant of the history of motion practice, and the problem of *timing* of contention discovery in particular.[347] Thus, the Advisory Committee's Note went to the extraordinary length of suggesting that late scheduling of contention discovery was one means of avoiding difficulties with this newly legitimized form of discovery.[348]

Rule 30(b)(6) was created in the same discovery amendments report issued in 1969 and went into effect on the same

343.  *Id.* With respect to patent litigation, the court commented that "[u]nderstanding that dynamic, and describing the relationships that serve as the bases for a given parties' [sic] contentions, is something best done by patent lawyers, and best done after at least most other discovery has been completed." *Id.*
344.  *McCormick-Morgen*, 134 F.R.D. at 287.
345.  *See* Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 459, 524 (1970).
346.  *Id.* at 523-24.
347.  *Id.* at 524.
348.  *Id.*

718    Alabama Law Review    [Vol. 50:3:651

day in 1970 as the contention interrogatory provision.[349] The Advisory Committee's Note accompanying this new deposition provision *makes no mention of contentions.* Indeed the flavor of the deposition rule characterization by the Committee is that the designation device was a *minor convenience* being created to avoid unnecessary guesswork at the outset of a case when the party litigating against the entity may lack information as to which of many officers and employees has personal knowledge of topics relevant to the lawsuit.[350] Given the extensive discussion of the difficulties attending *contentions* in the Rule 33 amendments, it is inconceivable that the Committee intended to authorize an alternative exploration of these same matters under another procedure, and surely it would not have attempted to do so without even *mentioning* the concept anywhere in the Advisory Notes. If the Committee had intended to address the years of bickering over contention interrogatories by suggesting that oral deposition was a solution, that startling proposition would have required considerable explanation.

The timing aspects also demonstrate that it could not have been an intention of the rules' drafters that depositions be used for this purpose. The Committee was quite conscious of the fact that the discovery of contentions generates substantial volumes of motion practice, and that the goal of providing fair description of trial contentions is best advanced by a statement of them *late in the preparations.*[351] On the other hand, the entire flavor of the new provision for entity depositions reflects concerns applicable at *the outset of the litigation.*[352] It is at that early stage when the adversary of a company will know least about the internal structure of the entity.

The essential purpose of the Rule 30(b)(6) deposition mechanism is reflected in the Advisory Committee's focus on the burdens involved. The Committee recognized that finding witnesses to address topics required effort by an entity.[353] The counterweight—the factor which was stated by the Committee to justify

---

349. *Id.* at 515, 524.
350. Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 459, 524 (1970).
351. *Id.* at 524.
352. *Id.* at 515.
353. *Id.*

1999]    Discovering Corporate Knowledge    719

the imposition of this burden on the company[354]—was *not* that the discovering party had a need to learn contentions (a matter not even raised in the comment to Rule 30(b)(6)). Rather, it was the discovering party's need to obtain *leads to the identity of knowledgeable people* and some basic information about the company.[355]

Given the practical concerns of the courts discussed above, and this legislative history, it is crystal clear that depositions should not be used as a contention specification mechanism.

### C. *"Complete Support" Questions and Work Product*

The work product doctrine "promote[s] the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of an opponent."[356] The doctrine, set forth in Rule 26(b)(3), implements the Supreme Court's decision in *Hickman v. Taylor.*[357] It generally protects documents and tangible things prepared in anticipation of litigation or for trial and by or for another party or by or for that other party's representative.[358] Special concern is directed to disclosures which are calculated to reveal the mental processes of counsel.[359]

*Facts and the Confidentiality Doctrines.* Of course, the privilege and work product protections do not preclude discovery of *factual information.*[360] Clients cannot refuse to disclose facts which their attorneys conveyed to them and which the attorneys obtained from independent sources.[361] And a discovery request

---

354. *Id.*
355. Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 524 (1970).
356. Shields v. Sturm, Ruger & Co., 864 F.2d 379, 382 (5th Cir. 1989) (citing United States v. AT&T, 642 F.2d 1285, 1299 (D.C. Cir. 1980)).
357. 329 U.S. 495 (1947).
358. Blockbuster Entertainment Corp. v. McComb Video, Inc., 145 F.R.D. 402, 403 (M.D. La. 1992) ("Protection is given to those documents prepared by agents of an attorney because an attorney must rely on the assistance of others in preparation for trial.").
359. FED. R. CIV. P. 26(b)(3); *see Hickman,* 329 U.S. at 510, 512-13.
360. Upjohn Co. v. United States, 449 U.S. 383, 395-96 (1981).
361. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 278-79 (D. Neb. 1989); *see Sedco Int'l, S.A. v. Cory,* 683 F.2d 1201, 1205 (8th Cir. 1982) (citing *Hickman,* 329 U.S. at 508); 8 J. WIGMORE, WIGMORE ON EVIDENCE § 2317

directed to facts supporting the allegations in a claim or defense does not implicate the protection of the confidentiality doctrines.[361]

Work product analysis in connection with midstream Rule 30(b)(6) depositions is more difficult. On occasion lawyers and judges have been tempted to skirt the reality of the effects of an early Rule 30(b)(6) deposition by noting that the attorney was "not asking [the deponent] to relate the opinion that your counsel gave you, I'm asking [the deponent] for the facts that support this allegation."[362] However, this approach fails to recognize that if an unknowledgeable witness has been educated by counsel in an effort to comply with Rule 30(b)(6) obligations, the attorney's thought processes in the selection of evidence and organization of issues will commonly be involved in that process. The deposition thus becomes an easy window into what the attorney for the entity thinks is important, relevant, supportive of a particular proposition, or persuasive on the facts.

Some courts have concluded flatly that "[t]here is simply nothing wrong with asking for facts from a deponent even though those facts may have been communicated to the deponent by the deponent's counsel."[363] This view proceeds from the assumption that questions asking a witness about what facts she was aware of which supported a particular allegation in a claim or defense do not improperly tend to elicit the mental impressions of the entity's lawyers who participate in the preparation of the witness or advice to the company during that process.[364]

Rule 612 of the Federal Rules of Evidence, which provides for disclosure of writings used to refresh a witness's recollection at trial, also provides for production of material consulted beforehand in preparations, and to the extent that depositions are considered hearings under this rule by some courts, the argument exists that the examining counsel has a basis for requesting to know what material was reviewed.[365] Even so, where all

(McNaughton rev. ed. 1961).

362.  *Protective Nat'l Ins.*, 127 F.R.D. at 279.

363.  *Id.*

364.  *Id.* at 280.

365.  *Id.*

366.  *See* authorities collected in Eibein, *supra* note 6, at 371 nn.17-18; *see* also

documents reviewed are a subset of the full production made to the discovering party, the specification of which members of that larger universe were identified by counsel in preparing the witness will reflect counsel's thinking most clearly. Indeed, it is the selection process itself that provides the basis for invoking work product protections relating to documents used to prepare witnesses for deposition testimony.

But even those courts taking a fairly uncompromising view of this proposition in the abstract recognize that the deposition device has special risks as a means of eliciting the factual information.[366] Thus, "depending upon how questions are phrased to the witness, deposition questions may tend to elicit the impressions of counsel about the relative significance of the facts; opposing counsel is not entitled to his adversaries' thought processes."[367] In such situations special effort is required "to protect against indirect disclosure of an attorney's mental impressions or theories of the case."[368]

Determining the degree to which a particular deposition question elicits the mental impressions of the attorney who communicated a fact to the deponent can be a difficult problem in the Rule 30(b)(6) situation in particular. "In a sense, any fact that a witness learns from his or her attorney presumably reveals in some degree the attorney's mental impressions of the case, or, presuming rationality, the attorney would not have communicated the fact to the client."[369] And the focus of Rule 30(b)(6) disputes on what a witness was asked to review presents the issue head on.

*Deposing Counsel or Witnesses Prepared by Counsel.* The propriety of questions of a specially prepared Rule 30(b)(6) witness raises some of the same concerns implicated when the deponent is the attorney herself. And where the deponent is opposing counsel and has engaged in a selective process of compiling documents from among voluminous files in preparation for liti-

Ronald B. Coolley, *Defending Corporate Officers in Depositions*, 73 J. PAT. OFF. SOC'Y 768, 773 (1991).

367.  *Protective Nat'l Ins.*, 127 F.R.D. at 280.

368.  *Id.* (citing Michael E. Wolfson, *Opinion Work Product—Solving the Dilemma of Compelled Disclosure*, 64 NEB. L. REV. 248, 258-62 (1985)).

369.  *Id.*

370.  *Id.*

gation, the mere acknowledgment of the study or review of, or perhaps even the existence of those documents, would reveal counsel's mental impressions, which are protected as work product.[371]

While the Federal Rules of Civil Procedure do not specifically prohibit the taking of opposing counsel's deposition,[372] the practice of taking opposing counsel's deposition is viewed by many as a "negative development in the area of litigation, and one that should be employed only in limited circumstances."[373] It is commonly thought that such activities should be undertaken only where no other means exist to obtain the information than to depose opposing counsel,[374] the information sought is relevant and nonprivileged, and the information is crucial to the preparation of the case.[375] The existence of interrogatory answers and documents already produced was deemed relevant to assessing the need for probing counsel's thought processes in assembling documents.[376]

To the extent that Rule 30(b)(6) depositions, particularly before the end of preparations, are uniquely calculated to disclose what counsel has advised the company are relevant or important or persuasive documents, similar considerations and similar need for restraint apply. Just as depositions of opposing counsel are shunned,[377] a Rule 30(b)(6) deposition that effectively discloses counsel's views on the preparation of the case for trial is inappropriate.[378]

Counsel's view as to the significance or lack thereof of particular facts, or any similar matters, reveals the company

---

371. Shelton v. American Motors Corp., 805 F.2d 1323, 1328 (8th Cir. 1986).
372. *See* FED. R. CIV. P. 30(a) (a party may take the deposition of "any person").
373. *Shelton*, 805 F.2d at 1327.
374. *Id.* (citing Fireman's Fund Ins. Co. v. Superior Court, 140 Cal. Rptr. 677, 679 (Cal. Ct. App. 1977)).
375. *Id.*
376. *Id.* at 1327-28.
377. *See* N.F.A. Corp. v. Riverview Narrow Fabrics, Inc., 117 F.R.D. 83, 85 (M.D.N.C. 1987); *see also* Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., 125 F.R.D. 578, 593 (N.D.N.Y. 1989) ("[T]he deposition of counsel increases the likelihood that the attorney will be called as a witness at trial. Under such circumstances the attorney would normally be disqualified from providing further services."); SEC v. World-Wide Coin Inv., Ltd., 92 F.R.D. 65, 67 (N.D. Ga. 1981) (barring deposition of SEC trial counsel).
378. *See* SEC v. Morelli, 143 F.R.D. 42, 46-47 (S.D.N.Y. 1992).

---

attorney's mental impressions concerning the case.[379] When this issue has been raised, interrogating counsel have on occasion been directed that, when formulating questions, they should avoid lines of inquiry intended to elicit the advice rendered by the designating company's counsel.[380] In one insurance case, the carrier, resisting aspects of a Rule 30(b)(6) notice, declined to designate a "spokesperson" under the rule "because the allegations contained in the answer and counterclaim and the information concerning the answer and counterclaim were derived from an ongoing investigation conducted by [the company's] attorneys and not from an officer, director or managing agent of Commonwealth or any other person subject to designation under Rule 30(b)(6)."[381]

The relationship between communication from counsel and a designated witness's "knowledge" poses difficulties in the Rule 30(b)(6) context, and has been known to make a deposition under the Rule "really . . . unravel."[382]

Discovery which provides to the adversary a roadmap to the disclosing party's selection, organization and assessment of a welter of facts and documents raises fundamental work product concerns.[383] A seminal decision on the issue of whether selection and compilation of documents by counsel in preparation for pretrial discovery falls within the protected category of opinion work product reasoned that the selection and compilation of documents by counsel inevitably reveals important aspects of an attorney's understanding of the case.[384] This conclusion follows

---

379. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 283 (D. Neb. 1989); *see* Ford v. Philips Elec. Instruments Co., 82 F.R.D. 359, 361 (E.D. Pa. 1979).
380. *See Protective Nat'l Ins.*, 137 F.R.D. at 283.
381. *Id.* at 270.
382. *Id.* at 272.
383. In one litigation, a union sought deposition of the United States Attorney's Office about the government's investigation of the matters in suit, and an FBI agent involved in the investigation gave an initial session of deposition testimony generally describing the procedures. Thereafter, the court found that the defendants' search for facts relevant to the allegations of the plaintiffs' complaint created an inevitable clash with matters arguably protected by the work product doctrine. United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *3-*4 (S.D.N.Y. Aug. 14, 1992).
384. Sporck v. Peil, 759 F.2d 312, 316 (3d Cir. 1985) (citing James Julian, Inc. v. Raytheon Co., 93 F.R.D. 138, 144 (D. Del. 1982)).

even though the individual documents included in the compilation are not protected under the work product doctrine.[385]

In a case in which corporate litigants had exchanged over 200,000 pages of documents during the course of discovery, deposed dozens of witnesses, and exchanged hundreds of interrogatories, the court was more than willing to assume that the Rule 30(b)(6) witness's company counsel

> have spent much of their time culling through hundreds of thousands of pages of documents, transcripts, and interrogatory responses, in an effort to select and compile the facts and documents relevant to each separate affirmative defense—in effect, to marshall the evidence in support of each of [the entity's] contentions. These activities are protected from discovery by the work-product doctrine.[386]

The criticism is true of a series of oral questions asking for the "facts and documents which [the entity] contends support" each affirmative claim averment or defense,[387] or of a notice stated with similar breadth.[388]

The "selection and compilation theory'" of work product has been recognized by a number of courts.[389] Thus, in the document-production process, production of otherwise unprivileged documents may be protected from discovery if disclosure of the

---

items presents a real concern that the thought processes of counsel would be exposed.[390] A concrete or practical risk that the thought processes of counsel will be disclosed is a concern, while remote risks[391] or mere speculation to that effect will not trigger work product concerns.[392] At the end of the case, and particularly where production of documents is ordered by the court as a case-management tool in planning trial, some circuits have concluded either that disclosure of the selection and screening of documents would not substantially reveal an attorney's thought processes and therefore did not constitute "opinion work product," or that such thought processes would be revealed in any event in a short time at the trial itself.[393]

Thus, while some courts have imposed a form of synthesis obligation upon a party, particularly a governmental agency,[394] more recently courts are carefully considering the facts of such situations to determine whether legitimate information needs of a party preparing for trial are actually going un-met, after frustrating efforts to use other discovery avenues, before a designated deposition witness will be seen as a rational solution to the dilemma.[395] One factor that has been noted is whether the

---

385. Schwarzkopf Technologies Corp. v. Ingersoll Cutting Tool Co., 142 F.R.D. 420, 423 (D. Del. 1992).

386. American Nat'l Red Cross v. Travelers Indem. Co. of R.I., 896 F. Supp. 8, 13 (D.D.C. 1995); Shelton v. American Motors Corp., 805 F.2d 1323, 1329 (8th Cir. 1986) ("In cases that involve reams of documents and extensive document discovery, the selection and compilation of documents is often more crucial than legal research.") (citing James Julian, Inc. v. Raytheon Co., 93 F.R.D. 138, 144 (D. Del. 1982)); see also Berkey Photo, Inc. v. Eastman Kodak Co., 74 F.R.D. 613, 616 (S.D.N.Y. 1977) (barring discovery of "counsel's ordering of the 'facts,' referring to the prospective proofs, organizing, aligning, and marshaling empirical data with the view to combative employment that is the hallmark of the adversary enterprise").

387. American Nat'l Red Cross, 896 F. Supp. at 14.

388. See SEC v. Morelli, 143 F.R.D. 42, 47 (S.D.N.Y. 1992) (stating that defendant's notice of Rule 30(b)(6) deposition "constitute[d] an impermissible attempt . . . to inquire into the mental processes and strategies of the SEC . . . [in that defendant's notice was] intended to ascertain how the SEC intends to marshall the facts, documents and testimony in its possession . . .").

389. See, e.g., United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *24 (S.D.N.Y. Aug. 14, 1992) (quoting In re Grand Jury Subpoenas Dated Oct. 22, 1991 and Nov. 1, 1991, 959 F.2d 1158 (2d Cir. 1992)).

---

390. See In re Grand Jury Subpoenas Dated October 22, 1991 and November 1, 1991, 959 F.2d 1158, 1167 (2d Cir. 1992) (determining that production was required because the documents sought from counsel were all telephone records relating to particular clients for a five-year period—not a select group of documents to which counsel attached particular relevance; recognizing a substantial need for the production because it was unlikely the information would otherwise be available from another source).

391. United States v. Pepper's Steel & Alloys, Inc., 132 F.R.D. 695, 698-99 (S.D. Fla. 1990) (noting that if those facts were learned by reviewing documents provided by counsel but that this situation presented only a remote risk of disclosure of counsel's impressions and thought processes).

392. In re San Juan DuPont Plaza Hotel Litig., 859 F.2d 1007, 1015 (1st Cir. 1988).

393. In re San Juan DuPont Plaza Hotel, 859 F.2d at 1017.

394. See FDIC v. Butcher, 116 F.R.D. 196 (E.D. Tenn. 1985), aff'd 116 F.R.D. 203 (E.D. Tenn. 1987).

395. See, e.g., United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH), 1992 U.S. Dist. LEXIS 12307, at *47-*48 (S.D.N.Y. Aug. 14, 1992). In District Council of Carpenters, the court analyzed the situation in FDIC v. Butcher, a case defendants relied on, as follows:

> [T]he defendant bank officers, sued for various acts of negligence in carrying out their duties, were frustrated in securing information as to even the most basic facts underlying the accusations against them, e.g. identification of the

witness has at least some knowledge based on personal participation in the events.[395]

Another factor is whether the disclosing party can aver that all of the underlying information that its deposition witness reviewed has already been produced. When the entity demonstrates that all relevant, non-privileged evidence has been disclosed to the defendants, a proposed Rule 30(b)(6) deposition seeking synthesis of the supporting facts "constitutes an impermissible attempt by defendant to inquire into the mental processes and strategies of the [entity],"[396] and hence the court was "drawn inexorably to the conclusion that [the] Notice of Deposition is intended to ascertain how the [entity] intends to marshall the facts, documents and testimony in its possession, and to discover the inferences that plaintiff believes properly can be drawn from the evidence it has accumulated."[397]

loans they were alleged to have negligently executed and administered and the amount of loss claimed for each loan. That information was known only by the FDIC (which presumably stood in the shoes of the banks) and was thoroughly set forth in an FDIC memorandum, which itself was found to be privileged. However, the facts contained in the document were not themselves privileged and were basic to understanding the claims asserted by the FDIC. When the FDIC Rule 30(b)(6) witnesses were deposed, subject to deposition notices that specifically apprised them of the facts being sought, they had not even reviewed the FDIC memorandum detailing those facts, had no role in preparing the memorandum and, essentially, were able to provide little or no useful information. The court, obviously concerned about the defendants facing "trial by ambush", found the deposition tactics of the plaintiff to be inefficient and wasteful since it could have presented the examiners who prepared the FDIC's memorandum and who had precise, first-hand knowledge of the clearly discoverable information being sought.

District Council of Carpenters, 1992 U.S. Dist. LEXIS 12307, at *47-*48.

396.  See, e.g., id. (distinguishing United States v. Pepper's Steel & Alloys, Inc., 132 F.R.D. 695 (S.D. Fla. 1990) on the grounds that, in that case, the employee designated under Rule 30(b)(6) "had knowledge of facts relevant to the claims in the issues in the case . . . [and] much of his knowledge was acquired first-hand over several years, as the supervising examiner of the company's liability division, and only some of his information was acquired in conversations with counsel or by reviewing documents in connection with the litigation").

397.  SEC v. Morelli, 143 F.R.D. 42, 47 (S.D.N.Y. 1992).

398.  Morelli, 143 F.R.D. at 47. The same reasoning animated the court in SEC v. Rosenfeld, No. 97 Civ. 1467 (RPP), 1997 U.S. Dist. Lexis 13996, at *2 (S.D.N.Y. Sept. 16, 1997) in which defendant Rosenfeld attempted to depose the SEC under Rule 30(b)(6), seeking, inter alia, "all information in the possession, custody, or control of, or reasonably available to, the SEC or its agents or employees, relating to the truth or falsity of statements in the complaint . . . ." The district court correctly reasoned that the designated witness would have to have participated in, or have

*Blunderbuss Requests.* A notice calling for a corporate witness to testify about facts supporting a large number of paragraphs in the party's denials and affirmative defenses also poses work product concerns. One court has acknowledged that while the discovering party has a legitimate interest in obtaining information about the facts upon which the entity will rely, the "attempt to discover those facts through a Rule 30(b)(6) deposition is overbroad, inefficient, and unreasonable."[399] Such a request also implicates serious privilege concerns, and potential problems with confidential information.[400] The corporate entity "is not required to have counsel 'marshal all of its factual proof and prepare a witness to be able to testify on a given defense or counterclaim."[401]

Requiring a party to provide a response to an "all of the facts" form of Rule 30(b)(6) designation, in effect, calls upon a party "to marshal all of its factual proof and then provide it to [the Rule 30(b)(6) designate] so that she could respond to what are essentially a form of contention interrogatories."[402] Indeed, if this procedure were permissible, one might ask why a party opponent would ever need to call for more than one deposition: the all-encompassing Rule 30(b)(6) deposition would provide a binding rendition of all factual information. "Aside from any issues of privilege, this would be highly inefficient and burden-

been prepared by, those who conducted the SEC investigation—namely the Commission's attorneys. Rosenfeld, 1997 U.S. Dist. LEXIS 13996, at *2. Thus, the 30(b)(6) inquiry "amounts to the equivalent of an attempt to depose the attorney for the other side." Id. The court then summarized the arsenal of alternatives available to the would-be deposing party:

Rather than using interrogatories as contemplated by the Local Civil Rules, and Requests to Produce Documents pursuant to Rule 34 of the Federal Rules of Civil Procedure, and then taking the necessary oral discovery from the witnesses with knowledge of the facts alleged in the complaint, Rosenfeld seeks to explore the extent of the SEC's knowledge (how much it knows and how much it does not know) as a result of the investigative efforts of its attorneys. This Rule 30(b)(6) discovery is obviously aimed at finding the nature of the SEC's attorney work product, and is denied for that reason.

Id. at *3.

399.  In re Independent Serv. Org. Antitrust Litig., 168 F.R.D. 651, 654 (D. Kan. 1996).

400.  In re Independent Serv. Org., 168 F.R.D. at 654.

401.  Id.

402.  United States v. District Council of Carpenters, No. 90 Civ. 5722 (CSH), 1992 WL 208284, at *15 (S.D.N.Y. Aug. 14, 1992).

some, rather than the most direct manner of securing relevant information . . . ."[403] Such reasoning is particularly persuasive where the context leaves open the prospect that the information can be discovered by other means."[404] At least one court has suggested that use of the Rule 30(b)(6) mechanism in this fashion would be permitted only upon a showing of substantial need to obtain the information via the broad Rule 30(b)(6) deposition mechanism.[405]

When the subjects sought in a notice under the Rule ask for all support for allegations in a pleading, the discovery does not "merely seek facts," but actually seeks to discover how the entity "intends to marshall the facts, documents and [statements] in its possession, and to discover the inferences that [the entity] believes properly can be drawn from the evidence it [h]as accumulated."[406] Several courts have held that "[w]ork product includes an attorney's intended lines of proof and his ordering of the facts."[407]

## VI. "BINDING" A WITNESS UNDER RULE 30(B)(6)

### A. Motivating a Misreading of the Rule

The decisions which take the most draconian view of the duty of preparation that attends production of a representative

403. *District Council of Carpenters*, 1992 WL 206284, at *16; accord *In re Independent Serv. Org.*, 168 F.R.D. at 481.

404. *In re Independent Serv. Org.*, 168 F.R.D. at 654 (citing EEOC v. HBE Corp., 157 F.R.D. 465, 466-67 (E.D. Mo. 1994)).

405. *In re Independent Serv. Org.*, 168 F.R.D. at 654. However, in response to the claim that disclosure of all supporting facts would disclose work product of counsel, another court dismissed the argument summarily, commenting that "a position taken in commercial litigation that was not the result of various privileged work product and communications would be a rare find." *Masco Corp. v. Price Pfister, Inc.*, 33 U.S.P.Q. 2d 1504, 1505 (E.D. Va. 1994). Of course, specific facts can be disclosed without revealing privileged communications, and some courts simply ignore the issue whether identification of all supporting materials, in effect, asks one party to prepare the case for the other, and to disclose counsel's assessment of the welter of possible proof items. *See Masco Corp.*, 33 U.S.P.Q. 2d at 1505.

406. EEOC v. American Int'l Group, Inc., No. 93 Civ. 6390 (PKL), 1994 U.S. Dist. LEXIS 9815, at *6 (S.D.N.Y. July 18, 1994) (citing SEC v. Morelli, 143 F.R.D. 42, 47 (S.D.N.Y. 1992)).

407. *American Int'l Group*, 1994 U.S. Dist. LEXIS 9815, at *6.

witness often combine the notion of sufficient preparation with the concept that the testimony must be of a nature to bind the entity."[408] Recent efforts to encourage even more widespread use of Rule 30(b)(6) depositions repeatedly claim that the ability to force the entity to provide "binding" admissions is the key purpose and advantage of the procedure.[409] Often, cases cited for this proposition are sanction decisions that do not reflect the implications of the entity deposition procedure itself."[410] However, several courts have recited, almost by rote, that the discovering party is "entitled to a 30(b)(6) deposition that obtains explicit statements that will bind [the company] on the matters in issue."[411] The recently publicized claim: "The whole point of

408. For example, *United States v. Taylor*, 166 F.R.D. 356, 360-61 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996), noted the earlier expression of these combined concerns:

A notice of deposition made pursuant to Rule 30(b)(6) requires the corporation to produce one or more officers to testify with respect to matters set out in the deposition notice or subpoena. A party need only designate, with reasonable particularity, the topics for examination. The corporation then must not only produce such number of persons as will satisfy the request, but more importantly, prepare them so that they may give complete, knowledgeable and binding answers on behalf of the corporation.

*Taylor*, 166 F.R.D. at 126 (quoting *Marker v. Union Fidelity Life Ins.*, 125 F.R.D. 121, 126 (M.D.N.C. 1989)) (citations omitted); see *Mitsui & Co. v. Puerto Rico Water Resource Auth.*, 93 F.R.D. 62 (D.P.R. 1981).

409. *See Solovy & Byman, supra* note 1, at B13, cols. 1, 2, 3, 4 (repeated claims of binding effect).

410. *See id.* (citing *Worthington Pump Corp. v. Holfert Marine Inc.*, 34 Fed. R. Serv. 2d 855 (D.N.J. 1982)). The court in *Worthington Pump* reviewed a magistrate judge's recommendation about sanctions for improper assertion of the privilege against self-incrimination. *Worthington Pump*, 34 Fed. R. Serv. 2d at 855. The magistrate judge had found the information sought to be material which "the defendants would, in fact, be obliged to provide or face imposition of the most extreme sanction available under Rule 37." *Id.* The district judge imposed a proof preclusion sanction for improper invocation of the privilege to shield a corporation (which lacks the privilege). *Id.* The sanction was "an inference" that the defendant is "unable to deny truthfully the allegations contained in paragraphs 5 and 7 of plaintiff's complaint." *Id.* at 857. Neither this sanction nor the accompanying direction that contrary proof would be barred was in any way attributed to the structure or requirements of Rule 30(b)(6).

411. *Masco Corp. v. Price Pfister, Inc.*, No. 94-729A, 1994 U.S. Dist. LEXIS 20597, at *8 (E.D. Va. Oct. 7, 1994); see, e.g., *Sanders v. Circle K Corp.*, 137 F.R.D. 292, 294 (D. Ariz. 1991); *Mellon Bank v. Bank of Mid-Jersey*, No. 91-3142, 1992 U.S. Dist. LEXIS 5633, at *4 (E.D. Pa. Apr. 14, 1992); *GTE Prods. Corp. v. Gee*, 115 F.R.D. 67, 68 (D. Mass. 1987). Note that some of the courts taking this view conclude that a corporation cannot be required to designate a Rule 30(b)(6) designee who lacks authority to speak on behalf of the corporation. *See Lapenna v. Upjohn*

30(b)(6) is that it creates testimony that binds the corporate entity,[410] is utterly belied by the legislative history of the Rule. And in the main, this approach reflects a misunderstanding of the applicable civil procedure rules as well as the rules of evidence, and is misguided as a policy matter.[411]

Rule 32(a)(1) allows the use of deposition testimony to contradict or impeach a trial witness in accordance with the Federal Rules of Evidence. Furthermore, Rule 32(a)(2) provides that the depositions of an officer, director or managing agent of a corporate party may be used by an adverse party at trial *for any purpose*, which includes admissions on the merits.[412] This is similar to the effect of transcripts from a Rule 30(b)(6) deposition, which the adverse party may also use for any purpose.

However, a party is not "bound" by its Rule 30(b)(6) deposition testimony as a matter of law" in the sense that matters admitted in the testimony cannot be controverted.[413] A corporation is "bound" by its Rule 30(b)(1) testimony only in the sense that any individual whose testimony was taken under Rule 30(b)(1) would be "bound" by that testimony. However, that locution simply means that the witness has committed to a position at a particular point in time; it does not mean that the witness has made a *judicial admission* that formally and finally decides an issue.[414] Judicial admissions may not be contradict-

Co., 110 F.R.D. 15, 20 (E.D. Pa. 1986) (stating that a Rule 30(b)(6) designee must have authority to speak on behalf of the corporation).

412. Solovy & Byman, *supra* note 1, at B12, col. 3.

413. Some courts have even asserted the nonsensical position that a corporate designee "can make admissions against interest under FED. R. EVID. 804(b)(3) which are binding on the corporation." United States v. Taylor, 166 F.R.D. 356, 362 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996) (citing Ierardi v. Lorillard, Inc., No. 90-749, 1991 U.S. Dist. LEXIS 11260 (E.D. Pa. Aug. 13, 1991)). This view is contradicted by accepted evidence law in two respects: first, the Rule 804 exceptions may only be used when the declarant is "unavailable" as defined in Rule 804(a). The corporation, a party in these situations, is always present, often through several representatives, and hence the hearsay exception would not apply. Second, and more importantly, Rule 804 provides only for admissibility, and testimony admitted pursuant to Rule 804(b)(3) may always be rebutted and contradicted.

414. W.R. Grace & Co. v. Viskase Corp., No. 90-5383, 1991 U.S. Dist. LEXIS 14651, at *4-*5 (N.D. Ill. Oct. 15, 1991); Fey v. Walston & Co., 493 F.2d 1036, 1045-46 (7th Cir. 1974) (ruling that a deposition of party witness may be introduced as substantive evidence even if party witness is available at trial).

415. *See* W.R. Grace & Co., 1991 U.S. Dist. LEXIS 14651, at *5.

416. *See id.*

---

ed.[417] Deposition testimony, on the other hand, is simply evidence, nothing more. Such evidence may be explained or contradicted.[418] The cases that use the word "binding" to describe deposition testimony should be read to use it in the limited sense described here.[419]

A party is not generally "bound" by the testimony of one of its employees taken in isolation, even if the subject matter is squarely within the subject matter of the witness's expertise and job functions. Thus, for example, in a case in which a party's damage claims were addressed by the testimony of an accountant who supervised the maintenance of plaintiff's books and testified to damages totaling $956,256.10, the party was *not* restricted to that computation.[420] The fact-finder was not compelled to accept the testimony in question, nor was the fact-finder restricted to that testimony.[421] Where other witnesses have irrelevant information, neither the party nor the fact-finder is bound by the more limited testimony of one person. The party, it is said, is "entitled to the benefit of evidence from other witnesses more favorable to him."[422]

How impeachment operates after a Rule 30(b)(6) deposition has rarely been discussed. In the one reported opinion we have located which comments on the process, the court stated in dicta that if the entity calls a witness at trial who "makes a statement that contradicts a position previously taken in a Rule 30(b)(6) deposition, then [the adversary] may impeach that witness with

417. Brown & Root, Inc. v. American Home Assurance Co., 353 F.2d 113, 116 (5th Cir. 1965).

418. *See* W.R. Grace & Co., 1991 U.S. Dist. LEXIS 14651, at *5.

419. *Id.* at *5 n.1 (citing Sanders v. Circle K Corp., 137 F.R.D. 292 (D. Ariz. 1991) (holding that a corporation cannot be compelled to designate a witness under Rule 30(b)(6) if that witness lacks authority to bind the corporation); Poitzin Tower Cranes, Inc. v. Capitol Tower Cranes, Inc., 892 F.2d 74 (4th Cir. 1989) (affirming summary judgment against a corporation based upon uncontroverted Rule 30(b)(6) deposition statements); Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11887, at *3 (E.D. Pa. Apr. 11, 1991) (stating that a corporation has duty to prepare its Rule 30(b)(6) designee to give binding answers, rather than allow the designee to profess ignorance until trial); McDevitt & Street Co. v. Marriott Corp., 713 F. Supp. 906 (E.D. Va. 1989) (similar to Ierardi).

420. Charles Dowd Box Co. v. Fireman's Fund Ins. Co., 218 N.E.2d 64, 68 (Mass. 1966).

421. Charles Dowd Box, 218 N.E.2d at 68.

422. *Id.* at 69 (quoting Reynolds v. Sullivan, 136 N.E.2d 128, 131 (Mass. 1953)).

the prior inconsistent statement."[423] This is, however, a broad rule: it means that every witness with personal knowledge who testifies at the trial may be impeached with a statement made by another person designated by the company to testify on that topic. That notion is inconsistent with the normal role of impeachment as a tool to illuminate issues of personal truthtelling and not to have the company's statements used to impeach individual witnesses. For example, would an interrogatory answer submitted on behalf of an entity be usable to impeach an individual witness other than the person signing the answers?[424]

At least one appellate court has noted the erroneous notion that a party is somehow "bound" conclusively by its officials' depositions under Rule 30(b)(6).[425] It implied that, at most, garden variety admissions are a "normal risk of litigation" and to the extent that the adversary party sought and the trial court granted any greater binding effect, "leading to more horrendous results, the actual effects [of such a misapplication of the rule] can be considered and if need be ameliorated on appeal."[426]

Indeed, it may be worth noting that the broad scope of deposition testimony under the Rule will not serve as a basis for trial testimony except to the extent used by the adversary. Thus, it has been held that at a deposition a corporate officer is *permitted* to recount corporate knowledge in testimony as long as the witness has personal knowledge of the events, whether or not the witness personally participated in the activity described.[427] At trial, of course, the general standards of Rule 601 of the Federal Rules of Evidence will intrude, requiring some showing of personal knowledge on the part of the witness.[428]

423. *See* W.R. Grace & Co. v. Viskase Corp., No. 90-5383, 1991 U.S. Dist. LEXIS 14651, at *7 (N.D. Ill. Oct. 15, 1991).

424. The issue may be somewhat unreal because the use of employee *admissions* on the merits has a more powerful impact than mere impeachment; therefore, admissibility of the other statement on the merits may dwarf the impeaching consequences of having the statement of another, albeit inconsistent with the testimony of the witness on the stand, read into the record.

425. *In re* Puerto Rico Elec. Power Auth., 687 F.2d 501, 503 (1st Cir. 1982).

426. *In re Puerto Rico Elec. Power Auth.*, 687 F.2d at 504 n.2.

427. Neeberis v. Texas Int'l Airlines, 497 F. Supp. 1234, 1299 (E.D. Pa. 1980).

428. *See* 3 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE §§ 601, 602 (2d ed. 1999); CHRISTOPHER MUELLER & LAIRD KIRKPATRICK, FEDERAL EVIDENCE § 236 (2d ed. 1994).

---

### B. Bindingness and the Conception of Trial Proof

One premise which seems to pervade the discussions of theoretical abuse by the entity is that only corporate knowledge of the party is potential evidence. Thus, courts imposing draconian burdens under Rule 30(b)(6) are wont to equate the universe of a company's trial proof with knowledge of its personnel:

> If a corporation has knowledge or a position as to a set of alleged facts or an area of inquiry, it is its officers, employees, agents or others who must present the position, give reasons for the position, and, more importantly, stand subject to cross-examination. A party's trial attorney normally does not fit that bill. Therefore, if a party states it has no knowledge or position as to a set of alleged facts or area of inquiry at a Rule 30(b)(6) deposition, it cannot argue for a contrary position at trial without introducing evidence explaining the reasons for the change.[429]

This reasoning elides the varieties of proof open to the corporation at trial. Indeed, if deemed strategically beneficial, the corporation could call *none* of its own personnel at trial and rely wholly on third-party witnesses or testimony from adverse witnesses associated with the opponent or use documentary or physical evidence.

This approach also loses sight of the issue of surprise. To the extent that the issue is whether, to be properly prepared, a Rule 30(b)(6) witness must review *other parties'* deposition testimony and documents of others, the reality is that the discovering party already has this information.

*Restrictions Based on the Role of Counsel.* Another thesis apparently motivating some courts to favor almost unlimited preparation burdens under the rule is that "[o]therwise, it is the attorney who is giving evidence, not the party."[430] From the premise that the *attorney* for an entity "is not at liberty to manufacture the corporation's contentions" the argument concludes

429. United States v. Taylor, 166 F.R.D. 356, 362 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996); See Ierardi v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11887, at *8 (E.D. Pa. Apr. 11, 1991).

430. *Taylor*, 166 F.R.D. at 362; *see also id.* at 363 n.5 ("What the corporation cannot do is have the attorney assert that the facts show a particular position on a topic when, at the Rule 30(b)(6) deposition, the corporation asserts no knowledge and no position.").

that, instead, "the corporation may designate a person to speak on its behalf and it is this position which the attorney must advocate."[431] Under this view, the attorney may only serve as a "conduit of the party"[432] and the party must speak through one or more deponents. The most expansive interpretations of the duty to prepare for a Rule 30(b)(6) deposition include the concept that if an entity plans to offer at trial a position "based on testimony from third parties, or their documents, the designee . . . must present an opinion as to why the corporation believes the facts should be so construed."[433]

There is nothing in corporation law, evidence principles or civil procedure which supports this conclusion. Corporate litigation positions either are taken by the entity through the decisions of officers, whether managerial or more purely legal, or are acted upon by a board of directors, executive committee or the like. No one person must be identified either to make or to state the position. And, as noted elsewhere in this article, there are several tools in the modern litigation systems for identifying what those positions will be.

Proof on behalf of the entity likewise is not restricted, by evidence law or any other principles, to items originating within the company or to matters as to which a corporate witness in knowledgeable: any witness may be offered, no corporate witnesses need be offered; and facts from all sources may be used to defend the corporation's positions in the trial. Even if the company does not have knowledge available to it at the time of an early deposition, it is not barred from offering proof from third-parties or other sources at the eventual hearing. Thus, a party does (and should) have the right under our system of litigation "to deny knowledge or position now, but then at trial to rely on the documents and testimony of others or to at least present argument that the evidence presented by others does not reflect the state of facts as contended by those parties."[434]

431. *Id.* at 361-62.
432. *Id.* at 362.
433. *Id.* at 361.
434. *Taylor,* 166 F.R.D. at 362.

### C. Preclusion of Proof and Impeachment

In *Taylor,* Union Carbide argued for the right to call witnesses at trial on a Rule 30(b)(6) topic if the witnesses had been identified as knowledgeable by the time the Rule 30(b)(6) deposition transcript was closed.[435] It also argued that failure to designate a witness on a particular topic or sub-topic should not preclude the ability to make arguments at trial with respect to such subjects through use of testimony or documents admitted by otherwise competent means (for example, previous deposition testimony and documents previously produced in discovery).[436] The court found these arguments unpersuasive. It did, however, include in its disposition provisions allowing Carbide to promptly designate and prepare a substitute deponent if, despite good-faith efforts to prepare a deponent, the deponent were unable to respond to a specific area of inquiry.[437]

At trial, while a party may be impeached upon changing Rule 30(b)(6) testimony, some courts have made the mistaken assumption that an *evidentiary showing* would be necessary to support such a change, requiring some sort of permission to present the altered position.[438] Imposition of such a burden, which is nowhere supported in the Rule, its legislative history, or evidentiary principles, proceeds from the assumption that differing trial testimony presents "a disruptive situation."[439] Rather, there is a simple remedy of impeachment[440] and not much risk in any event; the pretrial order will have alerted the

435. *Id.*
436. *Id.*
437. *Id.* at 359 n.5 (citing again the same court's earlier decision in *Marker v. Union Fidelity Life Ins. Co.,* 125 F.R.D. 121, 126 (M.D.N.C. 1989)). The *Taylor* court characterized this rule as holding that
> even where defendant in good faith thought deponent would satisfy the deposition notice, it had a duty to substitute another person once the deficiency of its designation became apparent during the course of the deposition, and to act immediately where plaintiff had traveled out of state to defendant's offices placing defendant in a better position to take care of exigencies.

*Id.*

438. *Taylor,* 166 F.R.D. at 363 n.8 ("At trial, [Carbide] will be required to make an evidentiary showing to support such a change in position.").
439. *Id.*
440. *Otis Eng'g Corp. v. Trade & Dev. Corp.,* No. 92-1574, 1994 U.S. Dist. LEXIS 3132, at *2-*3 (E.D. La. Mar. 16, 1994).

adversary to contentions, and contention interrogatories may also have defined the positions of the entity. The list of witnesses and exhibits set forth by the entity for the pretrial order, other common elements,[441] will also avoid surprise and allow the entity's opponent to be prepared to meet the evidence. Thus, the situation is starkly unlike the cases in which a party spells out its trial positions *in a pretrial order* and thereafter seeks to spring additional evidence on new issues upon the adversary at trial. Of course, in those cases, the notion that changing the pretrial order requires a *showing* is sensible. Then again, Rule 16 specifies that such orders cannot be changed without the proper showing, which—with respect to the final pretrial order—is stringent: "The order following a final pretrial conference shall be modified only to prevent manifest injustice."[442]

In the only decision squarely ruling on the issue of limiting a party's trial testimony to the positions advanced in the Rule 30(b)(6) testimony of its designee, the court firmly held that the corporation was *not* barred from offering contrary proof.[443] In ruling on a motion captioned "Motion to Bar Otis Engineering Corporation from Materially Altering its Rule 30(b)(6) Deposition Testimony at Trial and from Offering Expert Evidence to the Contrary at Trial," the court found the relief unavailable.[444] The court commented that if a party "attempts to materially alter a Rule 30(b)(6) deposition, the opposing party has the ability and the responsibility to cross-examine and impeach the witness using the different, but sworn to, prior testimony. The trier of fact then determines which, if any, of the testimony to credit."[445] Thus, the court found that it was "more appropriate for the trier of fact to decide the credibility of witnesses as opposed to the court preventing a witness from changing their prior testimony . . . ."[446]

It is generally recognized, therefore, that while individual witnesses may not have comprehensive knowledge of the facts in a given case, their testimony cannot be deemed to limit the evi-

---

441. MANUAL FOR COMPLEX LITIGATION ¶ 41.7 (1995).
442. FED. R. CIV. P. 16(e).
443. *Otis Eng'g*, 1994 U.S. Dist. LEXIS 3132, at *2-*3.
444. *Id.* at *1.
445. *Id.* at *2.
446. *Id.* at *3.

dence that the entity can present at trial.[447] If a party wishes to confine trial evidence to that which is disclosed during discovery, it must propound appropriate contention interrogatories.[448] When courts have actually focused on the "binding" effect of testimony under the Rule, they have recognized, at least on the superficial level, that the testimony is not calculated to be the equivalent of a judicial admission.[449]

In sum, Rule 30(b)(6) nowhere states that the purpose of this device is to bind the corporation in any sense. Nor does the Advisory Committee commentary that accompanied the rule indicate that aspiration. Once it is understood that the true purpose of the Rule 30(b)(6) device is to provide leads to other discovery and to assure efficiency in a deposition program by avoiding random stabs by the discovering party, the question of whether the testimony "binds" the corporation loses significance.

## VII. SANCTIONS DOCTRINES RECAPITULATE THE SCOPE OF RULE 30(B)(6) DUTY TODAY

The burdens of depositions under the rule are so great and the potential for case-altering sanctions so near the surface of the proceedings, that authoritative rulings are avidly sought.[450]

---

447. Arkwright Mutual Ins. Co. v. National Union Fire Ins. Co., No. 90-7811-KC, 1993 U.S. Dist. LEXIS 3162, at *8 (S.D.N.Y. Feb. 4, 1993).
448. *Arkwright Mutual Ins.*, 1993 U.S. Dist. LEXIS 1162, at *8.
449. *See, e.g.*, United States v. Taylor, 166 F.R.D. 356, 362 n.6 (M.D.N.C. 1996), *aff'd*, 166 F.R.D. 367 (M.D.N.C. 1996):

When the Court indicates that the Rule 30(b)(6) designee gives a statement or opinion binding on the corporation, this does not mean that said statement is tantamount to a judicial admission. Rather, just as in the deposition of individuals, it is only a statement of the corporate person which, if altered, may be explained and explored through cross-examination as to why the opinion or statement was altered.

*Taylor*, 166 F.R.D. at 362 (citing W.R. Grace & Co. v. Viskase Corp., No. 90-5383, 1991 U.S. Dist. LEXIS 14651 (N.D. Ill. Oct. 15, 1991)).
450. Bald claims that the Rule 30(b)(6) deposition would generate "undue burden" have not been persuasive. In general, at least where records exist within the company to permit study and preparation, while the preparation task "may be somewhat difficult, it is clear that if a corporate employee familiar with the structure and organization of the corporation would find this task difficult, [the adversaries], who have no such familiarity, likely would find it impossible." Israeli v. Lorillard, Inc., No. 90-7049, 1991 U.S. Dist. LEXIS 11887, at *4 (E.D. Pa. Aug. 23, 1991).

Similarly, some courts have expressed the view that a mere unsubstantiated

This conjunction of factors may explain, in part, the frequency with which "clarifications" are sought of rulings bearing on compliance with Rule 30(b)(6) obligations.[451] Most of the reported rulings arise on sanction applications, however, but without the benefit of appellate guidance.[452]

### A. Non-Appearance and Virtual Non-Appearance

Rule 37(d) of the Federal Rules of Civil Procedure provides that when a party or a person designated to testify under Rule 30(b)(6) fails to appear, an award of expenses will be entered.[453] As noted above, failure to designate an available,

---

knowledgeable, and readily identifiable witness has been deemed in practical effect "no appearance at all."[454] Sanctions have been denied, on the other hand, where "four deponents testified at length concerning the areas of their respective designations."[455] Clearly, to justify the imposition of sanctions, "the inadequacies in a deponent's testimony must be egregious and not merely lacking in desired specificity in discrete areas."[456] For example, in *Resolution Trust Corp. v. Southern Union Co.*[457] the deponent testified that he had no knowledge as to each item of inquiry designated in the notice.[458]

Seen through the lens of sanction decisions, much of the rhetoric which is driving the overuse of Rule 30(b)(6) depositions today is hollow. While dispositive sanctions are available when there is a total failure to appear for a properly noticed deposition under the Rule,[459] such situations are rare. And, in the normal case, if a witness of any sort is produced in response to a notice under the Rule, and the witness answers at least *some* questions, no dispositive sanctions have ever been awarded by a federal court.[460] Several decisions have ordered re-deposition

---

[451]. *See Taylor*, 166 F.R.D. at 358; *In re Puerto Rico Elec. Power Auth.*, 687 F.2d 501, 503-04 (1st Cir. 1982); *see also Isrardi*, 1991 U.S. Dist. LEXIS 11887, at *8-*9. Even a prompt clarification motion, however, is not likely to yield an order quashing a deposition in its entirety. Pre-testimony motions to quash, quite apart from the Rule 30(b)(6) context, are not favored and the general canon is that an order vacating a notice of deposition is regarded as unusual and is treated unfavorably. *See Arkwright Mutual Ins.*, 1993 U.S. Dist. LEXIS 1163, at *5 (citing Investment Properties Int'l, Ltd. v. IOS, Ltd., 459 F.2d 705, 708 (2d Cir. 1972)). In *Arkwright Mutual Insurance*, the court stated that "[g]enerally, one is required to show both that there is a likelihood of harassment and that the information sought is fully irrelevant before a party is altogether denied the right to take an individual's deposition." *Id.* (quoting United States v. Miracle Recreation Equip. Co., 118 F.R.D. 100, 104 (S.D. Iowa 1987)) (citation omitted); *see Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979); West Peninsular Title Co. v. Palm Beach County, 132 F.R.D. 301, 302 (S.D. Fla. 1990).

[452]. In at least one case, a petition for mandamus was lodged prior to a Rule 30(b)(6) deposition after a flurry of cross-motions were filed in the wake of a notice under the Rule and rulings followed by "clarifications" were entered by the trial court. *In re Puerto Rico Elec. Power Auth.*, 687 F.2d at 503. Of course, in courts that will hear the matter at all, there is a heavy burden to justify mandamus against a discovery order of this sort. A party must demonstrate that the district court exceeded its jurisdictional authority to such a degree that its actions amounted to a "usurpation of power." *Id.* (citing DeBeers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 217 (1945)). Merely characterizing the discovery request as so burdensome as to be impossible of fulfillment, or pointing to statements of opposing counsel in the record which seem to suggest a fallacious expectation that the deposition will "bind" the entity in some conclusive manner have been held to fall "well short of demonstrating a case for mandamus." *Id.*

[453]. Rule 37 provides in part that "the court shall require the party failing to

---

act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(d).

[454]. *Resolution Trust Corp. v. Southern Union Co.*, 985 F.2d 196, 197 (5th Cir. 1993); *see supra* text accompanying notes 107-19; *see also* Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 78 (S.D.N.Y. 1991) (sanctioning a party that failed to provide witnesses knowledgeable in areas requested in notice under Rule 30(b)(6)).

[455]. *Zappia Middle East Constr. Co. v. The Emirate of Abu Dhabi*, No. 94 Civ. 1942, 1996 U.S. Dist. LEXIS 17187, at *26 (S.D.N.Y. Nov. 17, 1996).

[456]. *Zappia Middle East Constr. Co.*, 1996 U.S. Dist. LEXIS 17187, at *26.

[457]. 985 F.2d 196, 197 (5th Cir. 1993).

[458]. *Southern Union*, 985 F.2d at 196-97; *see supra* text accompanying notes 107-40.

[459]. *See Eastway Gen. Hosp., Ltd. v. Eastway Women's Clinic, Inc.*, 737 F.2d 503, 504-05 (5th Cir. 1984) (determining that repeated non-designation and then non-appearance by the tardily designated witness combined with numerous other failures to abide by firm directions of the court in addition to those concerning Rule 30(b)(6) depositions after express warnings made it not an abuse of discretion to impose preclusive sanctions).

[460]. The situation is the same in state courts, where only one (unreported) decision of a state trial judge has imposed sanctions for failure of a designated witness to have complete knowledge of all of the topics designated for testimony. Ashley v. Coopers & Lybrand Deloitte (U.K.), No. CL-95-6466 (Albemarle County Circuit Court Mar. 31, 1997) (on file with the authors). Even within the state of Virginia, where

because answers were incomplete, but even most of these decisions decline to impose the cost recovery that Rule 37(a) would make available in that situation.

### B. Dealing with Gaps in Testimony: Rule 37(a) and (b) Situations Distinguished

*Violation of Orders.* In contrast to cases that involve some arguable failure to comply with a notice issued under the Rule itself, when there have been *orders* directing a party to provide certain testimony, violation of the orders triggers "a panoply of sanctions, from the imposition of costs to entry of default."[461] Of course, sanction orders that take a party's averments as established or barred, or which award judgment on that basis are "the most severe penalty," and are authorized only in "extreme circumstances."[462] Most courts have concluded, therefore, that to warrant imposition of such precipitous sanctions, the violations must be "due to willfulness, bad faith, or fault of the party."[463]

An oral order for the disclosure of contentions is enforceable,[464] and violation thereof can lead to Rule 37(b) sanctions, such as limiting a party's claims to the disclosed theories.[465] In a case involving the lucrative patents for air and liquid cushioned sports shoes, the defendant took the deposition of Nike Incorporated to elucidate Nike's theory of patent infringement.[466] At the deposition, the designated Nike witness denied

that the company was asserting a claim of infringement under the "doctrine of equivalents," a set of patent law principles.[467] Nike then sent the discovering party a letter stating that "NIKE has not made any contention that defendants have infringed the '304 patent under the doctrine of equivalents."[468] Hedging Nike's position, however, the letter further asserted that "[w]hether or not NIKE will make such a contention in the future is dependent on the results of an investigation being conducted by NIKE's technical expert."[469] Because the discovery in Nike's case had closed without further disclosure concerning allegations of infringement based on the doctrine of equivalents, an order restricting the party's case to contentions identified within the time specified by directions of the court was upheld, even though there was no express violation of court order involved.[470]

*General Shortfalls.* On the other hand, if there has been no prior court order with respect to the *content* of a Rule 30(b)(6) deposition, the sanctions available in the discretion of the reviewing judge on an initial motion to compel are those of Rule 37(a)(4) of the Federal Rules of Civil Procedure, setting forth provisions for recovery of fees and expenses,[471] and not the pro-

---

that case arose, the reported case law denies sanctions. See Aetna Cas. and Sur. Co. v. Corroon & Black, 10 Va. Cir. 207 (Richmond Cir. Ct. 1967).

461.  United States v. Taylor, 166 F.R.D. 356, 363 (M.D.N.C. 1996), aff'd, 166 F.R.D. 367 (M.D.N.C. 1996) (citing Fed. R. Civ. P. 37(b)(2)).

462.  CFTC v. Noble Metals Int'l, 67 F.3d 766, 770-71 (9th Cir. 1995) (citing United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co., 857 F.2d 600, 603 n.5 (9th Cir. 1988)); see also Fjelstad v. American Honda Motor Co., 762 F.2d 1334, 1338 (9th Cir. 1985).

463.  Noble Metals Int'l, 67 F.3d at 771 (quoting Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983)).

464.  See Henry v. Sneiders, 490 F.2d 315, 318 (9th Cir. 1974) (upholding default judgment based upon an oral order to produce documents).

465.  Nike, Inc. v. Wolverine World Wide, Inc., 43 F.3d 644, 648-49 (D.C. Cir. 1994).

466.  Nike, 43 F.3d at 645. Nike is the assignee of the '304 patent, which is directed to a shoe having an improved cushioning sole structure. Claim One of the

patent is representative of the claims at issue and reads in relevant part as follows: Footwear comprising an upper, a sole member attached to said upper, said sole member including a sealed inner member of flexible material, said inner member being inflated with a gaseous medium to form a compliant and resilient insert having spaced upper, lower, front, back and side surfaces, an elastomeric yieldable outer member encapsulating said insert about preselected portions of said insert, said preselected portions including a major portion of at least said upper or lower surface and a portion of said side surfaces, said inner and outer members functioning together to form a viscoelastic unit for attenuating shock and returning energy of foot impact.

Id. at 645.

467.  Id. at 648.

468.  Id.

469.  Id.

470.  Nike, 43 F.3d at 648-49.

471.  The proper measure of recoverable costs and fees on a successful motion to compel for gaps in the deponent's knowledge should be the portion of the deposition time devoted to demonstrating lack of knowledge (not the entire deposition, including the productive and responsive parts) and the time spent preparing and presenting the motion to compel. Some courts have noted this logic, though other courts have allowed recovery of the entire costs of the initial transcript and the time spent on the deposition as well as the motion. See Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 79 (S.D.N.Y. 1991) ("[A] total of 68.5 hours were expended, and at the

visions of Rule 37(b)(2), which provides more stringent sanctions for the flouting of a court order.[471] The most common outcome, therefore, when a deposition witness under the Rule is deemed to have been inadequately prepared to provide a reasonable scope of information is that the entity "will just have to do it again, probably at its own expense."[472]

Note that even in cases in which the *fact* or *timing* of a deposition has been the subject of a prior motion, as long as the issues concerning whether the witness should be compelled to answer the questions involved in a later motion were not previously before the court, only Rule 37(a) sanctions should be considered available. This issue commonly arises, given the broad reach of many Rule 30(b)(6) deposition notices. And a ruling that a witness "should be required to appear at a date and place certain" is not violated when a witness appears at the specified time and place but lacks the completeness of knowledge desired by the discovering party.[473] In such a situation the reviewing court on a motion to compel directed to the *content* of the deposition responses is "limited to awarding fees and expenses 'incurred in obtaining the order.'"[474] The court, therefore, would "not have the authority to impose sanctions, such as the award of expenses for the taking of the second deposition, pursuant to Federal Rule of Civil Procedure 37(b)(2), because the expense provisions of 37(a)(4) are more limited than the sanctions under 37(b)(2)."[475] Recovery has been denied for fees or expenses

---

requested rate of $96.00 per hour, this results in a total fee request of $6,517.00. In addition, the plaintiff incurred expenses of $206.85 for the transcript of the Huddleston deposition.").

When a second witness is designated after an initial representative deponent testifies with obvious gaps in the subject matters to be covered, the case law suggests that there is at least a theoretical argument for recoupment of incremental costs occasioned by having a second, separate deposition, if producing both individuals on the same day would, for example, have avoided duplicate travel expenses. *See* Autrey v. Bilaora Int'l, No. 94-0022, 1994 U.S. Dist. LEXIS 18883, at *7-*8 (S.D. Ala. Nov. 18, 1994) (denying sanctions absent a showing of costs attending a second deposition that could have been obviated if both witnesses had been produced for the initial response).

472. Protective Nat'l Ins. Co. v. Commonwealth Ins. Co., 137 F.R.D. 267, 283 (D. Neb. 1989). *See generally* FED. R. CIV. P. 37(a).

473. *Cyprus, supra* note 5, at 7.

474. *Protective Nat'l Ins.*, 137 F.R.D. at 283.

475. *Id.* (applying FED. R. CIV. P. 37(a)(4)).

476. *Id.*

---

which will be encountered upon a re-deposition or continuation of the examination of a witness whose testimony is found to be inadequate.[477]

Even in awarding fees, courts are mindful of the premise that such awards are improper under Rule 37(a)(4) if the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.[478] Similarly, various courts have denied recovery of expenses where there was a genuine disagreement on the merits of the discovery, such as a bona fide dispute over issues of privilege arising out of a deposition.[479]

However, where an examining counsel "[l]ike Jack Webb . . . wanted 'just the facts . . . ,'" costs and fees may be awarded, usually in fairly limited dollar amounts.[480]

### C. Patterns of Abuse in Sanction Cases

Most of the Rule 30(b)(6) cases in which even the minor remedies of costs and fees have been imposed in the course of ordering further disclosure may be explained by the fact that the disclosing party has engaged in other, distinct acts of discovery abuse, such as destruction of evidence.[481] Thus, one factor that clearly motivates some sanction decisions concerning Rule 30(b)(6) is a *pattern* of discovery difficulties. For example, a party which has produced documents reluctantly, after several motions, and then only on a "sample" basis, may be deemed to have sought to create for itself a right to "self-selecting discovery."[482] When that party subsequently produces a witness in

---

477. *Id.* at 283-84.

478. *Id.* at 283 (citing 4A JAMES WILLIAM MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 37.02[10] (2d ed. 1988)). *See generally* FED. R. CIV. P. 37(a).

479. *Protective Nat'l Ins.*, 137 F.R.D. at 283.

480. *Id.* at 284 (limiting recovery to a maximum of $1,000). The court, writing in 1999, did not feel it necessary to explain to readers the allusion to the long-running television series from the black-and-white era, *Dragnet*, from which the reference to Sergeant Joe Friday's portrayal by veteran actor Jack Webb arises.

481. Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 78 (S.D.N.Y. 1991) (imposing sanctions in the form of costs and attorneys fees for failure to respond in two of four designated deposition topics, lying about a third, and destroying evidence).

482. Boycke-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 343 (N.D. Ill. 1995).

response to a Rule 30(b)(6) notice who has only partial knowl-
edge of the corporation's activities, and especially when there is
no reason to doubt that others within the organization could
have supplied more complete information, the combination of
earlier discovery recalcitrance and the deposition short-fall may
lead to imposition of sanctions.[483]

In one case, on the deposition date only defense counsel
appeared because the two corporate parties on whom the Rule
30(b)(6) notices were served failed to designate a deposition
representative.[484] Their counsel assured the governmental
plaintiff that appropriate designations would be made, and the
depositions were rescheduled.[485] At the next scheduled deposi-
tion date, a principal officer of one of the two entities appeared
on behalf of both companies and promptly invoked his Fifth
Amendment privilege against self-incrimination, and he refused
to answer any relevant questions.[486]

When the inevitable motion to compel reached the magis-
trate judge supervising the trial preparations in the case, the
court found that the entities had representatives available to
them who would not have invoked their Fifth Amendment privi-
lege; therefore, the entities had not made a good-faith effort to
locate suitable representatives.[487] The magistrate judge or-
dered payment of a $500 sanction and directed the corporations
to "designate a person to represent them, pursuant to Fed. R.
Civ. P. 30(b)(6), who will not invoke the Fifth Amendment privi-
lege."[488] Not only was this sanction award not paid, but the
corporation failed to designate an appropriate representative,
seek reconsideration of the order, or seek a protective order.
Instead, the corporation simply elected to provide the discover-
ing party with "a list of persons who, for various reasons, would
*not testify.*"[489] They then re-designated the same individual
previously produced as their representative, knowing he would
invoke the privilege against self-incrimination. The discovering

party moved for sanctions, and then the two entities for the first
time sought a protective order. On this record, the magistrate
judge ordered the corporations to explain "how responding to the
area of inquiry would place either Defendant in danger of self-
incrimination."[490] Neither entity responded. The magistrate
judge made findings on these matters which were adopted by
the district judge. Under the provisions of Rule 37(b)(2)(a), the
district court decreed that all allegations of the complaint would
be established as true against both of the responding enti-
ties.[491]

### D. Warnings and Limits on Trial Proof

Because of the fear that a corporation may at its Rule
30(b)(6) deposition aver that "it has no corporate knowledge of
designated matters, and then, after the deposition has conclud-
ed, state that after further effort it does indeed have corporate
knowledge of a designated matter," some courts have considered
providing a "warning" to the entity that it will be "precluded
from asserting a position at trial different than the position
taken at its deposition," or that it may be precluded from assert-
ing any position whatsoever at trial where none was taken dur-
ing the deposition if the information forming the basis of that
position was known or reasonably available to it prior to or
during the deposition.[492] This urge has been tempered, howev-
er, by the recognition that information could be discovered in
good faith later that could form the basis for a different position
at trial.[493] Thus, "inadequate preparation of a Rule 30(b)(6)
designee [may only] be sanctioned based on the lack of good
faith, prejudice to the opposing side, and disruption of the pro-
ceedings."[494]

Another approach requires that for each deposition topic or
subject of examination or area of inquiry for which the entity
"intends to present evidence at trial through testimony or depo-

483. *Bucke-Roberson*, 182 F.R.D. at 345.
484. CFTC v. *Noble Metals Int'l*, 67 F.3d 766, 769 (9th Cir. 1996).
485. *Noble Metals Int'l*, 67 F.3d at 769.
486. *Id.*
487. *Id.* at 770.
488. *Id.* (emphasis omitted).
489. *Id.*

490. *Noble Metals Int'l*, 67 F.3d at 770.
491. *Id.*
492. United States v. *Taylor*, 166 F.R.D. 356, 363 (M.D.N.C. 1996), *aff'd* 166
F.R.D. 367 (M.D.N.C. 1996).
493. *See Taylor*, 166 F.R.D. at 363.
494. *Id.*

sition exhibits," the witness must designate one or more current or former employee or other designees to testify on that area of inquiry at the Rule 30(b)(5) deposition.[495]

The practical implication of this approach, of course, is that, if the entity intends to rely on testimony from a non-party at trial to address a topic listed in the deposition specification, the entity may be *required* to designate the non-party as its Rule 30(b)(6) witness. As discussed above,[496] this requirement, which overreaches any authority found in the rule, is problematic on several levels. Each litigant should be allowed to offer specific evidence from non-parties supporting its case without having to make them corporate spokespersons.

In *Taylor*, again setting a record for expansive reading of the rule, Carbide was ordered to designate deponents for all seventy-six topics listed in the government's Rule 30(b)(6) notice.[497] If the company chose not to designate a deponent to testify at its Rule 30(b)(6) deposition on one or more particular areas of inquiry, the court deemed that Carbide would "thereby tak[e] the position that it has no corporate knowledge and position on that area;" as a result, Carbide would not

> without extremely good cause shown, be allowed to introduce evidence consisting of documents prepared, sent or received by [it], or of testimony of current or former . . . employees to affirmatively support or oppose a designated claim or defense with respect to the area of inquiry, and in addition, it may be prohibited from introducing any evidence as to such area of inquiry, pursuant to Fed. R. Civ. P. 37(b)(2)(B).[498]

The court concluded that "[a]ll claims of newly discovered evidence to support an exception to this portion of the Order will be strictly scrutinized."[499]

### E. Talking Sanctions and Resorting to Warnings

Even under the most expansive reading of preparation duties under Rule 30(b)(6), and even in a case in which there were several motions and pre-depositions orders, serious monetary or case-dispositive evidentiary sanctions have not been imposed under the Rule.[500] Most commonly, renewed sessions of the deposition are ordered if the initial sessions do not adequately address topics which are within the reasonable reach of the responding entity.[501]

Overall, therefore, in many cases even the courts which comment about the imposition of sanctions do not impose them. This may result from failure of the moving party to present the issue in the proper fashion,[502] but often it reflects the judgment that an initial failure to provide complete responses is generally grounds for a warning and expression of the expectation that further discovery will cure any defect.[503]

One factor that bears upon the imposition of sanctions appears to be whether the entity recognizes in advance that there will be difficulties addressing the topics specified in the notice served upon the entity. Even where a company does not move against the breadth of the notice, advising the discovering party's counsel of the limitations on the likely scope of the designee's testimony augurs against a finding of bad faith.[504]

Clearly, a party served with a problematic Rule 30(b)(6) deposition request will often be well-advised to elect to seek a protective order rather than presenting a limited witness in response to the notice of deposition.[505]

Conversely, the fact that a protest was lodged to the adequacy of the testimony of a Rule 30(b)(6) witness *nine months*

---

495.  *Id.* at 364 ¶ 2.
496.  *See supra* text accompanying notes 61-80
497.  *Taylor*, 166 F.R.D. at 364.
498.  *Id.* at 365.
499.  *Id.*

500.  *Id.* at 364-66.
501.  *Id.* at 364 ¶ 1.
502.  *See* Buycks-Roberson v. Citibank Fed. Sav. Bank, 162 F.R.D. 338, 342 (N.D. Ill. 1995) (holding that sanctions or other expense cannot be awarded when the moving party fails to negotiate a resolution before petitioning the court for relief).
503.  *Id.*
504.  *Antrey v. Bilsom Int'l*, No. 94-0022, 1994 U.S. Dist. LEXIS 18863, at *6-*7 (S.D. Ala. Nov. 18, 1994).
505.  *Schwarzkopf Tech. Corp. v. Ingersoll Cutting Tool Co.*, 142 F.R.D. 420, 421-22 (D. Del. 1992).

*after* deposition appeared to be a factor undercutting the assertion that the testimony was unsatisfactory.[506] While the discovering party noted four discrete areas on which the testimony was allegedly lacking, the court noted that the discovering party "failed to follow up on the information conveyed" by the deponent tendered.[507] Thus, leads provided by the witness to sources of information relevant to subject matters on which the witness was not herself completely knowledgeable demonstrated that there was not a culpable failure to comply with the obligations of Rule 30(b)(6).[508] Identification by the witness of the appropriate "department" within the corporate entity was proper.[509] Specification of the categories of information that would aid the discovering party was also evidence that the deposition under the Rule achieved the expected purposes.[510] In denying sanctions, the reviewing court concluded that "[d]espite being provided with this roadmap, plaintiffs apparently did not follow up and obtain the information. No additional 30(b)(6) notice was served and no additional witnesses were requested."[511] Failure to "attempt[] to obtain the necessary information through utilization of other discovery mechanisms" was also relevant in assessing whether relief was appropriate for perceived weaknesses in the testimony of the initial Rule 30(b)(6) deponent.[512]

"[A]ny sanction [imposed] must be 'just' [and] specifically related to the particular 'claim' which was at issue in the order to provide discovery."[513] It is often held that "the record must show a willful and bad-faith failure to comply, and that the other party has been prejudiced by that failure."[514] The risk of

506. IDS Life Ins. v. SunAmerica, Inc., 958 F. Supp. 1258, 1271 (N.D. Ill. 1997), *aff'd in part and vacated on other grounds*, 136 F.3d 537 (7d Cir. 1998).
507. *IDS Life Ins.*, 958 F. Supp. at 1271.
508. *Id.*
509. *Id.* (specifying the department that would be knowledgeable about specialized financial maneuvers such as "dollar rolls" and the other department familiar with "reverse repos").
510. *See id.* (identifying passive investment information and corporate financial activities as topics the discovering party could pursue to obtain information beyond the knowledge of the designated deposition witness).
511. *Id.*
512. *IDS Life Ins.*, 958 F. Supp. at 1271.
513. Insurance Corp. of Ir. v. Compagnie des Bauxites, 456 U.S. 694, 707 (1982).
514. Shelton v. American Motors Corp., 805 F.2d 1323, 1330 (8th Cir. 1986) (citing Edgar v. Slaughter, 548 F.2d 770, 773 (8th Cir. 1977)).

exposing work product has expressly been noted as a factor in finding that non-disclosure was not culpable under these standards.[515]

## VIII. CONCLUSION

The unfairness of using Rule 30(b)(6) depositions as a broad requirement for corporate parties to create a grand synthesis of the entire case, on pain of dismissal or summary judgment or sanction motions if the Herculean witnesses called on the entity's behalf have any gaps in their knowledge of corporate records, facts and contentions, seems quite evident.

Thus, what may once have been a "forgotten rule," originally adopted to ease an adversary's discovery of appropriate witnesses—in effect to defeat a shield of obfuscation and inefficiency that could be thrown up by an institutional litigant—has now sometimes been construed by courts as a powerful sword that fundamentally transforms the nature of discovery in cases involving corporations and other organizations.[516] So construed, it becomes an offensive weapon, predicated on pernicious assumptions, which has bizarre implications.[517] At the extreme of this interpretation, it implies that in no case involving a party subject to its application need the opposing party call more than the one or more witnesses designated under Rule 30(b)(6) to learn each and every fact about the case.[518] According to the broad reading, an institutional party must be prepared to proffer one or more Rule 30(b)(6) witnesses capable of testifying about any fact known or reasonably ascertainable by anyone having the requisite affiliation with that institutional party.

The Rule 30(b)(6) device, so construed, is seen as a "great assistance" to the plaintiff's bar in litigating against companies.[519] It operates as a tool to circumvent the normal privilege and work product protections that attend legal work on behalf of

515. *Shelton*, 805 F.2d at 1330.
516. *Cymrot*, *supra* note 5, at 7-10; Elbein, *supra* note 6, at 365-66.
517. *See* Elbein, *supra* note 6, at 365-66.
518. *Id.* at 368-69.
519. F.N. Harkins, III, *How to Mount an Effective Defense of Company Employee Depositions*, 53 DEF. COUNS. J. 180, 184 (1991).

the entity,[520] which facilitates the making of unreasonable demands upon a party and its witnesses. Thus, counsel and those courts pushing the expansive view of the obligations under the Rule believe that "'I do not know' and 'I do not remember' are not adequate answers under Rule 30(b)(6)—even if they are true."[521]

In so inflating the scope of the Rule, this reading necessarily eclipses the privileged ground whereon the corporation's counsel attempts to prepare its witnesses and, through efforts traditionally respected as work product, synthesize what is known about the facts and their legal implications. On the expansive interpretation of the Rule, however, all the party's knowledge, as normally adduced through the testimony of a number of competent witnesses, must be ingested, digested, and regurgitated through the designee(s). And the very process by which such a witness might, under the best circumstances, be created—i.e., by painstaking fact-finding, cross-checking, integration, and amalgamation conducted by the party's lawyer—will itself be subject to disclosure through the examination of the witness whose testimony has been the product of the lawyer's efforts. One would surely think that if a single rule had been promulgated to radically transform the nature of litigation in cases involving one special kind of party, that far-reaching consequence would have been expressly disclosed and deliberated before the Rule was adopted. The legislative history in the form of Advisory Committee Note belies this reading.

While lawyers living under this system can only try to make "the best of a bad situation," the judiciary can focus more carefully on the legislative history and proper office of the deposition device, particularly in comparison to the contention interrogatories permitted under Rule 33. A more narrow conception of the mission of this tool is workable, useful, and fair.

The misuse of Rule 30(b)(6) discussed in this Article not only ignores the purposes and legislative history of the entity device to the extent that it is applied to "contentions" of an entity, but also loses its philosophical bearings when it applies to defining corporate "knowledge."

---

520. Cymrot, supra note 5, at 7-8.
521. Elbein, supra note 6, at 375 (citing Cymrot, supra note 5, at 7).

The history of philosophy is replete with a disparate set of models, theories, and conceptions of what it means to "have knowledge" of something, and what is necessary to satisfy that definition. For example, knowledge is said to be an accurate "picture" of the facts;[522] to capture the unchanging forms or essences which give permanence and order to a world of changing appearances;[523] to consist of linguistic representations which stand in a one-to-one, mirror relationship with their designata;[524] or to provide a map on the basis of which usable and useful predictions may be generated.[525]

As elaborated in various epistemologies, knowledge has been identified broadly as consisting of some sort of correspondence with reality; or coherence within a general system; or with the potential to generate testable consequences. But with one exception, noted below, knowledge has invariably been thought to be something generated, possessed, and passed on by individuals. That is, the thing in question, however it is conceived, is joined at birth and by its very nature to a single human being capable of thinking, inquiring and/or perceiving in a way deemed adequate to create (or to comprehend) the knowledge in question.

The exception to the general view that knowledge is possessed exclusively by individuals is a contribution of idealist theorists. That view asserts that some sort of collective entity, rather than separate individuals, accumulates knowledge over time. Perhaps the most modern and plausible rendition of this somewhat moribund position was the one proposed by Charles Sanders Peirce, an American philosopher who wrote in the second half of the nineteenth and early twentieth centuries. Peirce,

---

522. See, e.g., ARISTOTLE, METAPHYSICS Book IV ("To say of what is that it is not, or of what is not that it is, is false, while to say of what is that it is, and of what is not that it is not, is true . . . ."; see also LUCRETIUS, ON THE NATURE OF THINGS Book IV [The mind replicates the characteristics possessed by external objects]).

523. PLATO, THE REPUBLIC Book VI.

524. E.g., LUDWIG WITTGENSTEIN, TRACTATUS LOGICO-PHILOSOPHICUS [true propositions correspond, element-by-element, to facts]; Bertrand Russell, The Philosophy of Logical Atomism, reprinted in LOGIC AND KNOWLEDGE (R.C. Marsh ed., 1956).

525. ABRAHAM KAPLAN, THE NEW WORLD OF PHILOSOPHY, LECTURE ONE: PRAGMATISM 27 (1961) ("The pragmatist theory of truth amounts, I think, to this: that candidates for truth are fundamentally not descriptions but predictions, and what they predict is the outcome of possible action."); see, e.g., WILLIAM JAMES, THE MEANING OF TRUTH Ch. 2 (1909).

a strikingly original thinker who is most often identified as one of the founders of pragmatism, conceived of truth as the limit approached by an infinite number of scientists making inquiry over an infinite course of time.[526] Thus, the object of knowledge-seeking activity becomes a kind of heuristic ideal: we get closer to it as collective human inquiry proceeds and as the results accumulate. At any given moment, however, we have only the best current *approximation* of that end. Further refinements will be made as history (and the attendant human inquiry) trudges onward.[527]

To the extent that current efforts to over-read the mission of Rule 30(b)(6) presuppose a deponent whose knowledge conforms to a collective, rather than individual model, such a reading fails to recognize that the process of integration and collection requires a community of actors (here, including corporate personnel and the lawyers representing the entity) to allow the process to proceed with any reasonable hope of success. The attempt to use a Rule 30(b)(6) deposition as a convenient synthesis of an entire case on demand simply ignores the everyday fact that the process of perfecting the product (i.e., the truth) demands a laborious sifting and winnowing of alternatives with unimpeded access to data which can be shared, tested and refined. And, most critically, it does not even grasp that this is a process and thus requires time to generate results, evolves as it proceeds,

526. Charles S. Peirce, *How to Make Our Ideas Clear*, POPULAR SCI. MONTHLY, Jan. 1878, at 286-302. [Truth is] the opinion which is fated to be ultimately agreed to by all who investigate."

527. Three things should be noted about this collective conception of knowledge: (1) It trades upon, and presupposes, a dedicated corps of skilled knowledge-seekers (scientists) whose work incrementally expands the boundaries of the known, weeding out inconsistencies, devising experiments to test new theories (in the sense of trying to dis-confirm them), and utilizing (or creating) whatever instruments are available at a given time to collect, examine, and test empirical data; (2) It assumes that there are open lines of communication within the community of scientists, so that anomalous results, or inconsistent hypotheses, may come to light and be challenged; and (3) It teaches that, rather than being an instantaneous, time-neutral affair, the accretion of knowledge is a process that only develops through time. Indeed, by its very nature, the collective fruits of human inquiry, while "better" as a whole than what had been achieved in times past, is also never quite as good, by definition, as what will be achieved as the process moves forward. It follows, then, that the cumulative approximation achieved by inquiry as it stands at any given moment is always subject to revision, is always incomplete, and is always going to be more accurate (useful, complete) in the future.

and may not lead to fixed, final and definitive statements of position.[528]

In sum, even taking as a model the single modern epistemological theory that provides some meaningful view of what is required for an entity (such as a corporation or a partnership) to possess some sort of collective knowledge—a theoretical amalgamation of all the bits and pieces experienced by, or known to, its human agents—the extreme interpretation of Rule 30(b)(6) adopted by certain courts fails to acknowledge the time-bound, re-constructive efforts that must be undertaken to achieve the collective results.

In effect, what such courts are doing is committing a philosophical error: they are retaining a simplistic paradigm for human knowledge of matters of fact (the mind holds a mirror up to nature and simply reflects what is there)—which may serve well enough for practical purposes when what is being considered is the ability of individuals to record and recount what they have experienced—and then applying that paradigm to a larger entity, assuming that its ability to "know the facts" is just the same

528. Indeed, from the perspective of Peirce's later cohorts in the species of epistemology that came to be known generally as "pragmatism," knowledge—as it is best elaborated and refined through the procedures adopted within scientific inquiry—is characteristically and inherently projective, testable by its fruits, and forward-looking. True statements ("warranted assertions" in the pragmatist lexicon) do not simply "picture" or re-produce what is (or was) there, but instead either elaborate operations for transferring what is there into something deemed more satisfactory, or predict what will be there if specified procedures are duplicated. If we adopt the rather metaphysical phrase "antecedent reality" to designate that which exists—"what is (or was) there"—prior to the onset of inquiry, then, according to this view of knowledge, the definitive function of inquiry is not to portray or mirror antecedent reality, because the unique business of discovery (i.e., of coming up with a true account of that which we are looking into) is to mediate the processes of reconstruction, not mere passive re-presentation. From the pragmatist perspective, active thought and inquiry. The specific function of knowledge-generating activities is to be a sort of tool of all tools which serves, not simply to hold a mirror up to "the facts," but rather to provide us with some leverage for the production of testable, observable consequences. Put yet another way: even the most precise, lightfingered, and delicate of descriptions cannot avoid an inherent requalification of the subject matter under investigation. In other words, even what is (or was) there, to be described (viz., for example, something as pedestrian as a party's statement of the facts of the case) is a function of what is being looked for, and is dependent upon the tools, linguistic and legal categories, observational apparatus and techniques, and the specific purposes that we inevitably bring with us even when we set out simply to "look and see" what facts are there.

754        Alabama Law Review        [Vol. 50:3:651

sort of mirror, only writ large. This viewpoint results in a mud-
dled and incoherent picture of "collective knowledge." But, what
is worse, it leads some courts to enforce an unworkable, unreal-
istic, and unfair set of requirements in litigation under the Fed-
eral Rules of Civil Procedure.

# ENHANCED OBLIGATION OF GOOD FAITH: A MINE FIELD OF UNANSWERED QUESTIONS AFTER *L & S ROOFING SUPPLY CO.*

*Karon O. Bowdre*[*]

## I. INTRODUCTION

In 1987, the Alabama Supreme Court took insurance compa-
nies, insurance defense counsel,[1] and insureds down a road less
traveled regarding the reservation-of-rights defense and good
faith in a liability insurance policy. On that road, a mine field
awaits even cautious insurance companies and prudent defense
counsel. This Article provides guidance through that mine field.

In *L & S Roofing Supply Co. v. St. Paul Fire & Marine
Insurance Co.*,[2] the Alabama Supreme Court adopted a minority
approach to the problems presented when an insurance company
defends its insured while maintaining its right to deny coverage
for the claims asserted against the insured.[3] In a reservation-of-
rights defense,[4] the interests of the insured and the insurance

[*] Professor of Law and Director of Legal Research & Writing, Cumberland
School of Law. B.A. 1977, Samford University; J.D. 1981, Cumberland School of Law.
The author wishes to express appreciation to J.D. Smith, Charles Jones, and Shea
Carroll for their research assistance, and to Mike Beard and Richard Ogle for their
review and comments. Special thanks to Cumberland Continuing Legal Education for
the opportunities to present and discuss the ideas contained in this Article with
practicing attorneys who regularly face these issues.

[1] As used in this Article, "insurance defense counsel" or "defense counsel"
refers to the attorney hired by the insurance company to defend its insured against
a liability claim. "Insurance coverage counsel" refers to the attorney hired by the
insurance company to advise it regarding coverage matters and possibly to represent
it in a coverage dispute with the insured.

[2] 521 So. 2d 1298 (Ala. 1987).

[3] *L & S Roofing Co.*, 521 So. 2d at 1304.

[4] A "reservation-of-rights" notice simply states that the insurance company will
defend the insured but reserves its right to challenge coverage. A reservation of
rights is unilateral, usually in the form of a letter to the insured in which the in-
surance company sets forth the reasons it claims that coverage may not exist and
notifies the insured of the right to hire separate counsel at the insured's expense. A

# EXHIBIT 11

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


RELIANT PHARMACEUTICALS, INC., )
                              )
         Plaintiff,       )
                              ) C.A. No. 06-774
v.                          )
                              )
PAR PHARMACEUTICAL, INC.,    )
                              )
         Defendant.      )


Friday, March 7, 2008
11:30 a.m.
Courtroom 4B


844 King Street
Wilmington, Delaware


BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
        United States District Court Judge


APPEARANCES:

        MORRIS NICHOLS ARSHT & TUNNELL
        BY:  JACK BLUMENFELD, ESQ.

            -and-

        KIRKLAND & ELLIS
        BY:  CHRISTINE WILGOOS, ESQ.

             Counsel for the Plaintiff

2

APPEARANCES (Cont'd:)


          YOUNG CONAWAY STARGATT & TAYLOR
          BY:  KAREN L. PASCALE, ESQ.

                    -and-

          FROMMER, LAWRENCE & HAUG
          BY:  JOHN G. TAYLOR, ESQ.

                    Counsel for the Defendant

3

```
 1              THE COURT:  Next we'll take
 2     Reliant and Barr.  All right.  The dispute I
 3     have been waiting for.  Do you want to announce
 4     your appearances.
 5              MR. BLUMENFELD:  Thank you, Your
 6     Honor.  Jack Blumenfeld again for Reliant
 7     Pharmaceutical with Christine Willgoos from
 8     Kirkland & Ellis.
 9              THE COURT:  Good morning.
10              MS. PASCALE:  Good morning, Your
11     Honor.  Karen Pascale from Young Conaway and I
12     would like to introduce John Taylor from
13     Frommer, Lawrence & Haug, the New York office.
14              MR. TAYLOR:  Good morning Your
15     Honor.
16              THE COURT:  Okay.  Actually you
17     have a pretty straightforward dispute.  I have
18     one question about the motion to compel
19     documents relating to consumption, disposal or
20     destruction of Par samples.
21              I think what I read was that there
22     have been replacement samples provided and can
23     somebody address that.
24              MS. WILLGOOS:  Good morning, Your
```

4

1    Honor.  Reliant has requested two types of

2    samples from Par.  Their submission samples

3    which is the product that they're seeking

4    approval for in this ANDA as well as what we

5    have been calling experimental batches which are

6    comparative examples used in their ANDA that

7    they have not submitted specifically for

8    approval but are referenced in the ANDA.

9              It's come to our attention Par

10   recently informed us that they inadvertently

11   produced a sample of an experimental batch to us

12   and represented that it was a submission batch.

13   They have now replaced that and have produced

14   the submission batch, Your Honor.

15              THE COURT:  So this has kind of

16   gone away?

17              MS. WILLGOOS:  It's not gone away,

18   Your Honor.  Par's internal documents indicate

19   that there has an ongoing project at Par to

20   discard or destroy samples that were no longer

21   necessary.  Some of those appear to have been

22   for pathonomic samples that they have not

23   produced to us, so we're seeking documents to

24   determine what samples they actually have in

1    their possession and to the extent that any are

2    destroyed, the circumstances and dates of such

3    destruction or, you know, consumption or

4    disposal.

5                    THE COURT:  All right.  Do you

6    want to answer what their concern is?

7                    MR. TAYLOR:  Certainly, Your

8    Honor.  This whole motion is based on Reliant's

9    mistaken and persistent belief that Par has

10   manufactured lots of its proposed ANDA product

11   that are different from the three lots that Par

12   has already produced samples from.  And that

13   they also assume that these other lots that they

14   think exist may have been destroyed or used up.

15                    But that belief is based on

16   Reliant's own assumptions and on its misreading

17   of documents that were produced by Par.  And

18   despite Par's best efforts to explain what is a

19   really fairly simple story which is fully

20   supported by Par's documents that there are only

21   three lots of its submission product made, they

22   have produced samples from all three, and that

23   none were destroyed.

24                    The facts are here Par had

6

1    produced samples from the each of the only three

2    lots it produced of its proposed ANDA product

3    and that was produced last April.

4              They also produced documents last

5    April that detailed how these three lots were

6    made.

7              Par has not destroyed any samples

8    and we have represented that to Reliant, but

9    even if it had, it really wouldn't make a

10   difference here, they made three lots, they

11   could have destroyed 90 percent of it as long as

12   they kept enough to produce to Reliant in this

13   litigation which they have enough for their FDA

14   requirements.  It wouldn't have matter if they

15   destroyed the rest, but they didn't.  We still

16   have plenty of samples from these three lots and

17   if you can tell us why you need more than the

18   original sixty that you asked for, we would be

19   happy to provide those.  They haven't said why

20   they need anymore.

21             What's happened here is they

22   refuse to believe that Par has samples, capsules

23   of produced ANDA product that come from other

24   than these three lots.  And in spite of our

7

1    representations and documents to the contrary,

2    they're now demanding that we produce documents

3    explaining what happened to each and every

4    capsule that was made in these three large, 325,

5    425 milligram for pathanome and wants to know

6    what did you give to the FDA, what did you do

7    in-house testing on, what went to clinical

8    trials, they want all this information which is

9    not arguably relevant to this case.

10                    Par could have destroyed and used

11    up most of these three lots as long as it had

12    some left to produce. It has, it produced

13    documents as to how they were made. These

14    documents that they're asking for on the

15    consumption, all the post manufacture, what

16    happens to these capsules later is not going to

17    answer the question which we seem to be doubting

18    did you make more than these three lots.

19                    THE COURT:  Your representation is

20    you didn't?

21                    MR. TAYLOR:  Right, absolutely.

22                    THE COURT:  All right.  What I'm

23    going to do is deny the motion, accepting your

24    representation as you set forth in your papers

8

```
1    and represented here this morning.

2              MR. TAYLOR:  Yes, Your Honor.

3    Thank you.

4              THE COURT:  And that will resolve

5    that motion.

6              Now, while I have you at the

7    podium, interestingly you want to take a

8    30(b)(6) deposition on the contentions of

9    Reliant and they have told you that there is

10   some transcript law, case law that in this

11   district there is a practice that I think I'll

12   put it a little differently than they have

13   argued it, in this district there is a practice

14   that disfavors depositions on contentions in

15   deference to interrogatories.

16             And you answered there is no local

17   rule, there is other case law that says 30(b)(6)

18   is an appropriate mechanism to delve into the

19   factual basis for a response to a contention

20   interrogatory.

21             Now, did I pretty much sum that

22   up?

23             MR. TAYLOR:  I wouldn't

24   characterize it as we are seeking their
```

9

1    contentions, I think the factual basis, and if I

2    may --

3                THE COURT:  You're seeking the

4    facts.

5                MR. TAYLOR:  And I can explain why

6    it's a little different than why here, we really

7    are seeking facts that they in response to our

8    contention interrogatories, they have stated

9    facts that they say support their contention

10   interrogatories.  We have their contentions, but

11   they have stated facts in support of those, and

12   we want to explore those in very general terms.

13   We want to explore those fact and the most

14   efficient went way to do it is to sit down with

15   someone who is more knowledgeable with these, we

16   are not seeking -- we have their contentions, we

17   just want the facts that they've identified that

18   they're relying on that support their

19   contentions.

20               THE COURT:  That's the interesting

21   question that you present.  There is fact

22   discovery in an ANDA case; right?  Why do you

23   keep like swooping back trying to get under the

24   contention umbrella?  You have got their

1   contentions, and now you want to have discovery

2   on facts at issue in this case.  Why isn't it

3   just a straight forward 30(b)(6) deposition?

4                MR. TAYLOR:  Well it is.  And

5   perhaps it was unfortunate that we said the

6   factual basis underlying your contentions, using

7   my words, but it's clear that we're looking for

8   factual discovery about certain topics.  And

9   again, as I said, we have served them with

10   contentions, they have given us responses and in

11   those responses to support their contentions,

12   they have identified facts, and those are the

13   facts --

14                THE COURT:  Give me an example --

15   are you satisfied taking it out from under the

16   contention umbrella, which incidentally I

17   actually found a Fifth Circuit case that says

18   you can take 30(b)(6) on beliefs and opinions of

19   the entity, which I don't want to mess this case

20   up with, but it interest me.

21                But let's assume that they are

22   correct that in this district absent some

23   factual circumstance, we prefer that contentions

24   be done by interrogatory, that's been

1    accomplished, now you have the responses and now

2    you're in fact discovery, are you comfortable

3    just saying we want fact discovery and this

4    30(b)(6) is one of the ones you're allotted in

5    the scheduling and move forward.

6             MR. TAYLOR:  Yes, Your Honor, it's

7    the fact, again, we said underlying their

8    contentions, but it's the facts about those

9    topics is what we're looking for, the facts that

10   --

11            THE COURT:  Give me an example of

12   the kind of question on the fact issue that

13   you're trying to describe to me would be --

14            MR. TAYLOR:  For example, one of

15   our 30(b)(6) topics is the factual contentions

16   underlying your -- the factual basis underlying

17   your contention -- perhaps we should have used

18   some other phrase that the secondary

19   considerations of nonobviousness apply, or

20   support your theory that -- support the validity

21   of the patents, in response to that, they named

22   the usual secondary indicia, commercial success,

23   failures of others, long felt need and they also

24   stated there is a direct nexus between these

1    second indicia and our product, and the support

2    of each of these second indicia, for example,

3    failure of others, long felt need, they went

4    then on to if long felt need supports, and then

5    under that they made statements like others have

6    failed.  We have no evidence that anybody else

7    has ever successfully produced a product like

8    that.

9              THE COURT:  Why do you have expert

10   discovery on their expert as opposed to a

11   30(b)(6) representative deposition on facts

12   underlying a contention?

13             MR. TAYLOR:  They have put in

14   play, they have -- Reliant has represented that

15   they are not aware of evidence, or that they

16   have evidence to support each of these or they

17   have a factual basis for supporting each of

18   these, we simply want to know what that is.

19             THE COURT:  As long as you can get

20   it, but if you have to get it as part of the

21   underlying support for their expert's opinion,

22   why wouldn't that satisfy your need?

23             MR. TAYLOR:  Well, at this point

24   Reliant itself has already formed these opinions

13

```
 1      based on these facts, we want to know what these

 2      facts are now so we can begin preparing our

 3      defense rather than waiting while we're in fact

 4      discovery we could find out, what evidence, what

 5      investigation did you undergo to support these

 6      statements you made, long felt need, they talk

 7      about all these doctors have prescribed this as

 8      their first choice.

 9              THE COURT:  Why don't you serve an

10      interrogatory?

11              MR. TAYLOR:  This is where this

12      came from, we served an interrogatory.

13              THE COURT:  No, for supplemental

14      response.

15              MR. TAYLOR:  We have, and earlier

16      in this case we did.  We had a dispute over

17      their initial response to our infringement

18      interrogatory, we got all the way to the point

19      of briefing it, the last week briefing was done

20      as we withdrew it on based on the representation

21      that they would supplement, and they did, but in

22      these cases they give very general statement of

23      fact that support.  We can go back and say we

24      need more detail and they will come back and
```

1    give us more detail, we'll say that's not

2    enough, we'll end up back in motion practice.

3    Now that we have their factual contention, we

4    have documents they produced, if they produce a

5    knowledgeable witness we can sit down with the

6    witness and question the person, we know what

7    the issues are that we are going to ask about,

8    it's not overly burdensome for their witness to

9    answer those, it's a more efficient way of doing

10   it instead of going back and forth.

11              THE COURT:  All right.  Thank you.

12              MS. WILLGOOS:  Your Honor, first

13   of all, we agreed with you that particularly

14   with respect to infringement and validity, our

15   factual bases and contentions are primarily

16   appropriate subject matter for the expert report

17   and not for a deposition.

18              In addition, we have provided them

19   with both interrogatory responses that they have

20   never asked us to supplement since we did that

21   until their opposition to this motion, they

22   never in the five months since we served them at

23   any time indicated that those were lacking in

24   any way.

15

1          In addition, we are providing them

2     with a 30(b)(6) witness regarding sales,

3     marketing, that's occurring next week.  We have

4     already provided them with a 30(b)(6) witness

5     regarding Reliant's basis for bringing suit, and

6     have pursued investigation.

7          And so the discovery that they

8     claim that they need they already have or will

9     get in the next several weeks in the form of

10    interrogatories and appropriate deposition

11    topics that are limited specifically to facts

12    and not to Reliant's contentions and legal

13    conclusions.

14          THE COURT:  All right.  Thank you.

15    She says you're going to get everything you are

16    asking for, just not in I guess the form --

17          MR. TAYLOR:  Well, I guess the

18    topic she identified, if I go to one, one of the

19    categories, 30(b)(6) which would be the

20    infringement was the main concern there again

21    was what did they know at the time, what

22    investigation did they do at the time they filed

23    their complaint.  In fact, yes, we do have some

24    other 30(b)(6) categories that should cover that

16

1   for that one topic.  Another topic, it's a

2   little bit different, we also have a 30(b)(6)

3   topic that concerns the factual basis for the

4   allegation that this is an exceptional case that

5   warrants attorneys' fees under Section 3 USC

6   285.  The information they're seeking here is

7   very limited and there would be no burden on

8   Reliant to prepare a witness for this.  Willful

9   infringement is the most common basis for

10   finding an exceptional case.

11          Here there is case law that filing

12   an ANDA cannot be the basis for willful

13   infringement.  We simply want Reliant to tell us

14   what acts has Par committed, that you think Par

15   has committed that would raise the level of

16   willful infringement or what other conduct do

17   you think Par has engaged in that would justify

18   an exceptional case so that way we know what

19   we're defending because right now we have no

20   information.

21          Interestingly in our opposition

22   papers, we cited a case, Brocko from New Jersey.

23   In distinguishing that case in their reply brief

24   they actually confirm why this topic is

17

1    appropriate for 30(b)(6).  There it was a false

2    advertisement case as Reliant characterized it,

3    a false advertising case.  The plaintiff did not

4    identify the statements that were made by the

5    defendant that they thought resulted in false

6    advertisement, so a 30(b)(6) is appropriate to

7    tell them what statements did you make.

8             Here, all we're asking for is what

9    conduct, what do you think we did that would

10   rise to the level of an exceptional case.  We

11   know what we're defending against.  We don't

12   have anything yet.  In this sort of limited

13   topic, 30(b)(6) is an appropriate efficient way

14   of doing it and their analysis of the case

15   supports that.

16            As far as I can give other

17   examples of the factual statements made in their

18   responses, so the factual -- again, and the

19   responses, the contention interrogatories that

20   are not the couple of topics that my colleague

21   identified which kind of went, for the most part

22   went towards our infringement 30(b)(6) topic,

23   but again, I have already talked about the

24   secondary consideration topic, they have

18

1    identified underlying facts and we want to know

2    what evidence, what do you have that supports,

3    for example that doctors are making this their

4    primary choice, that for example, and also for

5    long felt need -- I'm sorry, for failure of

6    others that no one else has been able to come up

7    with this product, so there is a failure of

8    others, other than saying that our ANDA shows

9    that that is true, because we -- they say we're

10   unable to come up with another formulation.

11             Another of our topics seeks the

12   factual basis for that belief that their

13   product, their commercial embodiment falls

14   within the '580 patent that's at issue here.

15             Again, this was stated, this

16   itself stated that the Ritheral product, our

17   commercial embodiment, falls within the patent,

18   we stated as a fact in support of their

19   secondary considerations interrogatory response.

20             They must have had a belief or

21   they had some basis for believing that their

22   product falls within the '580 patent, they have

23   data about the characteristics about its

24   performance that show that it falls within the

19

1   limitations of the patent.  Certainly there must

2   be technical people at Reliant who can testify

3   about here is the evidence we have had about how

4   our drug performs, here is the evidence that we

5   have about its characteristics and describe and

6   explain to us what this document, what this

7   evidence, again, it's something they have

8   introduced in response to a contention

9   interrogatory as a fact.

10              And we need, although we can

11  certainly get an expert's opinion on why this

12  evidence is warranted, we should be able to

13  investigate what evidence do you have, what

14  other evidence might you have that can

15  contradict or support your belief that this drug

16  falls within the '580 patent.  We believe in

17  these circumstances which we have already

18  submitted contention interrogatories and facts

19  have been identified, we now should be able to

20  explore the basis for the factual statements

21  that they make.

22              THE COURT:  All right.  Thank you.

23              Okay.  With regard to the

24  plaintiff's motion, Reliant's position motion

20

```
1    for a protective order regarding Par's notice of

2    deposition to Reliant pursuant to Rule 30(b)(6)

3    which is Docket Item 172, I find that the

4    requested deposition is in this context of

5    inquiring about the contentions that Reliant

6    asserts in the litigation.  I think that that's

7    clear both from the papers and from the

8    presentation here this morning.

9              30(b)(6) depositions I think can

10   be a mechanism to a party to ascertain the

11   contentions of the opponent because I think

12   30(b)(6) depositions can be used to probe for

13   beliefs and opinions held by a party or the

14   entity that is a party.

15             I think that Reliant has correctly

16   stated in its papers that in this district there

17   is a preference that contention discovery be

18   conducted by interrogatory even when factual

19   information is sought, and then that information

20   can be further probed in the course of the other

21   available mechanisms for discovery.

22             Having found that this is

23   contention discovery that's sought, even though

24   it's in a factual nature, I'm going to deny the
```

21

1    motion being persuaded that this -- our district

2    practice of deferring to interrogatories is

3    appropriate in the circumstances of this case.

4    So the motion will be granted for the protective

5    order on that notice of deposition.

6            I should also add that with the

7    circumstances of this case I think it's clear

8    that the information sought is available in

9    several other procedures available under the

10   discovery rules.

11           Okay.  I think that closes your

12   two applications out.

13           MR. BLUMENFELD:  It does, Your

14   Honor.

15           MR. TAYLOR:  I'm not raising this

16   trying to argue it, but we have had a motion for

17   disqualification of former lawyers.  I just want

18   to make sure it was on your Your Honor's radar

19   screen.

20           THE COURT:  Absolutely.  I'm sure

21   you have heard this before, I don't know if

22   everyone has heard it, I never lose a motion on

23   the screen.  I know they're there, in fact I get

24   a weekly report from the chamber staff, and I

```
 1    sometimes don't move to certain motions

 2    because -- not because I don't know they're

 3    there or because I don't have the energy to

 4    attend to them, there is usually something else

 5    behind my holding back.

 6              And so I'm aware of the

 7    disqualification motion, I know I heard it back

 8    in November or something the first time or

 9    whenever it was, but I'm holding it and you'll

10    probably hear from me in the future on that

11    motion.

12              You know, not to talk about that

13    motion, I was holding an opinion, and I wanted

14    to hold it longer, I'm just anxious to see the

15    Federal Circuit on this double patent in the

16    pharmaceutical cases.  I just know something has

17    got to be coming out of there.

18              But sometimes it's hard to explain

19    that to the parties who are anxious to get a

20    decision.  You think there is going to be an all

21    four corners dropping of a bomb, and if you -- I

22    had in the Lipitor case on written description,

23    and then I didn't hold it because everybody

24    wanted Lipitor out and sure enough they decided
```

23

1    it and then told me what I did wrong by

2    predicting what they might do, so sometimes

3    that's going on, too.  But don't ever feel that

4    radar has broken, if you do, it's good to bring

5    it.  I do appreciate that.  You can be sure that

6    we have it on the scope, but I'm well aware of

7    the motion, I have it in mind, it keeps me up

8    some nights even if that makes you feel any

9    better.

10                  MR. TAYLOR:  In that same vein,

11   Your Honor, just a reminder that Barr also has a

12   motion that's been pending since January to

13   compel the discovery of foreign inventors who

14   are also trying to get through the procedure --

15                  THE COURT:  It's on the list as I

16   came to this.  As a matter of fact, the group

17   before you had two motions to dismiss.  I mean,

18   I know about them, too, but all in time.

19                  MR. TAYLOR:  Thank you, Your

20   Honor.

21                  THE COURT:  But you know, again,

22   don't ever be afraid to bring it to my

23   attention, that can also be helpful, too.  I'm

24   never offended when someone says we want to

24

1        remind you this is pending.

2                    Thank you.

3                    (Court recessed at 11:50 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1      State of Delaware      )
                              )
2      New Castle County      )

3

4                CERTIFICATE OF REPORTER

5
              I, Dale C. Hawkins, Registered Merit
6   Reporter and Notary Public, do hereby certify that
    the foregoing record is a true and accurate
7   transcript of my stenographic notes taken on March 7,
    2008, in the above-captioned matter.

8
              IN WITNESS WHEREOF, I have hereunto
9   set my hand and seal this 14th day of March, 2008 at
    Wilmington.

10

11            _____
                        Dale C. Hawkins, RMR
12

13

14

15

16

17

18

19

20

21

22

23

24
```

EXHIBIT 12

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
2              IN AND FOR THE DISTRICT OF DELAWARE
3                        - - -
4   McKESSON INFORMATION SOLUTIONS    :   CIVIL ACTION
    LLC,
5              Plaintiff              :
6        vs.                         :
7   THE TRIZETTO GROUP, INC.,        :
8              Defendant             :   NO. 04-1258 (SLR)
9                     - - -
10                      Wilmington, Delaware
                        Tuesday, August 2, 2005
11                      4:50 o'clock, p.m.
12                    - - -
13  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge
14                   - - -
15  APPEARANCES:
16        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17        BY:  MICHAEL A. BARLOW, ESQ.
18              -and-
19
20
21
22
23                   Valerie J. Gunning
                     Official Court Reporter
24
25
```

**Page 2**

```
1   APPEARANCES (Continued):
2        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
3        BY:  JEFFREY G. RANDALL, ESQ.
           (Palo Alto, California)
4
           Counsel for Plaintiff
5
6        MORRIS, NICHOLS, ARSHT & TUNNELL
         BY:  RODGER D. SMITH, ESQ.
7
8              -and-
9
         GIBSON, DUNN & CRUTCHER LLP
10       BY:  MICHAEL SITZMAN, ESQ.
           (San Francisco, California)
11
           Counsel for Defendant
12
             - - -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

PROCEEDINGS

(Proceedings commenced in the courtroom, beginning at 4:50 p.m.)

THE COURT:  Good afternoon, counsel.  I take it the fact that you are here means that there must be some disputes?

MR. SITZMAN:  Actually, your Honor, to sort of jump ahead, we've been trying to find out for a week and a half from plaintiff what disputes they think are at issue.  We wrote them about 12 days ago and said that we ought to be able to obviate the need for a discovery conference because there's nothing at issue between us and, as of Friday, we still had no indication from them what they planned on raising.

I got an e-mail Thursday night saying that we will try in the next few days to get you an itemized list and I have yet to see any kind of indication from them as to what they intend on raising.

THE COURT:  All right.  Well, then you and I are both in the same boat.

All right.  Let's hear from plaintiff's counsel, then, as to what it is believed to be problematic

**Page 4**

here.

MR. RANDALL:  Your Honor, Jeff Randall, representing Plaintiff, McKesson, with Skadden Arps.

I'm glad to hear that there are no issues that TriZetto has with McKesson.  We do have three issues that we'd like to raise with the Court.

We did respond to the inquiries by TriZetto and indicated that we had been engaged in a whole series of letters with them regarding these three issues and that we would raise these issues.

The first issue is TriZetto's continued failure to comply with your Honor's May 19 order requiring them to adequately identify the anticipatory art that they are relying on and the art that they rely on of their obviousness argument.

The second issue is their failure to provide a 30(b)(6) witness or any witness for us in response to two 30(b)(6) notices that we served in early July.

And the third issue is their failure to provide adequate claim construction, as required by the Court's scheduling order.

With respect to the first issue, your Honor, let me give you some background.  We served our Interrogatories on TriZetto in December and this case involves a patent which we have known about for years.

**Page 21**

1    And so I guess I am hoping that we will hear
2  that document production is now finished.
3    And I think that's it.
4    THE COURT: All right. Before I hear from
5  Mr. Randall again, let me handle the easiest issues first.
6    That is with respect to the depositions.
7  Number one, I have never thought contention Interrogatories
8  are appropriately responded to via 30(b)(6) depositions. I
9  still maintain that position.
10    So if you ask for depositions concerning the
11  basis for a defense, that is a contention interrogatory.
12  You can ask who has knowledge and then you can take
13  individual depositions, but I don't believe that a
14  corporate deposition is appropriate for contention.
15    And may I ask of the six topics, there was an
16  indication from Mr. Randall that at least Topic No. 5,
17  there was agreement that that was not a contention
18  interrogatory; is that correct?
19    MR. SITZMAN: That is correct.
20    THE COURT: All right. With respect to the
21  outstanding contention interrogatory, the outstanding
22  30(b)(6) deposition notices and efforts to get invention
23  depositions by a week from today, and that is by August 9,
24  2005, by 5:00 o'clock, I will give you 15 minutes less
25  than a week, you are to exchange the names of the folks

**Page 22**

1  who will respond to all of the outstanding, as of today,
2  30(b)(6) notice depositions. You will provide to opposing
3  counsel the dates within the next 30 or -- I guess 30 days.
4  I don't know whether it should be 30 or 60 days that these
5  folks could be available. You will provide to opposing
6  counsel where they might be made available, so that you
7  all can coordinate efficiently the taking of these
8  depositions.
9    So that's by a week from today. Whoever fails
10  to comply with that will be brought to my attention and
11  we'll deal with whatever sanction there needs to be dealt
12  with. But it seems to me that, after all this time, you
13  all and your clients should have been thinking ahead and
14  getting this information together.
15    With respect to the Interrogatory about the
16  prior-art references, I am satisfied at this point with
17  the explanation provided by TriZetto. And that is that,
18  at this point, they only intend to use the 19 that are
19  charted, that the remaining have been identified as
20  relevant, but not as prior-art references that will be
21  used affirmatively at trial.
22    And I expect that if any are added, there
23  will be reason why they weren't added now as opposed to
24  later and that they will be charted adequately when they
25  are added.

**Page 23**

1    That leaves me with claim construction. And
2  I'm not sure I can respond to that without really looking
3  at the claim terms and construction and I have not heard
4  Mr. Randall on that. I do want to hear Mr. Randall on that.
5    And with respect to -- well, I guess I will
6  just hear also from Mr. Randall about whether, in fact,
7  they had provided the earliest version of the software
8  that they have in their possession or not.
9    So I think those are two issues that are still
10  left to be addressed by me.
11    And, Mr. Randall, I would like to hear your
12  response to those two issues.
13    MR. RANDALL: Sure. One clarification. That
14  is that our discovery cutoff is the 16th of September, so
15  I think that it would make sense to have all the
16  depositions at least scheduled by 30 days following the --
17    THE COURT: All right.
18    MR. RANDALL: And one other issue with respect
19  to their interrogatory claim chart. I would ask that they
20  be ordered to provide, at least as to those 19 that they
21  are relying on, identify where within the references
22  there's a motivation to combine the references that they
23  have asserted. So, for instance, for any one given claim,
24  if they are relying on an obviousness combination of six
25  references to render invalid based on obviousness one

**Page 24**

1  claim, they ought to identify where in those references
2  there's a motivation to combine the references.
3    THE COURT: Accept that the motivation to
4  combine can come from any place, can't it? It can come
5  from all sorts of different things. It does not
6  necessarily have to come from the references and, quite
7  frankly, I thought that was generally the gist of an
8  expert's report.
9    MR. RANDALL: Well, if they are relying on
10  anything within the documents, at least they should
11  identify that.
12    THE COURT: Certainly. If it's within the
13  documents, it should be identified. If it's not, then --
14    MR. RANDALL: They can do that by the 9th, as
15  well?
16    THE COURT: Yes.
17    MR. RANDALL: Thank you.
18    With respect to the document production, your
19  Honor, I wasn't aware that they were not seeking the most
20  current version. I have not gone through the transcript
21  of the hearing. I wasn't here. But it was my
22  understanding that they were arguing for the current
23  version of the software. But I will look -- we'll find
24  out if they were arguing for it or not. We went through
25  great efforts to get them the current version.

# EXHIBIT 13

Tuesday, October 11, 2005

SHEET 1

**1**

```
                IN THE UNITED STATES DISTRICT COURT

                IN AND FOR THE DISTRICT OF DELAWARE

                          - - -

PHARMACIA & UPJOHN COMPANY,        : CIVIL ACTION

            Plaintiff and          :
            Counter-defendant,     :

  v.                               :

SICOR INC., and SICOR              :
PHARMACEUTICALS INC.,              :

            Defendants and         : NO. 04-833 (KAJ)
            Counter-Claimants.     :

                   Wilmington, Delaware
            Tuesday, October 11, 2005 at 3:00 p.m.
                   TELEPHONE CONFERENCE

                          - - -

BEFORE:    HONORABLE KENT A. JORDAN, U.S.D.C.J.

                          - - -

APPEARANCES:

      MORRIS NICHOLS ARSHT & TUNNELL
      BY: MARYELLEN NOREIKA, ESQ.

          and

      McDONNELL BOEHNEN HULBERT & BERGHOFF, LLP
      BY: DANIEL A. BOEHNEN, ESQ.,
          JOSHUA R. RICH, ESQ., and
          GRANTLAND G. DRUTCHAS, ESQ.
          (Chicago, Illinois)

          Counsel for Pharmacia & Upjohn
          Company

                         Brian P. Gaffigan
                         Registered Merit Reporter
```

**2**

```
APPEARANCES: (Continued)

      ASHBY & GEDDES
      BY:  JOHN G. DAY, ESQ.

          and

      SONNENSCHEIN NATH & ROSENTHAL, LLP
      BY:  REID L. ASHINOFF, ESQ. and
           DAVID R. BAUM, ESQ.
           (New York, New York)

          and

      SONNENSCHEIN NATH & ROSENTHAL, LLP
      BY:  JORDAN A. SIGALE, ESQ.
           (Chicago, Illinois)

          Counsel for Sicor Inc. and Sicor
          Pharmaceuticals Inc.

                   - oOo -

             P R O C E E D I N G S

      (REPORTER'S NOTE:  The following telephone
conference was held in chambers, beginning at 3:00 p.m.)
      THE COURT:  Hi, this is Judge Jordan.  Who do I
have on the line?
      MS. NOREIKA:  Good afternoon, Your Honor.  It's
Maryellen Noreika from Morris Nichols for plaintiff
Pharmacia; and I have with me, Dan Boehnen and Joshua Rich
of the McDonnell Boehnen firm in Chicago.
      MR. BOEHNEN:  Also with us in Chicago is Grant
Drutchas.
```

**3**

1  MS. NOREIKA: Oh. I apologize, Grant.

2  THE COURT: All right. Who do I have on for

3  Sicor?

4  MR. DAY: Good afternoon, Your Honor. On behalf

5  of Sicor, you have John Day from Ashby & Geddes as local

6  counsel; and from the Sonnenschein firm in New York, Reid

7  Ashinoff and David Baum; and from Sonnenschein's office in

8  Chicago, Jordan Sigale.

9  THE COURT: All right.

10  MR. ASHINOFF: Good afternoon, Your Honor.

11  THE COURT: Good afternoon. Well, by my count,

12  this is the fifth time we're getting together in this case

13  because we have discovery issues. So this is not a good

14  record, ladies and gentlemen, but we're going to plow

15  through what we've got here.

16  Before we start, however, I have a question

17  for the folks at Sicor, which is, I got the in camera

18  submission that you sent over. Did you send a version,

19  redacted, if you thought necessary, of your legal argument

20  to the opposing counsel?

21  MR. ASHINOFF: Your Honor, what we served on

22  the opposing counsel is a motion that we filed and a

23  privilege log that listed the privilege material that the

24  Court got. What we served in camera on the Court was the

25  short discussion of the substance of the privileged material

**4**

1  and the actual privileged material. We did not serve copies

2  of the discussion and description of the privilege material

3  or the actual material on our adversary.

4  THE COURT: All right. I need to have you

5  identify yourself for the record.

6  MR. ASHINOFF: It's Reid Ashinoff. I'm sorry,

7  Your Honor.

8  THE COURT: All right. Mr. Ashinoff, that's not

9  going to cut it. I'm going to quote to you what I said in

10  our last teleconference on the 19th of September. Page 24

11  of the transcript:

12  "You can certainly submit your documents in

13  camera and your legal arguments ought to be submitted so

14  that the other side can respond to them."

15  Later on the same page:

16  "In short, you give me the documents but you

17  give your arguments to the attorney side, too, so they can

18  respond unless it's something genuinely extraordinary that

19  you think will get past me; all right?"

20  And what I was trying to communicate there and

21  what I will reemphasize is I'm not going to let you give me

22  legal argument without an opportunity for them to respond to

23  legal argument.

24  MR. ASHINOFF: Your Honor, I don't think we cite

25  any law at all in the material we submitted in camera. What

Tuesday, October 11, 2005

SHEET 9

**33**

1  representation from you folks that you have checked with the
2  folks he just named, an affirmation that in fact you have
3  inquired of and heard from these people that there are no
4  lab notebooks belonging to this inventor. And that's all
5  I'm hearing he is asking for. Are you telling me you got an
6  issue with that?
7      MR. BOEHNEN: To me, Your Honor, no, sir. And I
8  understand, just to restate it, I believe he is referring to
9  the Oblon firm, Jake Wood, which is JA Kemp & Co. in the
10  U.K, and --
11      MR. SIGALE: And the Nerviano Consulting firm
12  (phonetic) where many of these inventors found gainful
13  employment.
14      MR. BOEHNEN: -- the people in the Nerviano
15  Medical Sciences Facility as well as Pfizer itself.
16      THE COURT: Right. Okay.
17      MR. BOEHNEN: No, not a problem. We'll be happy
18  to do that.
19      THE COURT: Done.
20      MR. SIGALE: If I might, I'd prefer to have the
21  notebooks.
22      THE COURT: Well, I'm sure everybody would
23  prefer the notebooks were there because then we wouldn't be
24  having this fight at all. So obviously if the notebooks are
25  there, they'll be produced, but if they're not, you will get

**34**

1  an affirmation of what was done to look for them with these
2  other folks, right?
3      MR. BOEHNEN: Yes, sir.
4      MR. ASHINOFF: Your Honor, just to go back half
5  a step. On the foreign patent material that Mr. Boehnen,
6  Ms. Noreika say is now being collected, given that we plan
7  to try to go abroad and take the inventors on November 7th,
8  can we get some date not too late in October when that
9  material will be produced to us so we have the time to
10  assimilate it before we take the inventors?
11      THE COURT: Mr. Boehnen.
12      MR. BOEHNEN: We have already begun making every
13  effort to get that to them as soon as possible. Let's see.
14  We can start a rolling production to them by the end of next
15  week and I think we hope to have it to them by the end of
16  October.
17      THE COURT: All right. End of October it is.
18  And a rolling production is a good idea.
19      MR. ASHINOFF: Thank you.
20      THE COURT: Okay. Then we had the dispute about
21  the 30(b)(6) categories.
22      MR. ASHINOFF: And I'm going to let Mr. Sigale
23  address that, Your Honor.
24      MR. SIGALE: Your Honor, we propounded a number
25  of categories in a 30(b)(6) notice that asks for the factual

**35**

1  contentions underlying legal contentions I need to
2  understand and I thought this was an efficient way to do it.
3  For instance, if we take category number six. We asked for
4  the facts concerning Pharmacia's allegation that licensing
5  and adoption of the ready-to-use formula is evidence that
6  the patent satisfied the obviousness requirement.
7      I need to know what facts those are. That is
8  not a contention request. It is what licensing are you
9  talking about? What adoption are you talking about? What
10  are the circumstances about that licensing? And I thought
11  this was an efficient way to get that. I can go through a
12  couple other categories but I can assure you I'm not looking
13  for legal contentions, that is a waste of time. A lay
14  witness is not going to be able to give that to me, but
15  facts they certainly can.
16      THE COURT: All right. Mr. Boehnen, is this
17  yours again?
18      MS. NOREIKA: Your Honor, this is Maryellen
19  Noreika. I'll respond to this issue.
20      THE COURT: Okay.
21      MS. NOREIKA: Sicor, there doesn't seem to be
22  any disagreement that depositions are not the appropriate
23  means by which to obtain contentions. Instead, they're
24  saying, well, we're just seeking facts. But as the topic
25  that Mr. Sigale just read indicates, these are seeking

**36**

1  contentions: All facts regarding Pharmacia's allegations
2  regarding copying, commercial success, failure of others.
3  There is a topic asking for the data Pharmacia contends
4  shows secondary considerations and the conclusions a person
5  skilled in the art would draw from that data. There is a
6  topic asking for a witness to testify about Pharmacia's
7  response to a contention interrogatory on secondary
8  considerations.
9      THE COURT: Okay.
10      MS. NOREIKA: I mean the wording of these
11  topics.
12      THE COURT: I think I have your position. I
13  have other folks who need my attention at 4:00 o'clock so
14  let me tell you, having read this, what my impression is.
15      I think there is some good force to the argument
16  being made by Pharmacia that the inserting of the word
17  "facts" doesn't make this less of an effort to get at what
18  is essentially the legal position of the party, although you
19  may get the benefit as well of saying, well, these are the
20  pieces of specific evidence.
21      So in the first instance, and on an expedited
22  basis, not a 30-day turnaround, if you want the chance to
23  answer these as contention interrogatories, I'm going to
24  direct that you accept them as such and you answer them
25  forthwith. You know, the sort of thing that you get a

SHEET 10

**37**

1 couple of weeks to respond to.
2         And then if you folks on the Sicor side want to
3 do some follow-up deposition discovery, targeted at
4 inquiring about specific facts that are revealed in the
5 context of these interrogatory responses, you're free to
6 do that.
7         I take the point that Pharmacia is making here,
8 which is it's so broadly worded, it can't help but really be
9 a circumstance where somebody is asked to know every fact
10 pertaining to every contention and that's a little bit much
11 to put on a deponent.
12         So that is the resolution to that. You want to
13 treat them as contention interrogatory attorneys. Done.
14 Answer them in two weeks.
15         And then if you have some follow-up and more
16 targeted and specific 30(b)(6) effort you want to make,
17 Sicor, you follow up on it that way.
18         MR. ASHINOFF: Thank you, Your Honor.
19         THE COURT: Now, let me tell you one last thing.
20 And this is for you, Mr. Ashinoff, in the discussions that
21 you are going to be having with your client, to the extent
22 again that this is helpful.
23         And again, we're treading here carefully and
24 I'm very careful when we talk about the attorney-client
25 privilege. I want to assure you I have not made lightly

**38**

1 the decision I made about how to approach the bifurcation
2 request. To the extent it's helpful in your discussing
3 with your client my understanding of the Knorr opinion, I
4 view Knorr-Bremse as saying no adverse inference can be
5 drawn from either failing to get an opinion or declining to
6 produce it; that you are entitled to get your opinion and
7 to stay silent about it.
8         Viewing it that way, I have never yet heard
9 anybody make a reasoned argument to me why it could be
10 put before a jury after the Knorr-Bremse opinion that an
11 opinion was received but not tendered. And in the absence
12 of that, I'm inclined to think there probably isn't a
13 reasoned argument. That the only reason for putting it
14 in front of a jury would be so they draw an adverse
15 inference, which with what Knorr-Bremse says could not
16 happen.
17         So I give that to you as my best reading of
18 Knorr, in the absence of people having really been able to
19 put it forth, but I think it only fair, since people are
20 trying to grope around and make a decision, that they grope
21 a little less blindly. I hope that is helpful to you.
22         MR. ASHINOFF: It is, Your Honor. And it
23 actually comports with literally a 100-year old doctrine
24 in federal law in other appellate courts to the extent of
25 saying that to force somebody to assert the privilege in

**39**

1 front of a jury is reversible error and that comports with
2 what Your Honor is saying.
3         THE COURT: Okay. Well, I thank you for your
4 time today. I hope it has been helpful in getting some
5 things worked out. Let me tell you real quickly what I'm
6 looking for as a date in February because this is going to
7 appear in a revised scheduling order that we'll put out.
8 I'm going to see you folks for argument on February 3rd
9 instead of January 19th. That's a Friday. All right?
10         MR. BOEHNEN: Your Honor, one quick point for
11 Pharmacia.
12         THE COURT: Yes.
13         MR. BOEHNEN: Can we have a new date when our
14 briefs in opposition to bifurcation will be due? I would
15 suggest two weeks after they produced papers to us if they
16 chose to rely upon them.
17         THE COURT: Mr. Ashinoff, you're fine with that,
18 I assume.
19         MR. ASHINOFF: Yes, as long as Mr. Boehnen
20 doesn't in the interim try to put my witness in the chair
21 and force us to go through all kinds of contortions about
22 privilege.
23         THE COURT: Well, I'm sure everybody wants to be
24 efficient here, or at least I would like to think so.
25         Mr. Boehnen, you take that point, I'm sure.

**40**

1         MR. BOEHNEN: Yes, sir.
2         MR. ASHINOFF: Your Honor, one last comment on
3 what Your Honor last said, and I apologize for this.
4         This law firm has an annual weekend once a year
5 where it gathers its partners and their spouses and et
6 cetera and it happens to be February 1st through 4th of
7 2006.
8         THE COURT: Okay. That is enough said. I will
9 not trample on a firm tradition. If it's the 1st through
10 the 4th, then I'm shifting you guys to the next day I can
11 give you. And I think it's, yes, the next day I can give
12 you is the 9th and that's when I will set you down. We'll
13 do this at 10:00 a.m. on February 9th.
14         Can you do that, Mr. Boehnen?
15         MR. BOEHNEN: Yes, sir.
16         THE COURT: Okay.
17         MR. ASHINOFF: Thank you very much, Your Honor.
18         MR. SIGALE: Your Honor, I'm sorry. This is
19 Mr. Sigale. We left open the claim construction dates. You
20 were suggesting December 12th for the opening brief. The
21 opposition brief would be due?
22         THE COURT: It will follow the ordinary course:
23 Two weeks for answer, one week for reply.
24         MR. SIGALE: Right, which would be the 26th of
25 December; and inasmuch as I don't observe Christmas, I would

United States District Court for the District of Delaware
Before the Honorable Kent A. Jordan

# EXHIBIT 14

# HellerEhrman LLP

February 1, 2008

Peter E. Gratzinger
Peter.Gratzinger@hellerehrman.com
Direct +1.213.689.7547
Direct Fax +1.213.244.7861
Main +1 (213) 689-0200
Fax +1 (213) 614-1868

42791.0003

*via E-mail*

John D. Minton
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025

Re:    ***BigBand Networks, Inc. v. Imagine Communications, Inc.,*** **C.A. No. 07-351 (D.Del)**

Dear John:

     This responds to your letter regarding Imagine's discovery responses.

**Interrogatories:**

     General Objection 6:  Contentions are not admissions.  This objection merely clarifies that the scope of the claims is a question of law for the Court.   Imagine will not remove it.

     Interrogatories 2-3:  Imagine believes that BigBand filed this suit without proper basis and with an improper motive, and expects to seek sanctions at the appropriate juncture. BigBand has refused to provide discovery regarding its decision to file suit.  As such, its complaint that Imagine does not provide sufficient facts in its interrogatory response rings hollow.  Imagine's funding is not relevant to any claim or defense in this action.

     Interrogatories 4-6:  These request "facts," not contentions or charts.  Nonetheless, Imagine is willing to supply preliminary invalidity charts, provided that BigBand (a) narrows its allegations to a reasonable number of asserted claims and (b) supplements its infringement contentions for those claims so that they are based on documents actually relating to Imagine's products, rather than the patent application and generic marketing literature cited in BigBand's initial contentions.

     Interrogatories 10-11:  Imagine has done more than is required by providing at least one claim limitation from each claim that is not met by its products.  Imagine does not bear the burden of proof on infringement.  Unless BigBand is prepared to provide detailed

---

Heller Ehrman LLP   333 South Hope Street, 39th Floor   Los Angeles, CA  90071-3043   www.hellerehrman.com

Beijing   Hong Kong   London   Los Angeles   Madison, WI   New York   San Diego   San Francisco   Seattle/Anchorage   Silicon Valley   Singapore   Washington, D.C.

HellerEhrman LLP

John D. Minton
February 1, 2008
Page 2

"validity" and "equitable conduct" contentions, it should await the rebuttal that Imagine will provide in its expert reports.

**Document Requests**

General Objection 6: See above

General Objection 8: There are no such documents.

Requests 1-5: BigBand's requests as written are overbroad. Imagine is willing to meet and confer to define a reasonable scope for Imagine's search.

Request 6: See above.

Requests 8-13: Imagine will produce (and has produced) technical documentation relevant to BigBand's infringement contentions, and documents related to its invalidity contentions.

Request 17: Imagine will provide a privilege log with respect to any legal opinions obtained relating to BigBand's patents.

Request 19: BigBand's request as written is overbroad. Imagine is willing to meet and confer to define a reasonable scope for Imagine's search.

Request 20-24: Imagine will produce (and has produced) technical documentation relevant to BigBand's infringement contentions. "Contemplated" products are not relevant to BigBand's claims.

Requests 25-33: Imagine will produce (and has produced) technical documentation, manuals, marketing, revenue, sales, and profit documents relevant to BigBand's infringement contentions.

Request 34-35: A patent application cannot infringe a patent, and has no necessary relationship to any product of the applicant. Imagine stands on its objections.

Request 36-38: If BigBand wants to open the door to discovery relating to its good faith basis for filing suit, it must be a two-way street. If BigBand has case law stating that allegations relating to a plaintiff's lack of good faith basis for filing suit cannot be included in a Counterclaim, please provide it.

Request 55: BigBand's request as written is overbroad. Imagine is willing to meet and confer to define a reasonable scope for Imagine's search.

HellerEhrman LLP

John D. Minton
February 1, 2008
Page 3

I will identify deficiencies in BigBand's own discovery responses in a separate letter. Please feel free to call me to discuss.

Very truly yours,

/s/ Peter E. Gratzinger